**FLUSHING Bank**

1402 AVENUE J ▪ BROOKLYN, NY 11230

00007742 M0028901202250934380 01 000000000 0012493 003

2281 CHURCH AVE LLC
CHAPTER 11 DEBTOR-IN-POSSESSION
OPERATING ACCOUNT
1232 E 69TH ST
BROOKLYN NY 11234



STATEMENT DATE: 11/30/25
ACCOUNT NUMBER: [redacted]

00007742 0009598 0001-0004

****************** COMPLETE BUSINESS CHECKING 9990372080 ****************************

Account Detail

| Date | Description | | Credits | Debits | Balance |
|---|---|---|---|---|---|
| 10/31 | Balance Forward | | | | 22,087.61 |
| 11/03 | Flushing | Flushing | | 19,182.60- | 2,905.01 |
| 11/06 | Check Number | 172 | | 600.00- | 2,305.01 |
| 11/10 | Deposit | | 11,670.00 | | 13,975.01 |
| 11/13 | Check Number | 175 | | 600.00- | 13,375.01 |
| 11/14 | Check Number | 176 | | 1,000.00- | 12,375.01 |
| 11/14 | Check Number | 174 | | 1,500.00- | 10,875.01 |
| 11/20 | Check Number | 177 | | 600.00- | 10,275.01 |
| 11/25 | FIRST INSURANCE | INSURANCE | | 2,305.96- | 7,969.05 |
| 11/26 | Check Number | 179 | | 2,000.00- | 5,969.05 |

Checks in Order

| Date | Number | Amount | Date | Number | Amount |
|---|---|---|---|---|---|
| 11/06 | 172 | 600.00 | 11/14 | 176 | 1,000.00 |
| 11/14 | 174* | 1,500.00 | 11/20 | 177 | 600.00 |
| 11/13 | 175 | 600.00 | 11/26 | 179* | 2,000.00 |

(*) Check Numbers Missing

Account Summary
Previous Statement Date: 10/31/25

| Beginning Balance + | Deposits + | Interest Paid - | Withdrawals - | Service Charge = | Ending Balance |
|---|---|---|---|---|---|
| 22,087.61 | 11,670.00 | .00 | 27,788.56 | .00 | 5,969.05 |

Statement from 11/01/25 Thru 11/30/25

Average Balance: 9,504.99 Minimum Balance: 2,305.01

*****************Summary of Deposit Accounts *****************************************

| AP | ACCOUNT | BALANCE | INT-RATE% | YTD-INT | YTD-PENALTY | MATURITY |
|---|---|---|---|---|---|---|
| CK | [redacted] | 5,969.05 | | | | |

------ Continued on next page ------

FLUSHING Bank

1402 AVENUE J ▪ BROOKLYN, NY 11230

00007603 M002890110125083517O 01 000000000 0012169 003

2281 CHURCH AVE LLC
CHAPTER 11 DEBTOR-IN-POSSESSION
OPERATING ACCOUNT
1232 E 69TH ST
BROOKLYN NY 11234



STATEMENT DATE: 10/31/25
ACCOUNT NUMBER: [redacted]

00007603 0009839 0001-0004

****************** COMPLETE BUSINESS CHECKING 9990372080 *****************************

Account Detail

| Date | Description | | Credits | Debits | Balance |
|---|---|---|---|---|---|
| 09/30 | Balance Forward | | | | 7,756.17 |
| 10/02 | Check Number | 167 | | 600.00- | 7,156.17 |
| 10/06 | Deposit | | 10,670.00 | | 17,826.17 |
| 10/09 | Check Number | 168 | | 600.00- | 17,226.17 |
| 10/10 | Deposit | | 9,250.00 | | 26,476.17 |
| 10/16 | Flushing | Flushing | | 19,182.60- | 7,293.57 |
| 10/16 | Check Number | 169 | | 600.00- | 6,693.57 |
| 10/20 | Deposit | | 6,900.00 | | 13,593.57 |
| 10/22 | Check Number | 170 | | 600.00- | 12,993.57 |
| 10/27 | FIRST INSURANCE | INSURANCE | | 2,305.96- | 10,687.61 |
| 10/29 | Deposit | | 12,000.00 | | 22,687.61 |
| 10/29 | Check Number | 171 | | 600.00- | 22,087.61 |

Checks in Order

| Date | Number | Amount | Date | Number | Amount |
|---|---|---|---|---|---|
| 10/02 | 167 | 600.00 | 10/22 | 170 | 600.00 |
| 10/09 | 168 | 600.00 | 10/29 | 171 | 600.00 |
| 10/16 | 169 | 600.00 | | | |

Account Summary
Previous Statement Date: 09/30/25

| Beginning Balance + | Deposits + | Interest Paid - | Withdrawals - | Service Charge = | Ending Balance |
|---|---|---|---|---|---|
| 7,756.17 | 38,820.00 | .00 | 24,488.56 | .00 | 22,087.61 |

Statement from 10/01/25 Thru 10/31/25

Average Balance: 15,339.02 Minimum Balance: 6,693.57

*****************Summary of Deposit Accounts *******************************************

| AP | ACCOUNT | BALANCE | INT-RATE% | YTD-INT | YTD-PENALTY | MATURITY |
|---|---|---|---|---|---|---|
| CK | [redacted] | 22,087.61 | | | | |

------ Continued on next page ------

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------X

In re:

2281 CHURCH AVENUE LLC,

Debtor.

---------------------------------X

Chapter 11

Sub. V

Case No.: 24-43449 (JMM)

**ORDER AMENDING ORDER CONDITIONALLY GRANTING**
**FLUSHING BANK'S MOTION TO CONVERT CHAPTER 11 CASE**

Upon the motion, dated August 11, 2025 ECF 101 (the "Motion")[1] of Flushing Bank ("Flushing") for entry of an order converting this chapter 11 case to chapter 7, and for turnover of cash collateral, pursuant to § 1112(b) of the Bankruptcy Code; the Order Conditionally ranting Flushing Bank's Motion to Convert Chapter 11 Case ECF 113 (the "October 28, 2025 Order"); the Further Order Conditionally ranting Flushing Bank's Motion to Convert Chapter 11 Case ECF 119 ; the Notice of Default of October 28, 2025 Order filed on behalf of Flushing ECF 130 ; the Debtor's Response to Notice of Default of October 28, 2025 Order ECF 131 filed on behalf of 2281 Church Avenue LLC (the "Debtor"); the Letter Request for 14-Day Extension to File Sale Related Motion and Related Paperwork ECF 132 filed on behalf of Debtor; the Letter filed on behalf of Flushing ECF 133 ; and upon the Stipulation and Order Authorizing Final Use of Cash and Other Collateral and rant of Adequate Protection to Flushing Bank ECF 42 (the "Cash Collateral Order"); and upon the full record of the case, it is ORDERED that;

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

1. Paragraph 3 of the October 28, 2025 Order is modified to read as follows: If the Debtor has not accepted an offer by the end of the Marketing Period, the Debtor shall direct its Broker to advertise and conduct an auction of the Church Ave. Property (the "Auction"). Advertising for the Auction must commence by January 12, 2026. The Auction must commence by February 13, 2026 unless Flushing consents to an extension of the time for the Debtor to conduct the Auction. Flushing's right to credit bid at the Auction is preserved.

. Paragraph 5 of the October 28, 2025 Order is modified to read as follows: By January 19, 2026 (the "Sale Motion Deadline"), the Debtor shall file a motion (the "Sale Motion") seeking: (a) bankruptcy court approval of a sale of the Church Ave. Property to the bidder submitting the highest or otherwise best bid at the Auction; and (b) approval of the bid procedures to be used in connection with the Auction.

. Paragraph 6 of the October 28, 2025 Order is modified to read as follows: The Debtor shall file an application seeking a hearing on the Sale Motion on shortened notice in accordance with Rule 9077-1 of the Local Bankruptcy Rules for the Eastern District of New York.

4. The October 28, 2025 Order is modified to add the following after Paragraph 11: 12. The Debtor shall make payments due to Flushing for November, December and January under the Cash Collateral Order by January 16, 2026 and shall thereafter remain current on the Debtor's obligations under the Cash Collateral Order. The Debtor's failure to comply with this paragraph shall constitute a default under the October 28, 2025 Order in addition to a default under the Cash Collateral Order.

5. The October 28, 2025 Order shall otherwise remain in full force and effect.

6. The Court may retain exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

**Dated: January 7, 2026**
**Brooklyn, New York**

Jil Mazer-Marino
United States Bankruptcy Judge



35115048.v1

Cullen | Dykman

Cullen and Dykman LLP
The Omni Building
333 Earle Ovington Boulevard, 2nd Floor
Uniondale, New York 11553
T: 516.357.3700
F: 516.357.3792

***Bonnie L. Pollack, Esq.***
*Partner*
*Direct Dial: (516) 296-9143*
*bpollack@cullenllp.com*

January 7, 2026

**VIA ECF**

Chambers of the Honorable Jil Mazer-Marino
U.S. Bankruptcy Court, EDNY
271-C Cadman Plaza East - Suite 1595
Brooklyn, NY 11201-1800

Re: 2281 Church Avenue LLC
Case No. 24-43449 (JMM)

Dear Judge Mazer-Marino:

Yesterday, Debtor's counsel filed a sworn affirmation stating that the Debtor is not behind in their payments to Flushing Bank. He did so after being advised by me that is not the case, and after being advised that the Debtor has incorrectly taken this position in the past. I advised Mr. Dahiya that while there may be payments in any given month, they are making up for old payments that were missed, and that the Debtor is always at least one, and often several, months behind (i.e., a payment in November actually paying September). To say that the Debtor has made these same allegations to Flushing Bank, and Flushing Bank has provided evidence refuting same, numerous times is a vast understatement.

After the filing of the affirmation, I provided Mr. Dahiya with the attached statement, showing that the Debtor is indeed delinquent in its payments for November, December and January. I requested his immediate retraction of the untrue affirmation. Mr. Dahiya has not done so. We have reserved our rights against Mr. Dahiya based on this, but I felt that your Honor should be aware of this issue before ruling on the requested extension of time by the Debtor.

Thank you for your courtesies and consideration with this matter.

Respectfully,

*Bonnie Pollack*

Bonnie L. Pollack

cc: Karima Dahiya, Esq. (via email)
Gerard Luckman, Esq. (via email)

HIS 01/06/26 ND 2080
2281 CHURCH AVE LLC
TOTAL DEBITS : 77 258589.04 TOTAL CREDITS : 32 261666.43
ALL TRANSACTIONS BY DATE STATEMENT DATE : 1/06/26

| TR-DT | EF-DT | TRCD/DESCRIPTION | NONCK | AMOUNT | BALANCE | |
|---|---|---|---|---|---|---|
| 01/01/25 | | BALANCE FORWARD ---------> | | | 1425.27 | |
| 01/02/25 | 01/02/25 | DM8S NISSANFINANCE BILLPAY | * | 1145.00 | 280.27 | |
| 01/02/25 | 01/02/25 | DM8S PAYMENTUS BILLPAY | * | 3.90 | 276.37 | |
| 01/24/25 | 01/24/25 | MD5S DEPOSIT | * | 24870.00 | 25146.37 | |
| 01/29/25 | 01/29/25 | DM8S Flushing Flushing | * | 19194.10 | 5952.27 | January 1, 2025 PAYMENT |
| 01/29/25 | 01/29/25 | DM8S MORTGAGE SERV CT MTG PAYMT | * | 3364.61 | 2587.66 | |
| 01/31/25 | 01/31/25 | ID@ INTEREST PAID | * | 0.00 | 2587.66 | |
| 02/06/25 | 02/06/25 | MD5S DEPOSIT | * | 7320.00 | 9907.66 | |
| 02/07/25 | 02/06/25 | CF0S CHECK NUMBER | 102 | 1500.00 | 8407.66 | |
| 02/07/25 | 02/06/25 | CF0S CHECK NUMBER | 150 | 600.00 | 7807.66 | |
| 02/13/25 | 02/12/25 | CF0S CHECK NUMBER | 101 | 600.00 | 7207.66 | |
| 02/13/25 | 02/13/25 | MD5S DEPOSIT | * | 6210.00 | 13417.66 | |
| 02/20/25 | 02/19/25 | CF0S CHECK NUMBER | 103 | 600.00 | 12817.66 | |
| 02/28/25 | 02/28/25 | MD1S DEPOSIT | * | 7500.00 | 20317.66 | |
| 02/28/25 | 02/28/25 | ID@ INTEREST PAID | * | 0.00 | 20317.66 | |
| 03/03/25 | 02/28/25 | CF0S CHECK NUMBER | 104 | 600.00 | 19717.66 | |
| 03/04/25 | 03/04/25 | DM8S Flushing Flushing | * | 19194.10 | 523.56 | February 1, 2025 PAYMENT |
| 03/05/25 | 03/05/25 | MD5S DEPOSIT | * | 3740.00 | 4263.56 | |
| 03/07/25 | 03/06/25 | CF0S CHECK NUMBER | 106 | 600.00 | 3663.56 | |
| 03/10/25 | 03/10/25 | MD5S DEPOSIT | * | 7230.00 | 10893.56 | |
| 03/12/25 | 03/11/25 | CF0S CHECK NUMBER | 105 | 2500.00 | 8393.56 | |
| 03/13/25 | 03/12/25 | CF0S CHECK NUMBER | 107 | 600.00 | 7793.56 | |
| 03/21/25 | 03/20/25 | CF0S CHECK NUMBER | 108 | 600.00 | 7193.56 | |
| 03/27/25 | 03/26/25 | CF0S CHECK NUMBER | 109 | 600.00 | 6593.56 | |
| 03/28/25 | 03/28/25 | MD5S DEPOSIT | * | 9800.00 | 16393.56 | |
| 03/31/25 | 03/31/25 | ID@ INTEREST PAID | * | 0.00 | 16393.56 | |
| 04/01/25 | 04/01/25 | MD5S DEPOSIT | * | 6600.00 | 22993.56 | |
| 04/03/25 | 04/02/25 | CF0S CHECK NUMBER | 110 | 600.00 | 22393.56 | |
| 04/09/25 | 04/09/25 | MD5S DEPOSIT | * | 12156.43 | 34549.99 | |
| 04/09/25 | 04/09/25 | DM8S Flushing Flushing | * | 19182.60 | 15367.39 | March 1, 2025 PAYMENT |
| 04/11/25 | 04/10/25 | CF0S CHECK NUMBER | 111 | 600.00 | 14767.39 | |
| 04/17/25 | 04/16/25 | CF0S CHECK NUMBER | 112 | 600.00 | 14167.39 | |
| 04/24/25 | 04/23/25 | CF0S CHECK NUMBER | 113 | 600.00 | 13567.39 | |
| 04/24/25 | 04/24/25 | MD5S DEPOSIT | * | 6750.00 | 20317.39 | |
| 04/28/25 | 04/28/25 | MD5S DEPOSIT | * | 6700.00 | 27017.39 | |
| 04/29/25 | 04/29/25 | DM8S Flushing Flushing | * | 19182.60 | 7834.79 | April 1, 2025 PAYMENT |
| 04/30/25 | 04/30/25 | ID@ INTEREST PAID | * | 0.00 | 7834.79 | |
| 05/02/25 | 05/01/25 | CF0S CHECK NUMBER | 114 | 600.00 | 7234.79 | |
| 05/09/25 | 05/08/25 | CF0S CHECK NUMBER | 115 | 600.00 | 6634.79 | |
| 05/13/25 | 05/13/25 | MD5S DEPOSIT | * | 8370.00 | 15004.79 | |
| 05/15/25 | 05/14/25 | CF0S CHECK NUMBER | 116 | 600.00 | 14404.79 | |
| 05/15/25 | 05/15/25 | MD0S DEPOSIT | * | 5000.00 | 19404.79 | |
| 05/19/25 | 05/19/25 | DM8S Flushing Flushing | * | 19182.60 | 222.19 | May 1, 2025 PAYMENT |
| 05/28/25 | 05/28/25 | DD7S Transfer from #8253 | * | 3200.00 | 3422.19 | |
| 05/28/25 | 05/28/25 | MD5S DEPOSIT | * | 3700.00 | 7122.19 | |
| 05/29/25 | 05/28/25 | CF0S CHECK NUMBER | 118 | 600.00 | 6522.19 | |
| 05/31/25 | 05/31/25 | ID@ INTEREST PAID | * | 0.00 | 6522.19 | |
| 06/06/25 | 06/05/25 | CF0S CHECK NUMBER | 119 | 600.00 | 5922.19 | |
| 06/12/25 | 06/11/25 | CF0S CHECK NUMBER | 120 | 2000.00 | 3922.19 | |
| 06/12/25 | 06/11/25 | CF0S CHECK NUMBER | 122 | 600.00 | 3322.19 | |
| 06/13/25 | 06/13/25 | MD5S DEPOSIT | * | 6650.00 | 9972.19 | |
| 06/20/25 | 06/18/25 | CF0S CHECK NUMBER | 121 | 600.00 | 9372.19 | |
| 06/25/25 | 06/25/25 | MD5S DEPOSIT | * | 7900.00 | 17272.19 | |
| 06/26/25 | 06/25/25 | CF0S CHECK NUMBER | 123 | 600.00 | 16672.19 | |
| 06/30/25 | 06/30/25 | ID@ INTEREST PAID | * | 0.00 | 16672.19 | |
| 07/03/25 | 07/03/25 | MD1S DEPOSIT | * | 4420.00 | 21092.19 | |
| 07/07/25 | 07/03/25 | CF0S CHECK NUMBER | 124 | 6.00 | 21086.19 | |
| 07/08/25 | 07/08/25 | DW8S | * | 594.00 | 20492.19 | |
| | | Check # 124 las $6.00 sb $600.00 | | | | |
| 07/09/25 | 07/09/25 | MD1S DEPOSIT | * | 4250.00 | 24742.19 | |
| 07/11/25 | 07/11/25 | DM8S Flushing Flushing | * | 19182.60 | 5559.59 | June 1, 2025 Payment |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 07/14/25 | 07/11/25 | CF0S | CHECK NUMBER | | 125 | | 600.00 | 4959.59 | |
| 07/16/25 | 07/16/25 | MD1S | DEPOSIT | | | * | 10200.00 | 15159.59 | |
| 07/17/25 | 07/16/25 | CF0S | CHECK NUMBER | | 151 | | 600.00 | 14559.59 | |
| 07/17/25 | 07/17/25 | MD1S | DEPOSIT | | | * | 2500.00 | 17059.59 | |
| 07/23/25 | 07/23/25 | DM8S | HARLAND CLARKE | CHK ORDER | | * | 35.78 | 17023.81 | |
| 07/25/25 | 07/24/25 | CF0S | CHECK NUMBER | | 152 | | 600.00 | 16423.81 | |
| 07/28/25 | 07/25/25 | CF0S | CHECK NUMBER | | 153 | | 7497.82 | 8925.99 | |
| 07/28/25 | 07/28/25 | MD5S | DEPOSIT | | | * | 5400.00 | 14325.99 | |
| 07/30/25 | 07/29/25 | CF0S | CHECK NUMBER | | 155 | | 600.00 | 13725.99 | |
| 07/31/25 | 07/31/25 | ID@ | INTEREST PAID | | | * | 0.00 | 13725.99 | |
| 08/06/25 | 08/06/25 | MD5S | DEPOSIT | | | * | 9170.00 | 22895.99 | |
| 08/07/25 | 08/06/25 | CF0S | CHECK NUMBER | | 158 | | 600.00 | 22295.99 | |
| 08/11/25 | 08/11/25 | DM8S | Flushing | Flushing | | * | 19182.60 | 3113.39 | July 1, 2025 PAYMENT |
| 08/12/25 | 08/12/25 | MD5S | DEPOSIT | | | * | 4900.00 | 8013.39 | |
| 08/15/25 | 08/14/25 | CF0S | CHECK NUMBER | | 159 | | 600.00 | 7413.39 | |
| 08/21/25 | 08/20/25 | CF0S | CHECK NUMBER | | 160 | | 600.00 | 6813.39 | |
| 08/25/25 | 08/22/25 | CF0S | CHECK NUMBER | | 161 | | 2500.00 | 4313.39 | |
| 08/28/25 | 08/27/25 | CF0S | CHECK NUMBER | | 162 | | 600.00 | 3713.39 | |
| 08/31/25 | 08/31/25 | ID@ | INTEREST PAID | | | * | 0.00 | 3713.39 | |
| 09/04/25 | 09/04/25 | DM8S | FIRST INSURANCE | INSURANCE | | * | 2421.26 | 1292.13 | |
| 09/05/25 | 09/04/25 | CF0S | CHECK NUMBER | | 163 | | 600.00 | 692.13 | |
| 09/10/25 | 09/09/25 | CF0S | CHECK NUMBER | | 164 | | 600.00 | 92.13 | |
| 09/15/25 | 09/15/25 | MD1S | DEPOSIT | | | * | 11170.00 | 11262.13 | |
| 09/18/25 | 09/17/25 | CF0S | CHECK NUMBER | | 165 | | 600.00 | 10662.13 | |
| 09/25/25 | 09/25/25 | DM8S | FIRST INSURANCE | INSURANCE | | * | 2305.96 | 8356.17 | |
| 09/26/25 | 09/25/25 | CF0S | CHECK NUMBER | | 166 | | 600.00 | 7756.17 | |
| 09/30/25 | 09/30/25 | ID@ | INTEREST PAID | | | * | 0.00 | 7756.17 | |
| 10/03/25 | 10/02/25 | CF0S | CHECK NUMBER | | 167 | | 600.00 | 7156.17 | |
| 10/06/25 | 10/06/25 | MD1S | DEPOSIT | | | * | 10670.00 | 17826.17 | |
| 10/10/25 | 10/09/25 | CF0S | CHECK NUMBER | | 168 | | 600.00 | 17226.17 | |
| 10/10/25 | 10/10/25 | MD1S | DEPOSIT | | | * | 9250.00 | 26476.17 | |
| 10/16/25 | 10/16/25 | DM8S | Flushing | Flushing | | * | 19182.60 | 7293.57 | August 1, 2025 PAYMENT |
| 10/17/25 | 10/16/25 | CF0S | CHECK NUMBER | | 169 | | 600.00 | 6693.57 | |
| 10/20/25 | 10/20/25 | MD5S | DEPOSIT | | | * | 6900.00 | 13593.57 | |
| 10/23/25 | 10/22/25 | CF0S | CHECK NUMBER | | 170 | | 600.00 | 12993.57 | |
| 10/27/25 | 10/27/25 | DM8S | FIRST INSURANCE | INSURANCE | | * | 2305.96 | 10687.61 | |
| 10/29/25 | 10/29/25 | MD1S | DEPOSIT | | | * | 12000.00 | 22687.61 | |
| 10/30/25 | 10/29/25 | CF0S | CHECK NUMBER | | 171 | | 600.00 | 22087.61 | |
| 10/31/25 | 10/31/25 | ID@ | INTEREST PAID | | | * | 0.00 | 22087.61 | |
| 11/03/25 | 11/03/25 | DM8S | Flushing | Flushing | | * | 19182.60 | 2905.01 | September 1, 2025 PAYMENT |
| 11/07/25 | 11/06/25 | CF0S | CHECK NUMBER | | 172 | | 600.00 | 2305.01 | |
| 11/10/25 | 11/10/25 | MD5S | DEPOSIT | | | * | 11670.00 | 13975.01 | |
| 11/14/25 | 11/13/25 | CF0S | CHECK NUMBER | | 175 | | 600.00 | 13375.01 | |
| 11/17/25 | 11/14/25 | CF0S | CHECK NUMBER | | 176 | | 1000.00 | 12375.01 | |
| 11/17/25 | 11/14/25 | CF0S | CHECK NUMBER | | 174 | | 1500.00 | 10875.01 | |
| 11/21/25 | 11/20/25 | CF0S | CHECK NUMBER | | 177 | | 600.00 | 10275.01 | |
| 11/25/25 | 11/25/25 | DM8S | FIRST INSURANCE | INSURANCE | | * | 2305.96 | 7969.05 | |
| 11/28/25 | 11/26/25 | CF0S | CHECK NUMBER | | 179 | | 2000.00 | 5969.05 | |
| 12/01/25 | 11/28/25 | CF0S | CHECK NUMBER | | 180 | | 600.00 | 5369.05 | |
| 11/30/25 | 11/30/25 | ID@ | INTEREST PAID | | | * | 0.00 | 5369.05 | |
| 12/05/25 | 12/04/25 | CF0S | CHECK NUMBER | | 181 | | 600.00 | 4769.05 | |
| 12/10/25 | 12/09/25 | CF0S | CHECK NUMBER | | 183 | | 1386.55 | 3382.50 | |
| 12/10/25 | 12/10/25 | MD5S | DEPOSIT | | | * | 19820.00 | 23202.50 | |
| 12/11/25 | 12/10/25 | CF0S | CHECK NUMBER | | 184 | | 600.00 | 22602.50 | |
| 12/11/25 | 12/11/25 | DM8S | Flushing | #Flushing | | U* | 18932.93 | 3669.57 | October 1, 2025 PAYMENT |
| 12/18/25 | 12/17/25 | CF0S | CHECK NUMBER | | 185 | | 600.00 | 3069.57 | |
| 12/24/25 | 12/23/25 | CF0S | CHECK NUMBER | | 186 | | 600.00 | 2469.57 | |
| 12/29/25 | 12/29/25 | DM8S | FIRST INSURANCE | INSURANCE | | * | 2305.96 | 163.61 | |
| 12/31/25 | 12/31/25 | MD1S | DEPOSIT | | | * | 5650.00 | 5813.61 | |
| 12/31/25 | 12/31/25 | ID@ | INTEREST PAID | | | * | 0.00 | 5813.61 | |
| 01/05/26 | 01/02/26 | CF0S | CHECK NUMBER | | 188 | | 600.00 | 5213.61 | |
| 01/05/26 | 01/02/26 | CF0S | CHECK NUMBER | | 187 | | 710.95 | 4502.66 | |

Cullen | Dykman

Cullen and Dykman LLP
The Omni Building
333 Earle Ovington Boulevard, 2nd Floor
Uniondale, New York 11553
T: 516.357.3700
F: 516.357.3792

***Bonnie L. Pollack, Esq.***
*Partner*
*Direct Dial: (516) 296-9143*
*bpollack@cullenllp.com*

January 20, 2026

**VIA ECF**

Chambers of the Honorable Jil Mazer-Marino
U.S. Bankruptcy Court, EDNY
271-C Cadman Plaza East - Suite 1595
Brooklyn, NY 11201-1800

Re: 2281 Church Avenue LLC
Case No. 24-43449 (JMM)

Dear Judge Mazer-Marino:

As you are aware, this firm acts as counsel to Flushing Bank ("Flushing") in the above-referenced matter. The Court has issued several orders imposing deadlines by which the Debtor was required to act on certain matters. First, the Court entered an order on October 28, 2025 (the "October Order") which, among other things, required the Debtor to either obtain a contract to sell its Property or schedule an auction sale of the Property, and to file a plan that is consistent with that order. Based on the Debtor's non-compliance with the October Order, the Court entered an order on November 10, 2025 (the "November Order") whereby, in addition to the obligations under the October Order, the Debtor was required to reconvey its Property to the estate (after having transferred it without consideration during the pendency of the case), list the Property for sale by a certain date, and file a Plan consistent with the terms of the October Order by a certain date. Finally, on January 7, 2026 (the "January Order"; together with the October Order and the November Order, the "Orders"), the Court extended certain of the deadlines in the October Order and November Order but also required the Debtor to pay all amounts due to Flushing for the months of November, December and January by January 16, 2026. Please be advised that the Debtor is not in compliance with the following provisions of the Orders:

- The Debtor failed to make payment of the December and January amounts due to Flushing by January 16, 2026;
- The Debtor failed to sufficiently advertise the auction sale (the Property listing merely added a line that states "Please be aware that this property will be Auction [sic] on February 13, 2026");
- The Debtor failed to file a motion to be heard on shortened notice to approve a sales process and, ultimately, the auction sale, by January 19, 2026; and
- The Plan that the Debtor has filed does not comply with the terms of the Orders in

several respects and has ignored communications to address same (Flushing no longer considers the relocation of Debtor's counsel's office a reasonable excuse if it ever was, given the length of time that he has been relying on that position).

As a result, as set forth in paragraph 5 of the November Order, Flushing respectfully requests that the Court immediately enter an order converting the Debtor's case to one under chapter 7 of the Bankruptcy Code. It is patently clear that the Debtor is unable to comply with any obligations imposed, to the detriment of Flushing and other creditors.

Thank you for your continued courtesies and consideration with this matter.

Respectfully,

*Bonnie Pollack*

Bonnie L. Pollack

cc: Karam Dahiya, Esq. (via email)
Gerard Luckman, Esq. (via email)

DAHIYA LAW OFFICES LLC
*Attorneys*

111 John Street Suite 1860
New York, New York 10038
Tel: 212-766 8000
karam@dahiya.law

January 21, 2026

January 21, 2026

VIA ECF

Chambers of the Honorable Jil Mazer-Marino
U.S. Bankruptcy Court
EDNY 271-C Cadman Plaza East - Suite 1595
Brooklyn, NY 11201-1800

Re: *2281 Church Avenue LLC* Case No. 24-43449 (JMM)

Dear Judge Mazer-Marino:

I am writing on behalf of the Debtor, 2281 Church Avenue LLC, in response to the letter filed by Bonnie L. Pollack, Esq., counsel for Flushing Bank, dated January 20, 2026 (the "Pollack Letter"). While I respect Ms. Pollack's position, certain information in the Pollack Letter is not entirely accurate or complete, and I wish to provide the Court with additional context regarding the Debtor's compliance with the Court's directives, including the orders entered on October 28, 2025, November 10, 2025, and January 7, 2026 (collectively, the "Orders"). My intention has always been to fully comply with the Court's directives, and the Debtor is making meaningful progress toward that end.

By way of background, I have been in the process of relocating my office after more than 15 years at 75 Maiden Lane, New York, NY. This relocation, to my new address at 111 John Street, Suite 1860, New York, NY 10038, has been a two-month process, culminating in a two-day physical move. However, the move itself was fraught with unexpected complications that made it far more challenging and time-consuming than anticipated. Both the outgoing and incoming landlords imposed stringent demands, requiring that all moving parties be fully insured, with both buildings named as beneficiaries on the insurance policies, including comprehensive workers' compensation liability coverage. Additionally, the landlords enforced strict moving hours, mandating that the entire process occur after regular office hours—typically in the evenings or over weekends—to minimize disruption to other tenants. These requirements necessitated multiple rounds of negotiations, documentation reviews, and coordination with insurers and movers, which extended the timeline and added layers of complexity. As a sole practitioner handling this personally without administrative support, these hurdles turned what should have been a

straightforward relocation into an overwhelming ordeal that severely impacted my daily operations. It was only last night, January 19, 2026, that my computer network was finally connected and operational. This morning, upon opening my email for the first time since the connection was established, I discovered the Pollack Letter. This office relocation has temporarily disrupted my ability to conduct regular business, including timely monitoring of emails and filings.

Notwithstanding these challenges, the Debtor has taken significant steps to comply with the Orders. The broker, Rosalind Bolden of Blue Water Capital Realty Corp., has listed the Property for sale and advertised the auction scheduled for February 13, 2026. Attached hereto as **Exhibit A** is a copy of the MLS listing, which clearly reflects the auction date and details the Property's marketing as required. Additionally, Ms. Bolden has provided a letter dated January 20, 2026, outlining her extensive marketing efforts, including listing on the Multiple Listing Service (extended to Manhattan), Realtor.com, Zillow, and outreach to private and institutional investors and other brokers. These efforts have resulted in several showings and drive-by previews, despite occurring during the holiday season. A copy of Ms. Bolden's letter is attached hereto as **Exhibit B.**

Regarding post-petition payments, I have received correspondence from Debbie Harris-David, Power of Attorney for the Debtor, detailing her ongoing efforts to bring the account current. Ms. Harris-David reports that the November payment has been made, $11,000 is currently available, and $8,000 is being deposited today to complete the December payment. She is actively assembling funds for the January payment and anticipates being fully current shortly. She has explained that delays stemmed from the lender's reluctance to accept large cash deposits or wires in one go, leading to inquiries and interruptions in posting payments despite funds being tendered. A copy of Ms. Harris-David's email and letter to the Court dated January 20, 2026, is attached hereto as **Exhibit C.**

The Debtor has already filed a liquidating plan to sell the real property, consistent with the Orders. I am currently in the process of preparing an amended plan that incorporates bidding procedures for Court approval on an expedited basis through an Order to Show Cause. I did not realize the specific deadline suggested by Ms. Pollack for filing a motion to approve the sales process (to be heard on shortened notice by January 19, 2026), as I was under the impression it was January 26, 2026. This confusion arose because the Court's oral directions were not memorialized in a written order, and the office relocation further compounded the issue.

In furtherance of compliance, I have been diligently communicating with the Subchapter V Trustee, Gerard R. Luckman, Esq., via email to discuss the sale, bidding procedures, and related matters. Copies of these emails, dated January 13, 2026, January 14, 2026, and January 20, 2026, are attached hereto as **Exhibit D**. In these communications, I am also bring it to the attention of the Court that Ms. Harris-David is in the process of selling another property she owns at 814 Linden Blvd, Brooklyn, NY 11203. This sale is expected to net her more than $750,000 after satisfying the mortgage, with the proceeds to be used to satisfy creditors in this case. A loan commitment has been issued for that property, and the purchasers are ready, willing, and able to close pending attorney scheduling. **Ex. E. is the copy of the contract**. Additionally, Ms. Harris-

David has applied for a hard money loan and anticipates a commitment within the next 48 to 72 hours. These developments demonstrate tangible progress toward resolution. All this is being done is not at the expense of the auction sale. We are moving towards maximizing the value of the estate and make sure the creditors are paid,.

Now that I am settled in my new office, I am prepared to move quickly to fulfill all remaining obligations under the Orders. I do not believe it would be fair or equitable to prejudice the Debtor—particularly given the advanced age of the principal, who is entering his 100th year—due to this short-term office interruption, especially when substantial steps have been taken and progress is evident.

Accordingly, the undersigned respectfully requests an urgent hearing to address the Pollack Letter, provide further clarity on the applicable dates to ensure continued compliance. Thank you for your continued courtesies and consideration in this matter.

Respectfully submitted,

/s/ *Karamvir Dahiya*

Listing #1



## 2281 Church Ave, Brooklyn, NY 11226

| | |
|---|---|
| List Price | **$10,000,000** on 11/06/2025 |
| Status | Active for Sale |
| Shared in MLS | Yes |
| Listing ID | 11604460 |
| Property Type | Commercial Building |
| Commercial Type | Commercial |
| County | Kings |
| Township | Kings |
| Neighborhood | East Flatbush |
| Total Tax | $49,398 |
| FEMA Flood Map | fema.gov/portal |

INVESTOR'S DELIGHT*** Exceptional investment opportunity to own a centrally located commercial building in one of Brooklyn's most Vibrant corridors' The Heart of East Flatbush" this property sprawls over 12000 square feet featuring seven stores and spacious sought after event hall perfect for weddings, concerts, community events and galas, Property offers strong attractive rental income potential of over $750,000 annually with excellent upside. Strategically located on bustling and vibrant Church Avenue this property benefits from heavy foot traffic and close proximity to major shopping centers and easily accessible by all forms of public transportation making for retail tenants and their patrons as well as employees. Property is next to United States Post office and very close proximity to Flatbush Avenue. If you're seeking medium to long term real estate investment or exceptional passive income or a business owner seeking a flagship location this property offers the perfect blend of location scale and income. Serious Investors only. Property Highlights: 7 High income earing Leased stores, large event Hall suitable for large events. Approximately over 12,000 square feet. Reasonable property taxes. ***** Please be aware that this property will be Auction on February 13th, 2026.

### Property Details

- 12160 SF Lot
- Built in 1931
- 2 Stories
- Available 11/06/2025

### Unit Information

**Unit #1 – Commercial**, Gross Area: 12160, Net Leasable Area: 11896, Unit Count: 2

### Exterior Features

- Masonry - Brick Construction
- Masonry Siding
- Municipal Water
- Near Bus

### Community Details

- Walk-up (Bldg. Style)

### Commercial Info

- 2281 Church Ave, LLC (Business Name)
- Uses: Event Hall & Seven Stores

### Presented By

**Rosalind Bolden**, BLUEWATER CAPITAL REALTY CORP 718-413-6570 roz.bluewaters@gmail.com

Listing data is deemed reliable but is NOT guaranteed accurate.

Blue Water Capital

132 W. MERRICK ROAD, SUITE 689,
FREEPORT NY 11520
Tel: 718-484-8622
Fax: 718-228-8577
Email: roz.bluewaters@gmail.com

**BLUEWATERS CAPITAL REALTY CORP.**

January 20, 2026

RE: 2281 Church Ave LLC- Real Estate Marketing Info

Dear Mr. Dahiya,

Please be advised that Blue Water Capital Realty Corp has listed the commercial premises known as 2281 Church Ave Brooklyn NY 11226 from the inception of the commencement of the contractual agreement which started November 6th, 2025.

Please be advised that the property was listed on the Multiple listing service and even extended to Manhattan to attract a wide range of clients, additionally the property is featured on Realtor. Com and Zillow and personally as the broker our offices have sent property fact sheets out to several private and institutional investors also other Real Estate Brokers which have resulted in several showings and drive by previews.

Considering the fact that all of this has taken place during the height of the Christmas and New year's holidays as well as the religious holidays after being observed by many in the area, we believe that we are on track to have a firm accepted offer within next several days.

To be plausibly clear we have received offers but all way below market value and these types of offers increased after making mention of looming auction dates where many are trying to offset fire sale prices.

To further solidify the intention of the clients Mrs. Harris put up for sale another property she owned which was in her family for decades. That property located in Brooklyn at 814 Linden Blvd not far from the subject premises.

A loan commitment for that property has been issued, and the purchasers are ready willing and able to close just awaiting scheduling from the attorneys. This sale will net Mrs. Harris approximately $850,000.00 (Eight hundred and fifty thousand), all of which she is willing to pay into court to defray the outstanding debt.

To further place additional fail safes, she has also applied for a hard money loan. Based on communication with the lender she should have a commitment within next 48 to 72 hours.

Given all of the above-mentioned factors and given the age of the client who is entering his 100th year this year I join with everyone working on their behalf requesting that all involved use the auspices afforded them by their respective good offices to grant further leniency in allowing clients to complete this transaction because the inheritance of kids and other descendants would be forever lost.

Thank you in advance for your consideration of all afore mentioned.

Best & Kindest Regards

Rosalind Bolden
License Rael Estate Broker

January 20, 2026

Gmail KD <karam@dahiya.law>

## Status regarding payments

1 message

**Debbie Harris** <debbieharris399@gmail.com> Tue, Jan 20, 2026 at 2:18 PM
To: Karamvir Dahiya <karam@dahiya.law>

Re: Status Update Regarding Post-Petition Payments

Debtor: Oswald David

Property: 2281 Church Ave., Brooklyn, NY 11226

Submitted by: Debbie Harris-David POA

---

Dear Your Honor,

I respectfully submit this letter to provide a brief status update regarding mortgage payments following the Court's directive to bring the account current by January 16.

The November payment has been paid. Funds in the amount of $11,000 are currently available, and $8,000 is being deposited today to complete the December payment. I am actively assembling the remaining funds to bring the January payment current.

I also wish to advise the Court that, on multiple occasions, deposits made toward the mortgage have been questioned or delayed by the lender, including inquiries regarding amounts being deposited and frequency. These interruptions have at times impeded timely posting of payments towards the mortgage, despite funds being available and tendered.

Payments are presently being addressed and applied, and I respectfully request that the Court maintain this matter under Chapter 11 while the remaining January balance is being addressed, rather than convert the case to Chapter 7 at this time. Conversion now would risk irreversible harm while payments are actively being brought current.

Thank you for the Court's time and consideration.

Regards,

Debbie Harris-David POA

(347) 822-3970

Brooklyn, New York

Gmail

KD <karam@dahiya.law>

## (no subject)

**KD** <karam@dahiya.law> Tue, Jan 13, 2026 at 8:27 PM
To: "Gerard R. Luckman" <gluckman@forchellilaw.com>

Please let me know tomorrow what time is good for you, I need to talk to you about the  the list of items, I need to revise and take care in an expedited manner in Church Avenue property. Gillian, I have convinced her to sell the house, which she will do by end of this year. thanks.

--
***Karamvir Dahiya***
***Dahiya Law Offices LLC***
**111 John Street Suite 1860**
**New York New York 10038**
**Tel: 212 766 8000**

Gmail

KD <karam@dahiya.law>

## (no subject)

**KD** <karam@dahiya.law> Wed, Jan 14, 2026 at 11:42 AM
To: "Gerard R. Luckman" <gluckman@forchellilaw.com>

Luckman Sir, please advise of your availabilities. I need to bring an OSC for the sale bidding etc...and confirmation prior to the sale. I will have to prepare the same and not have legal pitfalls. Thanks.

--
***Karamvir Dahiya***
***Dahiya Law Offices LLC***
**111 John Street Suite 1860**
**New York New York 10038**
**Tel: 212 766 8000**

Gmail

KD <karam@dahiya.law>

## Church avenue

**KD** <karam@dahiya.law> Tue, Jan 20, 2026 at 9:56 AM
To: "Gerard R. Luckman" <gluckman@forchellilaw.com>

Luckman Sir, when can we talk? I have had sent few emails to you last week requesting your time, i need to amend the plan, put sale bids in the same and file an OSC to dispose off the property or a private sale or pay off of the parties...please call me on my cell 646 420 9000. Please treat this as urgent....last night i had office network and computers working. I need to do lot of catching up.

--
***Karamvir Dahiya***
***Dahiya Law Offices LLC***
**111 John Street Suite 1860**
**New York New York 10038**
**Tel: 212 766 8000**

Residential Contract of Sale 11-2000

*Jointly prepared by the Real Property Section of the New York State Bar Association, the New York State Land Title Association, the Committee on Real Property Law of the Association of the Bar of the City of New York and the Committee on Real Property Law of the New York County Lawyers' Association*

**WARNING: NO REPRESENTATION IS MADE THAT THIS FORM OF CONTRACT FOR THE SALE AND PURCHASE OF REAL ESTATE COMPLIES WITH SECTION 5-702 OF THE GENERAL OBLIGATIONS LAW ("PLAIN LANGUAGE").**

**CONSULT YOUR LAWYER BEFORE SIGNING THIS AGREEMENT**

**NOTE: FIRE AND CASUALTY LOSSES AND CONDEMNATION**
This contract form does not provide for what happens in the event of fire, or other casualty loss or condemnation before the title closing. Unless different provision is made in this contract, Section 5-1311 of the General Obligations Law will apply. One part of that law makes a Purchaser responsible for fire and casualty loss upon taking possession of the Premises before the title closing.

# Residential Contract of Sale

*Contract of Sale* made as of September , 2025 **BETWEEN**

DEBBIE A. HARRIS, 814 Linden Blvd., Brooklyn, NY 11203

hereinafter called "Seller" and

KELVIN ENDEAVOUR JR. and KELSEA N. CROCKETT, 250 Ashland Place, Apt. 30E, Brooklyn, NY 11217

hereinafter called "Purchaser"

## *The parties hereby agree as follows:*

**1. Premises.** Seller shall sell and convey and Purchaser shall purchase the property, together with all buildings and improvements thereon (collectively the "Premises"), more fully described on a separate page marked "Schedule A", annexed hereto and made a part hereof and also known as:
Street Address: 814 Linden Blvd.
Brooklyn, NY 11203
Block: 4678 Lot: 7

Together with Seller's ownership and rights, if any, to land lying in the bed of any street or highway, opened or proposed, adjoining the Premises to the center line thereof, including any right of Seller to any unpaid award by reason of any taking by condemnation and/or for any damage to the Premises by reason of change of grade of any street or highway. Seller shall deliver at no additional cost to Purchaser, at Closing (as hereinafter defined), or thereafter, on demand, any documents that Purchaser may reasonably require for the conveyance of such title and the assignment and collection of such award or damages.

**2. Personal Property.** This sale also includes all fixtures and articles of personal property now attached or appurtenant to the Premises, unless specifically excluded below. Seller represents and warrants that at Closing they will be paid for and owned by Seller, free and clear of all liens and encumbrances, except any existing mortgage to which this sale may be subject. They include, but are not limited to, plumbing, heating, lighting and cooking fixtures, chandeliers, bathroom and kitchen cabinets and counters, mantels, door mirrors, switch plates and door hardware, venetian blinds, window treatments, shades, screens, awnings, storm windows, storm doors, window boxes, mail box, TV aerials, weather vane, flagpole, pumps, shrubbery, fencing, outdoor statuary, tool shed, ~~dishwasher, washing machine, clothes dryer, garbage disposal unit,~~ 2 range ovens, built-in-microwave oven, piano ~~refrigerator, freezer, air conditioning equipment~~ and installations, wall to wall carpeting and built-ins not excluded below, staircase chair lift, all as may exist at the premises in their present "as is" condition.

Excluded from this sale are furniture and household furnishings and

**3. Purchase Price.** The purchase price is $1,170,000.00 payable as follows:

(a) On the signing of this contract, by Purchaser's good check payable to the Escrowee (as hereinafter defined), subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 6 of this contract (the "Downpayment"): $ 40,950.00

(b) By Seller Concession credit to assist Purchaser with payment of closing costs: $11,700.00

(c) By a purchase money note and mortgage from Purchaser to Seller: $

(d) Balance at Closing in accordance with paragraph 7: $ 1,129,050.00

4.~~**Existing Mortgage.** (*Delete if inapplicable*) If this sale is subject to an existing mortgage as indicated in paragraph 3(b) above:~~

~~(a) The Premises shall be conveyed subject to the continuing lien of the existing mortgage, which is presently payable, with interest at the rate of ______ percent per annum, in monthly installments of $ ______ which include principal, interest and escrow amounts, if any, and with any balance of principal being due and payable on ______~~

~~(b) To the extent that any required payments are made on the existing mortgage between the date hereof and Closing which reduce the unpaid principal amount thereof below the amount shown in paragraph 3(b), then the balance of the price payable at Closing under paragraph 3(d) shall be increased by the amount of the~~

~~payments of principal. Seller represents and warrants that the amount shown in paragraph 3(b) is substantially correct and agrees that only payments required by the existing mortgage will be made between the date hereof and Closing.~~

~~(c) If there is a mortgagee escrow account, Seller shall assign it to Purchaser, if it can be assigned, and in that case Purchaser shall pay the amount in the escrow account to Seller at Closing.~~

~~(d) Seller shall deliver to Purchaser at Closing a certificate dated not more that 30 days before Closing signed by the holder of the existing mortgage, in form for recording, certifying the amount of the unpaid principal, the date to which interest has been paid and the amounts, if any, claimed to be unpaid for principal and interest, itemizing the same. Seller shall pay the fees for recording such certificate. If the holder of the existing mortgage is a bank or other institution as defined in Section 274-a of the Real Property Law it may, instead of the certificate, furnish a letter signed by a duly authorized officer, employee or agent, dated not more then 30 days before Closing, containing the same information.~~

~~(e) Seller represents and warrants that (i) Seller has delivered to Purchaser true and complete copies of the existing mortgage, the note secured thereby and any extensions and modifications thereof, (ii) the existing mortgage is not now, and at the time of Closing will not be, in default, and (iii) the existing mortgage does not contain any provision that permits the holder of the mortgage to require its immediate payment in full or to change any other term thereof by reason of the sale or conveyance of the Premises.~~

~~**5. Purchase Money Mortgage.** *(Delete if inapplicable)* If there is to be a purchase money mortgage as indicated in paragraph 3(c) above:~~

~~(a) The purchase money note and mortgage shall be drawn by the attorney for Seller in the form attached or, if not, in the standard form adopted by the New York State Land Title Association. Purchaser shall pay at Closing the mortgage recording tax, recording fees and the attorney's fees in the amount of $ ______ for its preparation.~~

~~(b) The purchase money note and mortgage shall also provide that it is subject and subordinate to the lien of the existing mortgage and any extensions, modifications, replacements or consolidations of the existing mortgage, provided that (i) the interest rate thereof shall not be greater than ______ percent per annum and the total debt service thereunder shall not be greater than $ ______ per annum, and (ii) if the principal amount thereof shall exceed the amount of principal owing and unpaid on the existing mortgage at the time of placing such new mortgage or consolidated mortgage, the excess is to be paid to the holder of such purchase money mortgage in reduction of the principal thereof. The purchase money mortgage shall also provide that such payment to the holder thereof shall not alter or affect the regular installments, if any, of principal payable thereunder and that the holder thereof will, on demand and without charge therefore, execute, acknowledge and deliver any agreement or agreements further to effectuate such subordination.~~

**6. Downpayment in Escrow.**

(a) Seller's attorney ("Escrowee") shall hold the Downpayment in escrow in a segregated bank account at:
Address: CHASE BANK
until Closing or sooner termination of this contract shall pay over or apply the Downpayment in accordance with the terms of this paragraph. Escrowee shall hold the Downpayment in a(n) IOLA interest-bearing account. If interest is held for the benefit of the parties, it shall be paid to the party entitled to the Downpayment and the party receiving the interest shall pay any income taxes thereon. If interest is not held for the benefit of the parties, the Downpayment shall be placed in an IOLA account or as otherwise permitted or required by law. The Social Security or Federal Identification numbers of the parties shall be furnished to Escrowee upon request. At Closing, the Downpayment shall be paid by Escrowee to Seller. If for any reason Closing does not occur and either party gives Notice (as defined in paragraph 25) to Escrowee demanding payment of the Downpayment, Escrowee shall give prompt Notice to the other party of such demand. If Escrowee does not receive Notice of objection from such other party to the proposed payment within 10 business days after the giving of such Notice, Escrowee is hereby authorized and directed to make such payment. If Escrowee does receive such Notice of objection within such 10 day period or if for any other reason Escrowee in good faith shall elect not to make such payment, Escrowee shall continue to hold such amount until otherwise directed by Notice from the parties to this contract or a final, non-appealable judgment, order or decree of a court. However, Escrowee shall have the right at any time to deposit the Downpayment and the interest thereon with the clerk of a court in the county in which the Premises are located and shall give Notice of such deposit to Seller and Purchaser. Upon such deposit or other disbursement in accordance with the terms of this paragraph, Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

(b) The parties acknowledge that Escrowee is acting solely as a stakeholder at their request and for their convenience and that Escrowee shall not be liable to either party for any act or omission on its part unless taken or suffered in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee. Seller and Purchaser jointly and severally (with right of contribution) agree to defend (by attorneys selected by Escrowee), indemnify and hold Escrowee harmless from and against all costs, claims and expenses (including reasonable attorneys' fees) incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee.

(c) Escrowee may act or refrain from acting in respect of any matter referred to herein in full reliance upon and with the advice of counsel which may be selected by it (including any member of its firm) and shall be fully protected in so acting or refraining from action upon the advise of such counsel.

(d) Escrowee acknowledges receipt of the Downpayment by check subject to collection and Escrowee's agreement to the provisions of this paragraph by signing in the place indicated on the signature page of this contract.

(e) Escrowee or any member of its firm shall be permitted to act as counsel for Seller in any dispute as to the disbursement of the Downpayment or any other dispute between the parties whether or not Escrowee is in possession of the Downpayment and continues to act as Escrowee.

(f) The party whose attorney is Escrowee shall be liable for loss of the Downpayment.

**7. Acceptable Funds.** All money payable under this contract unless otherwise specified, shall be paid by:

(a) Cash, but not over $1,000.00

(b) Good certified check of Purchaser drawn on or official check issued by any bank, savings bank, trust company or savings and loan association having a banking office in the State of New York unendorsed and payable to the order of Seller, or as Seller may otherwise direct upon reasonable prior notice (by telephone or otherwise) to Purchaser.

(c) As to money other than the purchase price payable to Seller at Closing, uncertified check of Purchaser up to the amount of $ 1,000.00 ; and

(d) As otherwise agreed to in writing by Seller or Seller's attorney.

**8. Mortgage Commitment Contingency.** *(Delete paragraph if inapplicable. For explanation, see:* **NOTES ON MORTGAGE COMMITMENT CONTINGENCY CLAUSE.)**

(a) The obligation of Purchaser to purchase under this contract is conditioned upon issuance, on or before 60 ~~45~~ days after a fully executed copy of this contract is given to Purchaser or Purchaser's attorney in the manner set forth in paragraph 25 or subparagraph 8(j) (the "Commitment Date"), of a written commitment from an Institutional Lender pursuant to which such Institutional Lender agrees to make a first mortgage loan, including a VA, FHA or other governmentally insured loan, to Purchaser, at Purchaser's sole cost and expense, of $1,134,900.00~~948,000.00~~ for a term of at least 30 years (or such lesser sum or shorter term as Purchaser shall be willing to accept) at the prevailing fixed or adjustable rate of interest and on other customary commitment terms (the "Commitment"). To the extent a Commitment is conditioned on the sale of Purchaser's current home, payment of any outstanding debt, no material adverse change in Purchaser's financial condition or any other customary conditions, Purchaser accepts the risk that such conditions may not be met; however, a commitment conditioned on the Institutional Lender's approval of an appraisal shall not be deemed a "Commitment" hereunder until an appraisal is approved (and if that does not occur before the Commitment Date Purchaser may cancel under subparagraph 8(e) unless the Commitment Date is extended). Purchaser's obligations hereunder are conditioned only on issuance of a Commitment. Once a Commitment is issued, Purchaser is bound under this contract even if the lender fails or refuses to fund the loan for any reason, within Purchaser's control.

(b) Purchaser shall (i) make prompt application to one or, at Purchaser's election, more than one Institutional Lender for such mortgage loan, (ii) furnish accurate and complete information regarding Purchaser and members of Purchaser's family, as required, (iii) pay all fees, points and charges required in connection with such application and loan, (iv) pursue such application with diligence, and (v) cooperate in good faith with such Institutional Lender(s) to obtain a Commitment. Purchaser shall accept a Commitment meeting the terms set forth in subparagraph 8(a) and shall comply with all requirements of such Commitment (or any other commitment accepted by Purchaser). Purchaser shall furnish Seller with a copy of the Commitment promptly after receipt thereof.

(c) *(Delete this subparagraph if inapplicable)* Prompt submission by Purchaser of an application to a mortgage broker registered pursuant to Article 12-D of the New York Banking Law ("Mortgage Broker") shall constitute full compliance with the terms and conditions set forth in subparagraph 8(b)(i), provided that such Mortgage Broker promptly submits such application to such Institutional Lender(s). Purchaser shall cooperate in good faith with such Mortgage Broker to obtain a Commitment from such Institutional Lender(s).

(d) If all Institutional Lenders to whom applications were made deny such applications in writing prior to the Commitment Date, Purchaser may cancel this contract by giving Notice thereof to Seller, with a copy of such denials, provided that Purchaser has complied with all its obligations under this paragraph 8.

(e) If no Commitment is issued by an Institutional Lender on or before the Commitment Date, then, unless Purchaser has accepted a written commitment from an Institutional Lender that does not conform to the terms set forth in subparagraph 8(a), Either party may cancel this contract by giving Notice to the other within 5 business days after the Commitment Date, provided that such Notice includes the name and address of the Institutional Lender(s) to whom application was made and that Purchaser has complied with all its obligations under this paragraph 8.

(f) If this contract is canceled by Purchaser pursuant to subparagraphs 8(d) or (e), neither party shall thereafter have any further rights against, or obligations or liabilities to, the other by reason of this contract, except that the Downpayment shall be promptly refunded to Purchaser and except as set forth in paragraph 27.

(g) If Purchaser accepts a written commitment from an Institutional Lender that does not conform to the terms set forth in subparagraph 8(a), then Purchaser shall be deemed to have waived Purchaser's right to cancel this contract and to receive a refund of the Downpayment by reason of the contingency contained in this paragraph 8.

(h) If Seller has not received a copy of a commitment from an Institutional Lender accepted by Purchaser by the Commitment Date, Seller may cancel this contract by giving Notice to Purchaser within 5 business days after the Commitment Date, which cancellation shall become effective unless Purchaser delivers a copy of such commitment to Seller within 10 business days after the Commitment Date. After such cancellation neither party shall have any further rights against, or obligations or liabilities to, the other by reason of this contract, except that the Downpayment shall be promptly refunded to Purchaser (provided Purchaser has complied with all its obligations under this paragraph 8) and except as set forth in paragraph 27.

(i) For purposes of this contract, the term "Institutional Lender" shall mean any bank, savings bank, private banker, trust company, savings and loan association, credit union or similar banking institution whether organized under the laws of this state, the United States or any other state, foreign banking corporation licensed by the Superintendent of Banks of New York or regulated by the Comptroller of the Currency to transact business in New York State; insurance company duly organized or licensed to do business in New York State; mortgage banker licensed pursuant to Article 12-D of the Banking Law; and any instrumentality created by the United States or any state with the power to make mortgage loans.

(j) For purposes of subparagraph 8(a), Purchaser shall be deemed to have been given a fully executed copy of this contract on the third business day following the date of ordinary or regular mailing, postage prepaid.

**9. Permitted Exceptions.** The Premises are sold and shall be conveyed subject to:

(a) Zoning and subdivision laws and regulations, and landmark, historic or wetlands designation, provided that they are not violated by the existing buildings and improvements erected on the property or their use;

(b) Consents for the erection of any structures on, under or above any streets on which the Premises abut;

(c) Encroachments of stoops, areas, cellar steps, trim and cornices, if any, upon any street or highway;

(d) Real estate taxes that are a lien, but are not yet due and payable; and

(e) The other matters, if any, including a survey exception, set forth in a Rider attached.

**10. Governmental Violations and Orders.**

(a) Seller shall comply with all notes or notices of violations of law or municipal ordinances, orders or requirements noted or issued as of the date of closing by any governmental department having authority as to lands, housing, buildings, fire, health, environmental and labor conditions affecting the Premises. The Premises shall be conveyed free of them at Closing. Seller shall furnish Purchaser with any authorizations necessary to make the searches that could disclose these matters.

(b) *(Delete if inapplicable)* All obligations affecting the Premises pursuant to the Administrative Code of the City of New York incurred prior to Closing and payable in money shall be discharged by Seller at or prior to Closing.

**11. Seller's Representations.**

(a) Seller represents and warrants to Purchaser that:

I. The Premises abut or have a right of access to a public road;

II. Seller is the sole owner of the Premises and has the full right, power and authority to sell, convey and transfer the same in accordance with the terms of this contract;

III. Seller is not a "foreign person", as that term is defined for purposes of the Foreign Investment in Real Property Tax Act. Internal Revenue Code ("IRC") Section 1445, as amended, and the regulations promulgated thereunder (collectively "FIRPTA");

IV. The Premises are not affected by any exemptions or abatements of taxes; and

V. Seller has been known by no other name for the past ten years, except:

(b) Seller covenants and warrants that all of the representations and warranties set forth in this contract shall be true and correct at Closing.

(c) Except as otherwise expressly set forth in this contract, none of Seller's covenants, representations, warranties or other obligations contained in this contract shall survive Closing.

**12. Condition of Property.** Purchaser acknowledges and represents that Purchaser is fully aware of the physical condition and state of repair of the Premises and of all other property included in this sale, based on Purchaser's own inspection and investigation thereof, and that Purchaser is entering into this contract based solely upon such inspection and investigation and not upon any information, data, statements or representations, written or oral, as to the physical conditions, state of repair, use, cost of operation or any other matter related to the Premises or the other property included in the sale, given or made by Seller or its representatives, and shall accept the same "as is" in their present condition and state of repair, subject to reasonable use, wear, tear and natural deterioration between the date hereof and the date of Closing (except as otherwise set forth in paragraph 16(e), without any reduction in the purchase price or claim of any kind for any change in such condition by reason thereof subsequent to the date of this contract. Purchaser and its authorized representatives shall have the right, at reasonable times and upon reasonable notice (by telephone or otherwise) to Seller, to inspect the Premises before Closing.

**13. Insurable Title.** Seller shall give and Purchaser shall accept such title as any reputable title insurance company <u>chosen by Purchaser</u> licensed in New York State shall be willing to approve and insure in accordance with its standard form of title policy approved by the New York State Insurance Department, subject only to the matters provided for this contract.

**14. Closing, Deed and Title.**

(a) "Closing" means the settlement of the obligations of Seller and Purchaser to each other under this contract, including the payment of the purchase price to Seller, and the delivery to Purchaser of a bargain and sale with covenants against grantor's acts deed in proper statutory short form for record, duly executed and acknowledged, so as to convey to Purchaser fee simple title to the Premises, free of all encumbrances, except as otherwise herein stated. The deed shall contain a covenant by Seller as required by subd. 5 of Section 13 of the Lien Law.

(b) If Seller is a corporation, it shall deliver to Purchaser at the time of Closing (i) a resolution of its Board of Directors authorizing the sale and delivery of the deed, and (ii) a certificate by the Secretary or Assistant Secretary of the corporation certifying such resolution and setting forth facts showing that the transfer is in conformity with the requirements of Section 909 of the Business Corporation Law. The deed in such case shall contain a recital sufficient to establish compliance with that Section.

**15. Closing Date and Place.** Closing shall take place at the office of Seller's attorney at 10:00 o'clock on or about , 2025 or upon reasonable notice (by telephone or otherwise.

**16. Conditions to Closing.** This contract and Purchaser's obligation to purchase the Premises are also subject to and conditioned upon the fulfillment of the following conditions precedent:

(a) The accuracy, as of the date of Closing, of the representations and warranties of Seller made in this contract.

(b) The delivery by Seller to Purchaser of a valid and subsisting Certificate of Occupancy or other required certificate of compliance, or evidence that none was required, covering the building(s) and all of the other improvements located on the property authorizing their use as a two family dwelling at the date of Closing.

(c) The delivery by Seller to Purchaser of a certificate stating that Seller is not a foreign person, which certificate shall be in the form then required by FIRPTA or a withholding certificate from I.R.S. If Seller fails to deliver the aforesaid certificate or if Purchaser is not entitled under FIRPTA to rely on such certificate, Purchaser shall deduct and withhold from the purchase price a sum equal to 10% thereof (or any lesser amount permitted by law) and shall at Closing remit the withheld amount with the required forms to the Internal Revenue Service.

(d) The delivery of the Premises and all building(s) and improvements comprising a part thereof in broom clean condition, vacant and free of leases or tenancies, together with keys to the Premises.

(e) All plumbing (including water supply and septic systems, if any), heating and air conditioning, if any, electrical and mechanical systems, equipment, and machinery in the building(s) located on the property and all appliances which are included in this sale being in working order as of the date of Closing, and the roof shall be free of leaks

(f) If the Premises are a one or two family house, delivery by the parties at Closing of affidavits in compliance with state and local law requirements to the effect that there is installed in the Premises a smoke detecting alarm device or devices.

(g) The delivery by the parties of any other affidavits required as a condition of recording the deed.

**17. Deed Transfer and Recording Taxes.** At Closing, certified or official bank checks payable to the order of the appropriate State, City or County officer in the amount of any applicable transfer and/or recording tax payable by reason of the delivery or recording of the deed or mortgage, if any, shall be delivered by the party required by this contract to pay such transfer and/or recording tax, together with any required tax returns duly executed and sworn to, and such party shall cause any such checks and returns to be delivered to the appropriate officer promptly after Closing. The obligation to pay any additional tax or deficiency and any interest or penalties thereon shall survive Closing.

**18. Apportionments and Other Adjustments; Water Meter and Installment Assessments.**

(a) To the extent applicable, the following shall be apportioned as of midnight of the day before the day of Closing:
(i) taxes, water charges and sewer rents, on the basis of the fiscal period for which assessed; (ii) fuel; (iii) interest on the existing mortgage; (iv) premiums on existing transferable insurance policies and renewals of those expiring prior to Closing; (v) vault charges; (vi) rents as and when collected.

(b) If Closing shall occur before a new tax rate is fixed, the apportionment of taxes shall be upon the basis of the tax rate for the immediately preceding fiscal period applied to the latest assessed valuation.

(c) If there is a water meter on the Premises, Seller shall furnish a final actual reading to a date not more than 30 days before Closing and the unfixed meter charge and sewer rent, if any, shall be apportioned on the basis of such last reading.

(d) If at the date of Closing the Premises are affected by an assessment which is or may become payable in annual installments, and the first installment is then a lien, or has been paid, then for the purposes of this contract all the unpaid installments shall be considered due and shall be paid by Seller at or prior to Closing.

(e) Any errors or omissions in computing apportionments or other adjustments at Closing shall be corrected within a reasonable time following Closing. This subparagraph shall survive Closing.

**19. Allowance for Unpaid Taxes, etc.** Seller has the option to credit Purchaser as an adjustment to the purchase price with the amount of any unpaid taxes, assessments, water charges and sewer rents, together with any interest and penalties thereon to a date not less that five business dates after Closing, provided the official bills therefor computed to said date are produced at Closing.

**20. Use of Purchase Price to Remove Encumbrances.** If at Closing there are other liens or encumbrances that Seller is obligated to pay or discharge, Seller may use any portion of the cash balance of the purchase price to pay or discharge them, provided Seller shall simultaneously deliver to Purchaser at Closing instruments in recordable form and sufficient to satisfy such liens or encumbrances of record, together with the cost of recording or filing said instruments. As an alternative Seller may deposit sufficient monies with the title insurance company employed by Purchaser acceptable to and required by it to assure their discharge, but only if the title insurance company will insure Purchaser's title clear of the matters or insure against their enforcement out of the Premises and will insure Purchaser's Institutional Lender clear of such matters. Upon reasonable prior notice (by telephone or otherwise), Purchaser shall provide separate certified or official bank checks as requested to assist in clearing up these matters.

**21. Title Examination; Seller's Inability to Convey; Limitations of Liability.**

(a) Purchaser shall order an examination of title in respect of the Premises from a title company licensed or authorized to issue title insurance by the New York State Insurance Department or any agent for such title company promptly after the execution of this contract or, if this contract is subject to the mortgage contingency set forth in paragraph 8, after a mortgage commitment has been accepted by Purchaser. Purchaser shall cause a copy of the title report and of any additions thereto to be delivered to the attorney(s) for Seller promptly after receipt thereof.

(b) (i) If at the date of Closing, Seller is unable to transfer title to Purchaser in accordance with this contract, or Purchaser has other valid grounds for refusing to close, whether by reason of liens, encumbrances or other objections to title or otherwise (herein collectively called "Defects"), other than those subject to which Purchaser is obligated to accept title hereunder or which Purchaser may have waived and other than those which Seller has herein expressly agreed to remove, remedy or discharge and if Purchaser shall be unwilling to waive the same and to close title without abatement of the purchase price, then, except as hereinafter set forth, Seller shall have the right, at Seller's sole election, either to take such action as Seller may deem advisable to remove, remedy, discharge or comply with such Defects or to cancel this contract; (ii) if Seller elects to take action to remove, remedy or comply with such Defects, Seller shall be entitled from time to time, upon Notice to Purchaser, to adjourn the date for Closing hereunder for a period or periods not exceeding 60 days in the aggregate (but not extending beyond the date upon which Purchaser's mortgage commitment, if any, shall expire), and the date for Closing shall be adjourned to a date specified by Seller not beyond such period. If for any reason whatsoever, Seller shall not have succeeded in removing, remedying or complying with such Defects at the expiration of such adjournment(s), and if Purchaser shall still be unwilling to waive the same and to close title without abatement of the purchase price, then either party may cancel this contract by Notice to the other given within 10 days after such adjourned date; (iii) notwithstanding the foregoing, the existing mortgage (unless this sale is subject to the same) and any matter created by Seller after the date hereof shall be released, discharged or otherwise cured by Seller at or prior to Closing.

(c) If this contract is cancelled pursuant to its terms, other than as a result of Purchaser's default, this contract shall terminate and come to an end, and neither party shall have any further rights, obligations or liabilities against or to the other hereunder or otherwise, except that: (i) Seller shall promptly refund or cause the Escrowee to refund the Downpayment to Purchaser and, unless cancelled as a result of Purchaser's default or pursuant to paragraph 8, to reimburse Purchaser for the net cost of examination of title, including any appropriate additional charges related thereto, and the net cost, if actually paid or incurred by Purchaser for updating the existing survey of the Premises or of a new survey, and (ii) the obligations under paragraph 27 shall survive the termination of this contract.

**22. Affidavit as to Judgments, Bankruptcies, etc.** If a title examination discloses judgments, bankruptcies or other returns against persons having names the same as or similar to that of Seller, Seller shall deliver an affidavit at Closing showing that they are not against Seller.

**23. Defaults and Remedies.**

(a) If Purchaser defaults hereunder, Seller's sole remedy shall be to receive and retain the Downpayment as liquidated damages, it being agreed that Seller's damages in case of Purchaser's default might be

impossible to ascertain and the Downpayment constitutes a fair and reasonable amount of damages under the circumstances and is not a penalty.

(b) If Seller defaults hereunder, Purchaser shall have such remedies as Purchaser shall be entitled to at law or in equity, including but not limited to, specific performance.

**24. Purchaser's Lien.** All money paid on account of this contract, and the reasonable expenses of examination of title to the Premises and of any survey and survey inspection charges are hereby made liens on the Premises, but such liens shall not continue after default by Purchaser under this contract.

**25. Notices.** Any notice or other communication ("Notice") shall be in writing and either:

(a) sent by either of the parties hereto or by their respective attorneys who are hereby authorized to do so on their behalf or by the Escrowee, by registered or certified mail, postage prepaid, or

(b) delivered in person or by overnight courier, with receipt acknowledged, to the respective addresses given in this contract for the party and the Escrowee, to whom the Notice is to be given, or to such other address as such party or Escrowee shall hereafter designate by Notice given to the other party or parties and the Escrowee pursuant in this paragraph. Each Notice mailed shall be deemed given on the third business day following the date of mailing the same, except that any Notice to Escrowee shall be deemed given only upon receipt by Escrowee and each Notice delivered in person or by overnight courier shall be deemed given when delivered, or

(c) with respect to paragraph 7(b) or paragraph 20, sent by fax to the party's attorney. Each Notice by fax shall be deemed given when transmission is confirmed by the sender's fax machine. A copy of each Notice sent to a party shall also be sent to the party's attorney. The attorneys for the parties are hereby authorized to give and receive on behalf of their clients all Notices and deliveries. This contract may be delivered as provided above or by ordinary mail.

**26. No Assignment.** This contract may not be assigned by Purchaser without the prior written consent of Seller in each instance and any purported assignment(s) made without such consent shall be void.

**27. Broker.** Seller and Purchaser each represents and warrants to the other that it has not dealt with any broker in connection with this sale other than Bluewater Capital Realty Corp. and Keller Williams of Greater Nassau ("Broker") and Seller shall pay Broker any commission earned pursuant to a separate agreement between Seller and Broker. Seller and Purchaser shall indemnify and defend each other against any costs, claims and expenses, including reasonable attorney's fees arising out of the breach on their respective parts of any representation or agreement contained in this paragraph. The provisions of this paragraph shall survive Closing or, if Closing does not occur the termination of this contract. In accordance with law, purchaser shall pay to their broker such commission as has been agreed upon between them; and seller shall pay commission to her broker pursuant to their agreement.

**28. Miscellaneous.**

(a) All prior understanding, agreements, representations and warranties, oral or written, between Seller and Purchaser are merged in this contract; it completely expresses their full agreement and has been entered into after full investigation, neither party relying upon any statement made by anyone else that is not set forth in this contract.

(b) Neither this contract nor any provision thereof may be waived, changed or cancelled except in writing. This contract shall also apply to and bind the heirs, distributees, legal representatives, successors and permitted assigns of the respective parties. The parties hereby authorize their respective attorneys to agree in writing to any changes in dates and time periods provided for in this contract.

(c) Any singular word or term herein shall also be read as in the plural and the neuter shall include the masculine and feminine gender, whenever the sense of this contract may require it.

(d) The captions in this contract are for convenience of reference only and in no way define, limit or describe the scope of this contract and shall not be considered in the interpretation of this or any provisions hereof.

(e) This contract shall not be binding or effective until duly executed and delivered by Seller and Purchaser.

(f) Seller and Purchaser shall comply with IRC reporting requirements, if applicable. This subparagraph shall survive Closing.

(g) Each party shall, at any time and from time to time, execute, acknowledge where appropriate and deliver such further instruments and documents and take such other action as may be reasonably requested by the other in order to carry out the intent and purpose of this contract. This subparagraph shall survive Closing.

(h) This contract is intended for the exclusive benefit of the parties hereto and except as otherwise expressly provided herein, shall not be for the benefit of, and shall not create any rights in, or be enforceable by any other person or entity.

(i) If applicable, the complete and fully executed disclosure of information on lead-based paint and/or lead-based paint hazards is attached hereto and made a part hereof.

Continued on Rider attached hereto. *(Delete if inapplicable)*

**In Witness Whereof,** this contract has been duly executed by the parties hereto.

Debbie A. Harris
DEBBIE A. HARRIS, SELLER

Debbie A. Harris

DocuSigned by:
Kelvin Endeavour 9/30/2025
KELVIN ENDEAVOUR, JR., PURCHASER

Signed by:
Kelsea N. Crockett 9/30/2025
KELSEA N. CROCKETT, PURCHASER

**Attorney for Seller: GARNETT SULLIVAN, ESQ.**

Address: 1080 Grand Avenue
South Hempstead, New York 11550

Tel.: (516) 285-1575

**Attorney for Purchaser: KAREN SONN, ESQ.**

Address: 22 Jordan Road, Hastings on Hudson, NY 10706 ~~26 Gramercy Park South, Unit 1A~~

~~New York, New York 10003~~
Email: karen@sonnassociates.com
Tel.: 917-838-7748

Receipt of the Downpayment is acknowledged and the undersigned agrees to act in accordance with the provisions of paragraph 6 above.

*Escrowee*

# Contract of Sale

**TITLE NO.**

DEBBIE A. HARRIS
TO
KELVIN ENDEAVOUR, JR. and KELSEA N. CROCKETT

**PREMISES**

| | |
|---|---|
| Sheet | |
| Section | |
| Block | 4678 |
| Lot | 7 |
| Plate | |
| County or Town | KINGS |
| Street Number | 814 Linden Blvd. |

## NOTES ON MORTGAGE COMMITMENT CONTINGENCY CLAUSE
for
## RESIDENTIAL CONTRACT OF SALE

1. WARNING: The mortgage Commitment contingency clause for the Residential Contract of Sale is a bar association form that attempts to provide a mechanism that makes the rights and obligations of the parties clear in sale of residences in ordinary circumstances. It should be reviewed carefully by Seller and Purchaser and their attorneys in each and every transaction to make sure that all the provisions are appropriate for that transaction. Negotiated modifications should be made whenever necessary.
2. Under the clause, the obligation of Purchaser to purchase under the contract of sale is contingent on Purchaser's obtaining a mortgage Commitment letter from an Institutional Lender within the number of days specified for the amount specified. This refers to calendar days. Seller's attorney should state his/her calculation of the Commitment Date in the letter delivering the executed contract to Purchaser's attorney, to prevent confusion later. Purchaser should promptly confirm or correct that date. In applying for a loan, Purchaser should inform its lender of the scheduled date of Closing in the contract and request that the expiration date of the Commitment occur after the scheduled dated of Closing. Purchaser must comply with deadlines and pursue the application in good faith. The Commitment contingency is satisfied by issuance of a Commitment in the amount specified on or before the Commitment Date, unless the Commitment is conditioned on approval of an appraisal. If the Commitment is conditioned on approval of an appraisal and such approval does not occur prior to the Commitment Date, Purchaser should either cancel the contract or obtain an extension of the Commitment Date. If the Commitment is later withdrawn or not honored, Purchaser runs the risk of being in default under the contract of sale with Seller.
3. If there are loan terms and conditions that are required or would not be acceptable to Purchaser, such as the interest rate, term of the loan, points, fees or a condition requiring sale of the current home, those terms and conditions should be specified in a rider.
4. This clause assumes that initial review and approval of Purchaser's credit will occur before the Commitment letter is issued. Purchaser should confirm with the lender that this is the case before applying for the Commitment.
5. If, as has been common, the Commitment letter itself is conditioned on sale of Purchaser's home or payment of any outstanding debt or no material adverse change in Purchaser's financial condition, such a Commitment will satisfy the contract contingency nonetheless, and Purchaser will take the risk of fulfilling those Commitment conditions, including forfeiture of the Downpayment if Purchaser defaults on its obligation to close. Under New York case law, a defaulting Purchaser may not recover any part of the Downpayment, and Seller does not have to prove any damages. If Purchaser is not willing to take that risk, the clause must be modified accordingly.
6. Purchaser may submit an application to registered Mortgage Broker instead of applying directly to an Institutional Lender.
7. This clause allows Seller to cancel if a Commitment is not accepted by Purchaser by the Commitment Date, unless Purchaser timely supplies a copy of the Commitment, to allow Seller the option to avoid having to wait until the scheduled date of Closing to see if Purchaser will be able to close. Seller may prefer to cancel rather than to wait and settle for forfeiture of the Downpayment if Purchaser defaults. Because of Seller's right to cancel, Purchaser may not waive this contingency clause. This clause means that Purchaser is subject to cancellation by Seller even if Purchaser is willing to risk that he/she will obtain the Commitment after the Commitment Date. Some Purchasers may not want to be subject to such cancellation by Seller.
8. Purchaser may want to add to paragraph 21(c) that Purchaser's reimbursement should include non-refundable financing and inspection expenses of Purchaser, which should be refunded by Seller if Seller willfully defaults under the contract of sale (alternative: If Seller is unable to transfer title under the contract of sale).

9-25-00
Joint Committee on the Mortgage Contingency Clause:
Real Property Section of the New York State Bar Association
Real Property Law Committee of the Association of the Bar of the City of New York
Real Property Committee of the New York County Lawyers Association

**RIDER ATTACHED TO AND MADE A PART OF**

**CONTRACT OF SALE DATED:** September **, 2025**

**SELLERS: DEBBIE A. HARRIS**

**PURCHASERS: KELVIN ENDEAVOUR, JR. and KELSEA N. CROCKETT**

**PREMISES: 814 Linden Blvd., Brooklyn, NY 11203**

29. All notices mailed to Seller must be sent to their attorney except Default Notices which must be sent to the attorney:

**GARNETT H. SULLIVAN, ESQ.**
Attorney-At-Law
1080 Grand Ave., South Hempstead, NY 11550

No notice shall be valid unless emailed to Seller's Attorney except Default Notices which must be emailed overnighted via federal express or ups to both the attorney receiving the Default Notice.

30. Should written notice of cancellation of this Contract be given by the Seller or the Purchaser of failure to secure a mortgage commitment, then upon the return to the Purchaser of all sums paid on an account herein, this Contract shall be null and void and of no further force and effect.

31. In the event the Purchaser's title inspection report shows any defect or objections to title not set forth herein which would render title unmarketable or uninsurable, Purchaser shall forward a copy of such objections or defects to Seller's attorney. Delivery via email to the

Sellers attorney of a title report shall constitute Notice of any title objections or defects. The Seller shall have a reasonable time thereafter to cure such objections or defects however, it shall be not more than 40 days past the closing date in the contract or when Purchasers FHA mortgage commitment expires. However, Seller shall not be required to bring any action or proceedings or otherwise in excess of 1% of the sales price, to render title marketable or insurable. The Purchaser may, nevertheless accept such title as Seller may be able to convey without any reduction or purchase price or credit allowance against the sale and without any other liability on the part of the Seller.

32. Anything to the contrary herein, notwithstanding if there are any notes or notices of violations against the premises at the date hereof, the Seller shall only be obligated to expend a maximum of $2,500.00 to remove said violations. If the cost of removing such violations exceeds the sum of $2,500.00, Seller may cancel this contract subject to Purchaser's right to accept title to the premises with such violations outstanding and a credit of $2,500.00 in reduction of the purchase price.

In the event of such cancellation, the sole liability of the Seller will be to refund the Purchaser the amount paid on account of the purchase price, and upon said refund, this Contract shall be null and void.

33. Purchaser is hereby given the right to have a termite inspection of the premises by a qualified exterminator within ten (10) days from the date hereof.

In the event that within said time, notice is given to the Seller that there is an infestation or damage, then the Seller shall have the option to either;

1. remove such infestation at his own expense, cure the damage and provide a one (1) year guarantee.

In the event no notice is emailed from Purchaser's attorney within fifteen (15) business days from the date hereof, then this provision shall not apply and this Contract shall no longer be subject to this provision. The term "termite" shall include all wood destroying insects.

34. The Seller shall not be responsible for or be obligated to pay in whole or in part, any expenses, fees, discounts or other charges in connection with the Purchaser obtaining a mortgage loan commitment.

35. The Seller shall not be implied to have consented to make any repairs or alteration of the premises which might be required by the lending institution in order to grant a mortgage on the premises unless otherwise stated herein.

36. All checks due at the closing of title from Purchaser to Seller shall be first-party checks only, and shall be made payable directly to the Seller. All checks over the aggregate amount of $500 shall be certified or bank checks or wire as the parties may agree.

38. The parties agree that if, for any reason whatsoever, except Seller's willful default, Seller is unable to fulfill any of the terms of this Contract, including but not limited to the delivery of a good and marketable title, Seller shall not be required to bring any action or proceeding or incur any expenses in order to fulfill the terms of this Contract other than spending up to 1% of the sales price to cure same. If the Purchaser refuses to waive performances on the part of the Seller with respect to those conditions in dispute, Seller may rescind this

Contract and upon returning to the Purchaser the sum paid on the signing of this Contract, and net title company expenses for the examination of the title to the premises, and the survey charge, for the examination of the title to the premises, up to a maximum of $1,000.00, all further liability on the part of the Seller shall cease and terminate and the Contract on the part of the Seller shall cease and terminate and this contract shall become null and void and be canceled and be of no further force and effect and the Seller are not liable for any other costs or damages whatsoever.

39. This Contract shall not be construed as an offer to sell by Seller, until Seller have agreed to all of the terms and conditions by signing this Contract.

40. In the event of any conflict between the terms of this rider and the terms contained in the printed form (NYBTU Form WCA-1 rev. 7/99) the terms of this Rider shall be controlling.

41. The Purchaser agrees to indemnify Seller and hold them harmless from any expense or liability resulting from Purchaser's breach of their representation in paragraph #27 of the Contract of Sale. This provision as well as paragraph #27 shall survive closing.

42. Seller agrees to execute a FIRPTA affidavit certifying that they are not foreign persons or Purchaser shall be entitled to withhold 15% of the sales price to satisfy potential liability pursuant to Section 897 (c) of the Internal Revenue Service Code.

43. Seller agrees to have an operational smoke detector and carbon monoxide devise installed in the premises in accordance with NYC Administration Code Title 27, Article 6, Subdivision 17.

44. Seller shall provide a certificate of occupancy or equivalent for a **TWO**-family dwelling and all improvements thereto at or prior to closing for the premises as it currently exists. It being understood however, that if the cost to procure the same, including the cost of any required repairs, alterations or renovations, shall exceed the sum of 1% of the sales price, then the Seller shall have the right to cancel this contract by written notice to the Purchaser on or before the time fixed for closing, in accordance with provisions set forth herein, and the escrow agent is hereby directed to refund to the Purchaser the monies paid on account of this contract. Seller shall not be responsible to provide to purchaser a certificate of occupancy for any of the following: open patios, decks, enclosed porches, above ground pools, car ports, treehouse, or barbeque hut which may be removed by seller without compensation to purchaser, if purchaser's lending institution requires a certificate of occupancy or certificate of compliance.

45. Notwithstanding anything contained in paragraph 16(f) of the standard contract above:

(a) the seller(s) maximum liability for the repair or replacement of any appliance shall not exceed Three Hundred and 00/100 ($300.00) Dollars per appliance; and

46. Seller agrees to make the following repairs upon the premises prior to closing:

(a) Repair damaged soffit

(b) Install transition strips between doorways

DEBBIE A. HARRIS, SELLER

DocuSigned by:
Kelvin Endeavour 9/30/2025
KELVIN ENDEAVOUR, JR., PURCHASER

Signed by:
Kelsea N. Crockett 9/30/2025
KELSEA N. CROCKETT, PURCHASER

**SUPPLEMENTAL RIDER TO RESIDENTIAL CONTRACT OF SALE BETWEEN**

**DEBBIE A. HARRIS, AS SELLER, AND KELVIN ENDEAVOUR JR. AND KELSEA N. CROCKETT, AS PURCHASER FOR THE PREMISES 814 LINDEN BLVD, BROOKLYN, NY 11203**

In the event of any inconsistency between the provisions of this Supplemental Rider (this "Supplemental Rider") and those contained in the Residential Contract of Sale or any riders attached thereto (collectively, the "Contract") the provisions of this Supplemental Rider shall govern and be binding.

1. Seller shall supply any documents (including prior title insurance policies and existing surveys, if any) and/or affidavits requested by Purchaser or Purchaser's title insurance company and required thereby for the issuance of title insurance policies to Purchaser and Purchaser's mortgagee.

2. Seller agrees to maintain the Premises (including without limitation, the shrubs and landscaping), until the Closing or delivery and possession, whichever shall later occur, in the same condition in which they are at present.

3. Seller warrants and represents that the Premises and all improvements thereon, have been constructed and are being operated in accordance with all applicable zoning, subdivision, building, fire, health and environmental regulations, ordinances and requirements. Seller further warrants and represents that a Certificate of Occupancy, any health departmental approvals required and a Board of Fire Underwriter's Certificate covering the Premises and all structures thereon have been fully issued and are in full force and effect, and that these certificates and approvals are not violated by the existing structures or the use thereof as a two family dwelling. Seller agrees to deliver to Purchaser said certificates and approvals at closing. Seller agrees to indemnify and hold Purchaser harmless from and against all loss, cost, liability, damages, and expenses (including, without limitation, reasonable attorneys' fees and disbursements), which Purchaser may sustain as a result of the breach, inaccuracy, untruthfulness or misrepresentation of the foregoing representations. This paragraph shall survive the closing.

4. Seller represents and warrants that the Premises contain no underground tanks for the storage of petroleum products or other chemicals; that, the Premises is not the site of any spill, deposit, or storage of any toxic or hazardous waste, chemical, or substance; and that, no hazardous materials, including but not limited to asbestos, mold, paint containing lead, or urea formaldehyde, or any other type of foam insulation, has been installed in the Premises.

5. The articles of personal property which are attached or appurtenant to or used in connection with the Premises are included in this sale and no part of the purchase price is attributed thereto.

~~6. It is agreed that Seller shall permit Purchaser and Purchaser's architect, engineer, decorator and/or other authorized persons to have the right of access to the Premises from time to~~

~~time, upon reasonable notice at reasonable times, between the date hereof and the Closing (or delivery and possession, whichever shall later occur).~~

~~7.~~6. Prior to Closing, Seller shall deliver to Purchaser a Certificate of Occupancy for all improvements presently existing on the Premises requiring same, or a letter from the municipality confirming that no Certificate of Occupancy is required.

~~8.~~7. Seller represents and warrants as of the date hereof:

(a) the Premises has been and is now being used in accordance with all applicable zoning, subdivision, building, fire, health and environmental regulations, ordinances and has obtained all permits, if any, as required and the Premises and the present use and condition thereof do not violate any applicable deed restrictions or other covenants, restrictions or agreements applicable to the Premises;

(b) no notes or notices of violation of law or municipal ordinances or of Federal, State, County or Municipal or other governmental agency regulations, orders or requirements relating to the Premises have been entered or received by Seller and Seller has no reason to believe that any such note or notice may or will be entered;

(c) there is no action or proceeding (zoning or otherwise) or governmental investigation pending, or, to the knowledge of Seller, threatened against or relating to Seller, the Premises or the transactions contemplated by this Contract, nor, to the knowledge of Seller, is there any basis for such action;

(d) Seller is the sole owner of record and beneficial title to the Premises, free and clear of all liens and encumbrances, and Seller has full authority to transfer title to the Premises pursuant to this Contract. Except as specified herein, no person, firm or entity has any right to acquire the Premises or any rights or estates in and to the Premises;

(e) the execution of the Contract and Seller's performance hereunder does not violate any judgment, order, injunction, decree or award of any court, administrative agency or governmental body applicable to Seller or the Premises;

(f) the Premises are not located in a "wetlands" area; and

(g) the Premises are not located in a flood hazard area as defined by the Federal Insurance Administration.

Seller acknowledges that each of the representations, warranties and agreements made by it in this Paragraph ___ and elsewhere in this Contract is material to the Purchaser. All of the representations, warranties and agreements set forth herein and elsewhere in the Contract and this Supplemental Rider shall be true upon the execution of the Contract, shall be deemed to be repeated at and as of the date of the Closing and shall not survive the Closing. Without limiting any of the rights of Purchaser elsewhere provided for in the Contract, it is agreed that the obligation of Purchaser to close title under this Contract is conditioned upon the accuracy and completeness of all of Seller's warranties and representations and the due compliance by Seller of all of their agreements set forth herein and elsewhere in the Contract and this Supplemental Rider.

~~9.~~8. Paragraph 16(e) is amended to include that the heating, air conditioning, alarm systems, generator, sprinkler, electrical, mechanical systems and all appliances shall all be in working order and that the roof and basement, if any, shall be free of leaks at the time of Closing.

~~10.~~9. Prior to the Closing or delivery and possession, whichever shall later occur, Seller, at its own expense, shall remove the personal property located at the Premises and not included in the sale contemplated hereby and shall repair or provide an appropriate credit to Purchaser for all damage to the Premises resulting from the removal of such personal property. Any of Seller's personal property not included in the sale contemplated hereby which is not removed from the Premises shall be deemed abandoned property. Purchaser may (but shall not be obligated to), at Seller's risk and expense, cause any such abandoned property to be removed from the Premises. The provisions of this paragraph shall survive the Closing.

~~11.~~10. Supplementing and modifying paragraph 21 of the Contract, notwithstanding anything to the contrary contained in paragraph 21:

(a) Seller shall pay or discharge: (i) all Defects (other than mortgages) provided the cost to discharge the same does not exceed (i) one percent of the sales price and (ii) all mortgages, judgments, tax liens and other consensual items; and

~~(b) Add the phrase "and all reasonable engineer's fees and other costs and expenses incurred by Purchaser in connection with the inspection of the Premises" after the words "of a new survey" on line 8 of clause (c).~~

~~12.~~11. Intentionally omitted.

~~13.~~12. Each party shall sign all documents, which may be necessary for the payment of the New York State Transfer Tax and Mansion Tax . Seller shall pay the New York State Transfer Tax and Purchaser shall pay the Mansion Tax and shall not claim any exemptions thereof. This obligation shall survive Closing.

~~14.~~13. The parties hereto agree that Seller or its attorney shall be responsible for the completion and filing of Form 1099S or such other successor form as may be prescribed by the Internal Revenue Service and for fulfilling all the obligations and requirements of Section 6045(e) of the Internal Revenue Code of 1986, as amended.

~~15.~~14. This Contract shall be deemed executed when signed by the parties hereto notwithstanding that the Brokers' signatures on the Disclosure of Information on Lead-Based Paint and Lead-Based Paint Hazards have not yet been obtained.

~~16.~~15. Seller and Purchaser hereby agree to indemnify, defend and hold the other harmless from and against any and all claims, demands, causes of action, losses, costs and expenses (including reasonable attorneys' fees, court costs and disbursements) arising from any claim for commission, fees or other compensation or reimbursement for expenses made by any broker (including the Brokers) engaged by or claiming to have dealt with Seller and Purchaser in connection with the Purchase Agreement or the transactions contemplated thereby. The terms of this paragraph shall survive closing.

~~17.~~16. Purchaser shall have the opportunity to have the Premises inspected for termites, mold and asbestos within 15 days of contract date. Seller will cooperate in making the Premises available for such inspections. Purchaser shall furnish to Seller written notice (an "Objection Notice") containing a list of specific deficiencies relating to termites, mold and asbestos and the corrections needed, together with a copy of the inspection report(s). Seller shall respond to Purchaser, within five (5) calendar days after receipt of an Objection Notice, and indicate whether or not Seller will, at its sole cost and expense, remedy such items to which Purchaser objects. If no notice is received by Purchaser within said five (5) calendar days, or if Seller elects to so remedy, Seller shall effectuate such remedy, at its sole cost and expense, to Purchaser's reasonable satisfaction, prior to Closing. If Seller does not elect to remedy, at its sole cost and expense, any item to which Purchaser objects, Purchaser may, within five (5) calendar days after receipt of Seller's notice, either (i) elect to proceed with the Closing or (ii) elect to terminate the Contract, in which event the Downpayment (and all interest thereon) shall be disbursed to Purchaser within three (3) days after such termination, and neither Seller nor Purchaser shall have any further rights, claims or obligations with respect to one another arising out of the Contract.

~~18.~~17. At or prior to the Closing, Seller will deliver to Purchaser any warranties, instruction manuals, appliance information, maintenance contracts, floor plans, surveys and contact information for service providers and contractors who performed work to the Premises, to the extent same are in Seller's possession. Seller agrees to cooperate with Purchaser in order to obtain documents and information for work performed and the appliances installed in the Premises.

~~19. Seller represents and warrants that there is no damage (other than reasonable wear and tear) to any part of the Premises which is covered, hidden, concealed or which it was impracticable for Purchaser to view or inspect prior to the date hereof. In the event such damage is revealed prior to Closing, Seller agrees to repair same prior to Closing or establish a reasonable allowance or credit to Purchaser at Closing or a reasonable escrow to cover the cost or necessary repair or replacement. Seller represents that the flooring underneath any personal property to be removed will be of the same character and condition as the exposed flooring, normal wear, tear and fading excepted.~~

~~20.~~18. Supplementing and modifying paragraph 25 of the Contract, Seller and Purchaser do hereby authorize their respective attorneys to act on their behalf with regard to sending or receiving any Notices EXCEPT DEFAULT NOTICES to be given or received by any of the parties hereto and expressly grant the attorneys the authority to request and grant any extension of time period provided in the Contract or this Supplemental Rider VIA EMAIL. Any Notices required to be given may be sent to or received by the attorneys for the respective parties (as listed below) with the same force and effect as if the said Notices were sent or received by the relevant party hereto.

This contract may be executed by DOCUSIGN and/or "PDF" and/or in one or more counterparts, each of which when so executed and delivered shall be deemed an original, but all of which taken together shall constitute but one and the same original.

~~21.~~19. In the event of the death of either Purchaser, then the surviving Purchaser, shall have the sole right to terminate this Contract, provided written notice of termination is sent within thirty (30) days after the occurrence of such death. In the event of the exercise of said right of cancellation, Seller shall immediately return to said surviving Purchaser, all monies deposited

hereunder by Purchaser on account of the purchase price. Upon such refund being made, this Contract shall be null and void and of no further force and effect and all rights, obligations and liabilities of the parties hereunder shall cease and come to an end.

~~22.~~20. Seller and Purchaser agree that the Purchaser is applying for a FHA loan and Seller agrees to cooperate with same. The parties agree that in the event the lender does not fund for any reason other than Purchasers willful default, Seller shall refund the Contract Deposit and return the deposit monies to Purchaser, and upon return and clearance, the parties shall have no further rights or liabilities to one another. Purchasers failure to notify Seller of the Institutional Lender's issuance of a Loan Commitment letter shall not be grounds for Seller to keep Purchasers deposit. Purchaser shall cooperate with Seller as well.

**[Remainder of page intentionally left blank - Signature page follows]**

IN WITNESS WHEREOF, the parties hereto have executed this Supplemental Rider as of the date first above written.

**SELLER:**

[signature]

________________________

**PURCHASER:**

DocuSigned by:
Kelvin Endeavour 9/30/2025
F64FC10DBEE7414...
Signed by:
Kelsea N. Crockett 9/30/2025
382238160CEF475...

**Disclosure of Information on Lead-Based Paint and/or Lead-Based Paint Hazards**

**Lead Warning Statement**

*Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.*

**Seller's Disclosure**

(a) Presence of lead-based paint and/or lead-based paint hazards (check (i) or (ii) below):

(i) ______ Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

______________________________________________

(ii) DAH Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b) Records and reports available to the seller (check (i) or (ii) below):

(i) ______ Seller has provided the purchaser with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below).

______________________________________________

(ii) ______ Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Purchaser's Acknowledgment** (initial)

(c) LE KNC Purchaser has received copies of all information listed above.

(d) LE KNC Purchaser has received the pamphlet *Protect Your Family from Lead in Your Home.*

(e) Purchaser has (check (i) or (ii) below):

(i) LE KNC received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or

(ii) ______ waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

**Agent's Acknowledgment** (initial)

(f) ________ Agent has informed the seller of the seller's obligations under 42 U.S.C. 4852(d) and is aware of his/her responsibility to ensure compliance.

**Certification of Accuracy**

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

| | | | |
|---|---|---|---|
| Debbie A H [signature] | 10/1/25 | | |
| Seller | Date | Seller | Date |
| DocuSigned by: Kelvin Endeavour [signature] | 9/30/2025 | Signed by: Kelsea K. Crockett | 9/30/2025 |
| Purchaser | Date | Purchaser | Date |
| [signature] | 10/1/2025 | | |
| Agent | Date | Agent | Date |

Cullen | Dykman

Cullen and Dykman LLP
The Omni Building
333 Earle Ovington Boulevard, 2nd Floor
Uniondale, New York 11553
T: 516.357.3700
F: 516.357.3792

***Bonnie L. Pollack, Esq.***
*Partner*
*Direct Dial: (516) 296-9143*
*bpollack@cullenllp.com*

January 20, 2026

**VIA ECF**

Chambers of the Honorable Jil Mazer-Marino
U.S. Bankruptcy Court, EDNY
271-C Cadman Plaza East - Suite 1595
Brooklyn, NY 11201-1800

Re: 2281 Church Avenue LLC
Case No. 24-43449 (JMM)

Dear Judge Mazer-Marino:

On January 20, 2026, the undersigned filed a letter on behalf of Flushing Bank respecting the defaults of the Debtor under various Orders (as defined in the January 20 Letter). This letter is written in response to the letter of Debtor's counsel filed this morning. The Debtor has unequivocally failed to make the required payments due to Flushing Bank in the January Order. Debtor's counsel was provided proof of the outstanding payments by me on January 7, 2026, attached hereto and filed on ECF on that same date. He was further advised on January 8, 2026 that it is Bank policy not to accept cash deposits from anyone other than the Borrower, which Ms. Harris is not. Since that communication (also attached), the Debtor has completely ignored this issue. Furthermore, since the entry of the October Order, the Debtor has filed two versions of a Plan which do not comply with the terms of the October Order and has not revised same despite numerous comments by the undersigned. Finally, Debtor's counsel's excuse regarding his move has been stale for quite some time. The fact that he may be disorganized is not Flushing's load to bear.

It is indisputable that the Debtor is in default of the Orders in several respects. This case has been pending for a year and a half with no meaningful progress, and with consistent defaults in payment to Flushing Bank. As required by the Orders, it is respectfully submitted that the case should be converted to one under chapter 7.

Thank you for your continued courtesies and consideration with this matter.

Respectfully,

*Bonnie Pollack*

Bonnie L. Pollack

**Rodriguez, Carolina**

| | |
|---|---|
| **From:** | Pollack, Bonnie |
| **Sent:** | Wednesday, January 7, 2026 10:26 AM |
| **To:** | KD; Gerard R. Luckman |
| **Subject:** | Church Avenue |
| **Attachments:** | Further letter responding to extension request(35409516.1).pdf; 2281 Church Ave - DIP Checking Transaction @ 1.6.2026.pdf |

Please see the attached filed on ECF. All rights of Flushing Bank in connection with this matter are reserved.

**Bonnie Pollack**
Partner
**Cullen and Dykman LLP**
333 Earle Ovington Boulevard, 2nd Floor
Uniondale, New York 11553
T: 516.296.9143 | F: 516.357.3792
E: bpollack@cullenllp.com
Pronouns: She/Her

ATTORNEY-CLIENT PRIVILEGED COMMUNICATION - DO NOT FORWARD OR COPY - CONFIDENTIALITY NOTICE: The contents of this e-mail message and any attachments are intended solely for the personal and confidential use of the recipient(s) named above. This communication is intended to be and to remain confidential and may be subject to applicable attorney/client and/or work product privileges. If you are not the intended recipient of this message, or if this message has been addressed to you in error, please immediately alert the sender by reply e-mail and then delete this message and its attachments.

Cullen | Dykman

Cullen and Dykman LLP
The Omni Building
333 Earle Ovington Boulevard, 2nd Floor
Uniondale, New York 11553
T: 516.357.3700
F: 516.357.3792

***Bonnie L. Pollack, Esq.***
*Partner*
*Direct Dial: (516) 296-9143*
*bpollack@cullenllp.com*

January 7, 2026

**VIA ECF**

Chambers of the Honorable Jil Mazer-Marino
U.S. Bankruptcy Court, EDNY
271-C Cadman Plaza East - Suite 1595
Brooklyn, NY 11201-1800

Re: 2281 Church Avenue LLC
Case No. 24-43449 (JMM)

Dear Judge Mazer-Marino:

Yesterday, Debtor's counsel filed a sworn affirmation stating that the Debtor is not behind in their payments to Flushing Bank. He did so after being advised by me that is not the case, and after being advised that the Debtor has incorrectly taken this position in the past. I advised Mr. Dahiya that while there may be payments in any given month, they are making up for old payments that were missed, and that the Debtor is always at least one, and often several, months behind (i.e., a payment in November actually paying September). To say that the Debtor has made these same allegations to Flushing Bank, and Flushing Bank has provided evidence refuting same, numerous times is a vast understatement.

After the filing of the affirmation, I provided Mr. Dahiya with the attached statement, showing that the Debtor is indeed delinquent in its payments for November, December and January. I requested his immediate retraction of the untrue affirmation. Mr. Dahiya has not done so. We have reserved our rights against Mr. Dahiya based on this, but I felt that your Honor should be aware of this issue before ruling on the requested extension of time by the Debtor.

Thank you for your courtesies and consideration with this matter.

Respectfully,

*Bonnie Pollack*

Bonnie L. Pollack

cc: Karima Dahiya, Esq. (via email)
Gerard Luckman, Esq. (via email)

HIS 01/06/26 ND 2080
2281 CHURCH AVE LLC
TOTAL DEBITS : 77 258589.04 TOTAL CREDITS : 32 261666.43
ALL TRANSACTIONS BY DATE STATEMENT DATE : 1/06/26

| TR-DT | EF-DT | TRCD/DESCRIPTION | | NONCK | AMOUNT | BALANCE | |
|---|---|---|---|---|---|---|---|
| 01/01/25 | | BALANCE FORWARD ---------> | | | | 1425.27 | |
| 01/02/25 | 01/02/25 | DM8S NISSANFINANCE | BILLPAY | * | 1145.00 | 280.27 | |
| 01/02/25 | 01/02/25 | DM8S PAYMENTUS | BILLPAY | * | 3.90 | 276.37 | |
| 01/24/25 | 01/24/25 | MD5S DEPOSIT | | * | 24870.00 | 25146.37 | |
| 01/29/25 | 01/29/25 | DM8S Flushing | Flushing | * | 19194.10 | 5952.27 | January 1, 2025 PAYMENT |
| 01/29/25 | 01/29/25 | DM8S MORTGAGE SERV CT | MTG PAYMT | * | 3364.61 | 2587.66 | |
| 01/31/25 | 01/31/25 | ID@ INTEREST PAID | | * | 0.00 | 2587.66 | |
| 02/06/25 | 02/06/25 | MD5S DEPOSIT | | * | 7320.00 | 9907.66 | |
| 02/07/25 | 02/06/25 | CF0S CHECK NUMBER | | 102 | 1500.00 | 8407.66 | |
| 02/07/25 | 02/06/25 | CF0S CHECK NUMBER | | 150 | 600.00 | 7807.66 | |
| 02/13/25 | 02/12/25 | CF0S CHECK NUMBER | | 101 | 600.00 | 7207.66 | |
| 02/13/25 | 02/13/25 | MD5S DEPOSIT | | * | 6210.00 | 13417.66 | |
| 02/20/25 | 02/19/25 | CF0S CHECK NUMBER | | 103 | 600.00 | 12817.66 | |
| 02/28/25 | 02/28/25 | MD1S DEPOSIT | | * | 7500.00 | 20317.66 | |
| 02/28/25 | 02/28/25 | ID@ INTEREST PAID | | * | 0.00 | 20317.66 | |
| 03/03/25 | 02/28/25 | CF0S CHECK NUMBER | | 104 | 600.00 | 19717.66 | |
| 03/04/25 | 03/04/25 | DM8S Flushing | Flushing | * | 19194.10 | 523.56 | February 1, 2025 PAYMENT |
| 03/05/25 | 03/05/25 | MD5S DEPOSIT | | * | 3740.00 | 4263.56 | |
| 03/07/25 | 03/06/25 | CF0S CHECK NUMBER | | 106 | 600.00 | 3663.56 | |
| 03/10/25 | 03/10/25 | MD5S DEPOSIT | | * | 7230.00 | 10893.56 | |
| 03/12/25 | 03/11/25 | CF0S CHECK NUMBER | | 105 | 2500.00 | 8393.56 | |
| 03/13/25 | 03/12/25 | CF0S CHECK NUMBER | | 107 | 600.00 | 7793.56 | |
| 03/21/25 | 03/20/25 | CF0S CHECK NUMBER | | 108 | 600.00 | 7193.56 | |
| 03/27/25 | 03/26/25 | CF0S CHECK NUMBER | | 109 | 600.00 | 6593.56 | |
| 03/28/25 | 03/28/25 | MD5S DEPOSIT | | * | 9800.00 | 16393.56 | |
| 03/31/25 | 03/31/25 | ID@ INTEREST PAID | | * | 0.00 | 16393.56 | |
| 04/01/25 | 04/01/25 | MD5S DEPOSIT | | * | 6600.00 | 22993.56 | |
| 04/03/25 | 04/02/25 | CF0S CHECK NUMBER | | 110 | 600.00 | 22393.56 | |
| 04/09/25 | 04/09/25 | MD5S DEPOSIT | | * | 12156.43 | 34549.99 | |
| 04/09/25 | 04/09/25 | DM8S Flushing | Flushing | * | 19182.60 | 15367.39 | March 1, 2025 PAYMENT |
| 04/11/25 | 04/10/25 | CF0S CHECK NUMBER | | 111 | 600.00 | 14767.39 | |
| 04/17/25 | 04/16/25 | CF0S CHECK NUMBER | | 112 | 600.00 | 14167.39 | |
| 04/24/25 | 04/23/25 | CF0S CHECK NUMBER | | 113 | 600.00 | 13567.39 | |
| 04/24/25 | 04/24/25 | MD5S DEPOSIT | | * | 6750.00 | 20317.39 | |
| 04/28/25 | 04/28/25 | MD5S DEPOSIT | | * | 6700.00 | 27017.39 | |
| 04/29/25 | 04/29/25 | DM8S Flushing | Flushing | * | 19182.60 | 7834.79 | April 1, 2025 PAYMENT |
| 04/30/25 | 04/30/25 | ID@ INTEREST PAID | | * | 0.00 | 7834.79 | |
| 05/02/25 | 05/01/25 | CF0S CHECK NUMBER | | 114 | 600.00 | 7234.79 | |
| 05/09/25 | 05/08/25 | CF0S CHECK NUMBER | | 115 | 600.00 | 6634.79 | |
| 05/13/25 | 05/13/25 | MD5S DEPOSIT | | * | 8370.00 | 15004.79 | |
| 05/15/25 | 05/14/25 | CF0S CHECK NUMBER | | 116 | 600.00 | 14404.79 | |
| 05/15/25 | 05/15/25 | MD0S DEPOSIT | | * | 5000.00 | 19404.79 | |
| 05/19/25 | 05/19/25 | DM8S Flushing | Flushing | * | 19182.60 | 222.19 | May 1, 2025 PAYMENT |
| 05/28/25 | 05/28/25 | DD7S Transfer from #8253 | | * | 3200.00 | 3422.19 | |
| 05/28/25 | 05/28/25 | MD5S DEPOSIT | | * | 3700.00 | 7122.19 | |
| 05/29/25 | 05/28/25 | CF0S CHECK NUMBER | | 118 | 600.00 | 6522.19 | |
| 05/31/25 | 05/31/25 | ID@ INTEREST PAID | | * | 0.00 | 6522.19 | |
| 06/06/25 | 06/05/25 | CF0S CHECK NUMBER | | 119 | 600.00 | 5922.19 | |
| 06/12/25 | 06/11/25 | CF0S CHECK NUMBER | | 120 | 2000.00 | 3922.19 | |
| 06/12/25 | 06/11/25 | CF0S CHECK NUMBER | | 122 | 600.00 | 3322.19 | |
| 06/13/25 | 06/13/25 | MD5S DEPOSIT | | * | 6650.00 | 9972.19 | |
| 06/20/25 | 06/18/25 | CF0S CHECK NUMBER | | 121 | 600.00 | 9372.19 | |
| 06/25/25 | 06/25/25 | MD5S DEPOSIT | | * | 7900.00 | 17272.19 | |
| 06/26/25 | 06/25/25 | CF0S CHECK NUMBER | | 123 | 600.00 | 16672.19 | |
| 06/30/25 | 06/30/25 | ID@ INTEREST PAID | | * | 0.00 | 16672.19 | |
| 07/03/25 | 07/03/25 | MD1S DEPOSIT | | * | 4420.00 | 21092.19 | |
| 07/07/25 | 07/03/25 | CF0S CHECK NUMBER | | 124 | 6.00 | 21086.19 | |
| 07/08/25 | 07/08/25 | DW8S | | * | 594.00 | 20492.19 | |
| | | Check # 124 las $6.00 sb $600.00 | | | | | |
| 07/09/25 | 07/09/25 | MD1S DEPOSIT | | * | 4250.00 | 24742.19 | |
| 07/11/25 | 07/11/25 | DM8S Flushing | Flushing | * | 19182.60 | 5559.59 | June 1, 2025 Payment |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 07/14/25 | 07/11/25 | CF0S | CHECK NUMBER | | 125 | | 600.00 | 4959.59 | |
| 07/16/25 | 07/16/25 | MD1S | DEPOSIT | | | * | 10200.00 | 15159.59 | |
| 07/17/25 | 07/16/25 | CF0S | CHECK NUMBER | | 151 | | 600.00 | 14559.59 | |
| 07/17/25 | 07/17/25 | MD1S | DEPOSIT | | | * | 2500.00 | 17059.59 | |
| 07/23/25 | 07/23/25 | DM8S | HARLAND CLARKE | CHK ORDER | | * | 35.78 | 17023.81 | |
| 07/25/25 | 07/24/25 | CF0S | CHECK NUMBER | | 152 | | 600.00 | 16423.81 | |
| 07/28/25 | 07/25/25 | CF0S | CHECK NUMBER | | 153 | | 7497.82 | 8925.99 | |
| 07/28/25 | 07/28/25 | MD5S | DEPOSIT | | | * | 5400.00 | 14325.99 | |
| 07/30/25 | 07/29/25 | CF0S | CHECK NUMBER | | 155 | | 600.00 | 13725.99 | |
| 07/31/25 | 07/31/25 | ID@ | INTEREST PAID | | | * | 0.00 | 13725.99 | |
| 08/06/25 | 08/06/25 | MD5S | DEPOSIT | | | * | 9170.00 | 22895.99 | |
| 08/07/25 | 08/06/25 | CF0S | CHECK NUMBER | | 158 | | 600.00 | 22295.99 | |
| 08/11/25 | 08/11/25 | DM8S | Flushing | Flushing | | * | 19182.60 | 3113.39 | July 1, 2025 PAYMENT |
| 08/12/25 | 08/12/25 | MD5S | DEPOSIT | | | * | 4900.00 | 8013.39 | |
| 08/15/25 | 08/14/25 | CF0S | CHECK NUMBER | | 159 | | 600.00 | 7413.39 | |
| 08/21/25 | 08/20/25 | CF0S | CHECK NUMBER | | 160 | | 600.00 | 6813.39 | |
| 08/25/25 | 08/22/25 | CF0S | CHECK NUMBER | | 161 | | 2500.00 | 4313.39 | |
| 08/28/25 | 08/27/25 | CF0S | CHECK NUMBER | | 162 | | 600.00 | 3713.39 | |
| 08/31/25 | 08/31/25 | ID@ | INTEREST PAID | | | * | 0.00 | 3713.39 | |
| 09/04/25 | 09/04/25 | DM8S | FIRST INSURANCE | INSURANCE | | * | 2421.26 | 1292.13 | |
| 09/05/25 | 09/04/25 | CF0S | CHECK NUMBER | | 163 | | 600.00 | 692.13 | |
| 09/10/25 | 09/09/25 | CF0S | CHECK NUMBER | | 164 | | 600.00 | 92.13 | |
| 09/15/25 | 09/15/25 | MD1S | DEPOSIT | | | * | 11170.00 | 11262.13 | |
| 09/18/25 | 09/17/25 | CF0S | CHECK NUMBER | | 165 | | 600.00 | 10662.13 | |
| 09/25/25 | 09/25/25 | DM8S | FIRST INSURANCE | INSURANCE | | * | 2305.96 | 8356.17 | |
| 09/26/25 | 09/25/25 | CF0S | CHECK NUMBER | | 166 | | 600.00 | 7756.17 | |
| 09/30/25 | 09/30/25 | ID@ | INTEREST PAID | | | * | 0.00 | 7756.17 | |
| 10/03/25 | 10/02/25 | CF0S | CHECK NUMBER | | 167 | | 600.00 | 7156.17 | |
| 10/06/25 | 10/06/25 | MD1S | DEPOSIT | | | * | 10670.00 | 17826.17 | |
| 10/10/25 | 10/09/25 | CF0S | CHECK NUMBER | | 168 | | 600.00 | 17226.17 | |
| 10/10/25 | 10/10/25 | MD1S | DEPOSIT | | | * | 9250.00 | 26476.17 | |
| 10/16/25 | 10/16/25 | DM8S | Flushing | Flushing | | * | 19182.60 | 7293.57 | August 1, 2025 PAYMENT |
| 10/17/25 | 10/16/25 | CF0S | CHECK NUMBER | | 169 | | 600.00 | 6693.57 | |
| 10/20/25 | 10/20/25 | MD5S | DEPOSIT | | | * | 6900.00 | 13593.57 | |
| 10/23/25 | 10/22/25 | CF0S | CHECK NUMBER | | 170 | | 600.00 | 12993.57 | |
| 10/27/25 | 10/27/25 | DM8S | FIRST INSURANCE | INSURANCE | | * | 2305.96 | 10687.61 | |
| 10/29/25 | 10/29/25 | MD1S | DEPOSIT | | | * | 12000.00 | 22687.61 | |
| 10/30/25 | 10/29/25 | CF0S | CHECK NUMBER | | 171 | | 600.00 | 22087.61 | |
| 10/31/25 | 10/31/25 | ID@ | INTEREST PAID | | | * | 0.00 | 22087.61 | |
| 11/03/25 | 11/03/25 | DM8S | Flushing | Flushing | | * | 19182.60 | 2905.01 | September 1, 2025 PAYMENT |
| 11/07/25 | 11/06/25 | CF0S | CHECK NUMBER | | 172 | | 600.00 | 2305.01 | |
| 11/10/25 | 11/10/25 | MD5S | DEPOSIT | | | * | 11670.00 | 13975.01 | |
| 11/14/25 | 11/13/25 | CF0S | CHECK NUMBER | | 175 | | 600.00 | 13375.01 | |
| 11/17/25 | 11/14/25 | CF0S | CHECK NUMBER | | 176 | | 1000.00 | 12375.01 | |
| 11/17/25 | 11/14/25 | CF0S | CHECK NUMBER | | 174 | | 1500.00 | 10875.01 | |
| 11/21/25 | 11/20/25 | CF0S | CHECK NUMBER | | 177 | | 600.00 | 10275.01 | |
| 11/25/25 | 11/25/25 | DM8S | FIRST INSURANCE | INSURANCE | | * | 2305.96 | 7969.05 | |
| 11/28/25 | 11/26/25 | CF0S | CHECK NUMBER | | 179 | | 2000.00 | 5969.05 | |
| 12/01/25 | 11/28/25 | CF0S | CHECK NUMBER | | 180 | | 600.00 | 5369.05 | |
| 11/30/25 | 11/30/25 | ID@ | INTEREST PAID | | | * | 0.00 | 5369.05 | |
| 12/05/25 | 12/04/25 | CF0S | CHECK NUMBER | | 181 | | 600.00 | 4769.05 | |
| 12/10/25 | 12/09/25 | CF0S | CHECK NUMBER | | 183 | | 1386.55 | 3382.50 | |
| 12/10/25 | 12/10/25 | MD5S | DEPOSIT | | | * | 19820.00 | 23202.50 | |
| 12/11/25 | 12/10/25 | CF0S | CHECK NUMBER | | 184 | | 600.00 | 22602.50 | |
| 12/11/25 | 12/11/25 | DM8S | Flushing | #Flushing | | U* | 18932.93 | 3669.57 | October 1, 2025 PAYMENT |
| 12/18/25 | 12/17/25 | CF0S | CHECK NUMBER | | 185 | | 600.00 | 3069.57 | |
| 12/24/25 | 12/23/25 | CF0S | CHECK NUMBER | | 186 | | 600.00 | 2469.57 | |
| 12/29/25 | 12/29/25 | DM8S | FIRST INSURANCE | INSURANCE | | * | 2305.96 | 163.61 | |
| 12/31/25 | 12/31/25 | MD1S | DEPOSIT | | | * | 5650.00 | 5813.61 | |
| 12/31/25 | 12/31/25 | ID@ | INTEREST PAID | | | * | 0.00 | 5813.61 | |
| 01/05/26 | 01/02/26 | CF0S | CHECK NUMBER | | 188 | | 600.00 | 5213.61 | |
| 01/05/26 | 01/02/26 | CF0S | CHECK NUMBER | | 187 | | 710.95 | 4502.66 | |

**From:** Pollack, Bonnie
**To:** KD
**Subject:** RE: [EXTERNAL]about Flushing payments

Karam- I have confirmed with the Bank that as a policy, it does not accept cash. The Debtor needs to deposit the cash into their account and they can do a transfer payment issue a bank check.

Thank you.

**Bonnie Pollack**
Partner
**Cullen and Dykman LLP**
333 Earle Ovington Boulevard, 2nd Floor
Uniondale, New York 11553
T: 516.296.9143 | F: 516.357.3792
E: bpollack@cullenllp.com
Pronouns: She/Her

ATTORNEY-CLIENT PRIVILEGED COMMUNICATION - DO NOT FORWARD OR COPY - CONFIDENTIALITY NOTICE: The contents of this e-mail message and any attachments are intended solely for the personal and confidential use of the recipient(s) named above. This communication is intended to be and to remain confidential and may be subject to applicable attorney/client and/or work product privileges. If you are not the intended recipient of this message, or if this message has been addressed to you in error, please immediately alert the sender by reply e-mail and then delete this message and its attachments.

**From:** KD <karam@dahiya.law>
**Sent:** Thursday, January 8, 2026 10:24 AM
**To:** Pollack, Bonnie <bpollack@cullenllp.com>
**Subject:** [EXTERNAL]about Flushing payments

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

I received the following message from the client's rep about the deposits. Can you please speak to your client branch to accept the monies, as the tenants pays in cash. Ms. Harris had been complaining about how Flushing Bank has not been accepting the full cash payments resulting in these late payments. Thank you.

Ms. Harris is headed to the bank again.
Dear Counsel,

I am writing to provide further clarification regarding the ongoing deposit issues we have experienced with Flushing Bank, which have affected the timing of mortgage payments.

In September, I went to Flushing Bank to deposit a total of $18,000 into the debtor-in-possession account held under 2281 Church Ave. LLC. Of that amount, $11,000 was in cash, and the remaining amount was in checks. Flushing Bank accepted all of the checks

but refused to accept the cash portion of the deposit because my name is not listed on the account, despite my providing valid identification and my Social Security number.

As a result, I was forced to deposit the $11,000 cash into a separate regular account. I then had to write a check for $11,000 from that account and return to Flushing Bank weeks later to deposit the check into the debtor-in-possession account. Only after completing this process was I able to proceed with paying the mortgage.

This extra and unnecessary step caused a delay in the availability of funds in the debtor-in-possession account and directly impacted the timing of the mortgage payment. The delay was not due to lack of funds or unwillingness to pay, but solely due to Flushing Bank's refusal to accept cash deposits from me, even when proper identification was provided.

I am documenting this to ensure there is a clear record that the payment delays were caused by banking restrictions and procedural issues outside of my control.

Please let me know if you require any additional details or documentation.

Respectfully,

Debbie Harris-David POA--
***Karamvir Dahiya***
***Dahiya Law Offices LLC***
**75 Maiden Lane Suite 606**
**New York New York 10038**
**Tel: 212 766 8000**

DAHIYA LAW OFFICES LLC
*Attorneys*
111 John Street Suite 1860
New York, New York 10038
Tel: 212-766 8000
karam@dahiya.law

January 22, 2026

VIA ECF
Chambers of the Honorable Jil Mazer-Marino
U.S. Bankruptcy Court
EDNY 271-C Cadman Plaza East - Suite 1595
Brooklyn, NY 11201-1800

Re: *2281 Church Avenue LLC* Case No. 24-43449 (JMM)

Dear Judge Mazer-Marino,

I am writing to sincerely apologize to the Court for certain statement made in my letter dated January 21, 2026, ECF docket No. 139. On Page 2 of the letter I wrote that the deadline were not memorialized in a written order. As is clear from January 7, 2026, order entered by this Court, the deadline to file the motion to approve the bidding procedure was set as January 19, 2026. Due to undue stress in moving, I completely missed that deadline and sincerely request from this Court to allow me until January 25, 2026 to file the motion for bidding procedure. I once again apologize for this oversight and mistake that I made in my letter. Please forgive me.

Yours sincerely,

*/s/karamvirdahiya*
Karamvir Dahiya

DAHIYA LAW OFFICES LLC
*Attorneys*

111 John Street Suite 1860
New York, New York 10038
Tel: 212-766 8000
karam@dahiya.law

January 22, 2026

Via ECF
Chambers of the Honorable Jil Mazer-Marino
U.S. Bankruptcy Court
EDNY 271-C Cadman Plaza East - Suite 1595
Brooklyn, NY 11201-1800

Re: *2281 Church Avenue LLC* Case No. 24-43449 (JMM)

Dear Judge Mazer-Marino:

I serve as counsel to the Debtor in the above-referenced matter. I write respectfully to request an emergency telephonic hearing to apprise the Court of a recent and significant development that warrants immediate attention. Your Honor, in light of this development, I humbly request that the Court afford the undersigned an opportunity to be heard prior to the entry of any order relating to requests submitted by any party in this case. Accordingly, it is most respectfully requested that the Court schedule an emergency telephonic hearing at its earliest convenience to address this matter.

I respect the Court's consideration of this request and stand ready to provide any additional information or clarification as may be required. Thank you for Your Honor's time and attention to this urgent issue. Respectfully submitted,

*/s/karamvirdahiya*

Karamvir Dahiya

Case No. 1-24-43449-JMM

Oswald David
2281 Church Ave., Brooklyn, NY 11226
Phone: 347-822-3970
Submitted by: Debbie Harris-David (Spouse and POA)

CLERK
U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF
NEW YORK
2026 JAN 22 P 3:40
RECEIVED

January 22, 2026

Honorable Judge Jil Mazer-Marino
U.S. Bankruptcy Court, EDNY
271-C Cadman Plaza East - Suite 1595
Brooklyn, NY 11201-1800

Re: Status Update; Authority to Act; Request to Maintain Chapter 11

Dear Judge Mazer-Marino,

I respectfully submit this letter to address recent filings seeking conversion of this matter from Chapter 11 to Chapter 7, to clarify my authority to act on behalf of my husband, Oswald David, and to advise the Court of payments already made under the Chapter 11 plan.

I am Mr. David's lawful spouse, and I also hold valid Power of Attorney, which I am submitting to the Court today. I have been acting on his behalf due to his age and medical condition, and solely for the purpose of managing his affairs, preserving assets, and complying with Court directives. Any suggestion that I lack authority to act is incorrect.

I also respectfully advise the Court that payments have already been made toward the Chapter 11 plan. Those plan payments were received by prior counsel, Ms. Fox, in connection with this case. These payments were made as part of our effort to comply with the Chapter 11 process and demonstrate commitment to reorganization rather than liquidation.

This Chapter 11 case was filed to obtain protection and relief, not to avoid obligations. Since the filing, we have been actively working to address payments, stabilize the matter, and preserve the property. The property located at 2281 Church Avenue is an income-producing property and a core part of our livelihood.

Conversion to Chapter 7 at this stage would cause irreversible harm, including the loss of income necessary to meet ongoing obligations and to resolve this matter. Such a result would significantly worsen the hardship already being experienced and would undermine the purpose of Chapter 11 relief.

Efforts to stabilize the case and complete outstanding obligations are ongoing and require reasonable time to be completed. Immediate conversion would prevent completion of those efforts and result in harm disproportionate to any benefit of liquidation.

I respectfully request that the Court consider the totality of the circumstances, including:

- My legal authority to act on behalf of Mr. David,
- The fact that Chapter 11 plan payments have already been made,
- The income-producing nature of the property, and
- The hardship that conversion and liquidation would impose.

For these reasons, I respectfully request that the Court maintain this matter under Chapter 11 and allow the process to continue as intended, rather than converting the case to Chapter 7.

Thank you for the Court's time and consideration.

Respectfully,

Debbie Harris-David-POA

Debbie Harris-David POA

KENNEDY FUNDING

# LETTER OF INTEREST

January 16, 2026

Mr. David Oswald
Oswald David Living Trust ("Borrower")
2281 Church Avenue
Brooklyn, NY 11226

Re: $4,000,000 ("Financing Request")
Secured by a first lien on 2281 Church Ave, Brooklyn, NY 11226: ("Collateral")

Dear Mr. Oswald:

Pursuant to our discussion regarding the above loan request, I am pleased to submit the following Letter of Interest. In no way should this be considered a firm loan commitment. Outlined below are the general terms and conditions required by Kennedy Funding Inc. (Lender). These terms are only general guidelines, and only upon issuance of a firm commitment can exact terms of the loan commitment be determined.

This Letter of Interest shall expire one (1) week from issuance.

TERMS:

1. Lender would make a loan of forty percent (40%) of the market value of the real estate Collateral used as security for the Loan. If Borrower were to dispute the value as determined by Lender, Borrower would have the right to have a third-party appraiser hired, approved by Lender, and Lender would offer a Loan of forty percent (40%) of the "as is" market value as determined by said appraiser or return the paid portion of the commitment fee. The market value would be based on a twelve (12) month sale to a cash buyer.

2. The loan would be for three years interest only with no prepayment penalty.

3. The interest rate for the first year of the loan shall be nine percent (9%) per annum paid monthly at (.75%) per month.

   The interest rate for the second year of the loan shall be ten percent (10%) per annum paid monthly at (.833%) per month.

   The interest rate for the third year of the loan shall be twelve percent (12%) per annum paid monthly at (1%) per month.

4. Upon receipt of a $10,000 wire transfer or certified check, which would be applied toward the commitment fee, Lender would provide you with a draft of a loan commitment containing the terms and conditions to be reviewed by you and your counsel. This amount is fully refundable for any reason if you do not execute a loan commitment with Lender and you request in writing within thirty (30) days of the date of this letter the return of the $10,000.

5. Upon signing of the loan commitment, a commitment fee equal to four percent (4%) of the Financing Request is due; one percent (1%) would be payable at the signing, and the remainder would be payable from the loan proceeds at closing. This fee would be fully refundable if Lender does not perform its obligations under the loan commitment. If the loan is repaid on time with no prior defaults, Borrower would receive a credit upon repayment of one percent (1%) of the loan amount.

6. A brokerage commission of two percent (2%) would be paid to International Merchant Bank Limited (IMBL) from the loan proceeds at closing.

7. The loan must be closed pursuant to the terms and conditions of the loan commitment.

8. Closing could occur in as quickly as three (3) to five (5) days after completion of our due diligence and receipt of title and all required documents. Our due diligence would commence within 24 hours after Lender receives an executed loan commitment from you.

9. Notwithstanding anything to the contrary contained herein, in no event shall the interest rate contracted for, charged, or received exceed the maximum rate allowed by law.

**THIS IS NOT A LOAN COMMITMENT.**

Very truly yours,

KENNEDY FUNDING INC.

Mark Falzone
Executive Loan Officer

I hereby acknowledge and agree to the above terms.

David Oswald
Oswald David **Living** Trust

AD/1oi/Oswald.Oswald

*Jointly prepared by the Real Property Section of the New York State Bar Association, the New York State Land Title Association, the Committee on Real Property Law of the Association of the Bar of the City of New York and the Committee on Real Property Law of the New York County Lawyers' Association*

**WARNING: NO REPRESENTATION IS MADE THAT THIS FORM OF CONTRACT FOR THE SALE AND PURCHASE OF REAL ESTATE COMPLIES WITH SECTION 5-702 OF THE GENERAL OBLIGATIONS LAW ("PLAIN LANGUAGE").**

**CONSULT YOUR LAWYER BEFORE SIGNING THIS AGREEMENT**

**NOTE: FIRE AND CASUALTY LOSSES AND CONDEMNATION**
This contract form does not provide for what happens in the event of fire, or other casualty loss or condemnation before the title closing. Unless different provision is made in this contract, Section 5-1311 of the General Obligations Law will apply. One part of that law makes a Purchaser responsible for fire and casualty loss upon taking possession of the Premises before the title closing.

# Residential Contract of Sale

***Contract of Sale*** made as of September , 2025 **BETWEEN**

DEBBIE A. HARRIS, 814 Linden Blvd., Brooklyn, NY 11203

hereinafter called "Seller" and

KELVIN ENDEAVOUR JR. and KELSEA N. CROCKETT, 250 Ashland Place, Apt. 30E, Brooklyn, NY 11217

hereinafter called "Purchaser"

## *The parties hereby agree as follows:*

1. **Premises.** Seller shall sell and convey and Purchaser shall purchase the property, together with all buildings and improvements thereon (collectively the "Premises"), more fully described on a separate page marked "Schedule A", annexed hereto and made a part hereof and also known as:

Street Address: 814 Linden Blvd.
Brooklyn, NY 11203
Block: 4678 Lot: 7

Together with Seller's ownership and rights, if any, to land lying in the bed of any street or highway, opened or proposed, adjoining the Premises to the center line thereof, including any right of Seller to any unpaid award by reason of any taking by condemnation and/or for any damage to the Premises by reason of change of grade of any street or highway. Seller shall deliver at no additional cost to Purchaser, at Closing (as hereinafter defined), or thereafter, on demand, any documents that Purchaser may reasonably require for the conveyance of such title and the assignment and collection of such award or damages.

2. **Personal Property.** This sale also includes all fixtures and articles of personal property now attached or appurtenant to the Premises, unless specifically excluded below. Seller represents and warrants that at Closing they will be paid for and owned by Seller, free and clear of all liens and encumbrances, except any existing mortgage to which this sale may be subject. They include, but are not limited to, plumbing, heating, lighting and cooking fixtures, chandeliers, bathroom and kitchen cabinets and counters, mantels, door mirrors, switch plates and door hardware, venetian blinds, window treatments, shades, screens, awnings, storm windows, storm doors, window boxes, mail box, TV aerials, weather vane, flagpole, pumps, shrubbery, fencing, outdoor statuary, tool shed, ~~dishwasher, washing machine, clothes dryer, garbage disposal unit,~~ 2 range ovens, built-in-microwave oven, piano ~~refrigerator, freezer, air conditioning equipment~~ and installations, wall to wall carpeting and built-ins not excluded below, staircase chair lift, all as may exist at the premises in their present "as is" condition.

Excluded from this sale are furniture and household furnishings and

3. **Purchase Price.** The purchase price is $1,170,000.00 payable as follows:

(a) On the signing of this contract, by Purchaser's good check payable to the Escrowee (as hereinafter defined), subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 6 of this contract (the "Downpayment"): $ 40,950.00

(b) By Seller Concession credit to assist Purchaser with payment of closing costs: $11,700.00

(c) By a purchase money note and mortgage from Purchaser to Seller: $

(d) Balance at Closing in accordance with paragraph 7: $ 1,129,050.00

~~4. **Existing Mortgage.** *(Delete if inapplicable)* If this sale is subject to an existing mortgage as indicated in paragraph 3(b) above:~~

~~(a) The Premises shall be conveyed subject to the continuing lien of the existing mortgage, which is presently payable, with interest at the rate of ——— percent per annum, in monthly installments of $ ——— which include principal, interest and escrow amounts, if any, and with any balance of principal being due and payable on ———~~

~~(b) To the extent that any required payments are made on the existing mortgage between the date hereof and Closing which reduce the unpaid principal amount thereof below the amount shown in paragraph 3(b), then the balance of the price payable at Closing under paragraph 3(d) shall be increased by the amount of the~~

payments of principal. Seller represents and warrants that the amount shown in paragraph 3(b) is substantially correct and agrees that only payments required by the existing mortgage will be made between the date hereof and Closing.

(c) If there is a mortgagee escrow account, Seller shall assign it to Purchaser, if it can be assigned, and in that case Purchaser shall pay the amount in the escrow account to Seller at Closing.

(d) Seller shall deliver to Purchaser at Closing a certificate dated not more that 30 days before Closing signed by the holder of the existing mortgage, in form for recording, certifying the amount of the unpaid principal, the date to which interest has been paid and the amounts, if any, claimed to be unpaid for principal and interest, itemizing the same. Seller shall pay the fees for recording such certificate. If the holder of the existing mortgage is a bank or other institution as defined in Section 274-a of the Real Property Law it may, instead of the certificate, furnish a letter signed by a duly authorized officer, employee or agent, dated not more then 30 days before Closing, containing the same information.

(e) Seller represents and warrants that (i) Seller has delivered to Purchaser true and complete copies of the existing mortgage, the note secured thereby and any extensions and modifications thereof, (ii) the existing mortgage is not now, and at the time of Closing will not be, in default, and (iii) the existing mortgage does not contain any provision that permits the holder of the mortgage to require its immediate payment in full or to change any other term thereof by reason of the sale or conveyance of the Premises.

**5. Purchase Money Mortgage.** *(Delete if inapplicable)* If there is to be a purchase money mortgage as indicated in paragraph 3(c) above:

(a) The purchase money note and mortgage shall be drawn by the attorney for Seller in the form attached or, if not, in the standard form adopted by the New York State Land Title Association. Purchaser shall pay at Closing the mortgage recording tax, recording fees and the attorney's fees in the amount of $ ______ for its preparation.

(b) The purchase money note and mortgage shall also provide that it is subject and subordinate to the lien of the existing mortgage and any extensions, modifications, replacements or consolidations of the existing mortgage, provided that (i) the interest rate thereof shall not be greater than ______ percent per annum and the total debt service thereunder shall not be greater than $ ______ per annum, and (ii) if the principal amount thereof shall exceed the amount of principal owing and unpaid on the existing mortgage at the time of placing such new mortgage or consolidated mortgage, the excess is to be paid to the holder of such purchase money mortgage in reduction of the principal thereof. The purchase money mortgage shall also provide that such payment to the holder thereof shall not alter or affect the regular installments, if any, of principal payable thereunder and that the holder thereof will, on demand and without charge therefore, execute, acknowledge and deliver any agreement or agreements further to effectuate such subordination.

**6. Downpayment in Escrow.**

(a) Seller's attorney ("Escrowee") shall hold the Downpayment in escrow in a segregated bank account at:
Address: CHASE BANK
until Closing or sooner termination of this contract shall pay over or apply the Downpayment in accordance with the terms of this paragraph. Escrowee shall hold the Downpayment in a(n) IOLA interest-bearing account. If interest is held for the benefit of the parties, it shall be paid to the party entitled to the Downpayment and the party receiving the interest shall pay any income taxes thereon. If interest is not held for the benefit of the parties, the Downpayment shall be placed in an IOLA account or as otherwise permitted or required by law. The Social Security or Federal Identification numbers of the parties shall be furnished to Escrowee upon request. At Closing, the Downpayment shall be paid by Escrowee to Seller. If for any reason Closing does not occur and either party gives Notice (as defined in paragraph 25) to Escrowee demanding payment of the Downpayment, Escrowee shall give prompt Notice to the other party of such demand. If Escrowee does not receive Notice of objection from such other party to the proposed payment within 10 business days after the giving of such Notice, Escrowee is hereby authorized and directed to make such payment. If Escrowee does receive such Notice of objection within such 10 day period or if for any other reason Escrowee in good faith shall elect not to make such payment, Escrowee shall continue to hold such amount until otherwise directed by Notice from the parties to this contract or a final, non-appealable judgment, order or decree of a court. However, Escrowee shall have the right at any time to deposit the Downpayment and the interest thereon with the clerk of a court in the county in which the Premises are located and shall give Notice of such deposit to Seller and Purchaser. Upon such deposit or other disbursement in accordance with the terms of this paragraph, Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

(b) The parties acknowledge that Escrowee is acting solely as a stakeholder at their request and for their convenience and that Escrowee shall not be liable to either party for any act or omission on its part unless taken or suffered in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee. Seller and Purchaser jointly and severally (with right of contribution) agree to defend (by attorneys selected by Escrowee), indemnify and hold Escrowee harmless from and against all costs, claims and expenses (including reasonable attorneys' fees) incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee.

(c) Escrowee may act or refrain from acting in respect of any matter referred to herein in full reliance upon and with the advice of counsel which may be selected by it (including any member of its firm) and shall be fully protected in so acting or refraining from action upon the advise of such counsel.

(d) Escrowee acknowledges receipt of the Downpayment by check subject to collection and Escrowee's agreement to the provisions of this paragraph by signing in the place indicated on the signature page of this contract.

(e) Escrowee or any member of its firm shall be permitted to act as counsel for Seller in any dispute as to the disbursement of the Downpayment or any other dispute between the parties whether or not Escrowee is in possession of the Downpayment and continues to act as Escrowee.

(f) The party whose attorney is Escrowee shall be liable for loss of the Downpayment.

**7. Acceptable Funds.** All money payable under this contract unless otherwise specified, shall be paid by:

(a) Cash, but not over $1,000.00

(b) Good certified check of Purchaser drawn on or official check issued by any bank, savings bank, trust company or savings and loan association having a banking office in the State of New York unendorsed and payable to the order of Seller, or as Seller may otherwise direct upon reasonable prior notice (by telephone or otherwise) to Purchaser.

(c) As to money other than the purchase price payable to Seller at Closing, uncertified check of Purchaser up to the amount of $ 1,000.00 ; and

(d) As otherwise agreed to in writing by Seller or Seller's attorney.

**8. Mortgage Commitment Contingency.** *(Delete paragraph if inapplicable. For explanation, see:* **NOTES ON MORTGAGE COMMITMENT CONTINGENCY CLAUSE.)**

(a) The obligation of Purchaser to purchase under this contract is conditioned upon issuance, on or before ~~60~~ 45 days after a fully executed copy of this contract is given to Purchaser or Purchaser's attorney in the manner set forth in paragraph 25 or subparagraph 8(j) (the "Commitment Date"), of a written commitment from an Institutional Lender pursuant to which such Institutional Lender agrees to make a first mortgage loan, including a VA, FHA or other governmentally insured loan, to Purchaser, at Purchaser's sole cost and expense, of $1,134,900.00~~948,000.00~~ for a term of at least 30 years (or such lesser sum or shorter term as Purchaser shall be willing to accept) at the prevailing fixed or adjustable rate of interest and on other customary commitment terms (the "Commitment"). To the extent a Commitment is conditioned on the sale of Purchaser's current home, payment of any outstanding debt, no material adverse change in Purchaser's financial condition or any other customary conditions, Purchaser accepts the risk that such conditions may not be met; however, a commitment conditioned on the Institutional Lender's approval of an appraisal shall not be deemed a "Commitment" hereunder until an appraisal is approved (and if that does not occur before the Commitment Date Purchaser may cancel under subparagraph 8(e) unless the Commitment Date is extended). Purchaser's obligations hereunder are conditioned only on issuance of a Commitment. Once a Commitment is issued, Purchaser is bound under this contract even if the lender fails or refuses to fund the loan for any reason, within Purchaser's control.

(b) Purchaser shall (i) make prompt application to one or, at Purchaser's election, more than one Institutional Lender for such mortgage loan, (ii) furnish accurate and complete information regarding Purchaser and members of Purchaser's family, as required, (iii) pay all fees, points and charges required in connection with such application and loan, (iv) pursue such application with diligence, and (v) cooperate in good faith with such Institutional Lender(s) to obtain a Commitment. Purchaser shall accept a Commitment meeting the terms set forth in subparagraph 8(a) and shall comply with all requirements of such Commitment (or any other commitment accepted by Purchaser). Purchaser shall furnish Seller with a copy of the Commitment promptly after receipt thereof.

(c) *(Delete this subparagraph if inapplicable)* Prompt submission by Purchaser of an application to a mortgage broker registered pursuant to Article 12-D of the New York Banking Law ("Mortgage Broker") shall constitute full compliance with the terms and conditions set forth in subparagraph 8(b)(i), provided that such Mortgage Broker promptly submits such application to such Institutional Lender(s). Purchaser shall cooperate in good faith with such Mortgage Broker to obtain a Commitment from such Institutional Lender(s).

(d) If all Institutional Lenders to whom applications were made deny such applications in writing prior to the Commitment Date, Purchaser may cancel this contract by giving Notice thereof to Seller, with a copy of such denials, provided that Purchaser has complied with all its obligations under this paragraph 8.

(e) If no Commitment is issued by an Institutional Lender on or before the Commitment Date, then, unless Purchaser has accepted a written commitment from an Institutional Lender that does not conform to the terms set forth in subparagraph 8(a), Either party may cancel this contract by giving Notice to the other within 5 business days after the Commitment Date, provided that such Notice includes the name and address of the Institutional Lender(s) to whom application was made and that Purchaser has complied with all its obligations under this paragraph 8.

(f) If this contract is canceled by Purchaser pursuant to subparagraphs 8(d) or (e), neither party shall thereafter have any further rights against, or obligations or liabilities to, the other by reason of this contract, except that the Downpayment shall be promptly refunded to Purchaser and except as set forth in paragraph 27.

(g) If Purchaser accepts a written commitment from an Institutional Lender that does not conform to the terms set forth in subparagraph 8(a), then Purchaser shall be deemed to have waived Purchaser's right to cancel this contract and to receive a refund of the Downpayment by reason of the contingency contained in this paragraph 8.

(h) If Seller has not received a copy of a commitment from an Institutional Lender accepted by Purchaser by the Commitment Date, Seller may cancel this contract by giving Notice to Purchaser within 5 business days after the Commitment Date, which cancellation shall become effective unless Purchaser delivers a copy of such commitment to Seller within 10 business days after the Commitment Date. After such cancellation neither party shall have any further rights against, or obligations or liabilities to, the other by reason of this contract, except that the Downpayment shall be promptly refunded to Purchaser (provided Purchaser has complied with all its obligations under this paragraph 8) and except as set forth in paragraph 27.

(i) For purposes of this contract, the term "Institutional Lender" shall mean any bank, savings bank, private banker, trust company, savings and loan association, credit union or similar banking institution whether organized under the laws of this state, the United States or any other state, foreign banking corporation licensed by the Superintendent of Banks of New York or regulated by the Comptroller of the Currency to transact business in New York State; insurance company duly organized or licensed to do business in New York State; mortgage banker licensed pursuant to Article 12-D of the Banking Law; and any instrumentality created by the United States or any state with the power to make mortgage loans.

(j) For purposes of subparagraph 8(a), Purchaser shall be deemed to have been given a fully executed copy of this contract on the third business day following the date of ordinary or regular mailing, postage prepaid.

**9. Permitted Exceptions.** The Premises are sold and shall be conveyed subject to:

(a) Zoning and subdivision laws and regulations, and landmark, historic or wetlands designation, provided that they are not violated by the existing buildings and improvements erected on the property or their use;

(b) Consents for the erection of any structures on, under or above any streets on which the Premises abut;

(c) Encroachments of stoops, areas, cellar steps, trim and cornices, if any, upon any street or highway;

(d) Real estate taxes that are a lien, but are not yet due and payable; and

(e) The other matters, if any, including a survey exception, set forth in a Rider attached.

**10. Governmental Violations and Orders.**

(a) Seller shall comply with all notes or notices of violations of law or municipal ordinances, orders or requirements noted or issued as of the date of closing by any governmental department having authority as to lands, housing, buildings, fire, health, environmental and labor conditions affecting the Premises. The Premises shall be conveyed free of them at Closing. Seller shall furnish Purchaser with any authorizations necessary to make the searches that could disclose these matters.

(b) *(Delete if inapplicable)* All obligations affecting the Premises pursuant to the Administrative Code of the City of New York incurred prior to Closing and payable in money shall be discharged by Seller at or prior to Closing.

**11. Seller's Representations.**

(a) Seller represents and warrants to Purchaser that:

I. The Premises abut or have a right of access to a public road;

II. Seller is the sole owner of the Premises and has the full right, power and authority to sell, convey and transfer the same in accordance with the terms of this contract;

III. Seller is not a "foreign person", as that term is defined for purposes of the Foreign Investment in Real Property Tax Act. Internal Revenue Code ("IRC") Section 1445, as amended, and the regulations promulgated thereunder (collectively "FIRPTA");

IV. The Premises are not affected by any exemptions or abatements of taxes; and

V. Seller has been known by no other name for the past ten years, except:

(b) Seller covenants and warrants that all of the representations and warranties set forth in this contract shall be true and correct at Closing.

(c) Except as otherwise expressly set forth in this contract, none of Seller's covenants, representations, warranties or other obligations contained in this contract shall survive Closing.

**12. Condition of Property.** Purchaser acknowledges and represents that Purchaser is fully aware of the physical condition and state of repair of the Premises and of all other property included in this sale, based on Purchaser's own inspection and investigation thereof, and that Purchaser is entering into this contract based solely upon such inspection and investigation and not upon any information, data, statements or representations, written or oral, as to the physical conditions, state of repair, use, cost of operation or any other matter related to the Premises or the other property included in the sale, given or made by Seller or its representatives, and shall accept the same "as is" in their present condition and state of repair, subject to reasonable use, wear, tear and natural deterioration between the date hereof and the date of Closing (except as otherwise set forth in paragraph 16(e), without any reduction in the purchase price or claim of any kind for any change in such condition by reason thereof subsequent to the date of this contract. Purchaser and its authorized representatives shall have the right, at reasonable times and upon reasonable notice (by telephone or otherwise) to Seller, to inspect the Premises before Closing.

**13. Insurable Title.** Seller shall give and Purchaser shall accept such title as any reputable title insurance company <u>chosen by Purchaser</u> licensed in New York State shall be willing to approve and insure in accordance with its standard form of title policy approved by the New York State Insurance Department, subject only to the matters provided for this contract.

**14. Closing, Deed and Title.**

(a) "Closing" means the settlement of the obligations of Seller and Purchaser to each other under this contract, including the payment of the purchase price to Seller, and the delivery to Purchaser of a bargain and sale with covenants against grantor's acts deed in proper statutory short form for record, duly executed and acknowledged, so as to convey to Purchaser fee simple title to the Premises, free of all encumbrances, except as otherwise herein stated. The deed shall contain a covenant by Seller as required by subd. 5 of Section 13 of the Lien Law.

(b) If Seller is a corporation, it shall deliver to Purchaser at the time of Closing (i) a resolution of its Board of Directors authorizing the sale and delivery of the deed, and (ii) a certificate by the Secretary or Assistant Secretary of the corporation certifying such resolution and setting forth facts showing that the transfer is in conformity with the requirements of Section 909 of the Business Corporation Law. The deed in such case shall contain a recital sufficient to establish compliance with that Section.

**15. Closing Date and Place.** Closing shall take place at the office of Seller's attorney at 10:00 o'clock on or about , 2025 or upon reasonable notice (by telephone or otherwise).

**16. Conditions to Closing.** This contract and Purchaser's obligation to purchase the Premises are also subject to and conditioned upon the fulfillment of the following conditions precedent:

(a) The accuracy, as of the date of Closing, of the representations and warranties of Seller made in this contract.

(b) The delivery by Seller to Purchaser of a valid and subsisting Certificate of Occupancy or other required certificate of compliance, or evidence that none was required, covering the building(s) and all of the other improvements located on the property authorizing their use as a two family dwelling at the date of Closing.

(c) The delivery by Seller to Purchaser of a certificate stating that Seller is not a foreign person, which certificate shall be in the form then required by FIRPTA or a withholding certificate from I.R.S. If Seller fails to deliver the aforesaid certificate or if Purchaser is not entitled under FIRPTA to rely on such certificate, Purchaser shall deduct and withhold from the purchase price a sum equal to 10% thereof (or any lesser amount permitted by law) and shall at Closing remit the withheld amount with the required forms to the Internal Revenue Service.

(d) The delivery of the Premises and all building(s) and improvements comprising a part thereof in broom clean condition, vacant and free of leases or tenancies, together with keys to the Premises.

(e) All plumbing (including water supply and septic systems, if any), heating and air conditioning, if any, electrical and mechanical systems, equipment, and machinery in the building(s) located on the property and all appliances which are included in this sale being in working order as of the date of Closing, and the roof shall be free of leaks

(f) If the Premises are a one or two family house, delivery by the parties at Closing of affidavits in compliance with state and local law requirements to the effect that there is installed in the Premises a smoke detecting alarm device or devices.

(g) The delivery by the parties of any other affidavits required as a condition of recording the deed.

**17. Deed Transfer and Recording Taxes.** At Closing, certified or official bank checks payable to the order of the appropriate State, City or County officer in the amount of any applicable transfer and/or recording tax payable by reason of the delivery or recording of the deed or mortgage, if any, shall be delivered by the party required by this contract to pay such transfer and/or recording tax, together with any required tax returns duly executed and sworn to, and such party shall cause any such checks and returns to be delivered to the appropriate officer promptly after Closing. The obligation to pay any additional tax or deficiency and any interest or penalties thereon shall survive Closing.

**18. Apportionments and Other Adjustments; Water Meter and Installment Assessments.**

(a) To the extent applicable, the following shall be apportioned as of midnight of the day before the day of Closing:
(i) taxes, water charges and sewer rents, on the basis of the fiscal period for which assessed; (ii) fuel; (iii) interest on the existing mortgage; (iv) premiums on existing transferable insurance policies and renewals of those expiring prior to Closing; (v) vault charges; (vi) rents as and when collected.

(b) If Closing shall occur before a new tax rate is fixed, the apportionment of taxes shall be upon the basis of the tax rate for the immediately preceding fiscal period applied to the latest assessed valuation.

(c) If there is a water meter on the Premises, Seller shall furnish a final actual reading to a date not more than 30 days before Closing and the unfixed meter charge and sewer rent, if any, shall be apportioned on the basis of such last reading.

(d) If at the date of Closing the Premises are affected by an assessment which is or may become payable in annual installments, and the first installment is then a lien, or has been paid, then for the purposes of this contract all the unpaid installments shall be considered due and shall be paid by Seller at or prior to Closing.

(e) Any errors or omissions in computing apportionments or other adjustments at Closing shall be corrected within a reasonable time following Closing. This subparagraph shall survive Closing.

**19. Allowance for Unpaid Taxes, etc.** Seller has the option to credit Purchaser as an adjustment to the purchase price with the amount of any unpaid taxes, assessments, water charges and sewer rents, together with any interest and penalties thereon to a date not less that five business dates after Closing, provided the official bills therefor computed to said date are produced at Closing.

**20. Use of Purchase Price to Remove Encumbrances.** If at Closing there are other liens or encumbrances that Seller is obligated to pay or discharge, Seller may use any portion of the cash balance of the purchase price to pay or discharge them, provided Seller shall simultaneously deliver to Purchaser at Closing instruments in recordable form and sufficient to satisfy such liens or encumbrances of record, together with the cost of recording or filing said instruments. As an alternative Seller may deposit sufficient monies with the title insurance company employed by Purchaser acceptable to and required by it to assure their discharge, but only if the title insurance company will insure Purchaser's title clear of the matters or insure against their enforcement out of the Premises and will insure Purchaser's Institutional Lender clear of such matters. Upon reasonable prior notice (by telephone or otherwise), Purchaser shall provide separate certified or official bank checks as requested to assist in clearing up these matters.

**21. Title Examination; Seller's Inability to Convey; Limitations of Liability.**

(a) Purchaser shall order an examination of title in respect of the Premises from a title company licensed or authorized to issue title insurance by the New York State Insurance Department or any agent for such title company promptly after the execution of this contract or, if this contract is subject to the mortgage contingency set forth in paragraph 8, after a mortgage commitment has been accepted by Purchaser. Purchaser shall cause a copy of the title report and of any additions thereto to be delivered to the attorney(s) for Seller promptly after receipt thereof.

(b) (i) If at the date of Closing, Seller is unable to transfer title to Purchaser in accordance with this contract, or Purchaser has other valid grounds for refusing to close, whether by reason of liens, encumbrances or other objections to title or otherwise (herein collectively called "Defects"), other than those subject to which Purchaser is obligated to accept title hereunder or which Purchaser may have waived and other than those which Seller has herein expressly agreed to remove, remedy or discharge and if Purchaser shall be unwilling to waive the same and to close title without abatement of the purchase price, then, except as hereinafter set forth, Seller shall have the right, at Seller's sole election, either to take such action as Seller may deem advisable to remove, remedy, discharge or comply with such Defects or to cancel this contract; (ii) if Seller elects to take action to remove, remedy or comply with such Defects, Seller shall be entitled from time to time, upon Notice to Purchaser, to adjourn the date for Closing hereunder for a period or periods not exceeding 60 days in the aggregate (but not extending beyond the date upon which Purchaser's mortgage commitment, if any, shall expire), and the date for Closing shall be adjourned to a date specified by Seller not beyond such period. If for any reason whatsoever, Seller shall not have succeeded in removing, remedying or complying with such Defects at the expiration of such adjournment(s), and if Purchaser shall still be unwilling to waive the same and to close title without abatement of the purchase price, then either party may cancel this contract by Notice to the other given within 10 days after such adjourned date; (iii) notwithstanding the foregoing, the existing mortgage (unless this sale is subject to the same) and any matter created by Seller
after the date hereof shall be released, discharged or otherwise cured by Seller at or prior to Closing.

(c) If this contract is cancelled pursuant to its terms, other than as a result of Purchaser's default, this contract shall terminate and come to an end, and neither party shall have any further rights, obligations or liabilities against or to the other hereunder or otherwise, except that: (i) Seller shall promptly refund or cause the Escrowee to refund the Downpayment to Purchaser and, unless cancelled as a result of Purchaser's default or pursuant to paragraph 8, to reimburse Purchaser for the net cost of examination of title, including any appropriate additional charges related thereto, and the net cost, if actually paid or incurred by Purchaser for updating the existing survey of the Premises or of a new survey, and (ii) the obligations under paragraph 27 shall survive the termination of this contract.

**22. Affidavit as to Judgments, Bankruptcies, etc.** If a title examination discloses judgments, bankruptcies or other returns against persons having names the same as or similar to that of Seller, Seller shall deliver an affidavit at Closing showing that they are not against Seller.

**23. Defaults and Remedies.**

(a) If Purchaser defaults hereunder, Seller's sole remedy shall be to receive and retain the Downpayment as liquidated damages, it being agreed that Seller's damages in case of Purchaser's default might be

impossible to ascertain and the Downpayment constitutes a fair and reasonable amount of damages under the circumstances and is not a penalty.

(b) If Seller defaults hereunder, Purchaser shall have such remedies as Purchaser shall be entitled to at law or in equity, including but not limited to, specific performance.

**24. Purchaser's Lien.** All money paid on account of this contract, and the reasonable expenses of examination of title to the Premises and of any survey and survey inspection charges are hereby made liens on the Premises, but such liens shall not continue after default by Purchaser under this contract.

**25. Notices.** Any notice or other communication ("Notice") shall be in writing and either:

(a) sent by either of the parties hereto or by their respective attorneys who are hereby authorized to do so on their behalf or by the Escrowee, by registered or certified mail, postage prepaid, or

(b) delivered in person or by overnight courier, with receipt acknowledged, to the respective addresses given in this contract for the party and the Escrowee, to whom the Notice is to be given, or to such other address as such party or Escrowee shall hereafter designate by Notice given to the other party or parties and the Escrowee pursuant in this paragraph. Each Notice mailed shall be deemed given on the third business day following the date of mailing the same, except that any Notice to Escrowee shall be deemed given only upon receipt by Escrowee and each Notice delivered in person or by overnight courier shall be deemed given when delivered, or

(c) with respect to paragraph 7(b) or paragraph 20, sent by fax to the party's attorney. Each Notice by fax shall be deemed given when transmission is confirmed by the sender's fax machine. A copy of each Notice sent to a party shall also be sent to the party's attorney. The attorneys for the parties are hereby authorized to give and receive on behalf of their clients all Notices and deliveries. This contract may be delivered as provided above or by ordinary mail.

**26. No Assignment.** This contract may not be assigned by Purchaser without the prior written consent of Seller in each instance and any purported assignment(s) made without such consent shall be void.

**27. Broker.** Seller and Purchaser each represents and warrants to the other that it has not dealt with any broker in connection with this sale other than Bluewater Capital Realty Corp. and Keller Williams of Greater Nassau ("Broker") and Seller shall pay Broker any commission earned pursuant to a separate agreement between Seller and Broker. Seller and Purchaser shall indemnify and defend each other against any costs, claims and expenses, including reasonable attorney's fees arising out of the breach on their respective parts of any representation or agreement contained in this paragraph. The provisions of this paragraph shall survive Closing or, if Closing does not occur the termination of this contract. In accordance with law, purchaser shall pay to their broker such commission as has been agreed upon between them; and seller shall pay commission to her broker pursuant to their agreement.

**28. Miscellaneous.**

(a) All prior understanding, agreements, representations and warranties, oral or written, between Seller and Purchaser are merged in this contract; it completely expresses their full agreement and has been entered into after full investigation, neither party relying upon any statement made by anyone else that is not set forth in this contract.

(b) Neither this contract nor any provision thereof may be waived, changed or cancelled except in writing. This contract shall also apply to and bind the heirs, distributees, legal representatives, successors and permitted assigns of the respective parties. The parties hereby authorize their respective attorneys to agree in writing to any changes in dates and time periods provided for in this contract.

(c) Any singular word or term herein shall also be read as in the plural and the neuter shall include the masculine and feminine gender, whenever the sense of this contract may require it.

(d) The captions in this contract are for convenience of reference only and in no way define, limit or describe the scope of this contract and shall not be considered in the interpretation of this or any provisions hereof.

(e) This contract shall not be binding or effective until duly executed and delivered by Seller and Purchaser.

(f) Seller and Purchaser shall comply with IRC reporting requirements, if applicable. This subparagraph shall survive Closing.

(g) Each party shall, at any time and from time to time, execute, acknowledge where appropriate and deliver such further instruments and documents and take such other action as may be reasonably requested by the other in order to carry out the intent and purpose of this contract. This subparagraph shall survive Closing.

(h) This contract is intended for the exclusive benefit of the parties hereto and except as otherwise expressly provided herein, shall not be for the benefit of, and shall not create any rights in, or be enforceable by any other person or entity.

(i) If applicable, the complete and fully executed disclosure of information on lead-based paint and/or lead-based paint hazards is attached hereto and made a part hereof.

Continued on Rider attached hereto. *(Delete if inapplicable)*

***In Witness Whereof,*** **this contract has been duly executed by the parties hereto.**

DEBBIE A. HARRIS, SELLER

DocuSigned by: Kelvin Endeavour 9/30/2025
KELVIN ENDEAVOUR, JR., PURCHASER

Signed by: Kelsea N. Crockett 9/30/2025
KELSEA N. CROCKETT, PURCHASER

**Attorney for Seller: GARNETT SULLIVAN, ESQ.**

Address: 1080 Grand Avenue
South Hempstead, New York 11550

Tel.: (516) 285-1575

Receipt of the Downpayment is acknowledged and the undersigned agrees to act in accordance with the provisions of paragraph 6 above.

**Attorney for Purchaser: KAREN SONN, ESQ.**

Address: 22 Jordan Road, Hastings on Hudson, NY 10706 ~~26 Gramercy Park South, Unit 1A~~

~~New York, New York 10003~~
Email: karen@sonnassociates.com
Tel : 917-838-7748

*Escrowee*

# *Contract of Sale*

**TITLE NO.**

DEBBIE A. HARRIS
TO
KELVIN ENDEAVOUR, JR. and KELSEA N. CROCKETT

**PREMISES**

| | |
|---|---|
| Sheet | |
| Section | |
| Block | 4678 |
| Lot | 7 |
| Plate | |
| County or Town | KINGS |
| Street Number | 814 Linden Blvd. |

## NOTES ON MORTGAGE COMMITMENT CONTINGENCY CLAUSE
for
## RESIDENTIAL CONTRACT OF SALE

1. WARNING: The mortgage Commitment contingency clause for the Residential Contract of Sale is a bar association form that attempts to provide a mechanism that makes the rights and obligations of the parties clear in sale of residences in ordinary circumstances. It should be reviewed carefully by Seller and Purchaser and their attorneys in each and every transaction to make sure that all the provisions are appropriate for that transaction. Negotiated modifications should be made whenever necessary.
2. Under the clause, the obligation of Purchaser to purchase under the contract of sale is contingent on Purchaser's obtaining a mortgage Commitment letter from an Institutional Lender within the number of days specified for the amount specified. This refers to calendar days. Seller's attorney should state his/her calculation of the Commitment Date in the letter delivering the executed contract to Purchaser's attorney, to prevent confusion later. Purchaser should promptly confirm or correct that date. In applying for a loan, Purchaser should inform its lender of the scheduled date of Closing in the contract and request that the expiration date of the Commitment occur after the scheduled dated of Closing. Purchaser must comply with deadlines and pursue the application in good faith. The Commitment contingency is satisfied by issuance of a Commitment in the amount specified on or before the Commitment Date, unless the Commitment is conditioned on approval of an appraisal. If the Commitment is conditioned on approval of an appraisal and such approval does not occur prior to the Commitment Date, Purchaser should either cancel the contract or obtain an extension of the Commitment Date. If the Commitment is later withdrawn or not honored, Purchaser runs the risk of being in default under the contract of sale with Seller.
3. If there are loan terms and conditions that are required or would not be acceptable to Purchaser, such as the interest rate, term of the loan, points, fees or a condition requiring sale of the current home, those terms and conditions should be specified in a rider.
4. This clause assumes that initial review and approval of Purchaser's credit will occur before the Commitment letter is issued. Purchaser should confirm with the lender that this is the case before applying for the Commitment.
5. If, as has been common, the Commitment letter itself is conditioned on sale of Purchaser's home or payment of any outstanding debt or no material adverse change in Purchaser's financial condition, such a Commitment will satisfy the contract contingency nonetheless, and Purchaser will take the risk of fulfilling those Commitment conditions, including forfeiture of the Downpayment if Purchaser defaults on its obligation to close. Under New York case law, a defaulting Purchaser may not recover any part of the Downpayment, and Seller does not have to prove any damages. If Purchaser is not willing to take that risk, the clause must be modified accordingly.
6. Purchaser may submit an application to registered Mortgage Broker instead of applying directly to an Institutional Lender.
7. This clause allows Seller to cancel if a Commitment is not accepted by Purchaser by the Commitment Date, unless Purchaser timely supplies a copy of the Commitment, to allow Seller the option to avoid having to wait until the scheduled date of Closing to see if Purchaser will be able to close. Seller may prefer to cancel rather than to wait and settle for forfeiture of the Downpayment if Purchaser defaults. Because of Seller's right to cancel, Purchaser may not waive this contingency clause. This clause means that Purchaser is subject to cancellation by Seller even if Purchaser is willing to risk that he/she will obtain the Commitment after the Commitment Date. Some Purchasers may not want to be subject to such cancellation by Seller.
8. Purchaser may want to add to paragraph 21(c) that Purchaser's reimbursement should include non-refundable financing and inspection expenses of Purchaser, which should be refunded by Seller if Seller willfully defaults under the contract of sale (alternative: If Seller is unable to transfer title under the contract of sale)

9-25-00
Joint Committee on the Mortgage Contingency Clause:
Real Property Section of the New York State Bar Association
Real Property Law Committee of the Association of the Bar of the City of New York
Real Property Committee of the New York County Lawyers Association

**RIDER ATTACHED TO AND MADE A PART OF**

**CONTRACT OF SALE DATED:** September **, 2025**

**SELLERS: DEBBIE A. HARRIS**

**PURCHASERS: KELVIN ENDEAVOUR, JR. and KELSEA N. CROCKETT**

**PREMISES: 814 Linden Blvd., Brooklyn, NY 11203**

29. All notices mailed to Seller must be sent to their attorney except Default Notices which must be sent to the attorney:

**GARNETT H. SULLIVAN, ESQ.**
Attorney-At-Law
1080 Grand Ave., South Hempstead, NY 11550

No notice shall be valid unless emailed to Seller's Attorney except Default Notices which must be emailed overnighted via federal express or ups to both the attorney receiving the Default Notice.

30. Should written notice of cancellation of this Contract be given by the Seller or the Purchaser of failure to secure a mortgage commitment, then upon the return to the Purchaser of all sums paid on an account herein, this Contract shall be null and void and of no further force and effect.

31. In the event the Purchaser's title inspection report shows any defect or objections to title not set forth herein which would render title unmarketable or uninsurable, Purchaser shall forward a copy of such objections or defects to Seller's attorney. Delivery via email to the

Sellers attorney of a title report shall constitute Notice of any title objections or defects. The Seller shall have a reasonable time thereafter to cure such objections or defects however, it shall be not more than 40 days past the closing date in the contract or when Purchasers FHA mortgage commitment expires. However, Seller shall not be required to bring any action or proceedings or otherwise in excess of 1% of the sales price, to render title marketable or insurable. The Purchaser may, nevertheless accept such title as Seller may be able to convey without any reduction or purchase price or credit allowance against the sale and without any other liability on the part of the Seller.

32. Anything to the contrary herein, notwithstanding if there are any notes or notices of violations against the premises at the date hereof, the Seller shall only be obligated to expend a maximum of $2,500.00 to remove said violations. If the cost of removing such violations exceeds the sum of $2,500.00, Seller may cancel this contract subject to Purchaser's right to accept title to the premises with such violations outstanding and a credit of $2,500.00 in reduction of the purchase price.

In the event of such cancellation, the sole liability of the Seller will be to refund the Purchaser the amount paid on account of the purchase price, and upon said refund, this Contract shall be null and void.

33. Purchaser is hereby given the right to have a termite inspection of the premises by a qualified exterminator within ten (10) days from the date hereof.

In the event that within said time, notice is given to the Seller that there is an infestation or damage, then the Seller shall have the option to either;

1. remove such infestation at his own expense, cure the damage and provide a one (1) year guarantee.

In the event no notice is emailed from Purchaser's attorney within fifteen (15) business days from the date hereof, then this provision shall not apply and this Contract shall no longer be subject to this provision. The term "termite" shall include all wood destroying insects.

34. The Seller shall not be responsible for or be obligated to pay in whole or in part, any expenses, fees, discounts or other charges in connection with the Purchaser obtaining a mortgage loan commitment.

35. The Seller shall not be implied to have consented to make any repairs or alteration of the premises which might be required by the lending institution in order to grant a mortgage on the premises unless otherwise stated herein.

36. All checks due at the closing of title from Purchaser to Seller shall be first-party checks only, and shall be made payable directly to the Seller. All checks over the aggregate amount of $500 shall be certified or bank checks or wire as the parties may agree.

38. The parties agree that if, for any reason whatsoever, except Seller's willful default, Seller is unable to fulfill any of the terms of this Contract, including but not limited to the delivery of a good and marketable title, Seller shall not be required to bring any action or proceeding or incur any expenses in order to fulfill the terms of this Contract other than spending up to 1% of the sales price to cure same. If the Purchaser refuses to waive performances on the part of the Seller with respect to those conditions in dispute, Seller may rescind this

Contract and upon returning to the Purchaser the sum paid on the signing of this Contract, and net title company expenses for the examination of the title to the premises, and the survey charge, for the examination of the title to the premises, up to a maximum of $1,000.00, all further liability on the part of the Seller shall cease and terminate and the Contract on the part of the Seller shall cease and terminate and this contract shall become null and void and be canceled and be of no further force and effect and the Seller are not liable for any other costs or damages whatsoever.

39. This Contract shall not be construed as an offer to sell by Seller, until Seller have agreed to all of the terms and conditions by signing this Contract.

40. In the event of any conflict between the terms of this rider and the terms contained in the printed form (NYBTU Form WCA-1 rev. 7/99) the terms of this Rider shall be controlling.

41. The Purchaser agrees to indemnify Seller and hold them harmless from any expense or liability resulting from Purchaser's breach of their representation in paragraph #27 of the Contract of Sale. This provision as well as paragraph #27 shall survive closing.

42. Seller agrees to execute a FIRPTA affidavit certifying that they are not foreign persons or Purchaser shall be entitled to withhold 15% of the sales price to satisfy potential liability pursuant to Section 897 (c) of the Internal Revenue Service Code.

43. Seller agrees to have an operational smoke detector and carbon monoxide devise installed in the premises in accordance with NYC Administration Code Title 27, Article 6, Subdivision 17.

44. Seller shall provide a certificate of occupancy or equivalent for a **TWO**-family dwelling and all improvements thereto at or prior to closing for the premises as it currently exists. It being understood however, that if the cost to procure the same, including the cost of any required repairs, alterations or renovations, shall exceed the sum of 1% of the sales price, then the Seller shall have the right to cancel this contract by written notice to the Purchaser on or before the time fixed for closing, in accordance with provisions set forth herein, and the escrow agent is hereby directed to refund to the Purchaser the monies paid on account of this contract. Seller shall not be responsible to provide to purchaser a certificate of occupancy for any of the following: open patios, decks, enclosed porches, above ground pools, car ports, treehouse, or barbeque hut which may be removed by seller without compensation to purchaser, if purchaser's lending institution requires a certificate of occupancy or certificate of compliance.

45. Notwithstanding anything contained in paragraph 16(f) of the standard contract above:

(a) the seller(s) maximum liability for the repair or replacement of any appliance shall not exceed Three Hundred and 00/100 ($300.00) Dollars per appliance; and

46. Seller agrees to make the following repairs upon the premises prior to closing:

(a) Repair damaged soffit

(b) Install transition strips between doorways

Debbie A Harris

**DEBBIE A. HARRIS, SELLER**

DocuSigned by:
Kelvin Endeavour 9/30/2025

**KELVIN ENDEAVOUR, JR., PURCHASER**

Signed by:
Kelsea N. Crockett 9/30/2025

**KELSEA N. CROCKETT, PURCHASER**

**SUPPLEMENTAL RIDER TO RESIDENTIAL CONTRACT OF SALE BETWEEN**

**DEBBIE A. HARRIS, AS SELLER, AND KELVIN ENDEAVOUR JR. AND KELSEA N. CROCKETT, AS PURCHASER FOR THE PREMISES 814 LINDEN BLVD, BROOKLYN, NY 11203**

In the event of any inconsistency between the provisions of this Supplemental Rider (this "Supplemental Rider") and those contained in the Residential Contract of Sale or any riders attached thereto (collectively, the "Contract") the provisions of this Supplemental Rider shall govern and be binding.

1. Seller shall supply any documents (including prior title insurance policies and existing surveys, if any) and/or affidavits requested by Purchaser or Purchaser's title insurance company and required thereby for the issuance of title insurance policies to Purchaser and Purchaser's mortgagee.

2. Seller agrees to maintain the Premises (including without limitation, the shrubs and landscaping), until the Closing or delivery and possession, whichever shall later occur, in the same condition in which they are at present.

3. Seller warrants and represents that the Premises and all improvements thereon, have been constructed and are being operated in accordance with all applicable zoning, subdivision, building, fire, health and environmental regulations, ordinances and requirements. Seller further warrants and represents that a Certificate of Occupancy, any health departmental approvals required and a Board of Fire Underwriter's Certificate covering the Premises and all structures thereon have been fully issued and are in full force and effect, and that these certificates and approvals are not violated by the existing structures or the use thereof as a two family dwelling. Seller agrees to deliver to Purchaser said certificates and approvals at closing. Seller agrees to indemnify and hold Purchaser harmless from and against all loss, cost, liability, damages, and expenses (including, without limitation, reasonable attorneys' fees and disbursements), which Purchaser may sustain as a result of the breach, inaccuracy, untruthfulness or misrepresentation of the foregoing representations. This paragraph shall survive the closing.

4. Seller represents and warrants that the Premises contain no underground tanks for the storage of petroleum products or other chemicals; that, the Premises is not the site of any spill, deposit, or storage of any toxic or hazardous waste, chemical, or substance; and that, no hazardous materials, including but not limited to asbestos, mold, paint containing lead, or urea formaldehyde, or any other type of foam insulation, has been installed in the Premises.

5. The articles of personal property which are attached or appurtenant to or used in connection with the Premises are included in this sale and no part of the purchase price is attributed thereto.

~~6. It is agreed that Seller shall permit Purchaser and Purchaser's architect, engineer, decorator and/or other authorized persons to have the right of access to the Premises from time to~~

~~time, upon reasonable notice at reasonable times, between the date hereof and the Closing (or delivery and possession, whichever shall later occur).~~

~~7.~~6. Prior to Closing, Seller shall deliver to Purchaser a Certificate of Occupancy for all improvements presently existing on the Premises requiring same, or a letter from the municipality confirming that no Certificate of Occupancy is required.

~~8.~~7. Seller represents and warrants as of the date hereof:

(a) the Premises has been and is now being used in accordance with all applicable zoning, subdivision, building, fire, health and environmental regulations, ordinances and has obtained all permits, if any, as required and the Premises and the present use and condition thereof do not violate any applicable deed restrictions or other covenants, restrictions or agreements applicable to the Premises;

(b) no notes or notices of violation of law or municipal ordinances or of Federal, State, County or Municipal or other governmental agency regulations, orders or requirements relating to the Premises have been entered or received by Seller and Seller has no reason to believe that any such note or notice may or will be entered;

(c) there is no action or proceeding (zoning or otherwise) or governmental investigation pending, or, to the knowledge of Seller, threatened against or relating to Seller, the Premises or the transactions contemplated by this Contract, nor, to the knowledge of Seller, is there any basis for such action;

(d) Seller is the sole owner of record and beneficial title to the Premises, free and clear of all liens and encumbrances, and Seller has full authority to transfer title to the Premises pursuant to this Contract. Except as specified herein, no person, firm or entity has any right to acquire the Premises or any rights or estates in and to the Premises;

(e) the execution of the Contract and Seller's performance hereunder does not violate any judgment, order, injunction, decree or award of any court, administrative agency or governmental body applicable to Seller or the Premises;

(f) the Premises are not located in a "wetlands" area; and

(g) the Premises are not located in a flood hazard area as defined by the Federal Insurance Administration.

Seller acknowledges that each of the representations, warranties and agreements made by it in this Paragraph __ and elsewhere in this Contract is material to the Purchaser. All of the representations, warranties and agreements set forth herein and elsewhere in the Contract and this Supplemental Rider shall be true upon the execution of the Contract, shall be deemed to be repeated at and as of the date of the Closing and shall not survive the Closing. Without limiting any of the rights of Purchaser elsewhere provided for in the Contract, it is agreed that the obligation of Purchaser to close title under this Contract is conditioned upon the accuracy and completeness of all of Seller's warranties and representations and the due compliance by Seller of all of their agreements set forth herein and elsewhere in the Contract and this Supplemental Rider.

~~9.~~8. Paragraph 16(e) is amended to include that the heating, air conditioning, alarm systems, generator, sprinkler, electrical, mechanical systems and all appliances shall all be in working order and that the roof and basement, if any, shall be free of leaks at the time of Closing.

~~10.~~9. Prior to the Closing or delivery and possession, whichever shall later occur, Seller, at its own expense, shall remove the personal property located at the Premises and not included in the sale contemplated hereby and shall repair or provide an appropriate credit to Purchaser for all damage to the Premises resulting from the removal of such personal property. Any of Seller's personal property not included in the sale contemplated hereby which is not removed from the Premises shall be deemed abandoned property. Purchaser may (but shall not be obligated to), at Seller's risk and expense, cause any such abandoned property to be removed from the Premises. The provisions of this paragraph shall survive the Closing.

~~11.~~10. Supplementing and modifying paragraph 21 of the Contract, notwithstanding anything to the contrary contained in paragraph 21:

(a) Seller shall pay or discharge: (i) all Defects (other than mortgages) provided the cost to discharge the same does not exceed (i) one percent of the sales price and (ii) all mortgages, judgments, tax liens and other consensual items; and

~~(b) Add the phrase "and all reasonable engineer's fees and other costs and expenses incurred by Purchaser in connection with the inspection of the Premises" after the words "of a new survey" on line 8 of clause (e).~~

~~12.~~11. Intentionally omitted.

~~13.~~12. Each party shall sign all documents, which may be necessary for the payment of the New York State Transfer Tax and Mansion Tax . Seller shall pay the New York State Transfer Tax and Purchaser shall pay the Mansion Tax and shall not claim any exemptions thereof. This obligation shall survive Closing.

~~14.~~13. The parties hereto agree that Seller or its attorney shall be responsible for the completion and filing of Form 1099S or such other successor form as may be prescribed by the Internal Revenue Service and for fulfilling all the obligations and requirements of Section 6045(e) of the Internal Revenue Code of 1986, as amended.

~~15.~~14. This Contract shall be deemed executed when signed by the parties hereto notwithstanding that the Brokers' signatures on the Disclosure of Information on Lead-Based Paint and Lead-Based Paint Hazards have not yet been obtained.

~~16.~~15. Seller and Purchaser hereby agree to indemnify, defend and hold the other harmless from and against any and all claims, demands, causes of action, losses, costs and expenses (including reasonable attorneys' fees, court costs and disbursements) arising from any claim for commission, fees or other compensation or reimbursement for expenses made by any broker (including the Brokers) engaged by or claiming to have dealt with Seller and Purchaser in connection with the Purchase Agreement or the transactions contemplated thereby. The terms of this paragraph shall survive closing.

~~17.~~16. Purchaser shall have the opportunity to have the Premises inspected for termites, mold and asbestos within 15 days of contract date. Seller will cooperate in making the Premises available for such inspections. Purchaser shall furnish to Seller written notice (an "Objection Notice") containing a list of specific deficiencies relating to termites, mold and asbestos and the corrections needed, together with a copy of the inspection report(s). Seller shall respond to Purchaser, within five (5) calendar days after receipt of an Objection Notice, and indicate whether or not Seller will, at its sole cost and expense, remedy such items to which Purchaser objects. If no notice is received by Purchaser within said five (5) calendar days, or if Seller elects to so remedy, Seller shall effectuate such remedy, at its sole cost and expense, to Purchaser's reasonable satisfaction, prior to Closing. If Seller does not elect to remedy, at its sole cost and expense, any item to which Purchaser objects, Purchaser may, within five (5) calendar days after receipt of Seller's notice, either (i) elect to proceed with the Closing or (ii) elect to terminate the Contract, in which event the Downpayment (and all interest thereon) shall be disbursed to Purchaser within three (3) days after such termination, and neither Seller nor Purchaser shall have any further rights, claims or obligations with respect to one another arising out of the Contract.

~~18.~~17. At or prior to the Closing, Seller will deliver to Purchaser any warranties, instruction manuals, appliance information, maintenance contracts, floor plans, surveys and contact information for service providers and contractors who performed work to the Premises, to the extent same are in Seller's possession. Seller agrees to cooperate with Purchaser in order to obtain documents and information for work performed and the appliances installed in the Premises.

~~19. Seller represents and warrants that there is no damage (other than reasonable wear and tear) to any part of the Premises which is covered, hidden, concealed or which it was impracticable for Purchaser to view or inspect prior to the date hereof. In the event such damage is revealed prior to Closing, Seller agrees to repair same prior to Closing or establish a reasonable allowance or credit to Purchaser at Closing or a reasonable escrow to cover the cost or necessary repair or replacement. Seller represents that the flooring underneath any personal property to be removed will be of the same character and condition as the exposed flooring, normal wear, tear and fading excepted.~~

~~20.~~18. Supplementing and modifying paragraph 25 of the Contract, Seller and Purchaser do hereby authorize their respective attorneys to act on their behalf with regard to sending or receiving any Notices EXCEPT DEFAULT NOTICES to be given or received by any of the parties hereto and expressly grant the attorneys the authority to request and grant any extension of time period provided in the Contract or this Supplemental Rider VIA EMAIL. Any Notices required to be given may be sent to or received by the attorneys for the respective parties (as listed below) with the same force and effect as if the said Notices were sent or received by the relevant party hereto.

This contract may be executed by DOCUSIGN and/or "PDF" and/or in one or more counterparts, each of which when so executed and delivered shall be deemed an original, but all of which taken together shall constitute but one and the same original.

~~21.~~19. In the event of the death of either Purchaser, then the surviving Purchaser, shall have the sole right to terminate this Contract, provided written notice of termination is sent within thirty (30) days after the occurrence of such death. In the event of the exercise of said right of cancellation, Seller shall immediately return to said surviving Purchaser, all monies deposited

hereunder by Purchaser on account of the purchase price. Upon such refund being made, this Contract shall be null and void and of no further force and effect and all rights, obligations and liabilities of the parties hereunder shall cease and come to an end.

~~22.~~20. Seller and Purchaser agree that the Purchaser is applying for a FHA loan and Seller agrees to cooperate with same. The parties agree that in the event the lender does not fund for any reason other than Purchasers willful default, Seller shall refund the Contract Deposit and return the deposit monies to Purchaser, and upon return and clearance, the parties shall have no further rights or liabilities to one another. Purchasers failure to notify Seller of the Institutional Lender's issuance of a Loan Commitment letter shall not be grounds for Seller to keep Purchasers deposit. Purchaser shall cooperate with Seller as well.

**[Remainder of page intentionally left blank - Signature page follows]**

Docusign Envelope ID: DA3A099A-8B0A-4385-9E9D-7748C6801531

IN WITNESS WHEREOF, the parties hereto have executed this Supplemental Rider as of the date first above written.

**SELLER:**

______________________

______________________

**PURCHASER:**

DocuSigned by:
Kelvin Endeavour 9/30/2025
F64FC10DBEE7414...

Signed by:
Kelsea N. Crockett 9/30/2025
382238160CEF475

**Disclosure of Information on Lead-Based Paint and/or Lead-Based Paint Hazards**

**Lead Warning Statement**

*Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.*

**Seller's Disclosure**

(a) Presence of lead-based paint and/or lead-based paint hazards (check (i) or (ii) below):

(i) ______ Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

______________________________________________

(ii) DAH Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b) Records and reports available to the seller (check (i) or (ii) below):

(i) ______ Seller has provided the purchaser with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below).

______________________________________________

(ii) ______ Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Purchaser's Acknowledgment** (initial)

(c) LE KLC Purchaser has received copies of all information listed above.

(d) LE KLC Purchaser has received the pamphlet *Protect Your Family from Lead in Your Home.*

(e) Purchaser has (check (i) or (ii) below):

(i) LE KLC received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or

(ii) ______ waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

**Agent's Acknowledgment** (initial)

(f) ________ Agent has informed the seller of the seller's obligations under 42 U.S.C. 4852(d) and is aware of his/her responsibility to ensure compliance.

**Certification of Accuracy**

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

| | | | |
|---|---|---|---|
| Debbie A H [signature] | 10/1/25 | | |
| Seller | Date | Seller | Date |
| DocuSigned by: [signature] | 9/30/2025 | DocuSigned by: Kelsea L. Crockett | 9/30/2025 |
| Purchaser | Date | Purchaser | Date |
| [signature] | 10/1/2025 | | |
| Agent | Date | Agent | Date |

CONTOUR MORTGAGE

# CONGRATULATIONS

## YOUR HOME LOAN IS **APPROVED**

Date 11/04/2025

**Dear Applicant,**

Contour Mortgage Corp. would like to thank you for submitting your home loan application. Your loan has been reviewed by our underwriting department and you are one step closer to closing on your home loan!

To make this process as efficient as possible, we believe communication is key. Your loan team professionals, detailed below, are always available to answer any questions or concerns you may have. Feel free to reach out to us by phone or email anytime.

**Loan Officer Juan Pablo Munoz NMLS #19351**
Email jmunoz@contourmtg.com
Phone 516-738-0339

**Processor Elizabeth Stano**
Email estano@contourmtg.com
Phone 516-393-8699

Corporate Office
990 Stewart Avenue, Suite 660
Garden City, NY 11530
Phone: 516.385.6900 Fax: 516.385.6999
NMLS# 34384

CONTOUR MORTGAGE

Corporate Office
990 Stewart Avenue, Suite 660
Garden City, NY 11530
Phone: (516) 385-6900 Fax: (516) 385-6999
NMLS#34384

## New York Prevailing Interest Rate Commitment

**Date: 11/04/2025** **Loan #: 2506177988**
**Borrower: Kelvin Endeavour**
**Co-Borrower: Kelsea N. Crockett**
**Address: 814 LINDEN BLVD, BROOKLYN, NY, 11203-3518**

We are pleased to advise you that your application for a mortgage loan has been approved. The loan will be evidenced by a note and secured by a first mortgage on the above captioned dwelling. The loan will only be made (the "Closing") if you meet all the terms and conditions in this commitment and all attached riders.

| | |
|---|---|
| **1. TYPE OF MORTGAGE:** | **Fixed** |
| **2. LOAN PURPOSE:** | **Purchase** |
| **3. PURCHASE AMOUNT:** | **$1,170,000.00** |
| **4. LOAN AMOUNT:** | **$1,148,808.00** |
| **5. DOWNPAYMENT:** | **$40,950.00** |
| **6. TERM OF LOAN:** | **360 Months** |
| **7. OCCUPANCY:** | **PrimaryResidence** |
| **8. LOAN TYPE:** | **FHA** |

**9. Interest Rate: Your interest rate will be determined at or prior to the closing date.**

Adjustment Period Months Caps: Per Adjustment Lifetime
Margin: % Index: % Index Source:
Interest Only Feature N
Balloon Payment: N

**10. MAXIMUM RATE: Should the rate of interest at the time the closing is scheduled exceed the rate for which you qualify, this commitment shall be null and void. The maximum rate of interest you qualify for is 6.625%**

**11. MONTHLY PAYMENT OF PRINCIPAL & INTEREST: $7,355.94**
**(If this is an adjustable rate mortgage, this is your initial monthly payment of principal and interest)**

**12. You will pay the following origination fees at the time of closing per your most recent Loan Estimate.**

**Origination Charge: $1,985.00**
**Discount Point (s): $8,616.06**
**Adjusted Origination Charge: $10,601**

**13. POINTS: The number of points that you will have to pay us will depend upon the interest rate that is set prior to closing. You will be required to pay a minimum of 0 points to a maximum of 3 points at closing.**

**14. COMMITMENT FEE: $**
**This fee is included in the Adjusted Origination Charge above.**

**15. COMMITMENT EXPIRATION DATE: The expiration date of this commitment is 01/03/2026 If your loan does not close by this date, we have no obligation to honor the terms of this agreement.**

**If this is a refinance of your primary residence, you will not receive the loan proceeds on the date of your closing. Therefore, your loan must close at least three (3) days prior to the expiration date stated above or the lender has no obligation to honor the terms of this agreement and may result in a higher interest rate or additional points being charged on your loan.**

16. Your Commitment Fee and/or points are non-refundable, except for the following conditions:

a. If this commitment is conditioned on the approval of a third-party investor or mortgage insurance company and that party rejects the loan.
b. If this commitment is conditioned upon the property appraisal report and said report is not favorable for the loan in which the commitment was issued.

**Borrower Initials _______**
**Co-Borrower Initials _____**

CONTOUR MORTGAGE

Corporate Office
990 Stewart Avenue, Suite 660
Garden City, NY 11530
Phone: (516) 385-6900 Fax: (516) 385-6999
NMLS#34384

**New York Prevailing Interest Rate Commitment**

c. If this commitment is conditioned upon an initial credit report and said report is not favorable for the loan which the commitment is issued.

d. If the interest rate exceeds the rate for which you qualify and therefore, this commitment becomes null and void.

17A. VA FUNDING FEE (If Applicable): $

17B. USDA Guarantee FEE (If Applicable): $

18. TITLE INSURANCE: The premises must have title insurance in an amount equal to the mortgage loan, insuring a valid first lien on the premises by a Title Insurance Company acceptable to us. Prior to the closing, our attorneys shall receive, at Your expense, (i) a copy of the title report from a licensed title insurance company, in form and content satisfactory to our attorneys including, among other things, departmental, judgment, and financing statement searches, and indicating only those exceptions as may be acceptable to our attorneys; (ii) copies of all instruments of record, leases, and/or other agreements affecting the premises; (iii) and accurate survey of the premises dated or re-dated to within thirty (30) days of the closing which, at our request, must be certified to Contour Mortgage Corp. At the closing, the title company must update the report.

19. CERTIFICATES, PERMITS, LICENSES AND APPROVALS: Prior to the closing, you must deliver to our attorney a valid permanent Certificate of Occupancy for the premises, and all other certificates, permits, licenses, and approvals by any governmental agency or anyone else having authority over the premises.

20. HAZARD INSURANCE: Prior to closing, you shall deliver a fully paid hazard insurance policy from an B rated company, in an amount equal to the full replacement value of the subject property. The policy must name CONTOUR MORTGAGE CORP., ISAOA. A paid receipt for the first year's premium must accompany the policy. Contour Mortgage Corp. cannot require you to obtain a policy in excess of the replacement costs of the improvements on the property securing the loan. THE POLICY MAY TAKE SEVERAL WEEKS TO PROCURE AND, ACCORDINGLY, YOU SHOULD NOT DELAY CONTACTING THE APPROPRIATE PROVIDERS. FAILURE TO PROCURE A POLICY WILL DELAY THE CLOSING.

21. FLOOD INSURANCE: Should it be determined your property lies in a Flood Zone, satisfactory flood insurance will be required as a condition of this loan, together with a paid receipt for the first year's premium, must be delivered to us at, or prior to closing.

22. PRIVATE MORTGAGE INSURANCE: PMI = N:
**Not required**, provided the appraised value of the property results in a Loan to Value ratio of 80% or less.
**If PMI is required**, you may initiate termination of the PMI when the principal balance of your loan reaches 80% of the original value of the home and you do the following: (1) submit a request in writing to your servicer requesting cancellation, (2) have a good payment history, (3) are current on your payments, (4) provide evidence that the value of the property has not declined below the original value of the property appraisal.

23. FHA MORTGAGE INSURANCE: If your mortgage is a loan guaranteed by the FHA an up-front mortgage insurance premium must be paid at closing, and an annual insurance premium will be included in your mortgage payment.

24. REAL ESTATE AND HAZARD INSURANCE ESCROWS: Escrow deposits shall be payable in monthly installments equal to one twelfth (1/12) of the estimated annual taxes, water and sewer charges as well as hazard, private mortgage insurance, monthly mortgage insurance premium, common charges as required. At closing, you will be required to pay an initial deposit, which along with monthly deposits, will be sufficient to pay for such items when due.

An escrow impound account is Not Waived at closing. If an account is established an initial escrow deposit will be required in accordance with RESPA.

25. COSTS, FEES AND EXPENSES DUE AT CLOSING: You will be required to pay at the closing, all costs, fees and expenses in connection with the loan. These may include, for example, the fees already referred to in this commitment, brokerage charges, mortgage tax, filing fees, recording fees and fees for title insurance, surveys, building department and other searches of the public record, including a final inspection fee.

26. OTHER FINANCING: There shall be no other financing affecting the premises at the closing.
**Borrower Initials _______**
**Co-Borrower Initials _____**

CONTOUR MORTGAGE

Corporate Office
990 Stewart Avenue, Suite 660
Garden City, NY 11530
Phone: (516) 385-6900 Fax: (516) 385-6999
NMLS#34384

**New York Prevailing Interest Rate Commitment**

27. CHANGE OF OWNERSHIP: Principal and interest to become due at the option of the holder of the mortgage on conveyance or transfer of title.

28. ADDITIONAL SECURITY: The mortgage will give Contour Mortgage Corp., a security interest in any rents and profits, insurance proceeds and condemnation awards affecting the premises

29. ASSUMPTION: Someone buying your house may assume your loan under certain conditions

30. CANCELLATION OF COMMITMENT: Contour Mortgage Corp. will not be obligated to close the loan if, at or prior to the closing, the premises are damaged by fire, smoke or other casualty, any change in who the borrower(s) is (are), any statement you have made, in your application or elsewhere, is found to be false or misleading, any change that adversely affects your financial condition or employment status from that presented in your application, any change in the property or in our information about the property, including its value or factors affecting value, you do not comply with any of the conditions contained in this commitment, and/or affected by any violation of law, statue, rule or regulation of any governmental or regulatory authority.

31. PREPAYMENT PROVISIONS: A prepayment penalty will not apply. Please refer to closing documents. You may prepay in whole or in part with no penalty.

32. ASSIGNMENT: This commitment may not be assigned or transferred by you.

33. NO ORAL MODIFICATION: This agreement cannot be changed orally.

34. APPROVALS: All details pertaining to this loan must be approved by Contour Mortgage Corp.'s attorney, and you must execute and deliver at the closing all documents required by Contour Mortgage Corp., in connection with the loan.

35. DOCUMENTATION: The following is a list of information and conditions that we may require you to produce and/or satisfy prior to closing your loan:

Title report and insurance, property survey, copy of Certificate of Occupancy for use, satisfactory final inspection (if new construction), evidence of appropriate hazard insurance, evidence of flood insurance as appropriate, master policy insurance certificate (if applicable in the case of condominiums), termite inspection report, radon test, well water test report and septic inspection report

If the mortgage loan is related to a cooperative housing unit you will also be required to produce and/or satisfy prior to closing the following:

Proprietary lease, recognition agreement, pledge of shares of stock, warranty and representation that no outstanding claims against the proprietary lease or stock will exist at closing and a copy of certificate of occupancy and title policy for the entire building if conversion has occurred within the last six (6) months.

36. ADDITIONAL CONDITIONS: This commitment is further subject to the following conditions and/or requirements.

**See Additional Conditions – Rider**

**Borrower Initials _______**
**Co-Borrower Initials _____**

CONTOUR MORTGAGE

Corporate Office
990 Stewart Avenue, Suite 660
Garden City, NY 11530
Phone: (516) 385-6900 Fax: (516) 385-6999
NMLS#34384

**New York Prevailing Interest Rate Commitment**

**ACCEPTANCE OF COMMITMENT**

**THE ISSUANCE OF THIS LOAN COMMITTMENT IS NOT CONSIDERED CONSUMATION OF THIS TRANSACTION. THE LOAN TERMS DESCRIBED IN THIS AGREEMENT APPLY ONLY TO THE LOAN PROGRAM YOU HAVE CHOSEN. IF YOU CHOOSE TO CHANGE PROGRAMS, THIS AGREEMENT MAY BECOME NULL AND VOID.**

**THIS COMMITMENT WILL BE NULL AND VOID IF YOU DO NOT SIGN AND RETURN THE ORIGINAL TO CONTOUR MORTGAGE CORP., WITHIN FIFTEEN DAYS (15) FROM THE DATE OF ISSUE.**

Thank You-

*Kathy Swensen* **11/04/2025**

**Underwriter – Contour Mortgage**

**IF YOU SIGN THIS COMMITMENT, AND YOU DO NOT CLOSE THIS LOAN IN ACCORDANCE WITH THE DESCRIBED TERMS, YOU MAY LOSE SOME OR ALL OF THE FEES OR CHARGES YOU HAVE PAID.**

**I/We hereby accept this Commitment and all conditions set forth therein and agree to proceed with the closing of the loan. I/We have received a duplicate original of this document.**

________________________ ______________

Borrower Date

________________________ ______________

Co – Borrower Date

________________________ ______________

Co – Borrower Date

________________________ ______________

Co – Borrower Date

**Borrower Initials ______**
**Co-Borrower Initials _____**

CONTOUR MORTGAGE

Corporate Office
990 Stewart Avenue, Suite 660
Garden City, NY 11530
Phone: (516) 385-6900 Fax: (516) 385-6999
NMLS#34384

## New York Prevailing Interest Rate Commitment

### Additional Conditions – Rider

Prior to Closing:

Appraisal - Acceptable appraisal report. Must also include Operating Income Statement

Credit - Loan Approval - Final loan approval is subject to receipt and acceptance of all initial loan conditions. Additional conditions may apply.

Credit - MAX DTI - Maximum Debt-to-Income Ratio is 55%

Credit - Other - Provide documentation to show Child Support Enforcement collection #NZ81572P1 has been brought current. Must also ensure all obligations accounted for, including arrears if applicable. Approval subject to and additional conditions may apply.

FHA - Amendatory Clause - Amendatory Clause/Real Estate certification to be executed by buyers, sellers and RE Agents.

Income - WVOE - Provide corrected written verification of employment for Kelvin with AMSC LLC along with year ending 2023, 2024 and most recent paystubs to verify all earnings including accurate breakdown of regular and overtime earnings. Income subject to change.

Insurance - Homeowners Insurance and Paid Receipt - Evidence of homeowners insurance policy with sufficient coverage and policy invoice or paid in full receipt.

Property - Title Review - Title Report including 24 month chain of title, judgement searches, patriot searches; OFAC searches and title clearance and bill.

QC - Commitment Letter - Final Locked - Commitment letter to be signed by all borrower(s) at least 3 days prior to closing.

QC - Quality Control Review - Quality Control to provide an acceptable pre-closing review of loan package.

Income - WVOE - Co-Borrower - Provide corrected written verification of employment for Kelsea with Catholic Guardian Svcs to include accurate year to date good through date along with explanation of w2 discrepancy amounts on wvoe and w2s provided. Also to provide year end 2023 and 2024 along with most recent paystubs. Income subject to change.

Credit - Credit explanation letter - Borrower(s) to provide a signed explanation letter for all address variations, inquiries and aka's listed on credit report.

Appraisal - HVCC Acknowledgment of Receipt - HVCC appraisal receipt confirmation disclosure.

Assets - EMD - Provide copy of wire confirmation

Assets - LOE - Provide explanation for Bam Go LIHTC web payment for $1115.62, NYC Law Dept. for $50 and zelle payments out of Bank statement

Credit - Additional Property - Provide documentation to support Kelvin has no ownership in 12022 194th St. Saint Albans, NY property

Assets - Escrow Letter - Escrow letter from seller's attorney confirming receipt of down payment - must state amount & date, property address & name of borrower(s).

Credit - Divorce Decree/Separation Agreement/Child Support/Alimony - Provide actual and complete child support orders as applicable for Kelvin- child support deductions reflected on paystubs for both jobs at varying amounts. Must ensure all support obligations are accounted for and included in liabilities. Approval subject to and additional conditions may apply.

Income - WVOE - Provide written verification of employment for Kelvin with the Brooklyn Hospital to verify all earnings. Income subject to change.

**Borrower Initials _______**
**Co-Borrower Initials _____**

CONTOUR MORTGAGE

Corporate Office
990 Stewart Avenue, Suite 660
Garden City, NY 11530
Phone: (516) 385-6900 Fax: (516) 385-6999
NMLS#34384

**New York Prevailing Interest Rate Commitment**

Income - WVOE - Co-Borrower - Provide written verification of employment for Kelsea with meaningful NY Initiative for People to verify all earnings. Income subject to change

Property - Repairs in Contract of Sale Satisfactorily Completed - Provide a letter from the borrowers, signed and dated, stating that all repairs required in Contract of Sale have been completed to their satisfaction.

At Closing:

Closing - (1003) Final 1003 & 92900's - Borrower(s) to sign and date final loan application (1003) and addendum (92900's).

Closing - Cash from borrower - Max cash from borrower at closing is $TBD. If cash from borrower exceeds this amount additional assets must be provided (sourced and seasoned) and loan must be returned to underwriting for review. Loan will not fund without UW approval.

Closing - AKA Affidavit - Borrowers to sign an AKA affidavit.

Closing - Closing Docs - Borrower(s) to sign and date all required closing disclosures.

Closing - Final CD - Final CD must be approved by the lender prior to closing.

Closing - Identity - Photo ID - Borrower(s) to bring acceptable valid photo id to closing. (Driver's License, Passport and/or Alien Registration Card.)

Closing - Legal - Seller Credit FHA - Seller credit on CD Settlement Statement not to exceed $11700. (Borrower must meet minimum statutory investment of 3.5% of purchase price.) Seller's concession not to exceed closing costs.

Closing - Max PITI - Max PITI is $8,892.11

Closing - Property - Contract of Sale Changes - All changes, strikeouts and squeeze ins to contract of sale, to be initialed by all parties.

Closing - CD- No repair credit or violation credit on CD - No repair credit or violation credit on CD.

**Borrower Initials** _______
**Co-Borrower Initials** _____

COURT
STATE OF NEW YORK, COUNTY OF

Index No. Year

OSWALD DAVID

POWER OF ATTORNEY

LAW OFFICE OF DENRICK W. COOPER, PLLC
Attorney At Law

*Attorney(s) for*

*Office and Post Office Address, Telephone*
207-23 Hillside Avenue
Queens Village, New York 11427
Telephone (718) 479-9500 Facsimile (718) 479-9509

To

Attorney(s) for

Signature (Rule 130-1.1-a)

Print name beneath

Service of a copy of the within is hereby admitted.

Dated: ______________________________

PLEASE TAKE NOTICE:

☐ NOTICE OF ENTRY
that the within is a *(certified) true* copy of a
entered in the office of the Clerk of the Court on

☐ NOTICE OF SETTLEMENT
that an order copy attached,
will be presented for a settlement to the HON. a judge of the
Court, at
on at M.

Dated,

LAW OFFICE OF DENRICK W. COOPER, PLLC

STATE OF NEW YORK, COUNTY OF ss.: ATTORNEY'S CERTIFICATION OF COPY — CPLR § 2105

I, the undersigned, an attorney admitted to practice in the courts of New York State, with offices at the address set forth on the reverse side, certify that I have compared the within with the original and found it to be a true and complete copy.

Dated:

Print name under signature

STATE OF NEW YORK, COUNTY OF ss.: VERIFICATION — CPLR §3020; §3021

I, the undersigned, *being duly sworn, depose and* say: I am

Check Applicable Box

☐ Individual Verification — in the within action; the foregoing is true to my own knowledge, except as to the matters therein stated to be alleged on information and belief, and as to them I believe it to be true.

☐ Corporate Verification — the a an officer of corporation; the foregoing is true to my own knowledge, except as to the matters therein stated to be alleged upon information and belief, and as to them I believe it to be true.

☐ Attorney Verification — an attorney admitted to practice in the courts of New York State, with offices at the address set forth on the reverse side; I affirm under penalties of perjury that: I am the attorney for the The reason this verification is made by me and not by

The foregoing is true to my own knowledge, except as to the matters therein stated to be alleged on information and belief, and as to them I believe it to be true.

The grounds for my belief as to all matters not stated upon my own knowledge are:

*Dated:*

*Sworn to before me on*

Print name under signature.

AFFIRMATION OF SERVICE OF PAPERS (CPLR §2103)

(If more than one box is checked — indicate after names type of service used.)

STATE OF NEW YORK, COUNTY OF ss.:

I, the undersigned, an attorney admitted to practice in New York State, with offices at the address set forth on the reverse side, affirm under penalties of perjury:

On I personally served the within

Check Applicable Box

☐ Service By Mail — by mailing a copy to each of the following persons at the last known address set forth after each name below.

☐ Personal Delivery — by delivering a copy to each of the following *attorney(s)* at the last known address set forth after each name below. I knew *the attorney(s)* served to be the *attorney(s) for* the party(ies) stated below.

☐ Overnight Delivery Service — by dispatching a copy by overnight delivery to each of the following persons at the last known address set forth after each name below.

☐ Additional Copy By Electronic Means — by transmitting a copy to the following persons by ☐ FAX at the telephone number set forth after each name below ☐ E-MAIL at the E-Mail address set forth after each name below, which was designated by the attorney for such purpose, and by mailing a copy to the address set forth after each name.

# Power of Attorney

# of

# Oswald David

## December 7, 2023

LAW OFFICES
LAW OFFICE OF DENRICK W COOPER PLLC
207-23 HILLSIDE AVE
QUEENS VILLAGE, NEW YORK 11427

# Power of Attorney of Oswald David Table of Contents


| | | |
|---|---|---|
| **Article One** | **Appointment, Effectiveness, and Durability** | **3** |
| Section 1.01 | Appointment | 3 |
| Section 1.02 | Authority to Delegate | 3 |
| Section 1.03 | Spouse as Agent | 3 |
| Section 1.04 | Prior or Joint Agent Unable to Act | 3 |
| Section 1.05 | Effectiveness | 3 |
| Section 1.06 | Durability | 3 |
| Section 1.07 | Termination of Power of Attorney | 3 |
| **Article Two** | **General Powers** | **4** |
| Section 2.01 | Real and Personal Property Sales and Purchases | 4 |
| Section 2.02 | Real Property Management | 4 |
| Section 2.03 | Tangible Personal Property Management | 5 |
| Section 2.04 | Residence and Tangible Personal Property | 6 |
| Section 2.05 | Bank Accounts and Banking Transactions | 6 |
| Section 2.06 | Investments and Investment Transactions | 6 |
| Section 2.07 | Securities | 7 |
| Section 2.08 | Business Operations | 7 |
| Section 2.09 | Partnership Interests | 9 |
| Section 2.10 | Obligations | 9 |
| Section 2.11 | Bankruptcy | 9 |
| Section 2.12 | Legal Actions | 10 |
| Section 2.13 | Fiduciary Positions | 10 |
| Section 2.14 | My Spouse | 10 |
| Section 2.15 | My Support | 10 |
| Section 2.16 | Support of Dependents | 11 |
| Section 2.17 | Recreation and Travel | 11 |
| Section 2.18 | Advance Funeral Arrangements | 11 |
| Section 2.19 | Memberships | 11 |
| **Article Three** | **Additional Powers** | **11** |
| Section 3.01 | Fixtures and Personalty | 11 |
| Section 3.02 | Insurance Transactions | 11 |
| Section 3.03 | Estate Transactions | 11 |
| Section 3.04 | Disclaimers and Statutory Elections | 12 |
| Section 3.05 | Powers of Appointment | 12 |

| | | |
|---|---|---|
| Section 3.06 | Trusts | 12 |
| Section 3.07 | Safe-Deposit Boxes | 12 |
| Section 3.08 | Business Succession Agreements | 12 |
| Section 3.09 | Loans and Notes | 13 |
| Section 3.10 | Annuities | 13 |
| Section 3.11 | Government Agencies and Benefits | 13 |
| Section 3.12 | Deal with Tax Authorities | 13 |
| Section 3.13 | Health Care Decisions | 14 |
| Section 3.14 | HIPAA Authorization | 14 |
| Section 3.15 | Reimbursement of Health Care Agent | 14 |
| Section 3.16 | Employment of Professionals | 14 |
| Section 3.17 | Gifting Powers | 15 |
| Section 3.18 | Gift-Splitting | 15 |
| Section 3.19 | Intent to Return Home | 15 |
| Section 3.20 | Domicile | 15 |
| Section 3.21 | Nomination of Conservator | 15 |
| Section 3.22 | Business Activities | 15 |
| Section 3.23 | Marital Agreements and Designation of Spouse as Agent | 16 |
| Section 3.24 | Caregiver Agreements | 16 |
| Section 3.25 | Qualified Plans | 16 |
| Section 3.26 | Enforcement Proceedings | 16 |
| Section 3.27 | Credit Cards | 16 |
| Section 3.28 | Online Accounts, Digital Assets, and Digital Devices | 16 |
| Section 3.29 | Domestic Pets | 18 |
| Section 3.30 | Estate and Long Term Care Planning | 18 |
| Section 3.31 | Ownership and Rights of Survivorship | 19 |
| Section 3.32 | Beneficiary Designations | 19 |
| Section 3.33 | Spiritual and Religious Needs | 19 |
| Section 3.34 | Companionship | 20 |
| Section 3.35 | U.S. Mail | 20 |
| **Article Four** | **Incidental Powers** | **20** |
| Section 4.01 | Document Execution | 20 |
| Section 4.02 | Custody of Documents | 20 |
| **Article Five** | **Limitation on Powers** | **20** |
| Section 5.01 | My Agent to Avoid Disrupting My Estate Plan | 20 |
| Section 5.02 | Tax Sensitive Powers | 21 |
| **Article Six** | **Administrative Powers and Provisions** | **21** |
| Section 6.01 | Compensation and Reimbursement to Agent | 21 |
| Section 6.02 | Amendment and Revocation | 22 |

| | | |
|---|---|---|
| Section 6.03 | Resignation | 22 |
| Section 6.04 | Signature of Agent | 22 |
| Section 6.05 | Interpretation | 22 |
| Section 6.06 | Use of "Agent" Nomenclature | 22 |
| Section 6.07 | Third-Party Reliance | 22 |
| Section 6.08 | Effect of Duplicate Originals or Copies | 23 |
| Section 6.09 | Governing Law | 23 |
| Section 6.10 | Severability | 23 |
| **Article Seven** | **Duties and Liabilities of My Agent** | **23** |
| Section 7.01 | Duty to Account | 23 |
| Section 7.02 | Limitation of Liability of My Agent | 23 |
| **Article Eight** | **Acceptance of Appointment as Agent** | **24** |
| **Article Nine** | **Declarations of the Principal** | **24** |

# Power of Attorney of Oswald David

**Statutory Notices under New York General Obligations Law section 1-1501B.1(d):**

CAUTION TO THE PRINCIPAL:

Your Power of Attorney is an important document. As the "principal," you give the person whom you choose (your "agent") authority to spend your money and sell or dispose of your property during your lifetime without telling you. You do not lose your authority to act even though you have given your agent similar authority.

When your agent exercises this authority, he or she must act according to any instructions you have provided or, where there are no specific instructions, in your best interest. "Important Information for the Agent" at the end of this document describes your agent's responsibilities.

Your agent can act on your behalf only after signing the Power of Attorney before a notary public.

You can request information from your agent at any time. If you are revoking a prior Power of Attorney, you should provide written notice of the revocation to your prior agent(s) and to any third parties who may have acted upon it, including the financial institutions where your accounts are located.

You can revoke or terminate your Power of Attorney at any time for any reason as long as you are of sound mind. If you are no longer of sound mind, a court can remove an agent for acting improperly.

Your agent cannot make health care decisions for you. You may execute a "Health Care Proxy" to do this.

The law governing Powers of Attorney is contained in the New York General Obligations Law, Article 5, Title 15. This law is available at a law library, or online through the New York State Senate or Assembly websites, www.senate.state.ny.us or www.assembly.state.ny.us.

If there is anything about this document that you do not understand, you should ask a lawyer of your own choosing to explain it to you.

IMPORTANT INFORMATION FOR THE AGENT:

When you accept the authority granted under this Power of Attorney, a special legal relationship is created between you and the principal. This relationship imposes on you legal responsibilities that continue until you resign or the Power of Attorney is terminated or revoked. You must:

(1) act according to any instructions from the principal, or, where there are no instructions, in the principal's best interest;

(2) avoid conflicts that would impair your ability to act in the principal's best interest;

(3) keep the principal's property separate and distinct from any assets you own or control, unless otherwise permitted by law;

(4) keep a record or all receipts, payments, and transactions conducted for the principal; and

(5) disclose your identity as an agent whenever you act for the principal by writing or printing the principal's name and signing your own name as "agent" in either of the following manners: (Principal's Name) by (Your Signature) as Agent, or (your signature) as Agent for (Principal's Name).

You may not use the principal's assets to benefit yourself or anyone else or make gifts to yourself or anyone else unless the principal has specifically granted you that authority in this document, which is either a Statutory Gifts Rider attached to a Statutory Short Form Power of Attorney or a Non-Statutory Power of Attorney. If you have that authority, you must act according to any instructions of the principal or, where there are no such instructions, in the principal's best interest. You may resign by giving written notice to the principal and to any co-agent, successor agent, monitor if one has been named in this document, or the principal's guardian if one has been appointed. If there is anything about this document or your responsibilities that you do not understand, you should seek legal advice.

Liability of agent:

The meaning of the authority given to you is defined in New York's General Obligations Law, Article 5, Title 15. If it is found that you have violated the law or acted outside the authority granted to you in the Power of Attorney, you may be liable under the law for your violation.

**Creation of Power of Attorney and Revocation of Prior Powers of Attorney:**

**NOTICE: You may rely on this document only if it is an original, as evidenced by the inked signature of the Principal, or a copy that has been attested by a licensed attorney or a state-authorized officer (such as a notary public) to be a true, exact, complete, and unaltered copy of an original. (See Section 6.08.)**

I, Oswald David of 1232 East 69th Street, Brooklyn, NY 11234, am creating a durable power of attorney intended to comply with New York law. I hereby revoke all powers of attorney previously granted by me as Principal and terminate all Agency relationships created by me.

# Article One
# Appointment, Effectiveness, and Durability

### Section 1.01 Appointment

I appoint Debbie Ann Harris to serve as my Agent.

### Section 1.02 Authority to Delegate

Any serving Agent may delegate, in writing, any of the Agent's authority granted under this Power of Attorney. The serving Agent making a delegation under this provision may revoke the delegation at any time.

### Section 1.03 Spouse as Agent

My spouse may not serve as my Agent if we are legally separated. If a named Agent was my spouse at the time of execution of this Power of Attorney and an action is filed for the dissolution or annulment of my marriage to the Agent or for our legal separation, then that named Agent may not serve (however, if I named a former spouse at the time of execution, my former spouse may serve as my Agent).

### Section 1.04 Prior or Joint Agent Unable to Act

A successor Agent, or an Agent serving jointly with another Agent, may establish that the acting Agent or joint Agent is no longer able to serve as Agent by signing an affidavit that states that the Agent is not available or is incapable of acting. The affidavit may (but need not) be supported by a death certificate of the Agent, a certificate showing that a guardian or conservator has been appointed for the Agent, a letter from a physician stating that the Agent is incapable of managing his or her own affairs, or a letter from the Agent stating his or her unwillingness to act or delegating his or her power to the successor Agent.

### Section 1.05 Effectiveness

The authority granted to my Agent under this Power of Attorney shall be effective immediately upon signing.

### Section 1.06 Durability

The authority granted to my Agent under this Power of Attorney shall not be affected by my subsequent disability, incompetency, incapacity, or lapse of time.

### Section 1.07 Termination of Power of Attorney

This Power of Attorney shall expire at the earlier of:

(i) my death (except for post-death matters allowed under state law); or

(ii) my revocation of this Power of Attorney.

# Article Two
# General Powers

My Agent may do all acts on my behalf with respect to my property. In addition, my Agent may do everything necessary to exercise any power, including powers with respect to any real property I now own or may acquire in the future.

## Section 2.01 Real and Personal Property Sales and Purchases

Unless specifically limited by the other provisions of this Power of Attorney, my Agent may:

(i) sell, exchange, and convey any interest I own in any kind of property, real or personal, including homestead property under New York law or the laws of any other state, and determine the terms of sale and grant options with regard to sales;

(ii) dispose of sales proceeds on my behalf as my Agent determines is appropriate;

(iii) buy any kind of property, real or personal, including homestead property under New York law or the laws of any other state, and determine the terms for buying property and may obtain options to buy property;

(iv) arrange to insure purchased property, and otherwise arrange for its safekeeping;

(v) borrow money for the purposes described in this Section and to secure the loan in any manner my Agent determines is appropriate, and repay the loan from my funds;

(vi) pay for any purchases made; and

(vii) repay any cash advanced from my credit cards.

## Section 2.02 Real Property Management

My Agent may manage any real property I now own or may acquire in the future, including my personal residence and homestead property under New York law or the laws of any other state. Unless specifically limited by the other provisions of this Power of Attorney, my Agent may:

(i) declare, create, or execute a homestead on my personal residence under New York law or the laws of any other state; and terminate, abandon, release, or give a waiver on any interest I have in a homestead;

(ii) lease and sublease property for any period, and grant options to lease or subdivide property, even if the term of the lease, sublease, or option extends beyond the term of this Power of Attorney;

(iii) eject and remove tenants or other persons from property, and recover the property by all lawful means;

(iv) collect and sue for rents;

(v) execute occupancy agreements on my behalf;

(vi) pay, compromise, or contest tax assessments and apply for tax assessment refunds;

(vii) subdivide, partition, develop, dedicate property to public use without consideration. and grant or release easements over my real property;

(viii) maintain, protect, repair, preserve, insure, build upon, improve, demolish, abandon, and alter all or any part of my real property;

(ix) employ laborers;

(x) obtain or vacate plats and adjust boundaries;

(xi) adjust differences in the property's value on exchange or partition by giving or receiving consideration;

(xii) release or partially release real property from a lien;

(xiii) enter into any contracts, covenants, and warranty agreements regarding my real property that my Agent considers appropriate; and

(xiv) encumber property, including homestead property under New York law or the laws of any other state, by mortgage or deed of trust.

## Section 2.03 Tangible Personal Property Management

My Agent may manage any tangible personal property I now own or may acquire in the future. Unless specifically limited by the other provisions of this Power of Attorney, my Agent may:

(i) lease and sublease property for any period, and grant options to lease or subdivide property, even if the term of the lease, sublease, or option extends beyond the term of this Power of Attorney;

(ii) recover my property by all lawful means;

(iii) collect and sue for rents;

(iv) take possession of and use my property in order to exercise any authority granted in this Power of Attorney;

(v) pay, compromise, or contest tax assessments and apply for tax assessment refunds;

(vi) maintain, protect, repair, preserve, insure, improve, destroy, and abandon all or any part of my property; and

(vii) grant security interests in my property.

My Agent may accept tangible personal property as a gift or as security for a loan.

### Section 2.04 Residence and Tangible Personal Property

Without limiting any other authority granted in this Power of Attorney, if my Agent determines that I will never be able to return to my residence from a hospital, hospice, nursing home, convalescent home, or similar facility, my Agent may sell, lease, sublease, or assign my interest in my residence on terms and conditions that my Agent considers appropriate.

As it relates to items of tangible personal property remaining in my residence, my Agent may:

(i) store and safeguard any items, and pay all storage costs;

(ii) sell any items that my Agent believes I will never need again on terms and conditions that my Agent considers appropriate; or

(iii) transfer custody and possession of any item to the person named in my estate planning documents as the person to receive that item upon my death.

### Section 2.05 Bank Accounts and Banking Transactions

My Agent may establish bank accounts of any type in one or more bank institutions that my Agent may choose. My Agent may modify, terminate, make deposits to, write checks on, make withdrawals from (including by electronic funds transfer), and grant security interests in any account in my name or to which I am an authorized signatory, except accounts held by me in a fiduciary capacity. In exercising this authority, it does not matter whether or not the account was established by me or for me by my Agent. My Agent is authorized to negotiate, endorse, or transfer any check or other instrument with respect to any account, to contract for any services rendered by any bank or financial institution, and to execute, on my behalf as principal, any agency or power of attorney forms furnished by a bank with respect to accounts with the bank that appoints the bank or any person as my Agent.

My Agent is authorized to access, establish, cancel, or continue online bank accounts (through the Internet or other similar method) and conduct online banking transactions of any kind as authorized in this Section.

### Section 2.06 Investments and Investment Transactions

My Agent may invest and reinvest all or any part of my property in any other property of whatever type, real or personal, tangible or intangible, and whether located inside or outside the geographic borders of the United States and its possession or territories. Unless specifically limited by the other provisions of this Power of Attorney, my Agent may:

(i) invest in securities of all kinds, limited partnership interests, real estate or any interest in real estate whether or not productive at the time of investment, commodities contracts of all kinds, interests in trusts including investment trusts;

(ii) participate in common, collective, or pooled trust funds or annuity contracts;

(iii) sell or otherwise terminate any investment made by me or on my behalf, and establish and terminate savings and money market accounts at banks and other financial institutions;

(iv) establish and terminate accounts with securities brokers and use brokerage accounts to make short sales;

(v) access, establish, cancel, or continue online investment accounts (through the Internet or other similar method) and conduct online investment transactions of any kind as authorized in this Section;

(vi) establish and terminate agency accounts with corporate fiduciaries; and

(vii) employ and fire financial and investment advisors.

## Section 2.07 Securities

My Agent may exercise all rights regarding securities that I own now or in the future. Specifically, my Agent may:

(i) buy, sell, and exchange all types of securities and financial instruments, including, but not limited to, stocks, bonds, and mutual funds;

(ii) receive certificates and other evidences of ownership with regard to securities;

(iii) hold securities in bearer or uncertified form and use a central depository, clearing agency, or book-entry system such as The Depository Trust Company, Euroclear, or the Federal Reserve Bank of New York;

(iv) execute stock powers or similar documents on my behalf and delegate to a transfer agent or similar person the authority to register any stocks, bonds, or other securities into or out of my name or nominee's name;

(v) place all or any part of my securities in the custody of a bank or trust company or in the name of its nominee;

(vi) employ a broker-dealer as custodian for my securities and register the securities in the name of the broker-dealer or its nominee;

(vii) exercise voting rights with respect to securities in person or by proxy, enter into voting trusts, and consent to limitations on the right to vote;

(viii) participate in any reorganization, recapitalization, merger, or similar transaction; and

(ix) exercise any subscription rights, option rights (whether or not qualified under the Internal Revenue Code) or other rights to which I am entitled now or in the future, or to sell and dispose of these rights, and, if required, to sign my name to rights, warrants, or other similar instruments.

## Section 2.08 Business Operations

My Agent may continue operating and managing any business in which I now or later own an interest for the period of time and in any manner my Agent considers appropriate.

Unless specifically limited by the other provisions of this Power of Attorney, my Agent may:

(i) act as a director, general or limited partner, or associate or officer of the business;

(ii) select and vote for directors, partners, associates, and officers of the business and enter into owners' agreements with other owners of any business in which I have an interest;

(iii) execute agreements and amendments to agreements necessary to the operation of the business including, but not limited to, stockholder agreements, partnership agreements, buy-sell agreements, and operating agreements for limited liability companies;

(iv) hire and fire employees;

(v) pay employees' salaries and provide for employee benefits;

(vi) employ legal, accounting, financial, and other consultants;

(vii) continue, modify, terminate, renegotiate, and extend any contracts with any person, firm, association, or corporation;

(viii) execute business tax returns and other government forms required for my business;

(ix) pay all business-related expenses;

(x) transact business for me in my name and on my behalf;

(xi) contribute additional capital to the business;

(xii) change the name or the form of the business;

(xiii) incorporate the business;

(xiv) enter into a partnership agreement with other persons;

(xv) join in a plan to reorganize or consolidate my business, or merge my business with any other business;

(xvi) establish the value of the business under "buy-out" or "buy-sell" agreements to which I am a party;

(xvii) create, continue, or terminate retirement plans for my business' employees and make contributions required by those plans;

(xviii) advance money or other property to the business and make loans of cash or securities to the business as my Agent considers appropriate; and

(xix) borrow for the business and secure any loans with business assets or my personal assets.

My Agent may sell, liquidate, or close a business upon terms my Agent considers appropriate, including a sale in exchange for cash, a private annuity, and an installment note or any combination of those arrangements.

### Section 2.09 Partnership Interests

My Agent may manage any general, limited, or special partnership interest I own now or in the future. Unless specifically limited by the other provisions of this Power of Attorney, my Agent may:

(i) exercise any right, power, privilege, or option I may have or may claim under any contract with the partnership;

(ii) modify or terminate my interest on terms and conditions my Agent considers appropriate;

(iii) enforce the terms of the partnership agreement for my protection by instituting or maintaining any action, proceeding or otherwise as my Agent considers appropriate; and

(iv) defend, arbitrate, settle, or compromise any action or other legal proceeding to which I am a party because of my membership in the partnership.

### Section 2.10 Obligations

My Agent may collect all rights and benefits to which I am entitled now or in the future, including, but not limited to rights to, cash payments, property, debts, accounts, legacies, bequests, devises, dividends, and annuities. In collecting my obligations, unless specifically limited by the other provisions of this Power of Attorney, my Agent may demand, sue for, arbitrate, settle, compromise, receive, deposit, expend for my benefit, reinvest, or otherwise dispose of these matters as my Agent determines appropriate.

### Section 2.11 Bankruptcy

My Agent may act for me with respect to bankruptcy or insolvency, whether voluntary or involuntary, concerning me or some other person, or with respect to a reorganization, receivership, or application for the appointment of a receiver or trustee that affects an interest I have in any property or other thing of value.

Specifically, and without limiting the preceding, my Agent may act for me with respect to filing for bankruptcy, and in support of such filing may—

(i) employ counsel to represent me;

(ii) select any exemptions available to me;

(iii) determine which debts to reaffirm;

(iv) make any decisions regarding repayment and reorganization plans;

(v) discuss my affairs with credit-counseling and debtor-education services;

(vi) discuss my affairs with and employ debt-restructuring services; and

(vii) take any other actions to further my interests.

### Section 2.12 Legal Actions

My Agent may engage in litigation involving me, my property, or my legal interests, including any property, interest, or person for which or whom I have or may have any responsibility. My Agent may institute, supervise, prosecute, defend, intervene in, abandon, compromise, adjust, arbitrate, settle, dismiss, and appeal from any and all legal, equitable, judicial, or administrative hearings, actions, suits, or proceedings involving me in any way. This authority includes, but is not limited to, claims by or against me arising out of property damage or personal injury suffered by or caused by me or under circumstances such that the resulting loss may be imposed on me.

### Section 2.13 Fiduciary Positions

My Agent may resign or renounce for me any fiduciary position I hold now or in the future including personal representative, trustee, guardian, attorney-in-fact, and officer or director of a corporation and any governmental or political office or position. In so doing, my Agent may file an accounting with the appropriate court of competent jurisdiction or settle on the basis of a receipt, release, or other appropriate method.

### Section 2.14 My Spouse

My Agent (including my spouse acting as my Agent) may deal with my spouse on my behalf. In dealing with my spouse, my Agent may transfer, transmute, partition, or exchange any of my property interests, whether separate or community property, between my spouse and me. My Agent may engage in divorce proceedings on my behalf. My Agent may enter into and execute on my behalf marital property agreements, partition or exchange agreements, transmutation agreements, or community property agreements, and may enforce, amend, or revoke any such agreements between my spouse and me, but only with respect to rights and obligations in property owned by my spouse, by me, or by both of us, and with respect to reclassification of ownership, management, and control of such property.

### Section 2.15 My Support

My Agent may do anything reasonably necessary to maintain my customary standard of living, including:

(i) maintain my residence by paying all operating costs, including, but not limited to, interest on mortgages or deeds of trust, amortization payments, repairs, and taxes, or by purchasing, leasing, or making other arrangement for a different residence;

(ii) provide normal domestic help;

(iii) provide clothing, transportation, medicine, food, and incidentals; and

(iv) make all necessary arrangements, contractual or otherwise, for my care at any hospital, hospice, nursing home, convalescent home or similar establishment, or in my own residence should I desire it, and assure that all of my essential needs are met wherever I may be.

### Section 2.16 Support of Dependents

My Agent may make payments as my Agent deems necessary for the health, education, maintenance, or support of my spouse and those my Agent determines to be dependent on me for support.

### Section 2.17 Recreation and Travel

My Agent may, at my expense, allow me to engage in recreational and sports activities as my health permits, including travel.

### Section 2.18 Advance Funeral Arrangements

My Agent may make advance arrangements for my funeral and burial, including a burial plot, marker, and any other related arrangements that my Agent considers appropriate.

### Section 2.19 Memberships

My Agent may establish, cancel, continue, or initiate my membership in organizations and associations of all kinds.

## Article Three
## Additional Powers

In addition to the powers specified in Article Two, my Agent has the powers specified in this Article. If a power specified in this Article conflicts with a power specified in Article Two, the power specified in this Article controls.

### Section 3.01 Fixtures and Personalty

My Agent may engage in real estate transactions or transactions which involve any proprietary lease or stock evidencing my ownership of a cooperative apartment, including all fixtures and articles of personal property used in connection with the real property (my Agent may include such property in the deeds, mortgages, agreements, and any other instruments to be executed and delivered in connection with real estate transactions and which may be described in said instruments with more particularity).

### Section 3.02 Insurance Transactions

My Agent may engage in insurance transactions, including applying for, maintaining, canceling, paying premiums on, increasing or decreasing coverage, collecting, borrowing from, transferring ownership, surrendering and/or purchasing insurance policies.

### Section 3.03 Estate Transactions

My Agent may engage in estate transactions, including Receipt, Release, and Refunding Agreements and Waivers and Consents.

### Section 3.04 Disclaimers and Statutory Elections

My Agent may make statutory elections and renounce or disclaim any interest in property by testate or intestate succession or by inter vivos transfer consistent with New York law.

### Section 3.05 Powers of Appointment

My Agent may exercise in whole or in part, or decline to exercise, or disclaim my rights under any special or general power of appointment or any rights retained by me in any trust or otherwise, whether or not any such trust or other instrument was created by me or others.

### Section 3.06 Trusts

My Agent may create and fund inter vivos trusts of any type, whether revocable or irrevocable, and whether or not I am a beneficiary. With respect to any trust created by me or on my behalf, my Agent may amend, modify, revoke, or terminate the trust. Further, my Agent may add property to an existing or subsequently created trust, and accept transfers or distributions from any trustee of any trust, including any trust over which I have a right of receipt or withdrawal, whether as grantor, beneficiary, or otherwise.

Also, and without limiting the authority granted to my Agent in this Section, my Agent may:

(i) create and fund a sole-benefit trust in accordance with United States Code, Title 42, Section 1396p(c)(2)(B);

(ii) create and fund a self-settled special needs trust in accordance with United States Code, Title 42, Section 1396p(d)(4)(A);

(iii) create and fund a qualified income trust in accordance with United States Code, Title 42, Section 1396p(d)(4)(B) if such a trust should be deemed necessary to qualify me for Medicaid benefits, and make arrangements for the diversion of my income to such a trust as necessary to comply with applicable Medicaid rules and regulations; and

(iv) sign all necessary documents to allow me to join any trust qualifying under United States Code, Title 42, Section 1396p(d)(4)(C) and transfer any portion of my assets to such trust.

### Section 3.07 Safe-Deposit Boxes

My Agent may enter any safe-deposit box or other place of safekeeping standing in my name alone or jointly with another and to remove the contents and to make additions.

### Section 3.08 Business Succession Agreements

My Agent may enter into buy/sell agreements and any other business succession agreements.

### Section 3.09 Loans and Notes

My Agent may engage in all dealings with respect to loans and forgiveness of debts. My Agent may borrow money on such terms as my Agent may decide in his or her sole discretion, on a secured or unsecured basis, and to execute all notes, mortgages, and other instruments relating to such, provided any such loan carries a fair market interest rate.

### Section 3.10 Annuities

My Agent may waive my right to be a beneficiary of a joint and survivor annuity, including a survivor benefit under a retirement plan. My Agent may withdraw from, transfer ownership, surrender, or purchase any commercial annuity, private annuity, or grantor retained annuity trust.

### Section 3.11 Government Agencies and Benefits

My Agent has the unrestricted power to deal with and obtain maximum entitlements and benefits relating to the Social Security Administration, Veterans Administration, Social Services Departments, Social Security Disability Insurance, Supplemental Security Income, Medicaid, Medicare, Worker's Compensation and all other government benefits or entitlement programs, including claims, planning for eligibility, and submission of applications and appeals. In this regard, my Agent is authorized to execute and deliver any power of attorney or authorization-to-act form requested or required by a governmental agency. This power shall impose no affirmative duty on my Agent to provide information and/or documentation to any government agency.

### Section 3.12 Deal with Tax Authorities

My Agent is authorized to:

(i) deal with tax authorities, to execute and sign on my behalf any and all Federal, state, local, and foreign income and gift tax returns (as authorized under Section 1.6012-1(a)(5) of Title 26 of the Code of Federal Regulations or under any state, local, or foreign authority), including estimated returns and interest, dividends, gains, and transfers, and to pay any taxes, penalties, and interest due thereon;

(ii) represent me or to sign an Internal Revenue Service Form 2848 (Power of Attorney or Declaration of Representative) or Form 8821 (Tax Information Authorization), or comparable authorization, appointing a qualified lawyer, certified public accountant, or enrolled agent (including my Agent, if so qualified) to represent me before any office of the Internal Revenue Service, state, local, or foreign taxing authority with respect to the types of taxes and years referred to above, and to specify on said authorization said types of taxes and years;

(iii) receive from or inspect confidential information in any office of the Internal Revenue Service, state, local, or foreign tax authority;

(iv) receive and deposit, in any one of my bank accounts, or those of any revocable trust of mine, checks in payment of any refund of Federal, state, local, or foreign taxes, penalties, and interest;

(v) execute waivers (and offers of waivers) of restrictions on assessment or collection of deficiencies in taxes and waivers of notice of disallowance of a claim for credit or refund;

(vi) execute consents extending the statutory period for assessment or collection of such taxes; to execute Offers in Compromise and Closing Agreements under Section 7121 or comparable provisions of the Internal Revenue Code, as amended, or any federal, state, local, or foreign tax statutes or regulations; and

(vii) delegate authority to, or substitute another representative for any one of those previously appointed by me or my Agent, and to receive copies of all notices and other written communications involving my federal, state, local, or foreign taxes at such address as my Agent designates.

### Section 3.13 Health Care Decisions

My Agent may make all health care decisions on my behalf. If I have executed a health care advance directive (including but not limited to a Health Care Proxy) designating a Health Care Agent, the terms of the directive control if the directive and this Power of Attorney are in conflict.

### Section 3.14 HIPAA Authorization

My Agent, and any successor Agent appointed in this power of attorney, shall have the power and authority of a designated representative for all purposes under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. Section 1320d and 45 C.F.R. Parts 160-164. My Agent and successor Agent are authorized to execute releases and other documents necessary to obtain disclosure of individually identifiable health information, medical records, and patient files, including psychotherapy notes. This information includes, but is not limited to, any written opinion or assessment of my decision making capacity. This authorization and release apply to all information protected by HIPAA and shall only expire if I revoke this power of attorney.

### Section 3.15 Reimbursement of Health Care Agent

My Agent may reimburse my Health Care Agent under any health care directive, including but not limited to a Health Care Proxy, even if such Health Care Agent is my Agent, for any costs (including legal fees) reasonably incurred in or as a result of acting pursuant to such health care directive.

### Section 3.16 Employment of Professionals

My Agent may retain, discharge, and pay for, in the sole discretion of my Agent, the services of professionals, including, but not limited to, information technology experts, attorneys, accountants, financial planners, geriatric care managers, social workers, and any other health care professionals. My Agent is not obligated to retain or pay for any health care professional on my behalf.

### Section 3.17 Gifting Powers

Notwithstanding any other provision of this Power of Attorney, other than to the persons who witnessed this Power of Attorney, my Agent may make gifts of any interest I have in real or personal property ("my property") to any person or entity, in any amount. including my Agent, but gifts to my Agent may only be made if Debbie Ann Harris is acting as my Agent.

Unless otherwise specified above, the value of any gift made pursuant to this Section may exceed the annual dollar limits of the federal gift tax exclusion under Section 2503(b) of the Internal Revenue Code.

### Section 3.18 Gift-Splitting

My Agent may make, join, and consent to gifts by my spouse pursuant to Section 2513 of the Internal Revenue Code, even if such gifts exceed my aggregate annual gift tax exclusion amount under Section 2503(b) of the Internal Revenue Code.

### Section 3.19 Intent to Return Home

It is my intention to return home if I should be in a hospital, rehabilitation center, or nursing home, and my Agent shall take all steps, including, but not limited to, executing any document, affidavit, or Declaration of Intent to Return Home on my behalf, to effectuate the same.

### Section 3.20 Domicile

My Agent may change or maintain my domicile and/or residency for any and all purposes and take any and all actions to effectuate the foregoing.

### Section 3.21 Nomination of Conservator

I intend hereby to render unnecessary any future proceeding for a court-appointed Conservator in the event I become temporarily or permanently incapacitated or incompetent. Accordingly, I request, in the strongest possible terms, that any court that may receive or act upon a petition for the appointment of a Conservator should deny such petition so long as my Agent is acting under this power of attorney.

If a Conservator is ever appointed for me in spite of this request, I direct that the person serving, or named to serve, as my Agent under this power of attorney be named as my Conservator.

### Section 3.22 Business Activities

My Agent may invest in, contribute to, establish, create, and fund any existing or newly created partnership, corporation, limited liability company, limited liability partnership, limited partnership, or other entity and to exercise all rights pertaining thereto.

### Section 3.23 Marital Agreements and Designation of Spouse as Agent

My Agent may enter into, modify, or amend any pre-nuptial or post-nuptial agreement to which I am or hereafter become a party. If a named Agent is my spouse, then this power of attorney as to that named Agent is automatically revoked, and that Agent is deemed to have resigned as Agent upon the filing of any separation or dissolution action between us.

### Section 3.24 Caregiver Agreements

My Agent may enter into, execute, modify, alter, or amend any contract or agreement (for example, a Caregiver Agreement or Personal Services Contract) pertaining to my medical, personal, or general care that I may require at my residence, assisted living facility, nursing facility, or in another's residence on my behalf. I expressly authorize my Agent to also serve as a caregiver under any such agreement and to be paid in accordance with the terms and conditions of such agreement, provided, however, that such services are compensated at fair market value.

### Section 3.25 Qualified Plans

My Agent may deal in all respects with any Qualified Plan or Individual Retirement Account that I may own and to make any and all available elections or beneficiary designations on my behalf. If my spouse is a participant in a Qualified Plan or Individual Retirement Account, I authorize my Agent to effect any waiver of my rights to any portion of said Plan or to any payout arrangement which may require my consent or approval by law, under any such Plan, or otherwise.

### Section 3.26 Enforcement Proceedings

My Agent may commence enforcement proceedings, at my expense, against any bank, savings and loan association, credit union, financial institution, brokerage firm, stock transfer agent, insurance company, title insurance company, or other person or entity that fails or refuses to honor this durable power of attorney.

### Section 3.27 Credit Cards

My Agent may use any credit card in my name; to make purchases on my behalf; to open a new credit card account and to close any existing credit card account.

### Section 3.28 Online Accounts, Digital Assets, and Digital Devices

Without limiting any other provision of this Power of Attorney, and subject to the limitations of any other provision of this Power of Attorney, my Agent has the powers described in this Section.

My Agent has full authority to deal with Online Accounts, Digital Assets, and Digital Devices of all kinds, wherever located. This authority includes, but is not limited to, the power to acquire, create, establish, access, control, modify, cancel, delete, continue, transfer, and take possession of such accounts, assets, and devices.

However, if I have used an online tool to direct the custodian of an Online Account, Digital Asset, or Digital Device to not disclose certain information, and if the online tool allows for the modification or deletion of that direction at all times, then such direction overrides the authority granted in this Section.

My Agent may request and change my access credentials to any Online Account, Digital Asset, and Digital Device (such as username, password, and secret question), and any third-party dealing with my Agent in good faith will be held harmless for releasing such access credentials.

For purposes of this Power of Attorney, the following definitions apply:

**(a) Online Accounts**

The term "Online Accounts" means accounts that are accessible through the Internet or other similar method, including, but not limited to: bank accounts; investment accounts; other financial accounts; accounts with health care providers; social media accounts (like LinkedIn, Facebook, and Twitter); gambling and poker accounts; accounts with publishers; accounts for access to employee benefits; email accounts; accounts with Internet service providers; accounts to manage websites and website domain names; accounts with retail vendors; tax-preparation service accounts; affiliate marketing accounts; accounts with utility companies; user access accounts on third-party Digital Devices; and any other online account.

**(b) Digital Assets**

The term "Digital Assets" means intangible personal property related to digital technology (whether located on a Digital Device or an Online Account), including, but not limited to: emails sent or received; text messages sent or received; other digital communications sent or received; digital music; digital photographs; digital videos; software licenses; social network accounts; file sharing accounts; online acccss to financial accounts; domain registrations; DNS service accounts; website hosting accounts; personal and commercial websites; tax preparation service accounts; online store accounts; affiliate marketing accounts; and other types of online accounts and digital items that currently exist or may exist as technology develops.

**(c) Digital Devices**

The term "Digital Devices" means tangible personal property related to digital technology capable of storing Digital Assets or accessing Online Accounts, and includes, but is not limited to: desktop computers; laptop computers; tablet computing devices (tablets); other mobile computing devices; peripheral devices; hard disk drives; solid state drives; flash memory devices; other storage devices; mobile telephones; smartphones; and any other type of digital device that currently exists or may exist as technology develops.

### Section 3.29 Domestic Pets

My Agent may make reasonable expenditures for the care, maintenance, support, and general welfare of my domestic pets, if any. Specifically, and without limitation, my Agent may consent to and make reasonable expenditures for medical treatment, boarding, and kennel care of any of my domestic pets. I authorize any and all payments from my funds for pet care provided by any person or entity, including my Agent.

In addition, my Agent may acquire a domestic service pet if, in my Agent's sole discretion, such service pet will benefit me.

### Section 3.30 Estate and Long Term Care Planning

My Agent may engage in estate and long term care planning in furtherance of achieving asset preservation. Property transfers made pursuant to the authority granted herein may be made without restriction as to the value of the transfer, and shall, for all purposes, be deemed to have been "in my best interest" if: (1) made in accordance with the provisions of this section; and (2) made in the context of estate planning, financial planning, Medicaid planning, long term care planning, or asset preservation planning pursuant to the recommendations of an attorney-at-law experienced in such matters. My Agent may engage in such planning based on all relevant factors, including:

(i) the value and nature of my property;

(ii) my foreseeable obligations and need for maintenance;

(iii) minimization of taxes, including income, estate, inheritance, generation skipping transfer, and gift taxes; and

(iv) eligibility for a benefit, a program, or assistance under a statute or government regulation.

My Agent may take any action necessary to effectuate the foregoing, including to qualify me for Social Security Benefits, Supplemental Security Income, Veterans Benefits, Medicaid or any other government benefit program. Such actions may include but shall not be limited to the following:

(i) convert non-exempt resources into exempt resources;

(ii) divest me of assets, without restriction as to the value of the divestment;

(iii) if my Agent is my spouse, my spouse may protect our assets, whether owned by me alone, my spouse alone, or by us together as husband and wife, so that my spouse's impoverishment because of my health care costs can be avoided, by whatever lawful methods that might be available;

(iv) sign a Spousal Refusal (even if my Agent is my spouse);

(v) sign an Assignment of Support (even if my Agent is my spouse);

(vi) divide community property assets equally or unequally between my spouse and me, without restriction as to the difference of the value of our shares, if any;

(vii) sign an application for Medical Assistance or any other government benefit program;

(viii) serve as representative payee;

(ix) transfer the family residence to a spouse who does not need long-term health or nursing care, without restriction as to the value of the transfer;

(x) make home improvements and additions to my family residence;

(xi) pay off, partly or in full, any encumbrance on my family residence;

(xii) purchase a family residence, if I do not own a family residence;

(xiii) purchase a more expensive family residence; and

(xiv) attend and represent me at Fair Hearings.

### Section 3.31 Ownership and Rights of Survivorship

My Agent may select, create, or change the rights of survivorship on any and all of my property, whether real or personal, including bank and investment accounts, insurance policies, annuities, qualified or nonqualified retirement plans, and real property interests, and may do so by any means, including by changing ownership, including the addition of a new joint tenant or the deletion of an existing joint tenant. My Agent may designate survivorship rights among one or more remaindermen and may designate the form of title among multiple remaindermen, including, but not limited to, as tenants in common, joint tenants, community property, or tenants by the entirety.

In particular, my Agent may execute any deed designating beneficiaries, including an enhanced life estate deed (also known as a "ladybird" deed), including with respect to my homestead property, if any, and may conduct any and all transactions with full power and authority in my Agent to sell, convey, mortgage, lease, and otherwise dispose of the property in accordance with the terms of the deed.

### Section 3.32 Beneficiary Designations

My Agent may select, create, revoke, or change beneficiary designations on any and all of my property, whether real or personal, including bank and investment accounts, insurance policies, annuities, qualified or nonqualified retirement plans, and real property interests.

### Section 3.33 Spiritual and Religious Needs

My Agent may arrange for the involvement of religious clergy or spiritual leaders in my care, provide said persons access to me at all times, arrange or maintain my membership in religious or spiritual organizations, and create opportunities for me to derive comfort and spiritual satisfaction from such activities, including the purchase of religious books, tapes, and other materials.

**Section 3.34 Companionship**

My Agent may provide for such companionship for me, in the sole discretion of my Agent, as will meet my needs and preferences at a time when I am disabled or otherwise unable to arrange for such companionship myself.

**Section 3.35 U.S. Mail**

My Agent may open, read, respond to, and redirect my mail, and represent me before the U.S. Postal Service in all matters relating to mail service.

## Article Four
## Incidental Powers

My Agent may perform those acts and execute and deliver those legal documents necessary or appropriate to the exercise of the powers set forth in this Power of Attorney, including, but not limited to, the following incidental powers.

**Section 4.01 Document Execution**

My Agent may sign, execute, endorse, seal, acknowledge, deliver, and file or record all appropriate legal documents necessary to exercise the powers granted under this Power of Attorney.

**Section 4.02 Custody of Documents**

My Agent may take, give, or deny custody of my important documents, including my Will and any codicils, trust agreements, deeds, leases, life insurance policies, contracts, or securities. My Agent may disclose or not disclose the whereabouts or contents of those documents as my Agent believes appropriate.

## Article Five
## Limitation on Powers

All powers granted to my Agent under this Power of Attorney are subject to the limitations set forth in this Article.

**Section 5.01 My Agent to Avoid Disrupting My Estate Plan**

If it becomes necessary for my Agent to liquidate or reinvest any of my assets to provide support for me, I direct that my Agent, to the extent that it is reasonably possible, avoid disrupting the dispositive provisions of my estate plan as established by me prior to my incapacity.

If it is necessary to disrupt the dispositive provisions of my estate plan, my Agent will use his or her best efforts to restore my plan as soon as possible. My Agent will make reasonable efforts to obtain and review my estate plan. I authorize any person with knowledge of my estate plan or possession of my estate planning documents to disclose information to my Agent and to provide copies of documents to my Agent.

### Section 5.02 Tax Sensitive Powers

No individual serving as my Agent may exercise any fiduciary power or discretion if the exercise of that power or discretion would:

(i) cause any income generated by my property to be attributed to my Agent for federal income tax purposes;

(ii) cause the value of any property subject to this Power of Attorney to be included in my Agent's gross estate for federal estate tax purposes;

(iii) cause any distribution made or allowed to be made by my Agent to be treated as a gift from my Agent; or

(iv) discharge a legal obligation of my Agent.

If the exercise of a power by my Agent under this Power of Attorney would cause any of the foregoing results, any other Agent that I have designated in this Power of Attorney to serve with the Agent or as a successor Agent may exercise the power or discretion, so long as such exercise would not also cause any of the foregoing results. The other Agent acting for this purpose must be an individual who is not related or subordinate to my Agent within the meaning of Section 672(c) of the Internal Revenue Code.

## Article Six
## Administrative Powers and Provisions

This Article contains certain administrative powers and provisions that facilitate the use of the Power of Attorney and that protect my Agent and those who rely upon my Agent.

### Section 6.01 Compensation and Reimbursement to Agent

If my Agent is a professional (such as an attorney; accountant; geriatric care manager; professional guardian, conservator, or other fiduciary; or other professional, including entities that provide similar services), my Agent is entitled to compensation for services rendered pursuant to this Power of Attorney at such professional's then stated rates. Further, if my Agent is a professional, my Agent is entitled to reimbursement for costs reasonably incurred while acting as my Agent, including, but not limited to: phone bills; postage; and travel expenses, if necessary, to supervise my care.

If my Agent is not a professional, my Agent is not entitled to compensation for services rendered or reimbursement for costs incurred while serving as Agent under this power of attorney.

### Section 6.02 Amendment and Revocation

I may amend or revoke this Power of Attorney at any time. Amendments to this document must be made in writing by me personally (not by my Agent) and must be attached to the original of this document and recorded in the same county or counties as the original if the original is recorded.

If this Power of Attorney is amended or revoked, no person will incur any liability to me or my estate as a result of permitting my Agent to exercise any power authorized by this Power of Attorney prior to that person's receipt of notice that it was amended or revoked.

### Section 6.03 Resignation

My Agent may resign by the execution of a written resignation delivered to me (or my guardian if I am incapacitated and one has been appointed for me) and to any Agent serving together with the resigning Agent, or if none, to the next successor Agent. If I am incapacitated, notice may be delivered to any person with whom I am residing or who has my care and custody.

### Section 6.04 Signature of Agent

My Agent shall use substantially the following form when signing documents on my behalf pursuant to this power:

*[Agent's name]*, as Agent for Oswald David.

### Section 6.05 Interpretation

This Power of Attorney is a general power of attorney and should be interpreted as granting my Agent all general powers permitted under New York law. The description of specific powers is not intended to, nor does it, limit or restrict any of the general powers granted to my Agent.

### Section 6.06 Use of "Agent" Nomenclature

The word "Agent" and any modifying or equivalent word or substituted pronoun includes the singular and the plural, as well as the masculine, feminine, and neuter genders, and includes the term "attorney-in-fact."

### Section 6.07 Third-Party Reliance

No person who relies in good faith on the authority of my Agent under this Power of Attorney will incur any liability to me, my estate, or my heirs, successors, and assigns.

Any party dealing with my Agent may conclusively rely upon an affidavit or certificate of my Agent stating that:

(i) the authority granted to my Agent under this Power of Attorney is in effect;

(ii) my Agent's actions are within the scope of my Agent's authority under this Power of Attorney;

(iii) I was competent when I executed this Power of Attorney;

(iv) I have not revoked this Power of Attorney; and

(v) my Agent is currently serving as my Agent.

### Section 6.08 Effect of Duplicate Originals or Copies

If this Power of Attorney has been executed in multiple counterparts, each counterpart original will have equal force and effect. A copy of this Power of Attorney will have the same force and effect as the original only if the copy is attested by a licensed attorney or a state-authorized officer (such as a notary public) to be a true, exact, complete, and unaltered copy of an original. A copy means an electronic, digital, facsimile, photocopy, or other reproduction of this Power of Attorney.

### Section 6.09 Governing Law

This Power of Attorney's validity and interpretation will be governed by New York law. To the extent permitted by law, this Power of Attorney is applicable to all of my property (whether real or personal, tangible or intangible, or legal or equitable), wherever located, and whether or not the property is owned by me now or in the future.

### Section 6.10 Severability

If any provision of this Power of Attorney is declared invalid for any reason, the remaining provisions will remain in full force and effect.

## Article Seven
## Duties and Liabilities of My Agent

### Section 7.01 Duty to Account

My Agent shall render statements of account of receipts, disbursements, principal on hand, and transactions conducted on my behalf pursuant to New York law.

### Section 7.02 Limitation of Liability of My Agent

I release and discharge any Agent acting in good faith from any and all civil liability and from all claims or demands of all kinds whatsoever by me, my estate, and my heirs, successors, and assigns arising out of the acts or omissions of my Agent, except for duties committed dishonestly, with improper motive, or with reckless indifference to the purposes of this Power of Attorney or my best interests, including willful misconduct or gross negligence. This protection extends to the estate, heirs, successors, and assigns of my Agent.

In particular, any Agent who acts in good faith is not liable to any beneficiary of my estate plan for failure to preserve the plan, and absent a breach of duty to me, my Agent is not liable if the value of my property declines.

## Article Eight
## Acceptance of Appointment as Agent

Any manifestation of acceptance of appointment as Agent, whether in writing or by conduct, is an acceptance of all aspects of this Power of Attorney, and may not be limited to only certain aspects. Appointment as Agent is accepted by:

(i) signing the Acceptance by Agent below or any other document manifesting acceptance;

(ii) exercising any authority or performing any duties as Agent under this Power of Attorney; or

(iii) any other assertion or conduct indicating acceptance.

## Article Nine
## Declarations of the Principal

I understand that this Power of Attorney is an important legal document. Before executing this Power of Attorney, my attorney explained to me the following:

(i) that this Power of Attorney provides my Agent with broad powers to dispose of, sell, convey, and encumber my real and personal property;

(ii) that the powers will exist for an indefinite period of time unless I revoke this Power of Attorney or I have limited their duration by specific provisions herein;

(iii) that this Power of Attorney remains in full force and effect during my subsequent disability or incapacity; and

(iv) that I may revoke or terminate this Power of Attorney at any time.

**NOTICE: You may rely on this document only if it is an original, as evidenced by the inked signature of the Principal, or a copy that has been attested by a licensed attorney or a state-authorized officer (such as a notary public) to be a true, exact, complete, and unaltered copy of an original. (See Section 6.08.)**

Dated: 12/7, 2023

x [signature]
**Oswald David, Principal**

STATE OF NEW YORK )
COUNTY OF Queens )

On the 7th day of December, in the year 2023, before me, the undersigned, personally appeared Oswald David, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

[signature]
Notary Public

BEVERLY G. PERKINS
Commissioner of Deeds
City of New York - No. 3-3639
Certificate Filed in Queens County
Commission Expires: July 1, 2025

## Declaration of Witnesses

The foregoing Power of Attorney was, on the day and year written above, published and declared by Oswald David, in our presence to be his Power of Attorney. We, in his presence and at his request, and in the presence of each other, have attested to the same and have signed our names as attesting witnesses.

We declare that at the time of our attestation of this instrument, Oswald David was, according to our best knowledge and belief, of sound mind and memory and under no undue duress or constraint.

| | |
|---|---|
| [signature] | [signature] |
| **(Witness signature)** | **(Witness signature)** |
| OMAR BAXTER | ERIC COOPER |
| (printed name) | (printed name) |
| | |
| (street address) | (street address) |
| | |
| (city, state zip) | (city, state zip) |

## Acceptance by Agent

The undersigned Agent hereby accepts the delegation of all authority set out in this Power of Attorney.

Dated: 12/7, 2023

[signature]
**Debbie Ann Harris, Agent**

Driver's License Number/State

STATE OF NEW YORK )
COUNTY OF Queens )

On the 7th day of December, in the year 2023, before me, the undersigned, personally appeared Debbie Ann Harris, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

BEVERLY G. PERKINS
Commissioner of Deeds
City of New York - No. 3-3639
Certificate Filed in Queens County
Commission Expires: July 1, 2025

Notary Public

This instrument was prepared by Denrick W. Cooper, Esq..

Case No. 1-24-43449-Jmm

CLERK
U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF
NEW YORK

2026 JAN 22 P 3:40

RECEIVED

Oswald David

2281 Church Ave., Brooklyn, NY 11226

Phone: 347-822-3970

Submitted by: Debbie Harris-David (Spouse and POA)

January 22, 2026

Honorable Judge Jil Mazer-Marino

U.S. Bankruptcy Court, EDNY

271-C Cadman Plaza East - Suite 1595

Brooklyn, NY 11201-1800

Re: Request for Voluntary Dismissal of Chapter 11 Case

Dear Judge Mazer-Marino,

I respectfully submit this letter to request voluntary dismissal of the Chapter 11 case filed on behalf of my husband, Oswald David.

The Chapter 11 was commenced to obtain protection and relief during a period of extraordinary hardship. As the case has progressed, however, it has become clear that maintaining the Chapter 11 is now creating additional hardship rather than relief, and is impeding completion of resolution steps that are already underway.

Mr. David is 99 years old and suffers from serious medical conditions requiring ongoing care. The complexity, expense, and restrictions associated with Chapter 11 have placed increasing strain on his health and on our ability to finalize resolutions.

I respectfully advise the Court that substantial funds—over $900,000—have already been assembled toward satisfaction of the judgment, and that arrangements are underway to complete payoff of the Flushing Bank mortgage through a hard-money loan, which is expected to be completed by the end of January. Continuing the Chapter 11 has limited access to financing and slowed these efforts, whereas dismissal would allow us to complete them promptly outside of bankruptcy.

Under these circumstances, dismissal, rather than conversion to Chapter 7, is the appropriate course. Dismissal will enable completion of payoffs and stabilization without the additional burdens of Chapter 11, while avoiding the irreversible harm that would result from liquidation—particularly given the income-producing nature of the property and its role in our livelihood.

This request is made respectfully and not to evade obligations, but to proceed in a practical and humane manner consistent with Mr. David's age, medical condition, and the advanced stage of resolution efforts already in progress.

In the alternative, should the Court decline dismissal, the undersigned respectfully requests that we are given time to close on the sale to satisfy the judgement by February 13, 2026.

Thank you for the Court's time and consideration.

Respectfully,

Debbie Harris-David POA

Debbie Harris-David POA

KENNEDY FUNDING

# LETTER OF INTEREST

January 16, 2026

Mr. David Oswald
Oswald David Living Trust ("Borrower")
2281 Church Avenue
Brooklyn, NY 11226

Re: $4,000,000 ("Financing Request")
Secured by a first lien on 2281 Church Ave, Brooklyn, NY 11226: ("Collateral")

Dear Mr. Oswald:

Pursuant to our discussion regarding the above loan request, I am pleased to submit the following Letter of Interest. In no way should this be considered a firm loan commitment. Outlined below are the general terms and conditions required by Kennedy Funding Inc. (Lender). These terms are only general guidelines, and only upon issuance of a firm commitment can exact terms of the loan commitment be determined.

This Letter of Interest shall expire one (1) week from issuance.

TERMS:

1. Lender would make a loan of forty percent (40%) of the market value of the real estate Collateral used as security for the Loan. If Borrower were to dispute the value as determined by Lender, Borrower would have the right to have a third-party appraiser hired, approved by Lender, and Lender would offer a Loan of forty percent (40%) of the "as is" market value as determined by said appraiser or return the paid portion of the commitment fee. The market value would be based on a twelve (12) month sale to a cash buyer.

2. The loan would be for three years interest only with no prepayment penalty.

3. The interest rate for the first year of the loan shall be nine percent (9%) per annum paid monthly at (.75%) per month.

   The interest rate for the second year of the loan shall be ten percent (10%) per annum paid monthly at (.833%) per month.

   The interest rate for the third year of the loan shall be twelve percent (12%) per annum paid monthly at (1%) per month.

4. Upon receipt of a $10,000 wire transfer or certified check, which would be applied toward the commitment fee, Lender would provide you with a draft of a loan commitment containing the terms and conditions to be reviewed by you and your counsel. This amount is fully refundable for any reason if you do not execute a loan commitment with Lender and you request in writing within thirty (30) days of the date of this letter the return of the $10,000.

5. Upon signing of the loan commitment, a commitment fee equal to four percent (4%) of the Financing Request is due; one percent (1%) would be payable at the signing, and the remainder would be payable from the loan proceeds at closing. This fee would be fully refundable if Lender does not perform its obligations under the loan commitment. If the loan is repaid on time with no prior defaults, Borrower would receive a credit upon repayment of one percent (1%) of the loan amount.

6. A brokerage commission of two percent (2%) would be paid to International Merchant Bank Limited (IMBL) from the loan proceeds at closing.

7. The loan must be closed pursuant to the terms and conditions of the loan commitment.

8. Closing could occur in as quickly as three (3) to five (5) days after completion of our due diligence and receipt of title and all required documents. Our due diligence would commence within 24 hours after Lender receives an executed loan commitment from you.

9. Notwithstanding anything to the contrary contained herein, in no event shall the interest rate contracted for, charged, or received exceed the maximum rate allowed by law.

**THIS IS NOT A LOAN COMMITMENT.**

Very truly yours,

KENNEDY FUNDING INC.

Mark Falzone
Executive Loan Officer

I hereby acknowledge and agree to the above terms.

David Oswald
Oswald David **Living** Trust

AD/1oi/Oswald.Oswald

Docusign Envelope ID: DA3A099A-8B0A-4385-9E9D-7748C6801531

Residential Contract of Sale 11-2000

*Jointly prepared by the Real Property Section of the New York State Bar Association, the New York State Land Title Association, the Committee on Real Property Law of the Association of the Bar of the City of New York and the Committee on Real Property Law of the New York County Lawyers' Association*

**WARNING: NO REPRESENTATION IS MADE THAT THIS FORM OF CONTRACT FOR THE SALE AND PURCHASE OF REAL ESTATE COMPLIES WITH SECTION 5-702 OF THE GENERAL OBLIGATIONS LAW ("PLAIN LANGUAGE").**

**CONSULT YOUR LAWYER BEFORE SIGNING THIS AGREEMENT**

**NOTE: FIRE AND CASUALTY LOSSES AND CONDEMNATION**
This contract form does not provide for what happens in the event of fire, or other casualty loss or condemnation before the title closing. Unless different provision is made in this contract, Section 5-1311 of the General Obligations Law will apply. One part of that law makes a Purchaser responsible for fire and casualty loss upon taking possession of the Premises before the title closing.

# Residential Contract of Sale

***Contract of Sale*** made as of September , 2025 **BETWEEN**

DEBBIE A. HARRIS, 814 Linden Blvd., Brooklyn, NY 11203

hereinafter called "Seller" and

KELVIN ENDEAVOUR JR. and KELSEA N. CROCKETT, 250 Ashland Place, Apt. 30E, Brooklyn, NY 11217

hereinafter called "Purchaser"

## *The parties hereby agree as follows:*

1. **Premises.** Seller shall sell and convey and Purchaser shall purchase the property, together with all buildings and improvements thereon (collectively the "Premises"), more fully described on a separate page marked "Schedule A", annexed hereto and made a part hereof and also known as:

Street Address: 814 Linden Blvd.
Brooklyn, NY 11203
Block: 4678 Lot: 7

Together with Seller's ownership and rights, if any, to land lying in the bed of any street or highway, opened or proposed, adjoining the Premises to the center line thereof, including any right of Seller to any unpaid award by reason of any taking by condemnation and/or for any damage to the Premises by reason of change of grade of any street or highway. Seller shall deliver at no additional cost to Purchaser, at Closing (as hereinafter defined), or thereafter, on demand, any documents that Purchaser may reasonably require for the conveyance of such title and the assignment and collection of such award or damages.

2. **Personal Property.** This sale also includes all fixtures and articles of personal property now attached or appurtenant to the Premises, unless specifically excluded below. Seller represents and warrants that at Closing they will be paid for and owned by Seller, free and clear of all liens and encumbrances, except any existing mortgage to which this sale may be subject. They include, but are not limited to, plumbing, heating, lighting and cooking fixtures, chandeliers, bathroom and kitchen cabinets and counters, mantels, door mirrors, switch plates and door hardware, venetian blinds, window treatments, shades, screens, awnings, storm windows, storm doors, window boxes, mail box, TV aerials, weather vane, flagpole, pumps, shrubbery, fencing, outdoor statuary, tool shed, ~~dishwasher, washing machine, clothes dryer, garbage disposal unit,~~ 2 range ovens, built-in-microwave oven, piano ~~refrigerator, freezer, air conditioning equipment~~ and installations, wall to wall carpeting and built-ins not excluded below, staircase chair lift, all as may exist at the premises in their present "as is" condition.

Excluded from this sale are furniture and household furnishings and

3. **Purchase Price.** The purchase price is $1,170,000.00 payable as follows:

(a) On the signing of this contract, by Purchaser's good check payable to the Escrowee (as hereinafter defined), subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 6 of this contract (the "Downpayment"): $ 40,950.00

(b) By Seller Concession credit to assist Purchaser with payment of closing costs: $11,700.00

(c) By a purchase money note and mortgage from Purchaser to Seller: $

(d) Balance at Closing in accordance with paragraph 7: $ 1,129,050.00

~~4. **Existing Mortgage.** (Delete if inapplicable) If this sale is subject to an existing mortgage as indicated in paragraph 3(b) above:~~

~~(a) The Premises shall be conveyed subject to the continuing lien of the existing mortgage, which is presently payable, with interest at the rate of ——— percent per annum, in monthly installments of $ ——— which include principal, interest and escrow amounts, if any, and with any balance of principal being due and payable on ———~~

~~(b) To the extent that any required payments are made on the existing mortgage between the date hereof and Closing which reduce the unpaid principal amount thereof below the amount shown in paragraph 3(b), then the balance of the price payable at Closing under paragraph 3(d) shall be increased by the amount of the~~

~~payments of principal. Seller represents and warrants that the amount shown in paragraph 3(b) is substantially correct and agrees that only payments required by the existing mortgage will be made between the date hereof and Closing.~~

~~(c) If there is a mortgagee escrow account, Seller shall assign it to Purchaser, if it can be assigned, and in that case Purchaser shall pay the amount in the escrow account to Seller at Closing.~~

~~(d) Seller shall deliver to Purchaser at Closing a certificate dated not more that 30 days before Closing signed by the holder of the existing mortgage, in form for recording, certifying the amount of the unpaid principal, the date to which interest has been paid and the amounts, if any, claimed to be unpaid for principal and interest, itemizing the same. Seller shall pay the fees for recording such certificate. If the holder of the existing mortgage is a bank or other institution as defined in Section 274-a of the Real Property Law it may, instead of the certificate, furnish a letter signed by a duly authorized officer, employee or agent, dated not more then 30 days before Closing, containing the same information.~~

~~(e) Seller represents and warrants that (i) Seller has delivered to Purchaser true and complete copies of the existing mortgage, the note secured thereby and any extensions and modifications thereof, (ii) the existing mortgage is not now, and at the time of Closing will not be, in default, and (iii) the existing mortgage does not contain any provision that permits the holder of the mortgage to require its immediate payment in full or to change any other term thereof by reason of the sale or conveyance of the Premises.~~

~~**5. Purchase Money Mortgage.** *(Delete if inapplicable)* If there is to be a purchase money mortgage as indicated in paragraph 3(c) above:~~

~~(a) The purchase money note and mortgage shall be drawn by the attorney for Seller in the form attached or, if not, in the standard form adopted by the New York State Land Title Association. Purchaser shall pay at Closing the mortgage recording tax, recording fees and the attorney's fees in the amount of $______ for its preparation.~~

~~(b) The purchase money note and mortgage shall also provide that it is subject and subordinate to the lien of the existing mortgage and any extensions, modifications, replacements or consolidations of the existing mortgage, provided that (i) the interest rate thereof shall not be greater than ______ percent per annum and the total debt service thereunder shall not be greater than $______ per annum, and (ii) if the principal amount thereof shall exceed the amount of principal owing and unpaid on the existing mortgage at the time of placing such new mortgage or consolidated mortgage, the excess is to be paid to the holder of such purchase money mortgage in reduction of the principal thereof. The purchase money mortgage shall also provide that such payment to the holder thereof shall not alter or affect the regular installments, if any, of principal payable thereunder and that the holder thereof will, on demand and without charge therefore, execute, acknowledge and deliver any agreement or agreements further to effectuate such subordination.~~

**6. Downpayment in Escrow.**

(a) Seller's attorney ("Escrowee") shall hold the Downpayment in escrow in a segregated bank account at:
Address: CHASE BANK
until Closing or sooner termination of this contract shall pay over or apply the Downpayment in accordance with the terms of this paragraph. Escrowee shall hold the Downpayment in a(n) IOLA interest-bearing account. If interest is held for the benefit of the parties, it shall be paid to the party entitled to the Downpayment and the party receiving the interest shall pay any income taxes thereon. If interest is not held for the benefit of the parties, the Downpayment shall be placed in an IOLA account or as otherwise permitted or required by law. The Social Security or Federal Identification numbers of the parties shall be furnished to Escrowee upon request. At Closing, the Downpayment shall be paid by Escrowee to Seller. If for any reason Closing does not occur and either party gives Notice (as defined in paragraph 25) to Escrowee demanding payment of the Downpayment, Escrowee shall give prompt Notice to the other party of such demand. If Escrowee does not receive Notice of objection from such other party to the proposed payment within 10 business days after the giving of such Notice, Escrowee is hereby authorized and directed to make such payment. If Escrowee does receive such Notice of objection within such 10 day period or if for any other reason Escrowee in good faith shall elect not to make such payment, Escrowee shall continue to hold such amount until otherwise directed by Notice from the parties to this contract or a final, non-appealable judgment, order or decree of a court. However, Escrowee shall have the right at any time to deposit the Downpayment and the interest thereon with the clerk of a court in the county in which the Premises are located and shall give Notice of such deposit to Seller and Purchaser. Upon such deposit or other disbursement in accordance with the terms of this paragraph, Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

(b) The parties acknowledge that Escrowee is acting solely as a stakeholder at their request and for their convenience and that Escrowee shall not be liable to either party for any act or omission on its part unless taken or suffered in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee. Seller and Purchaser jointly and severally (with right of contribution) agree to defend (by attorneys selected by Escrowee), indemnify and hold Escrowee harmless from and against all costs, claims and expenses (including reasonable attorneys' fees) incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee.

(c) Escrowee may act or refrain from acting in respect of any matter referred to herein in full reliance upon and with the advice of counsel which may be selected by it (including any member of its firm) and shall be fully protected in so acting or refraining from action upon the advise of such counsel.

(d) Escrowee acknowledges receipt of the Downpayment by check subject to collection and Escrowee's agreement to the provisions of this paragraph by signing in the place indicated on the signature page of this contract.

(e) Escrowee or any member of its firm shall be permitted to act as counsel for Seller in any dispute as to the disbursement of the Downpayment or any other dispute between the parties whether or not Escrowee is in possession of the Downpayment and continues to act as Escrowee.

(f) The party whose attorney is Escrowee shall be liable for loss of the Downpayment.

**7. Acceptable Funds.** All money payable under this contract unless otherwise specified, shall be paid by:

(a) Cash, but not over $1,000.00

(b) Good certified check of Purchaser drawn on or official check issued by any bank, savings bank, trust company or savings and loan association having a banking office in the State of New York unendorsed and payable to the order of Seller, or as Seller may otherwise direct upon reasonable prior notice (by telephone or otherwise) to Purchaser.

(c) As to money other than the purchase price payable to Seller at Closing, uncertified check of Purchaser up to the amount of $ 1,000.00 ; and

(d) As otherwise agreed to in writing by Seller or Seller's attorney.

**8. Mortgage Commitment Contingency.** *(Delete paragraph if inapplicable. For explanation, see:* **NOTES ON MORTGAGE COMMITMENT CONTINGENCY CLAUSE.)**

(a) The obligation of Purchaser to purchase under this contract is conditioned upon issuance, on or before ~~60~~ 45 days after a fully executed copy of this contract is given to Purchaser or Purchaser's attorney in the manner set forth in paragraph 25 or subparagraph 8(j) (the "Commitment Date"), of a written commitment from an Institutional Lender pursuant to which such Institutional Lender agrees to make a first mortgage loan, including a VA, FHA or other governmentally insured loan, to Purchaser, at Purchaser's sole cost and expense, of $1,134,900.00 ~~948,000.00~~ for a term of at least 30 years (or such lesser sum or shorter term as Purchaser shall be willing to accept) at the prevailing fixed or adjustable rate of interest and on other customary commitment terms (the "Commitment"). To the extent a Commitment is conditioned on the sale of Purchaser's current home, payment of any outstanding debt, no material adverse change in Purchaser's financial condition or any other customary conditions, Purchaser accepts the risk that such conditions may not be met; however, a commitment conditioned on the Institutional Lender's approval of an appraisal shall not be deemed a "Commitment" hereunder until an appraisal is approved (and if that does not occur before the Commitment Date Purchaser may cancel under subparagraph 8(e) unless the Commitment Date is extended). Purchaser's obligations hereunder are conditioned only on issuance of a Commitment. Once a Commitment is issued, Purchaser is bound under this contract even if the lender fails or refuses to fund the loan for any reason, within Purchaser's control.

(b) Purchaser shall (i) make prompt application to one or, at Purchaser's election, more than one Institutional Lender for such mortgage loan, (ii) furnish accurate and complete information regarding Purchaser and members of Purchaser's family, as required, (iii) pay all fees, points and charges required in connection with such application and loan, (iv) pursue such application with diligence, and (v) cooperate in good faith with such Institutional Lender(s) to obtain a Commitment. Purchaser shall accept a Commitment meeting the terms set forth in subparagraph 8(a) and shall comply with all requirements of such Commitment (or any other commitment accepted by Purchaser). Purchaser shall furnish Seller with a copy of the Commitment promptly after receipt thereof.

(c) *(Delete this subparagraph if inapplicable)* Prompt submission by Purchaser of an application to a mortgage broker registered pursuant to Article 12-D of the New York Banking Law ("Mortgage Broker") shall constitute full compliance with the terms and conditions set forth in subparagraph 8(b)(i), provided that such Mortgage Broker promptly submits such application to such Institutional Lender(s). Purchaser shall cooperate in good faith with such Mortgage Broker to obtain a Commitment from such Institutional Lender(s).

(d) If all Institutional Lenders to whom applications were made deny such applications in writing prior to the Commitment Date, Purchaser may cancel this contract by giving Notice thereof to Seller, with a copy of such denials, provided that Purchaser has complied with all its obligations under this paragraph 8.

(e) If no Commitment is issued by an Institutional Lender on or before the Commitment Date, then, unless Purchaser has accepted a written commitment from an Institutional Lender that does not conform to the terms set forth in subparagraph 8(a), Either party may cancel this contract by giving Notice to the other within 5 business days after the Commitment Date, provided that such Notice includes the name and address of the Institutional Lender(s) to whom application was made and that Purchaser has complied with all its obligations under this paragraph 8.

(f) If this contract is canceled by Purchaser pursuant to subparagraphs 8(d) or (e), neither party shall thereafter have any further rights against, or obligations or liabilities to, the other by reason of this contract, except that the Downpayment shall be promptly refunded to Purchaser and except as set forth in paragraph 27.

(g) If Purchaser accepts a written commitment from an Institutional Lender that does not conform to the terms set forth in subparagraph 8(a), then Purchaser shall be deemed to have waived Purchaser's right to cancel this contract and to receive a refund of the Downpayment by reason of the contingency contained in this paragraph 8.

(h) If Seller has not received a copy of a commitment from an Institutional Lender accepted by Purchaser by the Commitment Date, Seller may cancel this contract by giving Notice to Purchaser within 5 business days after the Commitment Date, which cancellation shall become effective unless Purchaser delivers a copy of such commitment to Seller within 10 business days after the Commitment Date. After such cancellation neither party shall have any further rights against, or obligations or liabilities to, the other by reason of this contract, except that the Downpayment shall be promptly refunded to Purchaser (provided Purchaser has complied with all its obligations under this paragraph 8) and except as set forth in paragraph 27.

(i) For purposes of this contract, the term "Institutional Lender" shall mean any bank, savings bank, private banker, trust company, savings and loan association, credit union or similar banking institution whether organized under the laws of this state, the United States or any other state, foreign banking corporation licensed by the Superintendent of Banks of New York or regulated by the Comptroller of the Currency to transact business in New York State; insurance company duly organized or licensed to do business in New York State; mortgage banker licensed pursuant to Article 12-D of the Banking Law; and any instrumentality created by the United States or any state with the power to make mortgage loans.

(j) For purposes of subparagraph 8(a), Purchaser shall be deemed to have been given a fully executed copy of this contract on the third business day following the date of ordinary or regular mailing, postage prepaid.

**9. Permitted Exceptions.** The Premises are sold and shall be conveyed subject to:

(a) Zoning and subdivision laws and regulations, and landmark, historic or wetlands designation, provided that they are not violated by the existing buildings and improvements erected on the property or their use;

(b) Consents for the erection of any structures on, under or above any streets on which the Premises abut;

(c) Encroachments of stoops, areas, cellar steps, trim and cornices, if any, upon any street or highway;

(d) Real estate taxes that are a lien, but are not yet due and payable; and

(e) The other matters, if any, including a survey exception, set forth in a Rider attached.

Docusign Envelope ID: DA3A099A-8B0A-4385-9E9D-7748C6801531

**10. Governmental Violations and Orders.**

(a) Seller shall comply with all notes or notices of violations of law or municipal ordinances, orders or requirements noted or issued as of the date of closing by any governmental department having authority as to lands, housing, buildings, fire, health, environmental and labor conditions affecting the Premises. The Premises shall be conveyed free of them at Closing. Seller shall furnish Purchaser with any authorizations necessary to make the searches that could disclose these matters.

(b) *(Delete if inapplicable)* All obligations affecting the Premises pursuant to the Administrative Code of the City of New York incurred prior to Closing and payable in money shall be discharged by Seller at or prior to Closing.

**11. Seller's Representations.**

(a) Seller represents and warrants to Purchaser that:

I. The Premises abut or have a right of access to a public road;

II. Seller is the sole owner of the Premises and has the full right, power and authority to sell, convey and transfer the same in accordance with the terms of this contract;

III. Seller is not a "foreign person", as that term is defined for purposes of the Foreign Investment in Real Property Tax Act. Internal Revenue Code ("IRC") Section 1445, as amended, and the regulations promulgated thereunder (collectively "FIRPTA");

IV. The Premises are not affected by any exemptions or abatements of taxes; and

V. Seller has been known by no other name for the past ten years, except:

(b) Seller covenants and warrants that all of the representations and warranties set forth in this contract shall be true and correct at Closing.

(c) Except as otherwise expressly set forth in this contract, none of Seller's covenants, representations, warranties or other obligations contained in this contract shall survive Closing.

**12. Condition of Property.** Purchaser acknowledges and represents that Purchaser is fully aware of the physical condition and state of repair of the Premises and of all other property included in this sale, based on Purchaser's own inspection and investigation thereof, and that Purchaser is entering into this contract based solely upon such inspection and investigation and not upon any information, data, statements or representations, written or oral, as to the physical conditions, state of repair, use, cost of operation or any other matter related to the Premises or the other property included in the sale, given or made by Seller or its representatives, and shall accept the same "as is" in their present condition and state of repair, subject to reasonable use, wear, tear and natural deterioration between the date hereof and the date of Closing (except as otherwise set forth in paragraph 16(e), without any reduction in the purchase price or claim of any kind for any change in such condition by reason thereof subsequent to the date of this contract. Purchaser and its authorized representatives shall have the right, at reasonable times and upon reasonable notice (by telephone or otherwise) to Seller, to inspect the Premises before Closing.

**13. Insurable Title.** Seller shall give and Purchaser shall accept such title as any reputable title insurance company <u>chosen by Purchaser</u> licensed in New York State shall be willing to approve and insure in accordance with its standard form of title policy approved by the New York State Insurance Department, subject only to the matters provided for this contract.

**14. Closing, Deed and Title.**

(a) "Closing" means the settlement of the obligations of Seller and Purchaser to each other under this contract, including the payment of the purchase price to Seller, and the delivery to Purchaser of a bargain and sale with covenants against grantor's acts deed in proper statutory short form for record, duly executed and acknowledged, so as to convey to Purchaser fee simple title to the Premises, free of all encumbrances, except as otherwise herein stated. The deed shall contain a covenant by Seller as required by subd. 5 of Section 13 of the Lien Law.

(b) If Seller is a corporation, it shall deliver to Purchaser at the time of Closing (i) a resolution of its Board of Directors authorizing the sale and delivery of the deed, and (ii) a certificate by the Secretary or Assistant Secretary of the corporation certifying such resolution and setting forth facts showing that the transfer is in conformity with the requirements of Section 909 of the Business Corporation Law. The deed in such case shall contain a recital sufficient to establish compliance with that Section.

**15. Closing Date and Place.** Closing shall take place at the office of Seller's attorney at 10:00 o'clock on or about , 2025 or upon reasonable notice (by telephone or otherwise.

**16. Conditions to Closing.** This contract and Purchaser's obligation to purchase the Premises are also subject to and conditioned upon the fulfillment of the following conditions precedent:

(a) The accuracy, as of the date of Closing, of the representations and warranties of Seller made in this contract.

(b) The delivery by Seller to Purchaser of a valid and subsisting Certificate of Occupancy or other required certificate of compliance, or evidence that none was required, covering the building(s) and all of the other improvements located on the property authorizing their use as a two family dwelling at the date of Closing.

(c) The delivery by Seller to Purchaser of a certificate stating that Seller is not a foreign person, which certificate shall be in the form then required by FIRPTA or a withholding certificate from I.R.S. If Seller fails to deliver the aforesaid certificate or if Purchaser is not entitled under FIRPTA to rely on such certificate, Purchaser shall deduct and withhold from the purchase price a sum equal to 10% thereof (or any lesser amount permitted by law) and shall at Closing remit the withheld amount with the required forms to the Internal Revenue Service.

(d) The delivery of the Premises and all building(s) and improvements comprising a part thereof in broom clean condition, vacant and free of leases or tenancies, together with keys to the Premises.

(e) All plumbing (including water supply and septic systems, if any), heating and air conditioning, if any, electrical and mechanical systems, equipment, and machinery in the building(s) located on the property and all appliances which are included in this sale being in working order as of the date of Closing, and the roof shall be free of leaks

(f) If the Premises are a one or two family house, delivery by the parties at Closing of affidavits in compliance with state and local law requirements to the effect that there is installed in the Premises a smoke detecting alarm device or devices.

(g) The delivery by the parties of any other affidavits required as a condition of recording the deed.

**17. Deed Transfer and Recording Taxes.** At Closing, certified or official bank checks payable to the order of the appropriate State, City or County officer in the amount of any applicable transfer and/or recording tax payable by reason of the delivery or recording of the deed or mortgage, if any, shall be delivered by the party required by this contract to pay such transfer and/or recording tax, together with any required tax returns duly executed and sworn to, and such party shall cause any such checks and returns to be delivered to the appropriate officer promptly after Closing. The obligation to pay any additional tax or deficiency and any interest or penalties thereon shall survive Closing.

**18. Apportionments and Other Adjustments; Water Meter and Installment Assessments.**

(a) To the extent applicable, the following shall be apportioned as of midnight of the day before the day of Closing:
(i) taxes, water charges and sewer rents, on the basis of the fiscal period for which assessed; (ii) fuel; (iii) interest on the existing mortgage; (iv) premiums on existing transferable insurance policies and renewals of those expiring prior to Closing; (v) vault charges; (vi) rents as and when collected.

(b) If Closing shall occur before a new tax rate is fixed, the apportionment of taxes shall be upon the basis of the tax rate for the immediately preceding fiscal period applied to the latest assessed valuation.

(c) If there is a water meter on the Premises, Seller shall furnish a final actual reading to a date not more than 30 days before Closing and the unfixed meter charge and sewer rent, if any, shall be apportioned on the basis of such last reading.

(d) If at the date of Closing the Premises are affected by an assessment which is or may become payable in annual installments, and the first installment is then a lien, or has been paid, then for the purposes of this contract all the unpaid installments shall be considered due and shall be paid by Seller at or prior to Closing.

(e) Any errors or omissions in computing apportionments or other adjustments at Closing shall be corrected within a reasonable time following Closing. This subparagraph shall survive Closing.

**19. Allowance for Unpaid Taxes, etc.** Seller has the option to credit Purchaser as an adjustment to the purchase price with the amount of any unpaid taxes, assessments, water charges and sewer rents, together with any interest and penalties thereon to a date not less that five business dates after Closing, provided the official bills therefor computed to said date are produced at Closing.

**20. Use of Purchase Price to Remove Encumbrances.** If at Closing there are other liens or encumbrances that Seller is obligated to pay or discharge, Seller may use any portion of the cash balance of the purchase price to pay or discharge them, provided Seller shall simultaneously deliver to Purchaser at Closing instruments in recordable form and sufficient to satisfy such liens or encumbrances of record, together with the cost of recording or filing said instruments. As an alternative Seller may deposit sufficient monies with the title insurance company employed by Purchaser acceptable to and required by it to assure their discharge, but only if the title insurance company will insure Purchaser's title clear of the matters or insure against their enforcement out of the Premises and will insure Purchaser's Institutional Lender clear of such matters. Upon reasonable prior notice (by telephone or otherwise), Purchaser shall provide separate certified or official bank checks as requested to assist in clearing up these matters.

**21. Title Examination; Seller's Inability to Convey; Limitations of Liability.**

(a) Purchaser shall order an examination of title in respect of the Premises from a title company licensed or authorized to issue title insurance by the New York State Insurance Department or any agent for such title company promptly after the execution of this contract or, if this contract is subject to the mortgage contingency set forth in paragraph 8, after a mortgage commitment has been accepted by Purchaser. Purchaser shall cause a copy of the title report and of any additions thereto to be delivered to the attorney(s) for Seller promptly after receipt thereof.

(b) (i) If at the date of Closing, Seller is unable to transfer title to Purchaser in accordance with this contract, or Purchaser has other valid grounds for refusing to close, whether by reason of liens, encumbrances or other objections to title or otherwise (herein collectively called "Defects"), other than those subject to which Purchaser is obligated to accept title hereunder or which Purchaser may have waived and other than those which Seller has herein expressly agreed to remove, remedy or discharge and if Purchaser shall be unwilling to waive the same and to close title without abatement of the purchase price, then, except as hereinafter set forth, Seller shall have the right, at Seller's sole election, either to take such action as Seller may deem advisable to remove, remedy, discharge or comply with such Defects or to cancel this contract; (ii) if Seller elects to take action to remove, remedy or comply with such Defects, Seller shall be entitled from time to time, upon Notice to Purchaser, to adjourn the date for Closing hereunder for a period or periods not exceeding 60 days in the aggregate (but not extending beyond the date upon which Purchaser's mortgage commitment, if any, shall expire), and the date for Closing shall be adjourned to a date specified by Seller not beyond such period. If for any reason whatsoever, Seller shall not have succeeded in removing, remedying or complying with such Defects at the expiration of such adjournment(s), and if Purchaser shall still be unwilling to waive the same and to close title without abatement of the purchase price, then either party may cancel this contract by Notice to the other given within 10 days after such adjourned date; (iii) notwithstanding the foregoing, the existing mortgage (unless this sale is subject to the same) and any matter created by Seller
after the date hereof shall be released, discharged or otherwise cured by Seller at or prior to Closing.

(c) If this contract is cancelled pursuant to its terms, other than as a result of Purchaser's default, this contract shall terminate and come to an end, and neither party shall have any further rights, obligations or liabilities against or to the other hereunder or otherwise, except that: (i) Seller shall promptly refund or cause the Escrowee to refund the Downpayment to Purchaser and, unless cancelled as a result of Purchaser's default or pursuant to paragraph 8, to reimburse Purchaser for the net cost of examination of title, including any appropriate additional charges related thereto, and the net cost, if actually paid or incurred by Purchaser for updating the
existing survey of the Premises or of a new survey, and (ii) the obligations under paragraph 27 shall survive the termination of this contract.

**22. Affidavit as to Judgments, Bankruptcies, etc.** If a title examination discloses judgments, bankruptcies or other returns against persons having names the same as or similar to that of Seller, Seller shall deliver an affidavit at Closing showing that they are not against Seller.

**23. Defaults and Remedies.**

(a) If Purchaser defaults hereunder, Seller's sole remedy shall be to receive and retain the Downpayment as liquidated damages, it being agreed that Seller's damages in case of Purchaser's default might be

impossible to ascertain and the Downpayment constitutes a fair and reasonable amount of damages under the circumstances and is not a penalty.

(b) If Seller defaults hereunder, Purchaser shall have such remedies as Purchaser shall be entitled to at law or in equity, including but not limited to, specific performance.

**24. Purchaser's Lien.** All money paid on account of this contract, and the reasonable expenses of examination of title to the Premises and of any survey and survey inspection charges are hereby made liens on the Premises, but such liens shall not continue after default by Purchaser under this contract.

**25. Notices.** Any notice or other communication ("Notice") shall be in writing and either:

(a) sent by either of the parties hereto or by their respective attorneys who are hereby authorized to do so on their behalf or by the Escrowee, by registered or certified mail, postage prepaid, or

(b) delivered in person or by overnight courier, with receipt acknowledged, to the respective addresses given in this contract for the party and the Escrowee, to whom the Notice is to be given, or to such other address as such party or Escrowee shall hereafter designate by Notice given to the other party or parties and the Escrowee pursuant in this paragraph. Each Notice mailed shall be deemed given on the third business day following the date of mailing the same, except that any Notice to Escrowee shall be deemed given only upon receipt by Escrowee and each Notice delivered in person or by overnight courier shall be deemed given when delivered, or

(c) with respect to paragraph 7(b) or paragraph 20, sent by fax to the party's attorney. Each Notice by fax shall be deemed given when transmission is confirmed by the sender's fax machine. A copy of each Notice sent to a party shall also be sent to the party's attorney. The attorneys for the parties are hereby authorized to give and receive on behalf of their clients all Notices and deliveries. This contract may be delivered as provided above or by ordinary mail.

**26. No Assignment.** This contract may not be assigned by Purchaser without the prior written consent of Seller in each instance and any purported assignment(s) made without such consent shall be void.

**27. Broker.** Seller and Purchaser each represents and warrants to the other that it has not dealt with any broker in connection with this sale other than Bluewater Capital Realty Corp. and Keller Williams of Greater Nassau ("Broker") and Seller shall pay Broker any commission earned pursuant to a separate agreement between Seller and Broker. Seller and Purchaser shall indemnify and defend each other against any costs, claims and expenses, including reasonable attorney's fees arising out of the breach on their respective parts of any representation or agreement contained in this paragraph. The provisions of this paragraph shall survive Closing or, if Closing does not occur the termination of this contract. In accordance with law, purchaser shall pay to their broker such commission as has been agreed upon between them; and seller shall pay commission to her broker pursuant to their agreement.

**28. Miscellaneous.**

(a) All prior understanding, agreements, representations and warranties, oral or written, between Seller and Purchaser are merged in this contract; it completely expresses their full agreement and has been entered into after full investigation, neither party relying upon any statement made by anyone else that is not set forth in this contract.

(b) Neither this contract nor any provision thereof may be waived, changed or cancelled except in writing. This contract shall also apply to and bind the heirs, distributees, legal representatives, successors and permitted assigns of the respective parties. The parties hereby authorize their respective attorneys to agree in writing to any changes in dates and time periods provided for in this contract.

(c) Any singular word or term herein shall also be read as in the plural and the neuter shall include the masculine and feminine gender, whenever the sense of this contract may require it.

(d) The captions in this contract are for convenience of reference only and in no way define, limit or describe the scope of this contract and shall not be considered in the interpretation of this or any provisions hereof.

(e) This contract shall not be binding or effective until duly executed and delivered by Seller and Purchaser.

(f) Seller and Purchaser shall comply with IRC reporting requirements, if applicable. This subparagraph shall survive Closing.

(g) Each party shall, at any time and from time to time, execute, acknowledge where appropriate and deliver such further instruments and documents and take such other action as may be reasonably requested by the other in order to carry out the intent and purpose of this contract. This subparagraph shall survive Closing.

(h) This contract is intended for the exclusive benefit of the parties hereto and except as otherwise expressly provided herein, shall not be for the benefit of, and shall not create any rights in, or be enforceable by any other person or entity.

(i) If applicable, the complete and fully executed disclosure of information on lead-based paint and/or lead-based paint hazards is attached hereto and made a part hereof.

Continued on Rider attached hereto. *(Delete if inapplicable)*

***In Witness Whereof,*** **this contract has been duly executed by the parties hereto.**

[signature] DEBBIE A. HARRIS, SELLER

[signature]

DocuSigned by: [signature] 9/30/2025
KELVIN ENDEAVOUR, JR., PURCHASER

Signed by: [signature] 9/30/2025
KELSEA N. CROCKETT, PURCHASER

**Attorney for Seller: GARNETT SULLIVAN, ESQ.**

Address: 1080 Grand Avenue
South Hempstead, New York 11550

Tel.: (516) 285-1575

Receipt of the Downpayment is acknowledged and the undersigned agrees to act in accordance with the provisions of paragraph 6 above.

**Attorney for Purchaser: KAREN SONN, ESQ.**

Address: 22 Jordan Road, Hastings on Hudson, NY 10706 ~~26 Gramercy Park South, Unit 1A~~

~~New York, New York 10003~~
Email: karen@sonnassociates.com
Tel.: 917-838-7748

*Escrowee*

# *Contract of Sale*

**TITLE NO.**

DEBBIE A. HARRIS
TO
KELVIN ENDEAVOUR, JR. and KELSEA N. CROCKETT

## PREMISES

| | |
|---|---|
| Sheet | |
| Section | |
| Block | 4678 |
| Lot | 7 |
| Plate | |
| County or Town | KINGS |
| Street Number | 814 Linden Blvd. |

## NOTES ON MORTGAGE COMMITMENT CONTINGENCY CLAUSE for RESIDENTIAL CONTRACT OF SALE

1. WARNING: The mortgage Commitment contingency clause for the Residential Contract of Sale is a bar association form that attempts to provide a mechanism that makes the rights and obligations of the parties clear in sale of residences in ordinary circumstances. It should be reviewed carefully by Seller and Purchaser and their attorneys in each and every transaction to make sure that all the provisions are appropriate for that transaction. Negotiated modifications should be made whenever necessary.
2. Under the clause, the obligation of Purchaser to purchase under the contract of sale is contingent on Purchaser's obtaining a mortgage Commitment letter from an Institutional Lender within the number of days specified for the amount specified. This refers to calendar days. Seller's attorney should state his/her calculation of the Commitment Date in the letter delivering the executed contract to Purchaser's attorney, to prevent confusion later. Purchaser should promptly confirm or correct that date. In applying for a loan, Purchaser should inform its lender of the scheduled date of Closing in the contract and request that the expiration date of the Commitment occur after the scheduled dated of Closing. Purchaser must comply with deadlines and pursue the application in good faith. The Commitment contingency is satisfied by issuance of a Commitment in the amount specified on or before the Commitment Date, unless the Commitment is conditioned on approval of an appraisal. If the Commitment is conditioned on approval of an appraisal and such approval does not occur prior to the Commitment Date, Purchaser should either cancel the contract or obtain an extension of the Commitment Date. If the Commitment is later withdrawn or not honored, Purchaser runs the risk of being in default under the contract of sale with Seller.
3. If there are loan terms and conditions that are required or would not be acceptable to Purchaser, such as the interest rate, term of the loan, points, fees or a condition requiring sale of the current home, those terms and conditions should be specified in a rider.
4. This clause assumes that initial review and approval of Purchaser's credit will occur before the Commitment letter is issued. Purchaser should confirm with the lender that this is the case before applying for the Commitment.
5. If, as has been common, the Commitment letter itself is conditioned on sale of Purchaser's home or payment of any outstanding debt or no material adverse change in Purchaser's financial condition, such a Commitment will satisfy the contract contingency nonetheless, and Purchaser will take the risk of fulfilling those Commitment conditions, including forfeiture of the Downpayment if Purchaser defaults on its obligation to close. Under New York case law, a defaulting Purchaser may not recover any part of the Downpayment, and Seller does not have to prove any damages. If Purchaser is not willing to take that risk, the clause must be modified accordingly.
6. Purchaser may submit an application to registered Mortgage Broker instead of applying directly to an Institutional Lender.
7. This clause allows Seller to cancel if a Commitment is not accepted by Purchaser by the Commitment Date, unless Purchaser timely supplies a copy of the Commitment, to allow Seller the option to avoid having to wait until the scheduled date of Closing to see if Purchaser will be able to close. Seller may prefer to cancel rather than to wait and settle for forfeiture of the Downpayment if Purchaser defaults. Because of Seller's right to cancel, Purchaser may not waive this contingency clause. This clause means that Purchaser is subject to cancellation by Seller even if Purchaser is willing to risk that he/she will obtain the Commitment after the Commitment Date. Some Purchasers may not want to be subject to such cancellation by Seller.
8. Purchaser may want to add to paragraph 21(c) that Purchaser's reimbursement should include non-refundable financing and inspection expenses of Purchaser, which should be refunded by Seller if Seller willfully defaults under the contract of sale (alternative: If Seller is unable to transfer title under the contract of sale).

9-25-00
Joint Committee on the Mortgage Contingency Clause:
Real Property Section of the New York State Bar Association
Real Property Law Committee of the Association of the Bar of the City of New York
Real Property Committee of the New York County Lawyers Association

**RIDER ATTACHED TO AND MADE A PART OF**

**CONTRACT OF SALE DATED:** September **, 2025**

**SELLERS: DEBBIE A. HARRIS**

**PURCHASERS: KELVIN ENDEAVOUR, JR. and KELSEA N. CROCKETT**

**PREMISES: 814 Linden Blvd., Brooklyn, NY 11203**

29. All notices mailed to Seller must be sent to their attorney except Default Notices which must be sent to the attorney:

**GARNETT H. SULLIVAN, ESQ.**
Attorney-At-Law
1080 Grand Ave., South Hempstead, NY 11550

No notice shall be valid unless emailed to Seller's Attorney except Default Notices which must be emailed overnighted via federal express or ups to both the attorney receiving the Default Notice.

30. Should written notice of cancellation of this Contract be given by the Seller or the Purchaser of failure to secure a mortgage commitment, then upon the return to the Purchaser of all sums paid on an account herein, this Contract shall be null and void and of no further force and effect.

31. In the event the Purchaser's title inspection report shows any defect or objections to title not set forth herein which would render title unmarketable or uninsurable, Purchaser shall forward a copy of such objections or defects to Seller's attorney. Delivery via email to the

Sellers attorney of a title report shall constitute Notice of any title objections or defects. The Seller shall have a reasonable time thereafter to cure such objections or defects however, it shall be not more than 40 days past the closing date in the contract or when Purchasers FHA mortgage commitment expires. However, Seller shall not be required to bring any action or proceedings or otherwise in excess of 1% of the sales price, to render title marketable or insurable. The Purchaser may, nevertheless accept such title as Seller may be able to convey without any reduction or purchase price or credit allowance against the sale and without any other liability on the part of the Seller.

32. Anything to the contrary herein, notwithstanding if there are any notes or notices of violations against the premises at the date hereof, the Seller shall only be obligated to expend a maximum of $2,500.00 to remove said violations. If the cost of removing such violations exceeds the sum of $2,500.00, Seller may cancel this contract subject to Purchaser's right to accept title to the premises with such violations outstanding and a credit of $2,500.00 in reduction of the purchase price.

In the event of such cancellation, the sole liability of the Seller will be to refund the Purchaser the amount paid on account of the purchase price, and upon said refund, this Contract shall be null and void.

33. Purchaser is hereby given the right to have a termite inspection of the premises by a qualified exterminator within ten (10) days from the date hereof.

In the event that within said time, notice is given to the Seller that there is an infestation or damage, then the Seller shall have the option to either;

1. remove such infestation at his own expense, cure the damage and provide a one (1) year guarantee.

In the event no notice is emailed from Purchaser's attorney within fifteen (15) business days from the date hereof, then this provision shall not apply and this Contract shall no longer be subject to this provision. The term "termite" shall include all wood destroying insects.

34. The Seller shall not be responsible for or be obligated to pay in whole or in part, any expenses, fees, discounts or other charges in connection with the Purchaser obtaining a mortgage loan commitment.

35. The Seller shall not be implied to have consented to make any repairs or alteration of the premises which might be required by the lending institution in order to grant a mortgage on the premises unless otherwise stated herein.

36. All checks due at the closing of title from Purchaser to Seller shall be first-party checks only, and shall be made payable directly to the Seller. All checks over the aggregate amount of $500 shall be certified or bank checks or wire as the parties may agree.

38. The parties agree that if, for any reason whatsoever, except Seller's willful default, Seller is unable to fulfill any of the terms of this Contract, including but not limited to the delivery of a good and marketable title, Seller shall not be required to bring any action or proceeding or incur any expenses in order to fulfill the terms of this Contract other than spending up to 1% of the sales price to cure same. If the Purchaser refuses to waive performances on the part of the Seller with respect to those conditions in dispute, Seller may rescind this

Contract and upon returning to the Purchaser the sum paid on the signing of this Contract, and net title company expenses for the examination of the title to the premises, and the survey charge, for the examination of the title to the premises, up to a maximum of $1,000.00, all further liability on the part of the Seller shall cease and terminate and the Contract on the part of the Seller shall cease and terminate and this contract shall become null and void and be canceled and be of no further force and effect and the Seller are not liable for any other costs or damages whatsoever.

39. This Contract shall not be construed as an offer to sell by Seller, until Seller have agreed to all of the terms and conditions by signing this Contract.

40. In the event of any conflict between the terms of this rider and the terms contained in the printed form (NYBTU Form WCA-1 rev. 7/99) the terms of this Rider shall be controlling.

41. The Purchaser agrees to indemnify Seller and hold them harmless from any expense or liability resulting from Purchaser's breach of their representation in paragraph #27 of the Contract of Sale. This provision as well as paragraph #27 shall survive closing.

42. Seller agrees to execute a FIRPTA affidavit certifying that they are not foreign persons or Purchaser shall be entitled to withhold 15% of the sales price to satisfy potential liability pursuant to Section 897 (c) of the Internal Revenue Service Code.

43. Seller agrees to have an operational smoke detector and carbon monoxide devise installed in the premises in accordance with NYC Administration Code Title 27, Article 6, Subdivision 17.

44. Seller shall provide a certificate of occupancy or equivalent for a **TWO**-family dwelling and all improvements thereto at or prior to closing for the premises as it currently exists. It being understood however, that if the cost to procure the same, including the cost of any required repairs, alterations or renovations, shall exceed the sum of 1% of the sales price, then the Seller shall have the right to cancel this contract by written notice to the Purchaser on or before the time fixed for closing, in accordance with provisions set forth herein, and the escrow agent is hereby directed to refund to the Purchaser the monies paid on account of this contract. Seller shall not be responsible to provide to purchaser a certificate of occupancy for any of the following: open patios, decks, enclosed porches, above ground pools, car ports, treehouse, or barbeque hut which may be removed by seller without compensation to purchaser, if purchaser's lending institution requires a certificate of occupancy or certificate of compliance.

45. Notwithstanding anything contained in paragraph 16(f) of the standard contract above:

(a) the seller(s) maximum liability for the repair or replacement of any appliance shall not exceed Three Hundred and 00/100 ($300.00) Dollars per appliance; and

46. Seller agrees to make the following repairs upon the premises prior to closing:

(a) Repair damaged soffit

(b) Install transition strips between doorways

Docusign Envelope ID: DA3A099A-8B0A-4385-9E9D-7748C6801531

Debbie A. Harris

**DEBBIE A. HARRIS, SELLER**

DocuSigned by:

Kelvin Endeavour 9/30/2025

**KELVIN ENDEAVOUR, JR., PURCHASER**

Signed by:

Kelsea N. Crockett 9/30/2025

**KELSEA N. CROCKETT, PURCHASER**

**SUPPLEMENTAL RIDER TO RESIDENTIAL CONTRACT OF SALE BETWEEN**

**DEBBIE A. HARRIS, AS SELLER, AND KELVIN ENDEAVOUR JR. AND KELSEA N. CROCKETT, AS PURCHASER FOR THE PREMISES 814 LINDEN BLVD, BROOKLYN, NY 11203**

In the event of any inconsistency between the provisions of this Supplemental Rider (this "Supplemental Rider") and those contained in the Residential Contract of Sale or any riders attached thereto (collectively, the "Contract") the provisions of this Supplemental Rider shall govern and be binding.

1. Seller shall supply any documents (including prior title insurance policies and existing surveys, if any) and/or affidavits requested by Purchaser or Purchaser's title insurance company and required thereby for the issuance of title insurance policies to Purchaser and Purchaser's mortgagee.

2. Seller agrees to maintain the Premises (including without limitation, the shrubs and landscaping), until the Closing or delivery and possession, whichever shall later occur, in the same condition in which they are at present.

3. Seller warrants and represents that the Premises and all improvements thereon, have been constructed and are being operated in accordance with all applicable zoning, subdivision, building, fire, health and environmental regulations, ordinances and requirements. Seller further warrants and represents that a Certificate of Occupancy, any health departmental approvals required and a Board of Fire Underwriter's Certificate covering the Premises and all structures thereon have been fully issued and are in full force and effect, and that these certificates and approvals are not violated by the existing structures or the use thereof as a two family dwelling. Seller agrees to deliver to Purchaser said certificates and approvals at closing. Seller agrees to indemnify and hold Purchaser harmless from and against all loss, cost, liability, damages, and expenses (including, without limitation, reasonable attorneys' fees and disbursements), which Purchaser may sustain as a result of the breach, inaccuracy, untruthfulness or misrepresentation of the foregoing representations. This paragraph shall survive the closing.

4. Seller represents and warrants that the Premises contain no underground tanks for the storage of petroleum products or other chemicals; that, the Premises is not the site of any spill, deposit, or storage of any toxic or hazardous waste, chemical, or substance; and that, no hazardous materials, including but not limited to asbestos, mold, paint containing lead, or urea formaldehyde, or any other type of foam insulation, has been installed in the Premises.

5. The articles of personal property which are attached or appurtenant to or used in connection with the Premises are included in this sale and no part of the purchase price is attributed thereto.

~~6. It is agreed that Seller shall permit Purchaser and Purchaser's architect, engineer, decorator and/or other authorized persons to have the right of access to the Premises from time to~~

~~time, upon reasonable notice at reasonable times, between the date hereof and the Closing (or delivery and possession, whichever shall later occur).~~

~~7.~~6. Prior to Closing, Seller shall deliver to Purchaser a Certificate of Occupancy for all improvements presently existing on the Premises requiring same, or a letter from the municipality confirming that no Certificate of Occupancy is required.

~~8.~~7. Seller represents and warrants as of the date hereof:

(a) the Premises has been and is now being used in accordance with all applicable zoning, subdivision, building, fire, health and environmental regulations, ordinances and has obtained all permits, if any, as required and the Premises and the present use and condition thereof do not violate any applicable deed restrictions or other covenants, restrictions or agreements applicable to the Premises;

(b) no notes or notices of violation of law or municipal ordinances or of Federal, State, County or Municipal or other governmental agency regulations, orders or requirements relating to the Premises have been entered or received by Seller and Seller has no reason to believe that any such note or notice may or will be entered;

(c) there is no action or proceeding (zoning or otherwise) or governmental investigation pending, or, to the knowledge of Seller, threatened against or relating to Seller, the Premises or the transactions contemplated by this Contract, nor, to the knowledge of Seller, is there any basis for such action;

(d) Seller is the sole owner of record and beneficial title to the Premises, free and clear of all liens and encumbrances, and Seller has full authority to transfer title to the Premises pursuant to this Contract. Except as specified herein, no person, firm or entity has any right to acquire the Premises or any rights or estates in and to the Premises;

(e) the execution of the Contract and Seller's performance hereunder does not violate any judgment, order, injunction, decree or award of any court, administrative agency or governmental body applicable to Seller or the Premises;

(f) the Premises are not located in a "wetlands" area; and

(g) the Premises are not located in a flood hazard area as defined by the Federal Insurance Administration.

Seller acknowledges that each of the representations, warranties and agreements made by it in this Paragraph ___ and elsewhere in this Contract is material to the Purchaser. All of the representations, warranties and agreements set forth herein and elsewhere in the Contract and this Supplemental Rider shall be true upon the execution of the Contract, shall be deemed to be repeated at and as of the date of the Closing and shall not survive the Closing. Without limiting any of the rights of Purchaser elsewhere provided for in the Contract, it is agreed that the obligation of Purchaser to close title under this Contract is conditioned upon the accuracy and completeness of all of Seller's warranties and representations and the due compliance by Seller of all of their agreements set forth herein and elsewhere in the Contract and this Supplemental Rider.

~~9.~~8. Paragraph 16(e) is amended to include that the heating, air conditioning, alarm systems, generator, sprinkler, electrical, mechanical systems and all appliances shall all be in working order and that the roof and basement, if any, shall be free of leaks at the time of Closing.

~~10.~~9. Prior to the Closing or delivery and possession, whichever shall later occur, Seller, at its own expense, shall remove the personal property located at the Premises and not included in the sale contemplated hereby and shall repair or provide an appropriate credit to Purchaser for all damage to the Premises resulting from the removal of such personal property. Any of Seller's personal property not included in the sale contemplated hereby which is not removed from the Premises shall be deemed abandoned property. Purchaser may (but shall not be obligated to), at Seller's risk and expense, cause any such abandoned property to be removed from the Premises. The provisions of this paragraph shall survive the Closing.

~~11.~~10. Supplementing and modifying paragraph 21 of the Contract, notwithstanding anything to the contrary contained in paragraph 21:

(a) Seller shall pay or discharge: (i) all Defects (other than mortgages) provided the cost to discharge the same does not exceed (i) one percent of the sales price and (ii) all mortgages, judgments, tax liens and other consensual items; and

~~(b) Add the phrase "and all reasonable engineer's fees and other costs 'and expenses incurred by Purchaser in connection with the inspection of the Premises" after the words "of a new survey" on line 8 of clause (e).~~

~~12.~~11. Intentionally omitted.

~~13.~~12. Each party shall sign all documents, which may be necessary for the payment of the New York State Transfer Tax and Mansion Tax . Seller shall pay the New York State Transfer Tax and Purchaser shall pay the Mansion Tax and shall not claim any exemptions thereof. This obligation shall survive Closing.

~~14.~~13. The parties hereto agree that Seller or its attorney shall be responsible for the completion and filing of Form 1099S or such other successor form as may be prescribed by the Internal Revenue Service and for fulfilling all the obligations and requirements of Section 6045(e) of the Internal Revenue Code of 1986, as amended.

~~15.~~14. This Contract shall be deemed executed when signed by the parties hereto notwithstanding that the Brokers' signatures on the Disclosure of Information on Lead-Based Paint and Lead-Based Paint Hazards have not yet been obtained.

~~16.~~15. Seller and Purchaser hereby agree to indemnify, defend and hold the other harmless from and against any and all claims, demands, causes of action, losses, costs and expenses (including reasonable attorneys' fees, court costs and disbursements) arising from any claim for commission, fees or other compensation or reimbursement for expenses made by any broker (including the Brokers) engaged by or claiming to have dealt with Seller and Purchaser in connection with the Purchase Agreement or the transactions contemplated thereby. The terms of this paragraph shall survive closing.

~~17.~~16. Purchaser shall have the opportunity to have the Premises inspected for termites, mold and asbestos within 15 days of contract date. Seller will cooperate in making the Premises available for such inspections. Purchaser shall furnish to Seller written notice (an "Objection Notice") containing a list of specific deficiencies relating to termites, mold and asbestos and the corrections needed, together with a copy of the inspection report(s). Seller shall respond to Purchaser, within five (5) calendar days after receipt of an Objection Notice, and indicate whether or not Seller will, at its sole cost and expense, remedy such items to which Purchaser objects. If no notice is received by Purchaser within said five (5) calendar days, or if Seller elects to so remedy, Seller shall effectuate such remedy, at its sole cost and expense, to Purchaser's reasonable satisfaction, prior to Closing. If Seller does not elect to remedy, at its sole cost and expense, any item to which Purchaser objects, Purchaser may, within five (5) calendar days after receipt of Seller's notice, either (i) elect to proceed with the Closing or (ii) elect to terminate the Contract, in which event the Downpayment (and all interest thereon) shall be disbursed to Purchaser within three (3) days after such termination, and neither Seller nor Purchaser shall have any further rights, claims or obligations with respect to one another arising out of the Contract.

~~18.~~17. At or prior to the Closing, Seller will deliver to Purchaser any warranties, instruction manuals, appliance information, maintenance contracts, floor plans, surveys and contact information for service providers and contractors who performed work to the Premises, to the extent same are in Seller's possession. Seller agrees to cooperate with Purchaser in order to obtain documents and information for work performed and the appliances installed in the Premises.

~~19. Seller represents and warrants that there is no damage (other than reasonable wear and tear) to any part of the Premises which is covered, hidden, concealed or which it was impracticable for Purchaser to view or inspect prior to the date hereof. In the event such damage is revealed prior to Closing, Seller agrees to repair same prior to Closing or establish a reasonable allowance or credit to Purchaser at Closing or a reasonable escrow to cover the cost or necessary repair or replacement. Seller represents that the flooring underneath any personal property to be removed will be of the same character and condition as the exposed flooring, normal wear, tear and fading excepted.~~

~~20.~~18. Supplementing and modifying paragraph 25 of the Contract, Seller and Purchaser do hereby authorize their respective attorneys to act on their behalf with regard to sending or receiving any Notices EXCEPT DEFAULT NOTICES to be given or received by any of the parties hereto and expressly grant the attorneys the authority to request and grant any extension of time period provided in the Contract or this Supplemental Rider VIA EMAIL. Any Notices required to be given may be sent to or received by the attorneys for the respective parties (as listed below) with the same force and effect as if the said Notices were sent or received by the relevant party hereto.

This contract may be executed by DOCUSIGN and/or "PDF" and/or in one or more counterparts, each of which when so executed and delivered shall be deemed an original, but all of which taken together shall constitute but one and the same original.

~~21.~~19. In the event of the death of either Purchaser, then the surviving Purchaser, shall have the sole right to terminate this Contract, provided written notice of termination is sent within thirty (30) days after the occurrence of such death. In the event of the exercise of said right of cancellation, Seller shall immediately return to said surviving Purchaser, all monies deposited

hereunder by Purchaser on account of the purchase price. Upon such refund being made, this Contract shall be null and void and of no further force and effect and all rights, obligations and liabilities of the parties hereunder shall cease and come to an end.

~~22.~~20. Seller and Purchaser agree that the Purchaser is applying for a FHA loan and Seller agrees to cooperate with same. The parties agree that in the event the lender does not fund for any reason other than Purchasers willful default, Seller shall refund the Contract Deposit and return the deposit monies to Purchaser, and upon return and clearance, the parties shall have no further rights or liabilities to one another. Purchasers failure to notify Seller of the Institutional Lender's issuance of a Loan Commitment letter shall not be grounds for Seller to keep Purchasers deposit. Purchaser shall cooperate with Seller as well.

**[Remainder of page intentionally left blank - Signature page follows]**

Docusign Envelope ID: DA3A099A-8B0A-4385-9E9D-7748C6801531

IN WITNESS WHEREOF, the parties hereto have executed this Supplemental Rider as of the date first above written.

**SELLER:**

______________________

______________________

**PURCHASER:**

DocuSigned by:
Kelvin Endeavour 9/30/2025
F64FC10DBEE7414...

Signed by:
Kelsea N. Crockett 9/30/2025
382238160CEF475

Docusign Envelope ID: DA3A099A-8B0A-4385-9E9D-7748C6801531

**Disclosure of Information on Lead-Based Paint and/or Lead-Based Paint Hazards**

**Lead Warning Statement**

*Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.*

**Seller's Disclosure**

(a) Presence of lead-based paint and/or lead-based paint hazards (check (i) or (ii) below):

(i) ______ Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

______________________________________________

(ii) DAH Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b) Records and reports available to the seller (check (i) or (ii) below):

(i) ______ Seller has provided the purchaser with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below).

______________________________________________

(ii) ______ Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Purchaser's Acknowledgment** (initial)

(c) LE KAC Purchaser has received copies of all information listed above.

(d) LE KAC Purchaser has received the pamphlet *Protect Your Family from Lead in Your Home.*

(e) Purchaser has (check (i) or (ii) below):

(i) LE KAC received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or

(ii) ______ waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

**Agent's Acknowledgment** (initial)

(f) ________ Agent has informed the seller of the seller's obligations under 42 U.S.C. 4852(d) and is aware of his/her responsibility to ensure compliance.

**Certification of Accuracy**

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

| | | | |
|---|---|---|---|
| Debbie A H [signature] | 10/1/25 | | |
| Seller | Date | Seller | Date |
| DocuSigned by: [signature] | 9/30/2025 | Signed by: Kelsea A. Crockett | 9/30/2025 |
| Purchaser | Date | Purchaser | Date |
| [signature] | 10/1/2025 | | |
| Agent | Date | Agent | Date |

CONTOUR MORTGAGE

# CONGRATULATIONS

## YOUR HOME LOAN IS **APPROVED**

Date 11/04/2025

**Dear Applicant,**

Contour Mortgage Corp. would like to thank you for submitting your home loan application. Your loan has been reviewed by our underwriting department and you are one step closer to closing on your home loan!

To make this process as efficient as possible, we believe communication is key. Your loan team professionals, detailed below, are always available to answer any questions or concerns you may have. Feel free to reach out to us by phone or email anytime.

**Loan Officer Juan Pablo Munoz NMLS #19351**
Email jmunoz@contourmtg.com
Phone 516-738-0339

**Processor Elizabeth Stano**
Email estano@contourmtg.com
Phone 516-393-8699

Corporate Office
990 Stewart Avenue, Suite 660
Garden City, NY 11530
Phone: 516.385.6900 Fax: 516.385.6999
NMLS# 34384

CONTOUR MORTGAGE

Corporate Office
990 Stewart Avenue, Suite 660
Garden City, NY 11530
Phone: (516) 385-6900 Fax: (516) 385-6999
NMLS#34384

**New York Prevailing Interest Rate Commitment**

**Date: 11/04/2025** **Loan #: 2506177988**
**Borrower: Kelvin Endeavour**
**Co-Borrower: Kelsea N. Crockett**
**Address: 814 LINDEN BLVD, BROOKLYN, NY, 11203-3518**

We are pleased to advise you that your application for a mortgage loan has been approved. The loan will be evidenced by a note and secured by a first mortgage on the above captioned dwelling. The loan will only be made (the "Closing") if you meet all the terms and conditions in this commitment and all attached riders.

| | |
|---|---|
| **1. TYPE OF MORTGAGE:** | **Fixed** |
| **2. LOAN PURPOSE:** | **Purchase** |
| **3. PURCHASE AMOUNT:** | **$1,170,000.00** |
| **4. LOAN AMOUNT:** | **$1,148,808.00** |
| **5. DOWNPAYMENT:** | **$40,950.00** |
| **6. TERM OF LOAN:** | **360 Months** |
| **7. OCCUPANCY:** | **PrimaryResidence** |
| **8. LOAN TYPE:** | **FHA** |

**9. Interest Rate: Your interest rate will be determined at or prior to the closing date.**

Adjustment Period Months Caps: Per Adjustment Lifetime
Margin: % Index: % Index Source:
Interest Only Feature N
Balloon Payment: N

**10. MAXIMUM RATE: Should the rate of interest at the time the closing is scheduled exceed the rate for which you qualify, this commitment shall be null and void. The maximum rate of interest you qualify for is 6.625%**

**11. MONTHLY PAYMENT OF PRINCIPAL & INTEREST: $7,355.94**
**(If this is an adjustable rate mortgage, this is your initial monthly payment of principal and interest)**

**12. You will pay the following origination fees at the time of closing per your most recent Loan Estimate.**

**Origination Charge: $1,985.00**
**Discount Point (s): $8,616.06**
**Adjusted Origination Charge: $10,601**

**13. POINTS: The number of points that you will have to pay us will depend upon the interest rate that is set prior to closing. You will be required to pay a minimum of 0 points to a maximum of 3 points at closing.**

**14. COMMITMENT FEE: $**
**This fee is included in the Adjusted Origination Charge above.**

**15. COMMITMENT EXPIRATION DATE: The expiration date of this commitment is 01/03/2026 If your loan does not close by this date, we have no obligation to honor the terms of this agreement.**

**If this is a refinance of your primary residence, you will not receive the loan proceeds on the date of your closing. Therefore, your loan must close at least three (3) days prior to the expiration date stated above or the lender has no obligation to honor the terms of this agreement and may result in a higher interest rate or additional points being charged on your loan.**

16. Your Commitment Fee and/or points are non-refundable, except for the following conditions:

a. If this commitment is conditioned on the approval of a third-party investor or mortgage insurance company and that party rejects the loan.
b. If this commitment is conditioned upon the property appraisal report and said report is not favorable for the loan in which the commitment was issued.

**Borrower Initials ______**
**Co-Borrower Initials _____**

CONTOUR MORTGAGE

Corporate Office
990 Stewart Avenue, Suite 660
Garden City, NY 11530
Phone: (516) 385-6900 Fax: (516) 385-6999
NMLS#34384

**New York Prevailing Interest Rate Commitment**

c. If this commitment is conditioned upon an initial credit report and said report is not favorable for the loan which the commitment is issued.
d. If the interest rate exceeds the rate for which you qualify and therefore, this commitment becomes null and void.

17A. VA FUNDING FEE (If Applicable): $

17B. USDA Guarantee FEE (If Applicable): $

18. TITLE INSURANCE: The premises must have title insurance in an amount equal to the mortgage loan, insuring a valid first lien on the premises by a Title Insurance Company acceptable to us. Prior to the closing, our attorneys shall receive, at Your expense, (i) a copy of the title report from a licensed title insurance company, in form and content satisfactory to our attorneys including, among other things, departmental, judgment, and financing statement searches, and indicating only those exceptions as may be acceptable to our attorneys; (ii) copies of all instruments of record, leases, and/or other agreements affecting the premises; (iii) and accurate survey of the premises dated or re-dated to within thirty (30) days of the closing which, at our request, must be certified to Contour Mortgage Corp. At the closing, the title company must update the report.

19. CERTIFICATES, PERMITS, LICENSES AND APPROVALS: Prior to the closing, you must deliver to our attorney a valid permanent Certificate of Occupancy for the premises, and all other certificates, permits, licenses, and approvals by any governmental agency or anyone else having authority over the premises.

20. HAZARD INSURANCE: Prior to closing, you shall deliver a fully paid hazard insurance policy from an B rated company, in an amount equal to the full replacement value of the subject property. The policy must name CONTOUR MORTGAGE CORP., ISAOA. A paid receipt for the first year's premium must accompany the policy. Contour Mortgage Corp. cannot require you to obtain a policy in excess of the replacement costs of the improvements on the property securing the loan. THE POLICY MAY TAKE SEVERAL WEEKS TO PROCURE AND, ACCORDINGLY, YOU SHOULD NOT DELAY CONTACTING THE APPROPRIATE PROVIDERS. FAILURE TO PROCURE A POLICY WILL DELAY THE CLOSING.

21. FLOOD INSURANCE: Should it be determined your property lies in a Flood Zone, satisfactory flood insurance will be required as a condition of this loan, together with a paid receipt for the first year's premium, must be delivered to us at, or prior to closing.

22. PRIVATE MORTGAGE INSURANCE: PMI = N:
**Not required**, provided the appraised value of the property results in a Loan to Value ratio of 80% or less.
**If PMI is required**, you may initiate termination of the PMI when the principal balance of your loan reaches 80% of the original value of the home and you do the following: (1) submit a request in writing to your servicer requesting cancellation, (2) have a good payment history, (3) are current on your payments, (4) provide evidence that the value of the property has not declined below the original value of the property appraisal.

23. FHA MORTGAGE INSURANCE: If your mortgage is a loan guaranteed by the FHA an up-front mortgage insurance premium must be paid at closing, and an annual insurance premium will be included in your mortgage payment.

24. REAL ESTATE AND HAZARD INSURANCE ESCROWS: Escrow deposits shall be payable in monthly installments equal to one twelfth (1/12) of the estimated annual taxes, water and sewer charges as well as hazard, private mortgage insurance, monthly mortgage insurance premium, common charges as required. At closing, you will be required to pay an initial deposit, which along with monthly deposits, will be sufficient to pay for such items when due.

An escrow impound account is Not Waived at closing. If an account is established an initial escrow deposit will be required in accordance with RESPA.

25. COSTS, FEES AND EXPENSES DUE AT CLOSING: You will be required to pay at the closing, all costs, fees and expenses in connection with the loan. These may include, for example, the fees already referred to in this commitment, brokerage charges, mortgage tax, filing fees, recording fees and fees for title insurance, surveys, building department and other searches of the public record, including a final inspection fee.

26. OTHER FINANCING: There shall be no other financing affecting the premises at the closing.
**Borrower Initials _______**
**Co-Borrower Initials _____**

CONTOUR MORTGAGE

Corporate Office
990 Stewart Avenue, Suite 660
Garden City, NY 11530
Phone: (516) 385-6900 Fax: (516) 385-6999
NMLS#34384

**New York Prevailing Interest Rate Commitment**

27. CHANGE OF OWNERSHIP: Principal and interest to become due at the option of the holder of the mortgage on conveyance or transfer of title.

28. ADDITIONAL SECURITY: The mortgage will give Contour Mortgage Corp., a security interest in any rents and profits, insurance proceeds and condemnation awards affecting the premises

29. ASSUMPTION: Someone buying your house may assume your loan under certain conditions

30. CANCELLATION OF COMMITMENT: Contour Mortgage Corp. will not be obligated to close the loan if, at or prior to the closing, the premises are damaged by fire, smoke or other casualty, any change in who the borrower(s) is (are), any statement you have made, in your application or elsewhere, is found to be false or misleading, any change that adversely affects your financial condition or employment status from that presented in your application, any change in the property or in our information about the property, including its value or factors affecting value, you do not comply with any of the conditions contained in this commitment, and/or affected by any violation of law, statue, rule or regulation of any governmental or regulatory authority.

31. PREPAYMENT PROVISIONS: A prepayment penalty will not apply. Please refer to closing documents. You may prepay in whole or in part with no penalty.

32. ASSIGNMENT: This commitment may not be assigned or transferred by you.

33. NO ORAL MODIFICATION: This agreement cannot be changed orally.

34. APPROVALS: All details pertaining to this loan must be approved by Contour Mortgage Corp.'s attorney, and you must execute and deliver at the closing all documents required by Contour Mortgage Corp., in connection with the loan.

35. DOCUMENTATION: The following is a list of information and conditions that we may require you to produce and/or satisfy prior to closing your loan:

Title report and insurance, property survey, copy of Certificate of Occupancy for use, satisfactory final inspection (if new construction), evidence of appropriate hazard insurance, evidence of flood insurance as appropriate, master policy insurance certificate (if applicable in the case of condominiums), termite inspection report, radon test, well water test report and septic inspection report

If the mortgage loan is related to a cooperative housing unit you will also be required to produce and/or satisfy prior to closing the following:

Proprietary lease, recognition agreement, pledge of shares of stock, warranty and representation that no outstanding claims against the proprietary lease or stock will exist at closing and a copy of certificate of occupancy and title policy for the entire building if conversion has occurred within the last six (6) months.

36. ADDITIONAL CONDITIONS: This commitment is further subject to the following conditions and/or requirements.

**See Additional Conditions – Rider**

**Borrower Initials ________**
**Co-Borrower Initials ______**

CONTOUR MORTGAGE

Corporate Office
990 Stewart Avenue, Suite 660
Garden City, NY 11530
Phone: (516) 385-6900 Fax: (516) 385-6999
NMLS#34384

## New York Prevailing Interest Rate Commitment

### ACCEPTANCE OF COMMITMENT

**THE ISSUANCE OF THIS LOAN COMMITTMENT IS NOT CONSIDERED CONSUMATION OF THIS TRANSACTION. THE LOAN TERMS DESCRIBED IN THIS AGREEMENT APPLY ONLY TO THE LOAN PROGRAM YOU HAVE CHOSEN. IF YOU CHOOSE TO CHANGE PROGRAMS, THIS AGREEMENT MAY BECOME NULL AND VOID.**

**THIS COMMITMENT WILL BE NULL AND VOID IF YOU DO NOT SIGN AND RETURN THE ORIGINAL TO CONTOUR MORTGAGE CORP., WITHIN FIFTEEN DAYS (15) FROM THE DATE OF ISSUE.**

Thank You-

*Kathy Swensen* **11/04/2025**

**Underwriter – Contour Mortgage**

**IF YOU SIGN THIS COMMITMENT, AND YOU DO NOT CLOSE THIS LOAN IN ACCORDANCE WITH THE DESCRIBED TERMS, YOU MAY LOSE SOME OR ALL OF THE FEES OR CHARGES YOU HAVE PAID.**

**I/We hereby accept this Commitment and all conditions set forth therein and agree to proceed with the closing of the loan. I/We have received a duplicate original of this document.**

______________________________ ________________

Borrower Date

______________________________ ________________

Co – Borrower Date

______________________________ ________________

Co – Borrower Date

______________________________ ________________

Co – Borrower Date

**Borrower Initials _______**
**Co-Borrower Initials _____**

CONTOUR MORTGAGE

Corporate Office
990 Stewart Avenue, Suite 660
Garden City, NY 11530
Phone: (516) 385-6900 Fax: (516) 385-6999
NMLS#34384

**New York Prevailing Interest Rate Commitment**

**Additional Conditions – Rider**

Prior to Closing:

Appraisal - Acceptable appraisal report. Must also include Operating Income Statement

Credit - Loan Approval - Final loan approval is subject to receipt and acceptance of all initial loan conditions. Additional conditions may apply.

Credit - MAX DTI - Maximum Debt-to-Income Ratio is 55%

Credit - Other - Provide documentation to show Child Support Enforcement collection #NZ81572P1 has been brought current. Must also ensure all obligations accounted for, including arrears if applicable. Approval subject to and additional conditions may apply.

FHA - Amendatory Clause - Amendatory Clause/Real Estate certification to be executed by buyers, sellers and RE Agents.

Income - WVOE - Provide corrected written verification of employment for Kelvin with AMSC LLC along with year ending 2023, 2024 and most recent paystubs to verify all earnings including accurate breakdown of regular and overtime earnings. Income subject to change.

Insurance - Homeowners Insurance and Paid Receipt - Evidence of homeowners insurance policy with sufficient coverage and policy invoice or paid in full receipt.

Property - Title Review - Title Report including 24 month chain of title, judgement searches, patriot searches; OFAC searches and title clearance and bill.

QC - Commitment Letter - Final Locked - Commitment letter to be signed by all borrower(s) at least 3 days prior to closing.

QC - Quality Control Review - Quality Control to provide an acceptable pre-closing review of loan package.

Income - WVOE - Co-Borrower - Provide corrected written verification of employment for Kelsea with Catholic Guardian Svcs to include accurate year to date good through date along with explanation of w2 discrepancy amounts on wvoe and w2s provided. Also to provide year end 2023 and 2024 along with most recent paystubs. Income subject to change.

Credit - Credit explanation letter - Borrower(s) to provide a signed explanation letter for all address variations, inquiries and aka's listed on credit report.

Appraisal - HVCC Acknowledgment of Receipt - HVCC appraisal receipt confirmation disclosure.

Assets - EMD - Provide copy of wire confirmation

Assets - LOE - Provide explanation for Bam Go LIHTC web payment for $1115.62, NYC Law Dept. for $50 and zelle payments out of Bank statement

Credit - Additional Property - Provide documentation to support Kelvin has no ownership in 12022 194th St. Saint Albans, NY property

Assets - Escrow Letter - Escrow letter from seller's attorney confirming receipt of down payment - must state amount & date, property address & name of borrower(s).

Credit - Divorce Decree/Separation Agreement/Child Support/Alimony - Provide actual and complete child support orders as applicable for Kelvin- child support deductions reflected on paystubs for both jobs at varying amounts. Must ensure all support obligations are accounted for and included in liabilities. Approval subject to and additional conditions may apply.

Income - WVOE - Provide written verification of employment for Kelvin with the Brooklyn Hospital to verify all earnings. Income subject to change.

**Borrower Initials _______**
**Co-Borrower Initials _____**

CONTOUR MORTGAGE

Corporate Office
990 Stewart Avenue, Suite 660
Garden City, NY 11530
Phone: (516) 385-6900 Fax: (516) 385-6999
NMLS#34384

## New York Prevailing Interest Rate Commitment

Income - WVOE - Co-Borrower - Provide written verification of employment for Kelsea with meaningful NY Initiative for People to verify all earnings. Income subject to change

Property - Repairs in Contract of Sale Satisfactorily Completed - Provide a letter from the borrowers, signed and dated, stating that all repairs required in Contract of Sale have been completed to their satisfaction.

At Closing:

Closing - (1003) Final 1003 & 92900's - Borrower(s) to sign and date final loan application (1003) and addendum (92900's).

Closing - Cash from borrower - Max cash from borrower at closing is $TBD. If cash from borrower exceeds this amount additional assets must be provided (sourced and seasoned) and loan must be returned to underwriting for review. Loan will not fund without UW approval.

Closing - AKA Affidavit - Borrowers to sign an AKA affidavit.

Closing - Closing Docs - Borrower(s) to sign and date all required closing disclosures.

Closing - Final CD - Final CD must be approved by the lender prior to closing.

Closing - Identity - Photo ID - Borrower(s) to bring acceptable valid photo id to closing. (Driver's License, Passport and/or Alien Registration Card.)

Closing - Legal - Seller Credit FHA - Seller credit on CD Settlement Statement not to exceed $11700. (Borrower must meet minimum statutory investment of 3.5% of purchase price.) Seller's concession not to exceed closing costs.

Closing - Max PITI - Max PITI is $8,892.11

Closing - Property - Contract of Sale Changes - All changes, strikeouts and squeeze ins to contract of sale, to be initialed by all parties.

Closing - CD- No repair credit or violation credit on CD - No repair credit or violation credit on CD.

**Borrower Initials _______**
**Co-Borrower Initials _____**

COURT
STATE OF NEW YORK, COUNTY OF

Index No. Year

OSWALD DAVID

POWER OF ATTORNEY

LAW OFFICE OF DENRICK W. COOPER, PLLC
Attorney At Law

*Attorney(s) for*

*Office and Post Office Address, Telephone*
207-23 Hillside Avenue
Queens Village, New York 11427
Telephone (718) 479-9500 Facsimile (718) 479-9509

To

Attorney(s) for

Signature (Rule 130-1.1-a)

Print name beneath

Service of a copy of the within is hereby admitted.

Dated: ______________________

**PLEASE TAKE NOTICE:**

☐ NOTICE OF ENTRY
that the within is a *(certified) true* copy of a
entered in the office of the Clerk of the Court on

☐ NOTICE OF SETTLEMENT
that an order copy attached,
will be presented for a settlement to the HON. a judge of the
Court, at
on at M.

Dated,

LAW OFFICE OF DENRICK W. COOPER, PLLC

STATE OF NEW YORK, COUNTY OF ss.: ATTORNEY'S CERTIFICATION OF COPY — CPLR § 2105

I, the undersigned, an attorney admitted to practice in the courts of New York State, with offices at the address set forth on the reverse side, certify that I have compared the within with the original and found it to be a true and complete copy.

Dated:

Print name under signature

STATE OF NEW YORK, COUNTY OF ss.: VERIFICATION — CPLR §3020; §3021

I, the undersigned, *being duly sworn, depose and* say: I am

Check Applicable Box

☐ Individual Verification — in the within action; the foregoing is true to my own knowledge, except as to the matters therein stated to be alleged on information and belief, and as to them I believe it to be true.

☐ Corporate Verification — the an officer of a corporation; the foregoing is true to my own knowledge, except as to the matters therein stated to be alleged upon information and belief, and as to them I believe it to be true.

☐ Attorney Verification — an attorney admitted to practice in the courts of New York State, with offices at the address set forth on the reverse side; I affirm under penalties of perjury that: I am the attorney for the The reason this verification is made by me and not by

The foregoing is true to my own knowledge, except as to the matters therein stated to be alleged on information and belief, and as to them I believe it to be true.

The grounds for my belief as to all matters not stated upon my own knowledge are:

*Dated:*

*Sworn to before me on*

Print name under signature.

STATE OF NEW YORK, COUNTY OF ss.: AFFIRMATION OF SERVICE OF PAPERS (CPLR §2103)

(If more than one box is checked — indicate after names type of service used.)

I, the undersigned, an attorney admitted to practice in New York State, with offices at the address set forth on the reverse side, affirm under penalties of perjury:

On I personally served the within

Check Applicable Box

☐ Service By Mail — by mailing a copy to each of the following persons at the last known address set forth after each name below.

☐ Personal Delivery — by delivering a copy to each of the following *attorney(s)* at the last known address set forth after each name below. I knew *the attorney(s)* served to be the *attorney(s) for* the party(ies) stated below.

☐ Overnight Delivery Service — by dispatching a copy by overnight delivery to each of the following persons at the last known address set forth after each name below.

☐ Additional Copy By Electronic Means — by transmitting a copy to the following persons by ☐ FAX at the telephone number set forth after each name below ☐ E-MAIL at the E-Mail address set forth after each name below, which was designated by the attorney for such purpose, and by mailing a copy to the address set forth after each name.

# Power of Attorney

# of

# Oswald David

# December 7, 2023

LAW OFFICES
LAW OFFICE OF DENRICK W COOPER PLLC
207-23 HILLSIDE AVE
QUEENS VILLAGE, NEW YORK 11427

# Power of Attorney of Oswald David Table of Contents


| | | |
|---|---|---|
| **Article One** | **Appointment, Effectiveness, and Durability** | **3** |
| Section 1.01 | Appointment | 3 |
| Section 1.02 | Authority to Delegate | 3 |
| Section 1.03 | Spouse as Agent | 3 |
| Section 1.04 | Prior or Joint Agent Unable to Act | 3 |
| Section 1.05 | Effectiveness | 3 |
| Section 1.06 | Durability | 3 |
| Section 1.07 | Termination of Power of Attorney | 3 |
| **Article Two** | **General Powers** | **4** |
| Section 2.01 | Real and Personal Property Sales and Purchases | 4 |
| Section 2.02 | Real Property Management | 4 |
| Section 2.03 | Tangible Personal Property Management | 5 |
| Section 2.04 | Residence and Tangible Personal Property | 6 |
| Section 2.05 | Bank Accounts and Banking Transactions | 6 |
| Section 2.06 | Investments and Investment Transactions | 6 |
| Section 2.07 | Securities | 7 |
| Section 2.08 | Business Operations | 7 |
| Section 2.09 | Partnership Interests | 9 |
| Section 2.10 | Obligations | 9 |
| Section 2.11 | Bankruptcy | 9 |
| Section 2.12 | Legal Actions | 10 |
| Section 2.13 | Fiduciary Positions | 10 |
| Section 2.14 | My Spouse | 10 |
| Section 2.15 | My Support | 10 |
| Section 2.16 | Support of Dependents | 11 |
| Section 2.17 | Recreation and Travel | 11 |
| Section 2.18 | Advance Funeral Arrangements | 11 |
| Section 2.19 | Memberships | 11 |
| **Article Three** | **Additional Powers** | **11** |
| Section 3.01 | Fixtures and Personalty | 11 |
| Section 3.02 | Insurance Transactions | 11 |
| Section 3.03 | Estate Transactions | 11 |
| Section 3.04 | Disclaimers and Statutory Elections | 12 |
| Section 3.05 | Powers of Appointment | 12 |

| | | |
|---|---|---|
| Section 3.06 | Trusts | 12 |
| Section 3.07 | Safe-Deposit Boxes | 12 |
| Section 3.08 | Business Succession Agreements | 12 |
| Section 3.09 | Loans and Notes | 13 |
| Section 3.10 | Annuities | 13 |
| Section 3.11 | Government Agencies and Benefits | 13 |
| Section 3.12 | Deal with Tax Authorities | 13 |
| Section 3.13 | Health Care Decisions | 14 |
| Section 3.14 | HIPAA Authorization | 14 |
| Section 3.15 | Reimbursement of Health Care Agent | 14 |
| Section 3.16 | Employment of Professionals | 14 |
| Section 3.17 | Gifting Powers | 15 |
| Section 3.18 | Gift-Splitting | 15 |
| Section 3.19 | Intent to Return Home | 15 |
| Section 3.20 | Domicile | 15 |
| Section 3.21 | Nomination of Conservator | 15 |
| Section 3.22 | Business Activities | 15 |
| Section 3.23 | Marital Agreements and Designation of Spouse as Agent | 16 |
| Section 3.24 | Caregiver Agreements | 16 |
| Section 3.25 | Qualified Plans | 16 |
| Section 3.26 | Enforcement Proceedings | 16 |
| Section 3.27 | Credit Cards | 16 |
| Section 3.28 | Online Accounts, Digital Assets, and Digital Devices | 16 |
| Section 3.29 | Domestic Pets | 18 |
| Section 3.30 | Estate and Long Term Care Planning | 18 |
| Section 3.31 | Ownership and Rights of Survivorship | 19 |
| Section 3.32 | Beneficiary Designations | 19 |
| Section 3.33 | Spiritual and Religious Needs | 19 |
| Section 3.34 | Companionship | 20 |
| Section 3.35 | U.S. Mail | 20 |
| **Article Four** | **Incidental Powers** | **20** |
| Section 4.01 | Document Execution | 20 |
| Section 4.02 | Custody of Documents | 20 |
| **Article Five** | **Limitation on Powers** | **20** |
| Section 5.01 | My Agent to Avoid Disrupting My Estate Plan | 20 |
| Section 5.02 | Tax Sensitive Powers | 21 |
| **Article Six** | **Administrative Powers and Provisions** | **21** |
| Section 6.01 | Compensation and Reimbursement to Agent | 21 |
| Section 6.02 | Amendment and Revocation | 22 |

| | | |
|---|---|---|
| Section 6.03 | Resignation | 22 |
| Section 6.04 | Signature of Agent | 22 |
| Section 6.05 | Interpretation | 22 |
| Section 6.06 | Use of "Agent" Nomenclature | 22 |
| Section 6.07 | Third-Party Reliance | 22 |
| Section 6.08 | Effect of Duplicate Originals or Copies | 23 |
| Section 6.09 | Governing Law | 23 |
| Section 6.10 | Severability | 23 |
| **Article Seven** | **Duties and Liabilities of My Agent** | **23** |
| Section 7.01 | Duty to Account | 23 |
| Section 7.02 | Limitation of Liability of My Agent | 23 |
| **Article Eight** | **Acceptance of Appointment as Agent** | **24** |
| **Article Nine** | **Declarations of the Principal** | **24** |

# Power of Attorney
# of
# Oswald David

**Statutory Notices under New York General Obligations Law section 1-1501B.1(d):**

CAUTION TO THE PRINCIPAL:

Your Power of Attorney is an important document. As the "principal," you give the person whom you choose (your "agent") authority to spend your money and sell or dispose of your property during your lifetime without telling you. You do not lose your authority to act even though you have given your agent similar authority.

When your agent exercises this authority, he or she must act according to any instructions you have provided or, where there are no specific instructions, in your best interest. "Important Information for the Agent" at the end of this document describes your agent's responsibilities.

Your agent can act on your behalf only after signing the Power of Attorney before a notary public.

You can request information from your agent at any time. If you are revoking a prior Power of Attorney, you should provide written notice of the revocation to your prior agent(s) and to any third parties who may have acted upon it, including the financial institutions where your accounts are located.

You can revoke or terminate your Power of Attorney at any time for any reason as long as you are of sound mind. If you are no longer of sound mind, a court can remove an agent for acting improperly.

Your agent cannot make health care decisions for you. You may execute a "Health Care Proxy" to do this.

The law governing Powers of Attorney is contained in the New York General Obligations Law, Article 5, Title 15. This law is available at a law library, or online through the New York State Senate or Assembly websites, www.senate.state.ny.us or www.assembly.state.ny.us.

If there is anything about this document that you do not understand, you should ask a lawyer of your own choosing to explain it to you.

IMPORTANT INFORMATION FOR THE AGENT:

When you accept the authority granted under this Power of Attorney, a special legal relationship is created between you and the principal. This relationship imposes on you legal responsibilities that continue until you resign or the Power of Attorney is terminated or revoked. You must:

(1) act according to any instructions from the principal, or, where there are no instructions, in the principal's best interest;

(2) avoid conflicts that would impair your ability to act in the principal's best interest;

(3) keep the principal's property separate and distinct from any assets you own or control, unless otherwise permitted by law;

(4) keep a record or all receipts, payments, and transactions conducted for the principal; and

(5) disclose your identity as an agent whenever you act for the principal by writing or printing the principal's name and signing your own name as "agent" in either of the following manners: (Principal's Name) by (Your Signature) as Agent, or (your signature) as Agent for (Principal's Name).

You may not use the principal's assets to benefit yourself or anyone else or make gifts to yourself or anyone else unless the principal has specifically granted you that authority in this document, which is either a Statutory Gifts Rider attached to a Statutory Short Form Power of Attorney or a Non-Statutory Power of Attorney. If you have that authority, you must act according to any instructions of the principal or, where there are no such instructions, in the principal's best interest. You may resign by giving written notice to the principal and to any co-agent, successor agent, monitor if one has been named in this document, or the principal's guardian if one has been appointed. If there is anything about this document or your responsibilities that you do not understand, you should seek legal advice.

Liability of agent:

The meaning of the authority given to you is defined in New York's General Obligations Law, Article 5, Title 15. If it is found that you have violated the law or acted outside the authority granted to you in the Power of Attorney, you may be liable under the law for your violation.

**Creation of Power of Attorney and Revocation of Prior Powers of Attorney:**

**NOTICE: You may rely on this document only if it is an original, as evidenced by the inked signature of the Principal, or a copy that has been attested by a licensed attorney or a state-authorized officer (such as a notary public) to be a true, exact, complete, and unaltered copy of an original. (See Section 6.08.)**

I, Oswald David of 1232 East 69th Street, Brooklyn, NY 11234, am creating a durable power of attorney intended to comply with New York law. I hereby revoke all powers of attorney previously granted by me as Principal and terminate all Agency relationships created by me.

# Article One
# Appointment, Effectiveness, and Durability

### Section 1.01 Appointment

I appoint Debbie Ann Harris to serve as my Agent.

### Section 1.02 Authority to Delegate

Any serving Agent may delegate, in writing, any of the Agent's authority granted under this Power of Attorney. The serving Agent making a delegation under this provision may revoke the delegation at any time.

### Section 1.03 Spouse as Agent

My spouse may not serve as my Agent if we are legally separated. If a named Agent was my spouse at the time of execution of this Power of Attorney and an action is filed for the dissolution or annulment of my marriage to the Agent or for our legal separation, then that named Agent may not serve (however, if I named a former spouse at the time of execution, my former spouse may serve as my Agent).

### Section 1.04 Prior or Joint Agent Unable to Act

A successor Agent, or an Agent serving jointly with another Agent, may establish that the acting Agent or joint Agent is no longer able to serve as Agent by signing an affidavit that states that the Agent is not available or is incapable of acting. The affidavit may (but need not) be supported by a death certificate of the Agent, a certificate showing that a guardian or conservator has been appointed for the Agent, a letter from a physician stating that the Agent is incapable of managing his or her own affairs, or a letter from the Agent stating his or her unwillingness to act or delegating his or her power to the successor Agent.

### Section 1.05 Effectiveness

The authority granted to my Agent under this Power of Attorney shall be effective immediately upon signing.

### Section 1.06 Durability

The authority granted to my Agent under this Power of Attorney shall not be affected by my subsequent disability, incompetency, incapacity, or lapse of time.

### Section 1.07 Termination of Power of Attorney

This Power of Attorney shall expire at the earlier of:

(i) my death (except for post-death matters allowed under state law); or

(ii) my revocation of this Power of Attorney.

# Article Two
# General Powers

My Agent may do all acts on my behalf with respect to my property. In addition, my Agent may do everything necessary to exercise any power, including powers with respect to any real property I now own or may acquire in the future.

### Section 2.01 Real and Personal Property Sales and Purchases

Unless specifically limited by the other provisions of this Power of Attorney, my Agent may:

(i) sell, exchange, and convey any interest I own in any kind of property, real or personal, including homestead property under New York law or the laws of any other state, and determine the terms of sale and grant options with regard to sales;

(ii) dispose of sales proceeds on my behalf as my Agent determines is appropriate;

(iii) buy any kind of property, real or personal, including homestead property under New York law or the laws of any other state, and determine the terms for buying property and may obtain options to buy property;

(iv) arrange to insure purchased property, and otherwise arrange for its safekeeping;

(v) borrow money for the purposes described in this Section and to secure the loan in any manner my Agent determines is appropriate, and repay the loan from my funds;

(vi) pay for any purchases made; and

(vii) repay any cash advanced from my credit cards.

### Section 2.02 Real Property Management

My Agent may manage any real property I now own or may acquire in the future, including my personal residence and homestead property under New York law or the laws of any other state. Unless specifically limited by the other provisions of this Power of Attorney, my Agent may:

(i) declare, create, or execute a homestead on my personal residence under New York law or the laws of any other state; and terminate, abandon, release, or give a waiver on any interest I have in a homestead;

(ii) lease and sublease property for any period, and grant options to lease or subdivide property, even if the term of the lease, sublease, or option extends beyond the term of this Power of Attorney;

(iii) eject and remove tenants or other persons from property, and recover the property by all lawful means;

(iv) collect and sue for rents;

(v) execute occupancy agreements on my behalf;

(vi) pay, compromise, or contest tax assessments and apply for tax assessment refunds;

(vii) subdivide, partition, develop, dedicate property to public use without consideration, and grant or release easements over my real property;

(viii) maintain, protect, repair, preserve, insure, build upon, improve, demolish, abandon, and alter all or any part of my real property;

(ix) employ laborers;

(x) obtain or vacate plats and adjust boundaries;

(xi) adjust differences in the property's value on exchange or partition by giving or receiving consideration;

(xii) release or partially release real property from a lien;

(xiii) enter into any contracts, covenants, and warranty agreements regarding my real property that my Agent considers appropriate; and

(xiv) encumber property, including homestead property under New York law or the laws of any other state, by mortgage or deed of trust.

### Section 2.03 Tangible Personal Property Management

My Agent may manage any tangible personal property I now own or may acquire in the future. Unless specifically limited by the other provisions of this Power of Attorney, my Agent may:

(i) lease and sublease property for any period, and grant options to lease or subdivide property, even if the term of the lease, sublease, or option extends beyond the term of this Power of Attorney;

(ii) recover my property by all lawful means;

(iii) collect and sue for rents;

(iv) take possession of and use my property in order to exercise any authority granted in this Power of Attorney;

(v) pay, compromise, or contest tax assessments and apply for tax assessment refunds;

(vi) maintain, protect, repair, preserve, insure, improve, destroy, and abandon all or any part of my property; and

(vii) grant security interests in my property.

My Agent may accept tangible personal property as a gift or as security for a loan.

### Section 2.04 Residence and Tangible Personal Property

Without limiting any other authority granted in this Power of Attorney, if my Agent determines that I will never be able to return to my residence from a hospital, hospice, nursing home, convalescent home, or similar facility, my Agent may sell, lease, sublease, or assign my interest in my residence on terms and conditions that my Agent considers appropriate.

As it relates to items of tangible personal property remaining in my residence, my Agent may:

(i) store and safeguard any items, and pay all storage costs;

(ii) sell any items that my Agent believes I will never need again on terms and conditions that my Agent considers appropriate; or

(iii) transfer custody and possession of any item to the person named in my estate planning documents as the person to receive that item upon my death.

### Section 2.05 Bank Accounts and Banking Transactions

My Agent may establish bank accounts of any type in one or more bank institutions that my Agent may choose. My Agent may modify, terminate, make deposits to, write checks on, make withdrawals from (including by electronic funds transfer), and grant security interests in any account in my name or to which I am an authorized signatory, except accounts held by me in a fiduciary capacity. In exercising this authority, it does not matter whether or not the account was established by me or for me by my Agent. My Agent is authorized to negotiate, endorse, or transfer any check or other instrument with respect to any account, to contract for any services rendered by any bank or financial institution, and to execute, on my behalf as principal, any agency or power of attorney forms furnished by a bank with respect to accounts with the bank that appoints the bank or any person as my Agent.

My Agent is authorized to access, establish, cancel, or continue online bank accounts (through the Internet or other similar method) and conduct online banking transactions of any kind as authorized in this Section.

### Section 2.06 Investments and Investment Transactions

My Agent may invest and reinvest all or any part of my property in any other property of whatever type, real or personal, tangible or intangible, and whether located inside or outside the geographic borders of the United States and its possession or territories. Unless specifically limited by the other provisions of this Power of Attorney, my Agent may:

(i) invest in securities of all kinds, limited partnership interests, real estate or any interest in real estate whether or not productive at the time of investment, commodities contracts of all kinds, interests in trusts including investment trusts;

(ii) participate in common, collective, or pooled trust funds or annuity contracts;

(iii) sell or otherwise terminate any investment made by me or on my behalf, and establish and terminate savings and money market accounts at banks and other financial institutions;

(iv) establish and terminate accounts with securities brokers and use brokerage accounts to make short sales;

(v) access, establish, cancel, or continue online investment accounts (through the Internet or other similar method) and conduct online investment transactions of any kind as authorized in this Section;

(vi) establish and terminate agency accounts with corporate fiduciaries; and

(vii) employ and fire financial and investment advisors.

## Section 2.07 Securities

My Agent may exercise all rights regarding securities that I own now or in the future. Specifically, my Agent may:

(i) buy, sell, and exchange all types of securities and financial instruments, including, but not limited to, stocks, bonds, and mutual funds;

(ii) receive certificates and other evidences of ownership with regard to securities;

(iii) hold securities in bearer or uncertified form and use a central depository, clearing agency, or book-entry system such as The Depository Trust Company, Euroclear, or the Federal Reserve Bank of New York;

(iv) execute stock powers or similar documents on my behalf and delegate to a transfer agent or similar person the authority to register any stocks, bonds, or other securities into or out of my name or nominee's name;

(v) place all or any part of my securities in the custody of a bank or trust company or in the name of its nominee;

(vi) employ a broker-dealer as custodian for my securities and register the securities in the name of the broker-dealer or its nominee;

(vii) exercise voting rights with respect to securities in person or by proxy, enter into voting trusts, and consent to limitations on the right to vote;

(viii) participate in any reorganization, recapitalization, merger, or similar transaction; and

(ix) exercise any subscription rights, option rights (whether or not qualified under the Internal Revenue Code) or other rights to which I am entitled now or in the future, or to sell and dispose of these rights, and, if required, to sign my name to rights, warrants, or other similar instruments.

## Section 2.08 Business Operations

My Agent may continue operating and managing any business in which I now or later own an interest for the period of time and in any manner my Agent considers appropriate.

Unless specifically limited by the other provisions of this Power of Attorney, my Agent may:

(i) act as a director, general or limited partner, or associate or officer of the business;

(ii) select and vote for directors, partners, associates, and officers of the business and enter into owners' agreements with other owners of any business in which I have an interest;

(iii) execute agreements and amendments to agreements necessary to the operation of the business including, but not limited to, stockholder agreements, partnership agreements, buy-sell agreements, and operating agreements for limited liability companies;

(iv) hire and fire employees;

(v) pay employees' salaries and provide for employee benefits;

(vi) employ legal, accounting, financial, and other consultants;

(vii) continue, modify, terminate, renegotiate, and extend any contracts with any person, firm, association, or corporation;

(viii) execute business tax returns and other government forms required for my business;

(ix) pay all business-related expenses;

(x) transact business for me in my name and on my behalf;

(xi) contribute additional capital to the business;

(xii) change the name or the form of the business;

(xiii) incorporate the business;

(xiv) enter into a partnership agreement with other persons;

(xv) join in a plan to reorganize or consolidate my business, or merge my business with any other business;

(xvi) establish the value of the business under "buy-out" or "buy-sell" agreements to which I am a party;

(xvii) create, continue, or terminate retirement plans for my business' employees and make contributions required by those plans;

(xviii) advance money or other property to the business and make loans of cash or securities to the business as my Agent considers appropriate; and

(xix) borrow for the business and secure any loans with business assets or my personal assets.

My Agent may sell, liquidate, or close a business upon terms my Agent considers appropriate, including a sale in exchange for cash, a private annuity, and an installment note or any combination of those arrangements.

### Section 2.09 Partnership Interests

My Agent may manage any general, limited, or special partnership interest I own now or in the future. Unless specifically limited by the other provisions of this Power of Attorney, my Agent may:

(i) exercise any right, power, privilege, or option I may have or may claim under any contract with the partnership;

(ii) modify or terminate my interest on terms and conditions my Agent considers appropriate;

(iii) enforce the terms of the partnership agreement for my protection by instituting or maintaining any action, proceeding or otherwise as my Agent considers appropriate; and

(iv) defend, arbitrate, settle, or compromise any action or other legal proceeding to which I am a party because of my membership in the partnership.

### Section 2.10 Obligations

My Agent may collect all rights and benefits to which I am entitled now or in the future, including, but not limited to rights to, cash payments, property, debts, accounts, legacies, bequests, devises, dividends, and annuities. In collecting my obligations, unless specifically limited by the other provisions of this Power of Attorney, my Agent may demand, sue for, arbitrate, settle, compromise, receive, deposit, expend for my benefit, reinvest, or otherwise dispose of these matters as my Agent determines appropriate.

### Section 2.11 Bankruptcy

My Agent may act for me with respect to bankruptcy or insolvency, whether voluntary or involuntary, concerning me or some other person, or with respect to a reorganization, receivership, or application for the appointment of a receiver or trustee that affects an interest I have in any property or other thing of value.

Specifically, and without limiting the preceding, my Agent may act for me with respect to filing for bankruptcy, and in support of such filing may—

(i) employ counsel to represent me;

(ii) select any exemptions available to me;

(iii) determine which debts to reaffirm;

(iv) make any decisions regarding repayment and reorganization plans;

(v) discuss my affairs with credit-counseling and debtor-education services;

(vi) discuss my affairs with and employ debt-restructuring services; and

(vii) take any other actions to further my interests.

### Section 2.12 Legal Actions

My Agent may engage in litigation involving me, my property, or my legal interests, including any property, interest, or person for which or whom I have or may have any responsibility. My Agent may institute, supervise, prosecute, defend, intervene in, abandon, compromise, adjust, arbitrate, settle, dismiss, and appeal from any and all legal, equitable, judicial, or administrative hearings, actions, suits, or proceedings involving me in any way. This authority includes, but is not limited to, claims by or against me arising out of property damage or personal injury suffered by or caused by me or under circumstances such that the resulting loss may be imposed on me.

### Section 2.13 Fiduciary Positions

My Agent may resign or renounce for me any fiduciary position I hold now or in the future including personal representative, trustee, guardian, attorney-in-fact, and officer or director of a corporation and any governmental or political office or position. In so doing, my Agent may file an accounting with the appropriate court of competent jurisdiction or settle on the basis of a receipt, release, or other appropriate method.

### Section 2.14 My Spouse

My Agent (including my spouse acting as my Agent) may deal with my spouse on my behalf. In dealing with my spouse, my Agent may transfer, transmute, partition, or exchange any of my property interests, whether separate or community property, between my spouse and me. My Agent may engage in divorce proceedings on my behalf. My Agent may enter into and execute on my behalf marital property agreements, partition or exchange agreements, transmutation agreements, or community property agreements, and may enforce, amend, or revoke any such agreements between my spouse and me, but only with respect to rights and obligations in property owned by my spouse, by me, or by both of us, and with respect to reclassification of ownership, management, and control of such property.

### Section 2.15 My Support

My Agent may do anything reasonably necessary to maintain my customary standard of living, including:

(i) maintain my residence by paying all operating costs, including, but not limited to, interest on mortgages or deeds of trust, amortization payments, repairs, and taxes, or by purchasing, leasing, or making other arrangement for a different residence;

(ii) provide normal domestic help;

(iii) provide clothing, transportation, medicine, food, and incidentals; and

(iv) make all necessary arrangements, contractual or otherwise, for my care at any hospital, hospice, nursing home, convalescent home or similar establishment, or in my own residence should I desire it, and assure that all of my essential needs are met wherever I may be.

### Section 2.16 Support of Dependents

My Agent may make payments as my Agent deems necessary for the health, education, maintenance, or support of my spouse and those my Agent determines to be dependent on me for support.

### Section 2.17 Recreation and Travel

My Agent may, at my expense, allow me to engage in recreational and sports activities as my health permits, including travel.

### Section 2.18 Advance Funeral Arrangements

My Agent may make advance arrangements for my funeral and burial, including a burial plot, marker, and any other related arrangements that my Agent considers appropriate.

### Section 2.19 Memberships

My Agent may establish, cancel, continue, or initiate my membership in organizations and associations of all kinds.

## Article Three
## Additional Powers

In addition to the powers specified in Article Two, my Agent has the powers specified in this Article. If a power specified in this Article conflicts with a power specified in Article Two, the power specified in this Article controls.

### Section 3.01 Fixtures and Personalty

My Agent may engage in real estate transactions or transactions which involve any proprietary lease or stock evidencing my ownership of a cooperative apartment, including all fixtures and articles of personal property used in connection with the real property (my Agent may include such property in the deeds, mortgages, agreements, and any other instruments to be executed and delivered in connection with real estate transactions and which may be described in said instruments with more particularity).

### Section 3.02 Insurance Transactions

My Agent may engage in insurance transactions, including applying for, maintaining, canceling, paying premiums on, increasing or decreasing coverage, collecting, borrowing from, transferring ownership, surrendering and/or purchasing insurance policies.

### Section 3.03 Estate Transactions

My Agent may engage in estate transactions, including Receipt, Release, and Refunding Agreements and Waivers and Consents.

### Section 3.04 Disclaimers and Statutory Elections

My Agent may make statutory elections and renounce or disclaim any interest in property by testate or intestate succession or by inter vivos transfer consistent with New York law.

### Section 3.05 Powers of Appointment

My Agent may exercise in whole or in part, or decline to exercise, or disclaim my rights under any special or general power of appointment or any rights retained by me in any trust or otherwise, whether or not any such trust or other instrument was created by me or others.

### Section 3.06 Trusts

My Agent may create and fund inter vivos trusts of any type, whether revocable or irrevocable, and whether or not I am a beneficiary. With respect to any trust created by me or on my behalf, my Agent may amend, modify, revoke, or terminate the trust. Further, my Agent may add property to an existing or subsequently created trust, and accept transfers or distributions from any trustee of any trust, including any trust over which I have a right of receipt or withdrawal, whether as grantor, beneficiary, or otherwise.

Also, and without limiting the authority granted to my Agent in this Section, my Agent may:

(i) create and fund a sole-benefit trust in accordance with United States Code, Title 42, Section 1396p(c)(2)(B);

(ii) create and fund a self-settled special needs trust in accordance with United States Code, Title 42, Section 1396p(d)(4)(A);

(iii) create and fund a qualified income trust in accordance with United States Code, Title 42, Section 1396p(d)(4)(B) if such a trust should be deemed necessary to qualify me for Medicaid benefits, and make arrangements for the diversion of my income to such a trust as necessary to comply with applicable Medicaid rules and regulations; and

(iv) sign all necessary documents to allow me to join any trust qualifying under United States Code, Title 42, Section 1396p(d)(4)(C) and transfer any portion of my assets to such trust.

### Section 3.07 Safe-Deposit Boxes

My Agent may enter any safe-deposit box or other place of safekeeping standing in my name alone or jointly with another and to remove the contents and to make additions.

### Section 3.08 Business Succession Agreements

My Agent may enter into buy/sell agreements and any other business succession agreements.

**Section 3.09 Loans and Notes**

My Agent may engage in all dealings with respect to loans and forgiveness of debts. My Agent may borrow money on such terms as my Agent may decide in his or her sole discretion, on a secured or unsecured basis, and to execute all notes, mortgages, and other instruments relating to such, provided any such loan carries a fair market interest rate.

**Section 3.10 Annuities**

My Agent may waive my right to be a beneficiary of a joint and survivor annuity, including a survivor benefit under a retirement plan. My Agent may withdraw from, transfer ownership, surrender, or purchase any commercial annuity, private annuity, or grantor retained annuity trust.

**Section 3.11 Government Agencies and Benefits**

My Agent has the unrestricted power to deal with and obtain maximum entitlements and benefits relating to the Social Security Administration, Veterans Administration, Social Services Departments, Social Security Disability Insurance, Supplemental Security Income, Medicaid, Medicare, Worker's Compensation and all other government benefits or entitlement programs, including claims, planning for eligibility, and submission of applications and appeals. In this regard, my Agent is authorized to execute and deliver any power of attorney or authorization-to-act form requested or required by a governmental agency. This power shall impose no affirmative duty on my Agent to provide information and/or documentation to any government agency.

**Section 3.12 Deal with Tax Authorities**

My Agent is authorized to:

(i) deal with tax authorities, to execute and sign on my behalf any and all Federal, state, local, and foreign income and gift tax returns (as authorized under Section 1.6012-1(a)(5) of Title 26 of the Code of Federal Regulations or under any state, local, or foreign authority), including estimated returns and interest, dividends, gains, and transfers, and to pay any taxes, penalties, and interest due thereon;

(ii) represent me or to sign an Internal Revenue Service Form 2848 (Power of Attorney or Declaration of Representative) or Form 8821 (Tax Information Authorization), or comparable authorization, appointing a qualified lawyer, certified public accountant, or enrolled agent (including my Agent, if so qualified) to represent me before any office of the Internal Revenue Service, state, local, or foreign taxing authority with respect to the types of taxes and years referred to above, and to specify on said authorization said types of taxes and years;

(iii) receive from or inspect confidential information in any office of the Internal Revenue Service, state, local, or foreign tax authority;

(iv) receive and deposit, in any one of my bank accounts, or those of any revocable trust of mine, checks in payment of any refund of Federal, state, local, or foreign taxes, penalties, and interest;

(v) execute waivers (and offers of waivers) of restrictions on assessment or collection of deficiencies in taxes and waivers of notice of disallowance of a claim for credit or refund;

(vi) execute consents extending the statutory period for assessment or collection of such taxes; to execute Offers in Compromise and Closing Agreements under Section 7121 or comparable provisions of the Internal Revenue Code, as amended, or any federal, state, local, or foreign tax statutes or regulations; and

(vii) delegate authority to, or substitute another representative for any one of those previously appointed by me or my Agent, and to receive copies of all notices and other written communications involving my federal, state, local, or foreign taxes at such address as my Agent designates.

### Section 3.13 Health Care Decisions

My Agent may make all health care decisions on my behalf. If I have executed a health care advance directive (including but not limited to a Health Care Proxy) designating a Health Care Agent, the terms of the directive control if the directive and this Power of Attorney are in conflict.

### Section 3.14 HIPAA Authorization

My Agent, and any successor Agent appointed in this power of attorney, shall have the power and authority of a designated representative for all purposes under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. Section 1320d and 45 C.F.R. Parts 160-164. My Agent and successor Agent are authorized to execute releases and other documents necessary to obtain disclosure of individually identifiable health information, medical records, and patient files, including psychotherapy notes. This information includes, but is not limited to, any written opinion or assessment of my decision making capacity. This authorization and release apply to all information protected by HIPAA and shall only expire if I revoke this power of attorney.

### Section 3.15 Reimbursement of Health Care Agent

My Agent may reimburse my Health Care Agent under any health care directive, including but not limited to a Health Care Proxy, even if such Health Care Agent is my Agent, for any costs (including legal fees) reasonably incurred in or as a result of acting pursuant to such health care directive.

### Section 3.16 Employment of Professionals

My Agent may retain, discharge, and pay for, in the sole discretion of my Agent, the services of professionals, including, but not limited to, information technology experts, attorneys, accountants, financial planners, geriatric care managers, social workers, and any other health care professionals. My Agent is not obligated to retain or pay for any health care professional on my behalf.

**Section 3.17 Gifting Powers**

Notwithstanding any other provision of this Power of Attorney, other than to the persons who witnessed this Power of Attorney, my Agent may make gifts of any interest I have in real or personal property ("my property") to any person or entity, in any amount, including my Agent, but gifts to my Agent may only be made if Debbie Ann Harris is acting as my Agent.

Unless otherwise specified above, the value of any gift made pursuant to this Section may exceed the annual dollar limits of the federal gift tax exclusion under Section 2503(b) of the Internal Revenue Code.

**Section 3.18 Gift-Splitting**

My Agent may make, join, and consent to gifts by my spouse pursuant to Section 2513 of the Internal Revenue Code, even if such gifts exceed my aggregate annual gift tax exclusion amount under Section 2503(b) of the Internal Revenue Code.

**Section 3.19 Intent to Return Home**

It is my intention to return home if I should be in a hospital, rehabilitation center, or nursing home, and my Agent shall take all steps, including, but not limited to, executing any document, affidavit, or Declaration of Intent to Return Home on my behalf, to effectuate the same.

**Section 3.20 Domicile**

My Agent may change or maintain my domicile and/or residency for any and all purposes and take any and all actions to effectuate the foregoing.

**Section 3.21 Nomination of Conservator**

I intend hereby to render unnecessary any future proceeding for a court-appointed Conservator in the event I become temporarily or permanently incapacitated or incompetent. Accordingly, I request, in the strongest possible terms, that any court that may receive or act upon a petition for the appointment of a Conservator should deny such petition so long as my Agent is acting under this power of attorney.

If a Conservator is ever appointed for me in spite of this request, I direct that the person serving, or named to serve, as my Agent under this power of attorney be named as my Conservator.

**Section 3.22 Business Activities**

My Agent may invest in, contribute to, establish, create, and fund any existing or newly created partnership, corporation, limited liability company, limited liability partnership, limited partnership, or other entity and to exercise all rights pertaining thereto.

**Section 3.23 Marital Agreements and Designation of Spouse as Agent**

My Agent may enter into, modify, or amend any pre-nuptial or post-nuptial agreement to which I am or hereafter become a party. If a named Agent is my spouse, then this power of attorney as to that named Agent is automatically revoked, and that Agent is deemed to have resigned as Agent upon the filing of any separation or dissolution action between us.

**Section 3.24 Caregiver Agreements**

My Agent may enter into, execute, modify, alter, or amend any contract or agreement (for example, a Caregiver Agreement or Personal Services Contract) pertaining to my medical, personal, or general care that I may require at my residence, assisted living facility, nursing facility, or in another's residence on my behalf. I expressly authorize my Agent to also serve as a caregiver under any such agreement and to be paid in accordance with the terms and conditions of such agreement, provided, however, that such services are compensated at fair market value.

**Section 3.25 Qualified Plans**

My Agent may deal in all respects with any Qualified Plan or Individual Retirement Account that I may own and to make any and all available elections or beneficiary designations on my behalf. If my spouse is a participant in a Qualified Plan or Individual Retirement Account, I authorize my Agent to effect any waiver of my rights to any portion of said Plan or to any payout arrangement which may require my consent or approval by law, under any such Plan, or otherwise.

**Section 3.26 Enforcement Proceedings**

My Agent may commence enforcement proceedings, at my expense, against any bank, savings and loan association, credit union, financial institution, brokerage firm, stock transfer agent, insurance company, title insurance company, or other person or entity that fails or refuses to honor this durable power of attorney.

**Section 3.27 Credit Cards**

My Agent may use any credit card in my name; to make purchases on my behalf; to open a new credit card account and to close any existing credit card account.

**Section 3.28 Online Accounts, Digital Assets, and Digital Devices**

Without limiting any other provision of this Power of Attorney, and subject to the limitations of any other provision of this Power of Attorney, my Agent has the powers described in this Section.

My Agent has full authority to deal with Online Accounts, Digital Assets, and Digital Devices of all kinds, wherever located. This authority includes, but is not limited to, the power to acquire, create, establish, access, control, modify, cancel, delete, continue, transfer, and take possession of such accounts, assets, and devices.

However, if I have used an online tool to direct the custodian of an Online Account, Digital Asset, or Digital Device to not disclose certain information, and if the online tool allows for the modification or deletion of that direction at all times, then such direction overrides the authority granted in this Section.

My Agent may request and change my access credentials to any Online Account, Digital Asset, and Digital Device (such as username, password, and secret question), and any third-party dealing with my Agent in good faith will be held harmless for releasing such access credentials.

For purposes of this Power of Attorney, the following definitions apply:

**(a) Online Accounts**

The term "Online Accounts" means accounts that are accessible through the Internet or other similar method, including, but not limited to: bank accounts; investment accounts; other financial accounts; accounts with health care providers; social media accounts (like LinkedIn, Facebook, and Twitter); gambling and poker accounts; accounts with publishers; accounts for access to employee benefits; email accounts; accounts with Internet service providers; accounts to manage websites and website domain names; accounts with retail vendors; tax-preparation service accounts; affiliate marketing accounts; accounts with utility companies; user access accounts on third-party Digital Devices; and any other online account.

**(b) Digital Assets**

The term "Digital Assets" means intangible personal property related to digital technology (whether located on a Digital Device or an Online Account), including, but not limited to: emails sent or received; text messages sent or received; other digital communications sent or received; digital music; digital photographs; digital videos; software licenses; social network accounts; file sharing accounts; online access to financial accounts; domain registrations; DNS service accounts; website hosting accounts; personal and commercial websites; tax preparation service accounts; online store accounts; affiliate marketing accounts; and other types of online accounts and digital items that currently exist or may exist as technology develops.

**(c) Digital Devices**

The term "Digital Devices" means tangible personal property related to digital technology capable of storing Digital Assets or accessing Online Accounts, and includes, but is not limited to: desktop computers; laptop computers; tablet computing devices (tablets); other mobile computing devices; peripheral devices; hard disk drives; solid state drives; flash memory devices; other storage devices; mobile telephones; smartphones; and any other type of digital device that currently exists or may exist as technology develops.

### Section 3.29 Domestic Pets

My Agent may make reasonable expenditures for the care, maintenance, support, and general welfare of my domestic pets, if any. Specifically, and without limitation, my Agent may consent to and make reasonable expenditures for medical treatment, boarding, and kennel care of any of my domestic pets. I authorize any and all payments from my funds for pet care provided by any person or entity, including my Agent.

In addition, my Agent may acquire a domestic service pet if, in my Agent's sole discretion, such service pet will benefit me.

### Section 3.30 Estate and Long Term Care Planning

My Agent may engage in estate and long term care planning in furtherance of achieving asset preservation. Property transfers made pursuant to the authority granted herein may be made without restriction as to the value of the transfer, and shall, for all purposes, be deemed to have been "in my best interest" if: (1) made in accordance with the provisions of this section; and (2) made in the context of estate planning, financial planning, Medicaid planning, long term care planning, or asset preservation planning pursuant to the recommendations of an attorney-at-law experienced in such matters. My Agent may engage in such planning based on all relevant factors, including:

(i) the value and nature of my property;

(ii) my foreseeable obligations and need for maintenance;

(iii) minimization of taxes, including income, estate, inheritance, generation skipping transfer, and gift taxes; and

(iv) eligibility for a benefit, a program, or assistance under a statute or government regulation.

My Agent may take any action necessary to effectuate the foregoing, including to qualify me for Social Security Benefits, Supplemental Security Income, Veterans Benefits, Medicaid or any other government benefit program. Such actions may include but shall not be limited to the following:

(i) convert non-exempt resources into exempt resources;

(ii) divest me of assets, without restriction as to the value of the divestment;

(iii) if my Agent is my spouse, my spouse may protect our assets, whether owned by me alone, my spouse alone, or by us together as husband and wife, so that my spouse's impoverishment because of my health care costs can be avoided, by whatever lawful methods that might be available;

(iv) sign a Spousal Refusal (even if my Agent is my spouse);

(v) sign an Assignment of Support (even if my Agent is my spouse);

(vi) divide community property assets equally or unequally between my spouse and me, without restriction as to the difference of the value of our shares, if any;

(vii) sign an application for Medical Assistance or any other government benefit program;

(viii) serve as representative payee;

(ix) transfer the family residence to a spouse who does not need long-term health or nursing care, without restriction as to the value of the transfer;

(x) make home improvements and additions to my family residence;

(xi) pay off, partly or in full, any encumbrance on my family residence;

(xii) purchase a family residence, if I do not own a family residence;

(xiii) purchase a more expensive family residence; and

(xiv) attend and represent me at Fair Hearings.

### Section 3.31 Ownership and Rights of Survivorship

My Agent may select, create, or change the rights of survivorship on any and all of my property, whether real or personal, including bank and investment accounts, insurance policies, annuities, qualified or nonqualified retirement plans, and real property interests, and may do so by any means, including by changing ownership, including the addition of a new joint tenant or the deletion of an existing joint tenant. My Agent may designate survivorship rights among one or more remaindermen and may designate the form of title among multiple remaindermen, including, but not limited to, as tenants in common, joint tenants, community property, or tenants by the entirety.

In particular, my Agent may execute any deed designating beneficiaries, including an enhanced life estate deed (also known as a "ladybird" deed), including with respect to my homestead property, if any, and may conduct any and all transactions with full power and authority in my Agent to sell, convey, mortgage, lease, and otherwise dispose of the property in accordance with the terms of the deed.

### Section 3.32 Beneficiary Designations

My Agent may select, create, revoke, or change beneficiary designations on any and all of my property, whether real or personal, including bank and investment accounts, insurance policies, annuities, qualified or nonqualified retirement plans, and real property interests.

### Section 3.33 Spiritual and Religious Needs

My Agent may arrange for the involvement of religious clergy or spiritual leaders in my care, provide said persons access to me at all times, arrange or maintain my membership in religious or spiritual organizations, and create opportunities for me to derive comfort and spiritual satisfaction from such activities, including the purchase of religious books, tapes, and other materials.

### Section 3.34 Companionship

My Agent may provide for such companionship for me, in the sole discretion of my Agent, as will meet my needs and preferences at a time when I am disabled or otherwise unable to arrange for such companionship myself.

### Section 3.35 U.S. Mail

My Agent may open, read, respond to, and redirect my mail, and represent me before the U.S. Postal Service in all matters relating to mail service.

## Article Four
## Incidental Powers

My Agent may perform those acts and execute and deliver those legal documents necessary or appropriate to the exercise of the powers set forth in this Power of Attorney, including, but not limited to, the following incidental powers.

### Section 4.01 Document Execution

My Agent may sign, execute, endorse, seal, acknowledge, deliver, and file or record all appropriate legal documents necessary to exercise the powers granted under this Power of Attorney.

### Section 4.02 Custody of Documents

My Agent may take, give, or deny custody of my important documents, including my Will and any codicils, trust agreements, deeds, leases, life insurance policies, contracts, or securities. My Agent may disclose or not disclose the whereabouts or contents of those documents as my Agent believes appropriate.

## Article Five
## Limitation on Powers

All powers granted to my Agent under this Power of Attorney are subject to the limitations set forth in this Article.

### Section 5.01 My Agent to Avoid Disrupting My Estate Plan

If it becomes necessary for my Agent to liquidate or reinvest any of my assets to provide support for me, I direct that my Agent, to the extent that it is reasonably possible, avoid disrupting the dispositive provisions of my estate plan as established by me prior to my incapacity.

If it is necessary to disrupt the dispositive provisions of my estate plan, my Agent will use his or her best efforts to restore my plan as soon as possible. My Agent will make reasonable efforts to obtain and review my estate plan. I authorize any person with knowledge of my estate plan or possession of my estate planning documents to disclose information to my Agent and to provide copies of documents to my Agent.

### Section 5.02 Tax Sensitive Powers

No individual serving as my Agent may exercise any fiduciary power or discretion if the exercise of that power or discretion would:

(i) cause any income generated by my property to be attributed to my Agent for federal income tax purposes;

(ii) cause the value of any property subject to this Power of Attorney to be included in my Agent's gross estate for federal estate tax purposes;

(iii) cause any distribution made or allowed to be made by my Agent to be treated as a gift from my Agent; or

(iv) discharge a legal obligation of my Agent.

If the exercise of a power by my Agent under this Power of Attorney would cause any of the foregoing results, any other Agent that I have designated in this Power of Attorney to serve with the Agent or as a successor Agent may exercise the power or discretion, so long as such exercise would not also cause any of the foregoing results. The other Agent acting for this purpose must be an individual who is not related or subordinate to my Agent within the meaning of Section 672(c) of the Internal Revenue Code.

## Article Six
## Administrative Powers and Provisions

This Article contains certain administrative powers and provisions that facilitate the use of the Power of Attorney and that protect my Agent and those who rely upon my Agent.

### Section 6.01 Compensation and Reimbursement to Agent

If my Agent is a professional (such as an attorney; accountant; geriatric care manager; professional guardian, conservator, or other fiduciary; or other professional, including entities that provide similar services), my Agent is entitled to compensation for services rendered pursuant to this Power of Attorney at such professional's then stated rates. Further, if my Agent is a professional, my Agent is entitled to reimbursement for costs reasonably incurred while acting as my Agent, including, but not limited to: phone bills; postage; and travel expenses, if necessary, to supervise my care.

If my Agent is not a professional, my Agent is not entitled to compensation for services rendered or reimbursement for costs incurred while serving as Agent under this power of attorney.

### Section 6.02 Amendment and Revocation

I may amend or revoke this Power of Attorney at any time. Amendments to this document must be made in writing by me personally (not by my Agent) and must be attached to the original of this document and recorded in the same county or counties as the original if the original is recorded.

If this Power of Attorney is amended or revoked, no person will incur any liability to me or my estate as a result of permitting my Agent to exercise any power authorized by this Power of Attorney prior to that person's receipt of notice that it was amended or revoked.

### Section 6.03 Resignation

My Agent may resign by the execution of a written resignation delivered to me (or my guardian if I am incapacitated and one has been appointed for me) and to any Agent serving together with the resigning Agent, or if none, to the next successor Agent. If I am incapacitated, notice may be delivered to any person with whom I am residing or who has my care and custody.

### Section 6.04 Signature of Agent

My Agent shall use substantially the following form when signing documents on my behalf pursuant to this power:

> *[Agent's name]*, as Agent for Oswald David.

### Section 6.05 Interpretation

This Power of Attorney is a general power of attorney and should be interpreted as granting my Agent all general powers permitted under New York law. The description of specific powers is not intended to, nor does it, limit or restrict any of the general powers granted to my Agent.

### Section 6.06 Use of "Agent" Nomenclature

The word "Agent" and any modifying or equivalent word or substituted pronoun includes the singular and the plural, as well as the masculine, feminine, and neuter genders, and includes the term "attorney-in-fact."

### Section 6.07 Third-Party Reliance

No person who relies in good faith on the authority of my Agent under this Power of Attorney will incur any liability to me, my estate, or my heirs, successors, and assigns.

Any party dealing with my Agent may conclusively rely upon an affidavit or certificate of my Agent stating that:

(i) the authority granted to my Agent under this Power of Attorney is in effect;

(ii) my Agent's actions are within the scope of my Agent's authority under this Power of Attorney;

(iii) I was competent when I executed this Power of Attorney;

(iv) I have not revoked this Power of Attorney; and

(v) my Agent is currently serving as my Agent.

### Section 6.08 Effect of Duplicate Originals or Copies

If this Power of Attorney has been executed in multiple counterparts, each counterpart original will have equal force and effect. A copy of this Power of Attorney will have the same force and effect as the original only if the copy is attested by a licensed attorney or a state-authorized officer (such as a notary public) to be a true, exact, complete, and unaltered copy of an original. A copy means an electronic, digital, facsimile, photocopy, or other reproduction of this Power of Attorney.

### Section 6.09 Governing Law

This Power of Attorney's validity and interpretation will be governed by New York law. To the extent permitted by law, this Power of Attorney is applicable to all of my property (whether real or personal, tangible or intangible, or legal or equitable), wherever located, and whether or not the property is owned by me now or in the future.

### Section 6.10 Severability

If any provision of this Power of Attorney is declared invalid for any reason, the remaining provisions will remain in full force and effect.

## Article Seven
## Duties and Liabilities of My Agent

### Section 7.01 Duty to Account

My Agent shall render statements of account of receipts, disbursements, principal on hand, and transactions conducted on my behalf pursuant to New York law.

### Section 7.02 Limitation of Liability of My Agent

I release and discharge any Agent acting in good faith from any and all civil liability and from all claims or demands of all kinds whatsoever by me, my estate, and my heirs, successors, and assigns arising out of the acts or omissions of my Agent, except for duties committed dishonestly, with improper motive, or with reckless indifference to the purposes of this Power of Attorney or my best interests, including willful misconduct or gross negligence. This protection extends to the estate, heirs, successors, and assigns of my Agent.

In particular, any Agent who acts in good faith is not liable to any beneficiary of my estate plan for failure to preserve the plan, and absent a breach of duty to me, my Agent is not liable if the value of my property declines.

## Article Eight
## Acceptance of Appointment as Agent

Any manifestation of acceptance of appointment as Agent, whether in writing or by conduct, is an acceptance of all aspects of this Power of Attorney, and may not be limited to only certain aspects. Appointment as Agent is accepted by:

(i) signing the Acceptance by Agent below or any other document manifesting acceptance;

(ii) exercising any authority or performing any duties as Agent under this Power of Attorney; or

(iii) any other assertion or conduct indicating acceptance.

## Article Nine
## Declarations of the Principal

I understand that this Power of Attorney is an important legal document. Before executing this Power of Attorney, my attorney explained to me the following:

(i) that this Power of Attorney provides my Agent with broad powers to dispose of, sell, convey, and encumber my real and personal property;

(ii) that the powers will exist for an indefinite period of time unless I revoke this Power of Attorney or I have limited their duration by specific provisions herein;

(iii) that this Power of Attorney remains in full force and effect during my subsequent disability or incapacity; and

(iv) that I may revoke or terminate this Power of Attorney at any time.

**NOTICE: You may rely on this document only if it is an original, as evidenced by the inked signature of the Principal, or a copy that has been attested by a licensed attorney or a state-authorized officer (such as a notary public) to be a true, exact, complete, and unaltered copy of an original. (See Section 6.08.)**

Dated: 12/7, 2023

**Oswald David, Principal**

STATE OF NEW YORK )
COUNTY OF Queens )

On the 7th day of December, in the year 2023 before me, the undersigned, personally appeared Oswald David, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

Notary Public

BEVERLY G. PERKINS
Commissioner of Deeds
City of New York - No. 3-3639
Certificate Filed in Queens County
Commission Expires: July 1, 2025

## Declaration of Witnesses

The foregoing Power of Attorney was, on the day and year written above, published and declared by Oswald David, in our presence to be his Power of Attorney. We, in his presence and at his request, and in the presence of each other, have attested to the same and have signed our names as attesting witnesses.

We declare that at the time of our attestation of this instrument, Oswald David was, according to our best knowledge and belief, of sound mind and memory and under no undue duress or constraint.

| | |
|---|---|
| [signature] **(Witness signature)** | [signature] **(Witness signature)** |
| OMAR BAXTER (printed name) | ERIC COOPER (printed name) |
| (street address) | (street address) |
| (city, state zip) | (city, state zip) |

## Acceptance by Agent

The undersigned Agent hereby accepts the delegation of all authority set out in this Power of Attorney.

Dated: 12/7, 2023

[signature]
**Debbie Ann Harris, Agent**

Driver's License Number/State

STATE OF NEW YORK )
COUNTY OF Queens )

On the 7th day of December, in the year 2023, before me, the undersigned, personally appeared Debbie Ann Harris, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

BEVERLY G. PERKINS
Commissioner of Deeds
City of New York - No. 3-3639
Certificate Filed in Queens County
Commission Expires: July 1, 2025

Notary Public

This instrument was prepared by Denrick W. Cooper, Esq..

**Garnett H. Sullivan** Attorney at Law

1080 Grand Avenue, Suite 200, South Hempstead, N.Y. 11550 | (516) 285-1575

Case No. 1-24-43449-JMM

CLERK
U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
RECEIVED - BROOKLYN
JAN 23 2026 PM03:24

January 23, 2026

Debbie Harris
814 Linden Blvd.
Brooklyn, NY 11201

*Re: Closing date*
*Premises: 814 Linden Blvd, Brooklyn NY 11201*

Dear Ms. Harris:

I have conferred with the purchaser's attorney who informed me that the bank's closing department gave final approval for closing. However, because this is an FHA loan, they require 10 days advance notice for closing. We are therefore endeavoring to schedule the closing for February 4, 2026.

Yours Sincerely,

s/ *Garnett H. Sullivan*
**GARNETT H. SULLIVAN, ESQ.**

Garnettsullivan@yahoo.com | Facsimile (516) 285-1608

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
In re:

2281 Church Avenue LLC,

Debtor.
------------------------------------------------------x

Chapter 11,

Case No. 24-43449-jmm

**ORDER SCHEDULING HEARING ON FLUSHING BANK'S NOTICE OF DEFAULT AND REQUEST FOR CONVERSION**

**WHEREAS**, the above-captioned debtor (the "Debtor") filed a petition for relief under chapter 11 of the Bankruptcy Code; and

**WHEREAS**, Debbie A. Harris – David ("Harris") is married to the Debtor's principal, Oswald David; and

**WHEREAS**, by Order entered May 1, 2025, the Debtor retained Jackie Henry Realty LLC as real estate broker [ECF No. 84]; and

**WHEREAS**, on December 26, 2026, the Debtor filed an application to retain Bluewater Capital Realty Corp. as real estate broker [ECF No. 129]; and

**WHEREAS,** the Court entered an order on October 28, 2024, authorizing the Debtor's use of cash collateral (the "Cash Collateral Order") [ECF No. 42]; and

**WHEREAS,** the Court entered an order on October 28, 2025, (the "October Order") [ECF No. 113] conditionally granting Flushing Bank's motion to convert this case to one under chapter 7 [ECF No.101] that required the Debtor, *inter alia*, to sell the property located at 2281 Church Avenue, Brooklyn, NY (the "Property"); and

**WHEREAS,** the Court entered an order on November 10, 2025 (the "November Order") [ECF No. 119] that, among other things, required Harris to convey the Property back to the Debtor, the Debtor to market the Property and to file an amended chapter 11 plan; and

**WHEREAS,** the Court entered an order on January 7, 2026 (the "January Order") [ECF No. 135], that extended certain deadlines in the October and November Orders and to make payments under the Cash Collateral Order that were past due; and

**WHEREAS,** Flushing Bank docketed a letter [ECF No. 138], advising that the Debtor defaulted under January Order, by failing to make timely adequate protection payments, advertise the Property for auction, file a Sale Motion (as defined in the January Order), or file a plan, and requesting immediate entry of an Order converting this case to chapter 7; and

**WHEREAS,** Debtor's counsel filed responsive letters requesting additional time to comply with the Orders [ECF Nos. 139, 140] and Flushing Bank filed a letter in reply [ECF No. 140]; and

**WHEREAS,** Harris filed letters requesting dismissal of this chapter 11 case [ECF Nos. 143 and 144].

**NOW, THEREFORE**, it is hereby

**ORDERED**, that Court will hold a hearing on the Motion before Judge Jil Mazer-Marino of the United States Bankruptcy Court, Eastern District of New York, Courtroom 3529, 271-C Cadman Plaza East, Brooklyn, New York 11201 on **February 4, 2026, at 2:30 p.m.** (the "Hearing"); and it is further

**ORDERED,** that Flushing Bank's counsel, Debtor's counsel, Harris, and Jackie Henry Realty LLC (or current listing agent for the Property) are **directed** to appear at the Hearing; and it is further

**ORDERED**, that the Hearing may be held in person, by phone, or by videoconference. Regardless of whether you intend to appear in person, by phone, or by videoconference, those intending to appear at the Hearing must register with eCourt Appearances no later than two (2) days prior to the Hearing. The phone number or video link for the Hearing will be emailed only to those that register with eCourt Appearances in advance of the Hearing. Instructions for registering with eCourt Appearances can be found at https://www.nyeb.uscourts.gov/node/2126. If you do not have internet access or are otherwise unable to register with eCourt Appearances, you may call or email Judge Mazer-Marino's courtroom deputy for instructions at (347) 394-1844, JMM_Hearings@nyeb.uscourts.gov; and it is further

**ORDERED,** that the Hearing will marked of the Court's calendar and the Court shall enter an Order converting this case to a case under chapter 7 if: (a) a Sale Motion, as defined in the January Order, is not docketed by January 26, 2026, or (b), debtor fails to file, by **February 2, 2026, at 3:00 p.m.**, proof of payment of all adequate protection payments due and owing as of January 30, 2026; and it is further

**ORDERED**, that by January 26, 2026Debtor's counsel shall serve a copy of this Order on (1) Harris, (2) Jackie Henry Realty LLC; (3) the Office of the United States Trustee for Region 2, (4) Counsel for Flushing Bank, (5) Bluewater Capital Realty Corp., attention Rosalind Bolden; (6) the Subchapter V Trustee, by e-mail and overnight mail; and it is further

**ORDERED**, that Debtor's counsel shall file proof of service of this Order by January 27, 2026.

**Dated: January 23, 2026**
**Brooklyn, New York**

Jil Mazer-Marino
United States Bankruptcy Judge

Return Date: MARCH 4, 2026 10:00 AM

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re: 2281 CHURCH AVE LLC

Case No. 1-24-43449-JMM

Debtor(s)

Chapter 11
-----------------------------------------------------------x

**NOTICE OF MOTION**

**PLEASE TAKE NOTICE**, a hearing will be held at the U.S. Bankruptcy Court for the Eastern District of New York, 271-C Cadman Plaza East, Brooklyn, New York 11201-1800 before the Honorable JMM, United States Bankruptcy Judge, to consider the motion for an order granting relief as follows: See Attached

CLERK
U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
BROOKLYN
RECEIVED
JAN 23 2026 PM03:44

**Date of hearing:** MARCH 4, 2026 **Time:** 10:00 AM

***Parties may appear by phone or video conference.***

All hearings before Judge Lord are held by phone or video. Parties will receive hearing instructions after completing registration on eCourt Appearances.

**Register for Hearing:** All parties must register 2-3 days prior to hearing on eCourt Appearances at *https://ecf.nyeb.uscourts.gov/cgi-bin/nyebAppearances.pl.*

Responsive papers shall be filed with the bankruptcy court no later than seven (7) days prior to the hearing date set forth above.

Dated: 02/23/2026

Signature: Debbie
Print name: DEBBIE HARRIS
Address: 1234 E 69TH ST
BROOKLYN, NY 11234
Phone: 347-822-3970
Email: ~~SHAKIE~~ DEBBIEHARRIS@GMAIL.COM

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF NEW YORK

In re:

Chapter 11

2281 Church Ave LLC, Case No. 1-24-43449-jmm

Debtor.

CLERK
U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
RECEIVED - BROOKLYN
JAN 23 2026 PM03:34

## **EMERGENCY MOTION TO TERMINATE COUNSEL AND OBJECTION TO UNAUTHORIZED AUCTION ACTIONS**

Debbie Harris-David, POA, for the Debtor 2281 Church Ave LLC, respectfully submits this Emergency Motion to terminate prior counsel and to object to any unauthorized auction or sale actions, and in support thereof states as follows:

## PRELIMINARY STATEMENT

1. This Motion is brought on an emergency basis due to imminent and unauthorized actions being taken by former counsel concerning an auction scheduled for February 13, without the Debtor's knowledge or consent.

2. Immediate Court intervention is necessary to protect the Debtor's rights and to prevent irreparable harm.

## JURISDICTION AND VENUE

3. This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1408.

## BACKGROUND

5. Debbie Harris-David is the duly authorized Power of Attorney (POA) for the Debtor, 2281 Church Ave LLC.

6. The Debtor was previously represented by Karamvir Dahiya, Esq., of Dahiya Law Offices LLC.

7. Without the Debtor's knowledge, consent, or authorization, Mr. Dahiya prepared and/or took steps toward filings and decisions related to an auction scheduled for February 13.

8. At no time did the Debtor authorize counsel to pursue, prepare, negotiate, or submit any documentation or communication related to an auction or sale of the property.

9. The Debtor was not consulted, nor informed in advance, of these actions.

10. These actions were contrary to the Debtor's instructions, intentions, and best interests, and caused confusion, delay, and prejudice.

## TERMINATION OF COUNSEL

11. Due to the above-described unauthorized conduct, Karamvir Dahiya, Esq. is terminated effective immediately as counsel for the Debtor.

12. Any filings, representations, communications, or negotiations made by Mr. Dahiya after the effective date of termination are unauthorized and voidable.

## OBJECTION TO AUCTION

13. The Debtor expressly objects to any proposed auction, sale, or related action scheduled for February 13 or any other date that was initiated or facilitated without proper authorization.

14. Any delay or inability of the Debtor to respond earlier was caused by lack of disclosure and unilateral action by former counsel, which prevented the Debtor from being timely and fully informed.

## RELIEF REQUESTED

WHEREFORE, the Debtor respectfully requests that the Court enter an Order:

A. Acknowledging the immediate termination of Karamvir Dahiya, Esq. as counsel for the Debtor;

B. Directing that Mr. Dahiya has no authority to act, file, negotiate, or communicate on behalf of the Debtor;

C. Sustaining the Debtor's objection to any unauthorized auction or sale actions, including the February 13 auction;

D. Directing all parties to communicate directly with the Debtor until new counsel is retained;

E. Granting such other and further relief as the Court deems just and proper.

## DECLARATION

I, Debbie Harris-David, declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

Dated: January 22, 2026

Respectfully submitted,

Debbie Harris-David/POA

**Debbie Harris-David, POA**

For: 2281 Church Ave LLC

1234 East 69th Street

Brooklyn, NY 11234

Phone: (347) 822-3970

Email: debbieharris399@gmail.com

cc:

Karamvir Dahiya, Esq.

Dahiya Law Offices LLC

Bonnie Pollack, Esq.

Cullen and Dykman LLP

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

**In re: 2281 Church Ave LLC**
Debtor
**Case No.: 1-24-43449-jmm**

**EMERGENCY MOTION TO TERMINATE COUNSEL AND IMMEDIATELY HALT UNAUTHORIZED AUCTION ACTIONS**

Debbie Harris-David, POA, for the Debtor 2281 Church Ave LLC ("Debtor"), moves this Court on an emergency basis for an order terminating prior counsel and immediately halting any unauthorized auction or sale actions. This motion is necessitated by imminent irreparable harm, including a proposed auction scheduled for February 13, initiated without the Debtor's knowledge or consent. The Debtor never authorized any auction or sale of the property. Immediate court intervention is required to prevent loss of property rights based on unauthorized conduct.

**DECLARATION**
I, Debbie Harris-David, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: 01/22/2026

Signature: Debbie Harris-David POA
Debbie Harris-David, POA

CLERK
U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
RECEIVED - BROOKLYN
JAN 23 2026 PM03:32

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
In re: Chapter 11

2281 Church Ave LLC,

Case No. 24-43449-jmm

Debtor.
-----------------------------------------------------X

**ORDER CONVERTING CASE UNDER CHA TER**
**TO A CASE UNDER CHA TER**

**WHEREAS,** the above-captioned debtor (the "Debtor") filed a petition for relief under chapter 11 of the Bankruptcy Code; and

**WHEREAS**, Debbie A. Harris – David ("Harris") is married to the Debtor's principal, Oswald David, and holds a power of attorney of him; and

**WHEREAS,** Flushing Bank filed a motion to convert this chapter 11 case to a case under chapter 7 on August 11, 2025 [ECF No. 101]; and

**WHEREAS,** the Court entered an order on October 28, 2025, (the "October Order") [ECF No. 113] conditionally granting Flushing Bank's motion to convert this case to one under chapter 7 [ECF No.101] that fixed deadlines for the Debtor to market the property located at 2281 Church Avenue, Brooklyn, NY (the "Property"), and to file a motion to sell the Property; and

**WHEREAS**, the Debtor conveyed the Property to Harris without Court approval; and

**WHEREAS,** the Court entered an order on November 10, 2025 (the "November Order") [ECF No. 119] that, among other things, required Harris to convey the Property back to the Debtor, and the Debtor to market the Property and to file an amended chapter 11 plan by November 21, 2025; and

**WHEREAS,** the Court entered an order on January 7, 2026 (the "January Order") [ECF No. 135], that extended certain deadlines in the October and November Orders; and

**WHEREAS,** on January 20, 2026, Flushing Bank docketed a letter [ECF No. 138], advising that the Debtor defaulted under January Order (the "Notice of Default") and requesting the Court convert this case to a case under chapter 7 pursuant to the November Order; and

**WHEREAS,** on January 23, 2026, the Court entered an order scheduling hearing (the "Hearing") [ECF No. 146] on the Notice of Default that, among other things, provided that the Hearing would be marked off the Court's calendar and the Court would enter an Order converting this case to a case under chapter 7 if a Sale Motion, as defined in the January Order, was not docketed by January 26, 2026; and

**WHEREAS,** the Debtor did not file a sale motion on the docket of this case by January 26, 2026; and

**WHEREAS,** cause exists under Bankruptcy Code section 1112(b)(2)(E) to convert this Chapter 11 case to one under Chapter 7 based on the Debtor's failure to comply with Orders of this Court and conversion of this Chapter 11 case to one under Chapter 7 being in the best interests of creditors and the estate.

**NOW THEREFORE** it is hereby

**ORDERED,** that this Chapter 11 case is hereby converted to a case under Chapter 7; and it is further;

**ORDERED**, that the Office of the United States Trustee shall appoint a Chapter 7 trustee; and it is further

**ORDERED**, that the Debtor forthwith shall turn over to the Chapter 7 Trustee all records and property of the estate remaining in the Debtor's custody and control, pursuant to Bankruptcy Rule 1019(d); and it is further

**ORDERED**, that within fourteen (14) days of entry of this order, the Debtor shall file a schedule of unpaid debts (that includes the name and address of each claim holder) incurred after the case was commenced but before conversion of this case to chapter 7.

**ORDERED** that the Court may retain jurisdiction to hear and determine all matters arising from or related to the implementation or interpretation of this Order.

Dated: January 29, 2026
Brooklyn, New York

Jil Mazer-Marino
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | |
| | Case No. 24-43449-jmm |
| 2281 Church Avenue LLC, | |
| Debtor. | (Chapter 7) |

**NOTICE OF APPOINTMENT OF TRUSTEE**

To: Lori Lapin Jones, Esq.
Lori Lapin Jones PLLC
98 Cutter Mill Road
Suite 255 South
Great Neck, NY 11021

The United States Trustee hereby appoints you as interim trustee, under 11 U.S.C. § 701(a), in the above captioned case, which was filed as a chapter 11 case on August 19, 2024, and converted to a case under chapter 7 on January 29, 2026.

You are covered by the Chapter 7 Blanket Bond, issued by the Liberty Mutual Insurance Company, which is on file with the Office of the United States Trustee for the Eastern District of New York, Brooklyn, New York. *See* 11 U.S.C. 322(a) and Fed. R. Bankr. P. 2010. In addition, because your blanket acceptance of appointment is on file, you are required to notify the undersigned in writing within seven days after receipt of this notice only if you reject this appointment. *See* Fed. R. Bankr. P. 2008 and 2010(a).

Dated: New York, New York
February 4, 2026

WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE, REGION 2

By: /s/ Marylou Martin
Marylou Martin
Assistant United States Trustee
One Bowling Green, Room 510
New York, NY 10004-1408
Phone: 212.206.2580
Email: Marylou.Martin@usdoj.gov

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
In re:

Chapter 11
Case No. 24-43449-jmm

2281 CHURCH AVENUE LLC,

Debtor.
-----------------------------------------------------------X

**ORDER GRANTING APPLICATION OF KAMINI FOX, PLLC AS FORMER COUNSEL FOR DEBTOR FOR ALLOWANCE OF FINAL COMPENSATION AND REIMBURSEMENT OF EXPENSES**

Upon the application dated January 27, 2026 of Kamini Fox, PLLC ("Applicant") seeking an award of final compensation and reimbursement of expenses for the period of April 12, 2025 through and including December 31, 2025 ("Application") [ECF No. 148]; and a hearing on the Application having been held on March 4, 2026 (the "Hearing"); and good and sufficient notice of the Application and the Hearing having been provided; and objections, if any, having been overruled, withdrawn or resolved, and good cause appearing therefor, it is

**ORDERED**, that the Application is granted to the extent provided in the attached Schedules, and it is further

**ORDERED**, that Applicant shall be permitted to apply the post-petition amount of $3,676.90 being held in Applicant's escrow to the fees and expenses approved in this Order, and it is further

**ORDERED**, that the holdback of 20% awarded under the first interim order awarding fees and expenses dated June 6, 2025 is hereby released to Applicant.

Dated: March 8, 2026
Brooklyn, New York

Jil Mazer-Marino
United States Bankruptcy Judge

**SCHEDULE A**

**SUMMARY OF FEE APPLICATIONS**

| Application ECF Nos. 76 & 85 | Fee Period | Interim Fees Requested | Interim Fees Awarded | Holdback [20]% | Expenses Requested | Expenses Awarded | Fees Paid | Expenses Paid |
|---|---|---|---|---|---|---|---|---|
| **PRIOR INTERIM PERIOD** | | | | | | | | |
| | **7/11/2024 to 4/11/2025** | $55,972.50 | $55,972.50 | $11,194.50 | $3,283.50 | $3,283.50 | $44,777.60[1] | $3,283.50 |
| **Application ECF No.** | **Fee Period** | **Final Fees Requested** | **Final Fees Awarded** | **Release of Holdback Requested** | **Expenses Requested** | **Expenses Awarded** | **Fees Paid** | **Expenses Paid** |
| **CURRENT PERIOD** | | | | | | | | |
| | **4/12/2025 to 12/31/2025** | $29,410.00 | $29,410.00 | $11,194.50 | $0.00 | $0.00 | $0.00 | $0.00 |

[1] Applicant is holding the amount of $3,676.90 paid by Debtor's principal which is to be applied to the final fees awarded.

**SCHEDULE B**

**ALL FEE PERIODS**

| TOTAL FEES REQUESTED | TOTAL FEES GRANTED | FEES PAID | UNPAID FEES |
|---|---|---|---|
| $85,382.50 | $85,382.50 | $48,454.50[2] | $36,928.00 |

| TOTAL EXPENSES REQUESTED | TOTAL EXPENSES GRANTED | EXPENSES PAID | UNPAID EXPENSES |
|---|---|---|---|
| $3,283.50 | $3,283.50 | $3,283.50 | $0.00 |

[2] Inclusive of the prior holdback of $11,194.50.

**LaMONICA HERBST & MANISCALCO, LLP**
*Counsel to Lori Lapin Jones, as Chapter 7 Trustee*
3305 Jerusalem Avenue, Suite 201
Wantagh, New York 11793
Telephone: (516) 826-6500
Holly R. Holecek, Esq.

**Hearing Date: April 21, 2026 at 11:00 a.m.**
**Objections Due: April 14, 2026 by 5:00 p.m.**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
In re: Chapter 7

2281 CHURCH AVENUE LLC, Case No.: 24-43449-jmm

Debtor.
-------------------------------------------------------x

**NOTICE OF HEARING ON MOTION SEEKING ENTRY OF AN ORDER, PURSUANT TO 11 U.S.C. §§ 105(a) AND 721, AUTHORIZING THE CHAPTER 7 TRUSTEE TO OPERATE THE DEBTOR'S BUSINESS AND PAY CERTAIN OPERATING EXPENSES OF THE ESTATE FOR A LIMITED PERIOD AND FOR RELATED RELIEF**

**PLEASE TAKE NOTICE** that, on **April 21, 2026 at 11:00 a.m.** ("Hearing"), or as soon thereafter as counsel may be heard, a telephonic or video conference shall be held at the United States Bankruptcy Court for the Eastern District of New York, 271-C Cadman Plaza East, Brooklyn, New York ("Court") before the Honorable Jil Mazer-Marino, United States Bankruptcy Judge, on the motion ("Motion") of Lori Lapin Jones, solely in her capacity as Chapter 7 Trustee ("Trustee") of the bankruptcy estate of 2281 Church Avenue LLC ("Debtor"), seeking pursuant to 11 U.S.C. §§ 105(a) and 721 ("Bankruptcy Code"): (i) entry of an Order authorizing the Trustee to operate the Debtor's business and pay certain operating expenses for a limited period from March 19, 2026 through and including July 21, 2026, without prejudice to seek extensions of such authority; (ii) entry of an interim bridge Order authorizing the Trustee to operate the Debtor's business and pay related expenses through and including April 21, 2026, or such other date as the Motion may be heard; and (iii) granting the Trustee such other and further relief as the Court may deem just and proper, and respectfully represents as follows:

**PLEASE TAKE FURTHER NOTICE** that any party that wishes to appear at the Hearing is required to register in advance of the Hearing by using the Court's eCourt Appearances, which can be located at: https://www.nyeb.uscourts.gov/registering-remote-hearing-appearance-using-ecourt-appearances.

**PLEASE TAKE FURTHER NOTICE** that objections to the relief requested in the Motion, if any, must be in writing, conform with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Rules, and be filed with the Court, with a courtesy copy to the Chambers of the Honorable Jil Mazer-Marino, United States Bankruptcy Judge, and served upon, so as to be received by the Trustee's undersigned counsel no later than **5:00 p.m. on April 14, 2026** as follows: (i) through the Court's electronic filing system, which may be accessed through the internet at the Court's website at www.nyeb.uscourts.gov, in portable document format (PDF) using Adobe Exchange Software for conversion; or (ii) if a party is unavailable to file electronically, such party shall submit the objection in PDF format on a compact disc in an envelope with the case name, case number, type and title of document, document number to which the objection refers and the file name on the outside of the envelope.

**PLEASE TAKE FURTHER NOTICE**, that the Hearing on the Motion may be adjourned from time to time without any other announcement other than that set forth in open Court.

Dated: March 19, 2026
Wantagh, New York

**LAMONICA HERBST & MANISCALCO, LLP**
*Counsel to Lori Lapin Jones, Chapter 7 Trustee*

By: *s/ Holly R. Holecek*
Holly R. Holecek, Esq.
A Partner of the Firm
3305 Jerusalem Avenue, Suite 201
Wantagh, New York 11793
Telephone: (516) 826-6500

**LaMONICA HERBST & MANISCALCO, LLP**
*Counsel to Lori Lapin Jones, as Chapter 7 Trustee*
3305 Jerusalem Avenue, Suite 201
Wantagh, New York 11793
Telephone: (516) 826-6500
Holly R. Holecek, Esq.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
In re: Chapter 7

2281 CHURCH AVENUE LLC, Case No.: 24-43449-jmm

Debtor.
-------------------------------------------------------x

**MOTION SEEKING ENTRY OF AN ORDER, PURSUANT TO 11 U.S.C. §§ 105(a) AND 721, AUTHORIZING THE CHAPTER 7 TRUSTEE TO OPERATE THE DEBTOR'S BUSINESS AND PAY CERTAIN OPERATING EXPENSES OF THE ESTATE FOR A LIMITED PERIOD AND FOR RELATED RELIEF**

TO THE HONORABLE JIL MAZER-MARINO,
UNITED STATES BANKRUPTCY JUDGE:

Lori Lapin Jones, solely in her capacity as Chapter 7 Trustee ("Trustee") of the bankruptcy estate of 2281 Church Avenue LLC ("Debtor"), by her undersigned counsel, submits this motion ("Motion") seeking pursuant to 11 U.S.C. §§ 105(a) and 721 ("Bankruptcy Code"): (i) entry of an Order, substantially in the form annexed as Exhibit A, authorizing the Trustee to operate the Debtor's business and pay certain operating expenses for a limited period from March 19, 2026 through and including July 21, 2026, without prejudice to seek extensions of such authority; (ii) entry of an interim bridge Order ("Bridge Order"), substantially in the form annexed as Exhibit B, authorizing the Trustee to operate the Debtor's business and pay related expenses through and including April 21, 2026, or such other date as this Motion may be heard ("Hearing"); and (iii) granting the Trustee such other and further relief as the Court may deem just and proper, and respectfully represents as follows:

## JURISDICTION, VENUE AND STATUTORY PREDICATES

1. The United States Bankruptcy Court for the Eastern District of New York ("Court") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The basis for the relief set forth in this Motion include sections 105(a) and 721 of the Bankruptcy Code.

## BACKGROUND

4. On August 19, 2024 ("Filing Date"), a voluntary petition for relief under subchapter V of Chapter 11 of the Bankruptcy Code was filed on the Debtor's behalf in the Court. See ECF No. 1.

5. According to the Debtor's Schedule A/B, as of the Filing Date, the Debtor owned the real properties located at: (a) 2281 Church Avenue, Brooklyn, New York 11226 ("Church Ave Property"); and (b) 1232 E. 69th Street, Brooklyn, New York 11234 ("69th Street Property"). See ECF No. 1.

6. On August 20, 2024, Gerard R. Luckman, Esq. was appointed as the Subchapter V Trustee. See ECF No. 17.

7. On October 25, 2024, Flushing Bank filed a secured claim in the Debtor's case in the amount of $1,517,889.80, arising out of a note and mortgage against the Church Ave Property.

8. On October 28, 2024, the Court entered a Stipulation and Order Authorizing Final Use of Cash and Other Collateral and Grant of Adequate Protection to Flushing Bank. See ECF No. 42.

9. By motion dated August 11, 2025, Flushing Bank sought entry of an Order

converting the Debtor's Chapter 11 case to a Chapter 7 case and for turnover of cash collateral. See ECF No. 101 ("Motion to Convert"). The Debtor opposed the Motion to Convert. See ECF No. 105. Flushing Bank replied to the Debtor's objection. See ECF No. 107.

10. On October 28, 2025, the Court entered an Order conditionally granting the Motion to Convert, see ECF No. 113 ("October Order"). Pursuant to the October Order, certain deadlines were fixed for the Debtor to market and sell the Church Ave Property. See id.

11. On November 10, 2025, the Court entered a further Order conditionally granting the Motion to Convert. See ECF No. 119 ("November Order"). The November Order, among other things, required Debbie A. Harris-David ("Harris") to convey tittle to the Church Ave Property back to the Debtor, and fixed a deadline for the Debtor to file an amended Chapter 11 plan. See id.

12. On January 7, 2026, the Court entered an Order extending certain deadlines in the October Order and the November Order. See ECF No. 135 ("January Order").

13. On January 20, 2026, Flushing Bank docketed a letter advising that the Debtor defaulted under the January Order and requesting that the Court convert the Debtor's case to a Chapter 7 case. See ECF No. 138.

14. On January 23, 2026, the Court entered an Order scheduling a hearing on the letter that was filed by Flushing Bank, which provided that the Court would enter an Order converting the Debtor's case to a Chapter 7 case if the Debtor did not file a sale motion on the docket by January 26, 2026. See ECF No. 146. The Debtor did not file a sale motion on the docket by January 26, 2026.

15. On January 29, 2026, the Court entered an Order converting the Debtor's Chapter 11 case to a Chapter 7 case. See ECF No. 151.

16. On February 4, 2026, Lori Lapin Jones was appointed as the interim Chapter 7

Trustee of the Debtor's estate. See ECF No. 155.

17. By letter dated February 4, 2026 ("February 4 Letter") counsel to the Trustee requested, inter alia, that documents and information relating to the Debtor's financial affairs be turned over by no later than February 13, 2026. The Debtor did not comply with the February 4 Letter.

18. The Debtor's business consists of the ownership and operation of the Church Ave Property and the 69th Street Property.

19. On February 10, 2026, the Trustee inspected the Church Ave Property with MYC & Associates, Inc. ("MYC"), the Trustee's proposed property manager and real estate broker.[1] The Church Ave Property consists of a 6,288 square foot lot improved by approximately 11,828 square feet of commercial retail space. There are seven (7) retail occupants on the ground floor and one (1) commercial occupant on the 2nd floor.

20. The 69th Street Property consists of a 4,475 square foot lot improved by an approximately 3,562 square foot multi-family dwelling. The Trustee is informed that there are three (3) residential occupancies at the 69th Street Property.

21. The Trustee intends to pursue the sale of the Church Ave Property and the 69th Street Property. Pending such sales (or other disposition of either property), the Trustee seeks authority to operate the Debtor's business and pay certain operating expenses for a limited period.[2]

22. To date, no funds have been turned over to the Trustee, and it is unknown whether any funds will be turned over to the Trustee.

---

[1] By separate application, the Trustee seeks to employ MYC as her property manager and real estate broker in this case.

[2] For avoidance of doubt, the Trustee and her professionals will use reasonable efforts to operate but are under no obligation to expend funds if none are in the estate.

**RELIEF REQUESTED**

23. By this Motion, the Trustee seeks pursuant to sections 105(a) and 721 of the Bankruptcy Code: (a) entry of an Order, substantially in the form annexed as Exhibit A, authorizing the Trustee to operate the Debtor's business and pay certain operating expenses for a limited period from March 19, 2026 through and including July 21, 2026, without prejudice to seek extensions of such authority; (b) entry of an interim bridge Order ("Bridge Order"), substantially in the form annexed as Exhibit B, authorizing the Trustee to operate the Debtor's business and pay related expenses until the Hearing; and (c) such other and further relief as the Court deems just and proper.

24. Pursuant to section 721 of the Bankruptcy Code, the Court may authorize the Trustee "to operate the business of the debtor for a limited period, if such operation is in the best interest of the estate and consistent with the orderly liquidation of the estate." 11 U.S.C. § 721. Pursuant to section 105(a) of the Bankruptcy Code, the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

25. In this case, the Debtor's business consists of the operation of the Church Ave Property and the 69th Street Property. Pending the sale or other disposition of the Church Ave Property and the 69th Street Property, it is in the best interests of the Debtor's estate and its creditors for the Trustee to operate the Debtor's business for a limited period and to pay related operating expenses to preserve and maintain the properties.

26. A line of well-established cases supports the relief requested herein. See, e.g., Miltenberger v. Logansport Ry., 106 U.S. 286, 312 (1882) (payment of pre-receivership claim prior to reorganization permitted to prevent "stoppage of [crucial] business relations"); Dudley v.

Mealey, 147 F.2d 268 (2d Cir. 1945), cert. denied, 325 U.S. 873 (1945) (Second Circuit extends doctrine for payment of prepetition claims beyond railroad reorganization cases); B & W Enters., Inc. v. Goodman Oil Co. (In re B & W Enters., Inc.), 713 F.2d 534 (9th Cir. 1983); Michigan Bureau of Workers' Disability Compensation v. Chateaugay Corp. (In re Chateaugay Corp.), 80 B.R. 279, 285-86 (S.D.N.Y. 1987), appeal dismissed, 838 F.2d 59 (2d Cir. 1988) (approving lower court order authorizing payment of prepetition wages, salaries, expenses, and benefits); In re Boston & Me. Corp., 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing the existence of a judicial power to authorize trustees to pay claims for goods and services that are indispensably necessary to debtors' continued operation); In re Ionosphere Clubs, Inc., 98 B.R. 174, 177 (Bankr. S.D.N.Y. 1989).

27. Based on the foregoing, the Trustee respectfully submits that the Court authorize the Trustee to operate the Debtor's business and pay certain necessary expenses on an interim basis through and including July 21, 2026, without prejudice to seek extensions of such authority.

**NOTICE AND NO PRIOR RELIEF**

28. Notice of this Motion will be served on all necessary parties in accordance with Rule 2002 of the Federal Rules of Bankruptcy Procedure.

29. No previous request for the relief sought herein has been made by the Trustee to this or any other Court.

**WHEREFORE** the Trustee respectfully requests that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated: March 19 2026
Wantagh, New York

**LAMONICA HERBST & MANISCALCO, LLP**
*Counsel to Lori Lapin Jones, Chapter 7 Trustee*

By: *s/ Holly R. Holecek*
Holly R. Holecek, Esq.
A Partner of the Firm
3305 Jerusalem Avenue, Suite 201
Wantagh, New York 11793
Telephone: (516) 826-6500

# **EXHIBIT A**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re: Chapter 7

2281 CHURCH AVENUE LLC, Case No.: 24-43449-jmm

Debtor.
-----------------------------------------------------------x

**ORDER, PURSUANT TO 11 U.S.C. §§ 105(a) AND 721, AUTHORIZING THE CHAPTER 7 TRUSTEE TO OPERATE THE DEBTOR'S BUSINESS AND PAY CERTAIN OPERATING EXPENSES OF THE ESTATE FOR A LIMITED PERIOD AND FOR RELATED RELIEF**

Upon the motion dated March 19, 2026 ("Motion") [ECF No. ] of Lori Lapin Jones, solely in her capacity as Chapter 7 Trustee ("Trustee") of the bankruptcy estate of 2281 Church Avenue LLC ("Debtor"), seeking pursuant to 11 U.S.C. §§ 105(a) and 721 ("Bankruptcy Code"): (i) entry of an Order authorizing the Trustee to operate the Debtor's business and pay certain operating expenses for a limited period from March 19, 2026 through and including July 21, 2026, without prejudice to seek extensions of such authority; (ii) entry of an interim bridge Order authorizing the Trustee to operate the Debtor's business and pay related expenses through and including April 21, 2026, or such other date as the Motion may be heard ("Bridge Order"); and (iii) granting the Trustee such other and further relief as the Court may deem just and proper; and upon the Court having entered the Bridge Order on March ___, 2026 [ECF No. ____]; and upon the telephonic or video hearing having been held before the Court on April 21, 2026 at 11:00 a.m. ("Hearing"), the record of which is incorporated herein by reference; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and there having been no objections to the relief sought in the Motion filed with the Court; and for the reasons set forth on the record at the Hearing, and the Court having found that the relief sought in the Motion was necessary and warranted; and venue being proper before

this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and after due deliberation and sufficient cause appearing therefore, it is hereby:

**ORDERED** that the Motion is granted as set forth herein; and, it is further

**ORDERED** that, pursuant to sections 105(a) and 721 of the Bankruptcy Code, the Trustee is authorized to, for the limited period from March 19, 2026 through and including July 21, 2026, without prejudice to seek further extensions of such authority: (i) operate the Debtor's business; (ii) collect use and occupancy payments from occupants of the Debtor's properties; (iii) enforce lease agreements (if any); (iv) pay or cause to be paid necessary expenses relating to the operation of the Debtor's business including, but not limited to, utilities, insurance, real estate taxes, and minor repairs; (v) take actions reasonably necessary to comply with local laws, building codes, and safety requirements; and (vi) maintain and, if necessary obtain, insurance coverage for the Debtor's properties; and, it is further

**ORDERED** that pursuant to section 704(a)(8) of the Bankruptcy Code, the Trustee shall prepare and file monthly operating business reports on the appropriate form issued by the U.S. Trustee; and, it is further

**ORDERED** that this Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order; and it is further

**ORDERED** that the Trustee is authorized and empowered to expend such funds and execute and deliver all documents as are reasonably necessary to implement the terms of this Order.

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
In re: Chapter 7

2281 CHURCH AVENUE LLC, Case No.: 24-43449-jmm

Debtor.
------------------------------------------------------x

**INTERIM ORDER AUTHORIZING THE CHAPTER 7 TRUSTEE TO OPERATE THE DEBTOR'S BUSINESS AND PAY CERTAIN OPERATING EXPENSES OF THE ESTATE FROM MARCH 19, 2026 UNTIL THE HEARING PURSUANT TO 11 U.S.C. §§ 105(a) AND 721**

Upon the motion filed on March 19, 2026 [ECF No. ____] ("Motion")[1] of Lori Lapin Jones, solely in her capacity as Chapter 7 Trustee ("Trustee") of the bankruptcy estate of 2281 Church Avenue LLC ("Debtor"), seeking pursuant to 11 U.S.C. §§ 105(a) and 721: (i) entry of an Order authorizing the Trustee to operate the Debtor's business and pay certain operating expenses for a limited period from March 19, 2026 through and including July 21, 2026, without prejudice to seek extensions of such authority; (ii) entry of an interim bridge Order authorizing the Trustee to operate the Debtor's business and pay related expenses through and including April 14, 2026, or such other date as this Motion may be heard; and (iii) granting the Trustee such other and further relief as the Court may deem just and proper; and the Motion having been served on all necessary parties; and upon the Court having scheduled a Hearing on this Motion on April 21, 2026 at 11:00 a.m. ("Hearing"); and after due deliberation and sufficient cause appearing therefore, it is hereby:

[1] Capitalized terms not otherwise defined herein shall have the definition ascribed to them in the Motion.

**ORDERED** that, while the Motion is pending, the Trustee is authorized to operate the Debtor's business and pay related expenses, on an interim basis, from March 19, 2026 until the date of the Hearing, i.e., April 21, 2026, or such date thereafter as the Motion is heard; and, it is further

**ORDERED** that the Trustee is authorized and directed to take such steps, execute such documents and expend such funds as may be reasonably necessary to effectuate and implement the terms and conditions of this Order.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
In re: Chapter 7

2281 CHURCH AVENUE LLC, Case No.: 24-43449-jmm

Debtor.
-------------------------------------------------------x

**INTERIM ORDER AUTHORIZING THE CHAPTER 7 TRUSTEE TO OPERATE THE DEBTOR'S BUSINESS AND PAY CERTAIN OPERATING EXPENSES OF THE ESTATE FROM MARCH 19, 2026 UNTIL THE HEARING PURSUANT TO 11 U.S.C. §§ 105(a) AND 721**

Upon the motion filed on March 19, 2026 [ECF No. 163] ("Motion")[1] of Lori Lapin Jones, solely in her capacity as Chapter 7 Trustee ("Trustee") of the bankruptcy estate of 2281 Church Avenue LLC ("Debtor"), seeking pursuant to 11 U.S.C. §§ 105(a) and 721: (i) entry of an Order authorizing the Trustee to operate the Debtor's business and pay certain operating expenses for a limited period from March 19, 2026 through and including July 21, 2026, without prejudice to seek extensions of such authority; (ii) entry of an interim bridge Order authorizing the Trustee to operate the Debtor's business and pay related expenses through and including April 14, 2026, or such other date as this Motion may be heard; and (iii) granting the Trustee such other and further relief as the Court may deem just and proper; and the Motion having been served on all necessary parties; and upon the Court having scheduled a Hearing on this Motion on April 21, 2026 at 11:00 a.m. ("Hearing"); and after due deliberation and sufficient cause appearing therefore, it is hereby:

[1] Capitalized terms not otherwise defined herein shall have the definition ascribed to them in the Motion.

**ORDERED** that, while the Motion is pending, the Trustee is authorized to operate the Debtor's business and pay related expenses, on an interim basis, from March 19, 2026 until the date of the Hearing, i.e., April 21, 2026, or such date thereafter as the Motion is heard; and, it is further

**ORDERED** that the Trustee is authorized and directed to take such steps, execute such documents and expend such funds as may be reasonably necessary to effectuate and implement the terms and conditions of this Order.

Dated: March 20, 2026
Brooklyn, New York

Jil Mazer-Marino
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
In re: Chapter 7

2281 CHURCH AVENUE LLC, Case No.: 24-43449-jmm

Debtor.
------------------------------------------------------x

**ORDER AUTHORIZING AND APPROVING THE EMPLOYMENT OF MYC & ASSOCIATES, INC. AS PROPERTY MANAGER AND REAL ESTATE BROKER TO THE CHAPTER 7 TRUSTEE**

Upon the application ("Application") of Lori Lapin Jones, solely in her capacity as Chapter 7 Trustee ("Trustee") of the bankruptcy estate of 2281 Church Avenue LLC ("Debtor"), seeking entry of an Order authorizing and approving the employment of MYC & Associates, Inc. ("MYC") as property manager and real estate broker to the Trustee to manage, market and solicit offers for the real properties located at: (i) 2281 Church Avenue, Brooklyn, New York 11226 ("Church Ave Property"); and (ii) 1232 E. 69th Street, Brooklyn, New York 11234 ("69th Street Property" and, together with the Church Ave Property, the "Properties"), and, as determined by the Trustee, to conduct an auction; and upon the declaration of Marc P. Yaverbaum, which is attached to the Application; and the Court being satisfied that: (i) MYC neither represents nor holds any interest adverse to the Trustee or to the Debtor's estate; (ii) MYC is a "disinterested person" as that term is defined in section 101(14) of title 11 of the United States Code ("Bankruptcy Code"); and (iii) the employment of MYC is necessary and would be in the best interest of the Debtor's estate; it is now hereby

**ORDERED** that, in accordance with section 327(a) of the Bankruptcy Code, MYC is authorized to represent the Trustee as her property manager and real estate broker to manage,

market and solicit offers for the Properties and, as determined by the Trustee, to conduct an auction; and, it is further

**ORDERED** that, for its services as property manager, MYC will charge the estate on an hourly basis at the rates set forth in the Declaration, and MYC shall be entitled to seek reimbursement of all out-of-pocket expenses; and, it is further

**ORDERED** that MYC will keep time and expense records for its property management services, provided that MYC may generally describe the on-site work performed and bundle the amount of time spent on-site; and, it is further

**ORDERED** that, for its services as real estate broker, MYC shall be entitled to seek compensation in the form of a commission of five percent (5%) of the gross sale price of each of the Properties, which shall be inclusive of MYC's out-of-pocket expenses relating to the marketing and sale of each of the Properties; and, it is further

**ORDERED** that MYC may co-list and co-broker the Properties provided that the commission for MYC and any co-broker shall never exceed five percent (5%) of the gross selling price of each of the Properties; and, it is further

**ORDERED** that MYC reserves the right to seek (upon prior consent of the Trustee) reasonable fees and reimbursement of expenses in the event there is no sale of either of the Properties; and, it is further

**ORDERED** that no compensation shall be paid to MYC or any co-broker except upon proper application pursuant to sections 330 and 331 of the Bankruptcy Code, upon notice, upon a hearing, and by further Order of the Court; and, it is further

**ORDERED** that this Court shall retain jurisdiction to hear and to determine all matters arising from or related to implementation of this Order.

NO OBJECTION:

William K. Harrington
United States Trustee for Region 2

By: *s/ Greg Zipes*
Greg Zipes, Esq., Trial Attorney

Dated: March 24, 2026
Brooklyn, New York

Jil Mazer-Marino
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 7 |
| 2281 CHURCH AVENUE LLC, | Case No.: 24-43449-jmm |
| Debtor. | |

-------------------------------------------------------x

**ORDER ESTABLISHING DEADLINE FOR FILING PROOFS OF CHAPTER 11 ADMINISTRATIVE EXPENSE CLAIMS THAT AROSE EITHER: (I) BETWEEN AUGUST 19, 2024 THOUGH AND INCLUDING JANUARY 29, 2026; OR (II) PURSUANT TO 11 U.S.C. §503(b)(9), AND APPROVING FORM, MANNER OF NOTICE AND PROCEDURES THEREOF**

Upon the application dated March 31, 2026 ("Application") of Lori Lapin Jones, solely in her capacity as Chapter 7 Trustee ("Trustee") of the estate of 2281 Church Avenue LLC ("Debtor"), seeking entry of an Order, pursuant to section 501 of title 11 of the United States Code ("Bankruptcy Code") and Rules 2002 and 3003(c)(3) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"): (i) establishing May 18, 2026 as the deadline ("Chapter 11 Bar Date") by which all persons or entities (including, without limitation, individuals, partnerships, corporations, joint ventures, and trusts) that assert Chapter 11 administrative expense claims against the Debtor which arose from August 19, 2024 through and including January 29, 2026 (inclusive of such dates) must file proofs of such Chapter 11 administrative expense claims ("Chapter 11 Administrative Claims" and each a "Chapter 11 Administrative Claim"); (ii) requiring all persons or entities (including, without limitation, individuals, partnerships, corporations, joint ventures, and trusts) who assert administrative expense claims for goods delivered to the Debtor in the ordinary course of the Debtor's business within twenty (20) days prior to the commencement of the Debtor's case pursuant to section 503(b)(9) of the Bankruptcy Code to file proof of such claims by the Chapter 11 Bar Date; (iii) approving the form and manner

of notice of the Chapter 11 Bar Date and procedures for filing proofs of Chapter 11 Administrative Claims against the Debtor's estate; and (iv) granting such other and further relief as is just and proper; and it appearing that the relief requested is in the best interests of the Debtor, the Debtor's estate, and creditors of the Debtor; and after due deliberation and good and sufficient cause appearing therefor, it is hereby

ORDERED that, except as otherwise provided herein, all persons and entities (including, without limitation, individuals, partnerships, corporations, joint ventures, and trusts) that assert a Chapter 11 Administrative Claim against the Debtor which arose from August 19, 2024 through and including January 29, 2026 (inclusive of such dates) shall file a proof of such Chapter 11 Administrative Claim in writing or electronically through the Court's Official Court Electronic Document Filing System ("CM/ECF") so that it is received on or before **May 18, 2026**; and, it is further

ORDERED that any person or entity that asserts an administrative expense claim for the value of goods delivered to the Debtor in the ordinary course of the Debtor's business within twenty (20) days prior to the commencement of the case pursuant to section 503(b)(9) of the Bankruptcy Code must file a proof of such claim on or before the Chapter 11 Bar Date; and, it is further

ORDERED that the following procedures for the filing of Chapter 11 Administrative Claims shall apply:

i. proofs of Chapter 11 Administrative Claims must conform substantially to the form annexed to the Application as Exhibit B;

ii. attorneys (with full access accounts) and employees of institutional creditors (with limited access accounts) should file proofs of Chapter 11 Administrative Claims electronically through CM/ECF. Those without accounts to the CM/ECF system may file their proofs of Chapter 11 Administrative Claims:

a. by mailing or delivering the original proof of Chapter 11 Administrative Claim to the United States Bankruptcy Court, Eastern District of New York, 271-C Cadman Plaza East, Suite 1595, Brooklyn, New York 11201-1800;

b. electronically at: https://www.nyeb.uscourts.gov/electronic-filing-proof-claim-epoc by selecting "File a Claim." This application does not require a login and password;

iii. proofs of Chapter 11 Administrative Claims will be deemed filed only when received by the Clerk of the Bankruptcy Court on or before the Chapter 11 Bar Date; and

iv. proofs of Chapter 11 Administrative Claims must: (a) be signed; (b) include supporting documentation (if voluminous, attach a summary) or an explanation as to why documentation is not available; (c) be in the English language; and (d) be denominated in United States currency.

and, it is further

ORDERED that proof of Chapter 11 Administrative Claims need not be filed on or prior to the Chapter 11 Bar Date for the following types of claims:

i. any proof of a Chapter 11 Administrative Claim that has already been filed against the Debtor as a Chapter 11 Administrative Claim in this case with the Clerk of the Bankruptcy Court for the Eastern District of New York in a form substantially similar to Official Bankruptcy Form 410 or the form annexed to the Application as Exhibit B with respect to such filed Chapter 11 Administrative Claim;

ii. any Chapter 11 Administrative Claim that previously has been allowed by order of this Court;

iii. any Chapter 11 Administrative Claim that has been paid in full;

iv. any Chapter 11 Administrative Claim for which a different deadline has previously been fixed by this Court;

v. any Chapter 11 Administrative Claim of any professional who has already filed a final fee application in the Debtor's case;

vi. any special charges or fees of the Clerk of the Court; and/or

vii. any administrative expense claim asserted by the United States Trustee under section 1930(a)(6) of title 28, United States Code;

and, it is further

ORDERED, that holders of equity interests in the Debtor need not file proofs of interest with respect to the ownership of such equity interest, provided, however, that if any such holder asserts a claim against the Debtor (including a claim relating to an equity interest or the purchase or sale of such equity interest), a proof of such claim must be filed on or prior to the Chapter 11 Bar Date pursuant to the procedures set forth in this Order; and, it is further

ORDERED that any person or entity that asserts a claim that arises from the rejection of an executory contract or unexpired lease as to which the order authorizing such rejection is dated on or before the date of this Order, must file a proof of claim based on such rejection on or before the Chapter 11 Bar Date, and any person or entity that holds a claim that arises from the rejection of an executory contract or unexpired lease, as to which an order authorizing such rejection is dated after the date of entry of this Order, must file a proof of claim on or before such date as the Court may fix in the applicable order authorizing such rejection; and, it is further

ORDERED that, pursuant to Bankruptcy Rule 3003(c)(2), all holders of Chapter 11 Administrative Claims that fail to comply with this Order by timely filing a proof of such Chapter 11 Administrative Claims in appropriate form shall not be treated as a creditor with respect to such claim for the purposes of distribution; and, it is further

ORDERED that the Chapter 11 Bar Date Notice, substantially in the form annexed to the Application as Exhibit C, is approved and shall be deemed adequate and sufficient notice of the Chapter 11 Bar Date if served by first-class mail at least thirty-five (35) days prior to the Chapter 11 Bar Date to:

i. the United States Trustee;

ii. all persons or entities that have requested notice in this case;

iii. all professionals employed by the Debtor by Order of the Court;

iv. all persons or entities that have filed claims against the Debtor's estate;

v. all creditors or other known holders of claims, including all persons or entities listed in the Debtor's schedules (and any amended schedules) as holding claims;

vi. all parties to executory contracts and unexpired leases of the Debtor (if any);

vii. all known parties to litigation with the Debtor (if any);

viii. the Internal Revenue Service for the district in which the case is pending and, if required by Bankruptcy Rule 2002(j), the Securities and Exchange Commission and any other required governmental units (a list of such agencies is available from the Clerk); and

ix. such additional persons and entities as deemed appropriate by the Trustee;

and, it is further

ORDERED that the Trustee is authorized and empowered to take such steps and perform such acts as may be necessary to implement and effectuate the terms of this Order; and, it is further

ORDERED that entry of this Order is without prejudice to the right to dispute, or assert offsets or defenses against, any proof of Chapter 11 Administrative Claim that is filed as to nature, amount, liability, classification or otherwise.

Dated: April 8, 2026
Brooklyn, New York

United States Bankruptcy Court
Eastern District of New York

Jil Mazer-Marino
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 7 |
| 2281 CHURCH AVENUE LLC, | Case No.: 24-43449-jmm |
| Debtor. | |

------------------------------------------------------x

**NOTICE OF DEADLINE REQUIRING FILING OF PROOFS OF CHAPTER 11 ADMINISTRATIVE EXPENSE CLAIMS BY MAY 18, 2026**

**TO ALL PERSONS AND ENTITIES WITH CLAIMS THAT AROSE BETWEEN AUGUST 19, 2024 THOUGH AND INCLUDING JANUARY 29, 2026 (INCLUSIVE OF SUCH DATES), OR PURSUANT TO 11 U.S.C. § 503(b)(9):**

The United States Bankruptcy Court for the Eastern District of New York ("**Bankruptcy Court**") has entered an Order establishing **May 18, 2026** ("**Chapter 11 Bar Date**") as the last date for each person or entity (including, without limitation, individuals, partnerships, corporations, joint ventures, and trusts) that assert a Chapter 11 administrative expense claim against 2281 Church Avenue LLC ("**Debtor**"), which arose either: (i) between August 19, 2024 through and including January 29, 2026 ("**Chapter 11 Administrative Claims**" and each a "**Chapter 11 Administrative Claim**"); or (ii) from the delivery of goods to the Debtor in the ordinary course of the Debtor's business within twenty (20) days prior to August 19, 2024 pursuant to 11 U.S.C. § 503(b)(9) ("**Bankruptcy Code**"), to file a proof of such Chapter 11 Administrative Claim.

The Chapter 11 Bar Date and the procedures set forth below for filing proofs of Chapter 11 Administrative Claims apply to all claims that arose against the Debtor: **(i) between August 19, 2024 through and including January 29, 2026 (inclusive of such dates); or (ii) for goods delivered to the Debtor in the ordinary course of the Debtor's business within twenty (20)**

**days prior to August 19, 2024**, except for those holders of the claims listed in Section 4 below that are specifically excluded from the Initial Chapter 11 Bar Date filing requirement.

**1. WHO MUST FILE A PROOF OF A CHAPTER 11 ADMINISTRATIVE CLAIM**

You MUST file a proof of a Chapter 11 Administrative Claim to share in any distributions from the Debtor's estate you have a claim that arose: (a) between August 19, 2024 through and including January 29, 2026; or (b) from the delivery of goods to the Debtor in the ordinary course of the Debtor's business within twenty (20) days prior to August 19, 2024, provided that it is not one of the types of claims described in Section 4 below. Claims based on acts or omissions of the Debtor that arose on or after August 19, 2024 through and including January 29, 2026 must be filed on or prior to the Chapter 11 Bar Date, even if such claims are not now fixed, liquidated or certain or did not mature or become fixed, liquidated or certain before January 29, 2026.

Claims for administrative expenses are specifically described in sections 503 and 507 of the Bankruptcy Code. Among other things, these sections provide that certain types of claims are entitled to administrative expense priority, including, without limitation:[1]

(i) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the bankruptcy case;

(ii) certain taxes and penalties related thereto;

(iii) compensation and reimbursement of certain professionals or officers;

(iv) the actual, necessary expenses incurred by:

(a) certain creditors,

(b) a creditor, an indenture trustee, equity security holders, or a committee representing any such entities, in making a substantial contribution to a debtor's chapter 11 case,

(c) a custodian,

(d) members of certain committees if incurred in the performance of the duties of such committees;

[1] For avoidance of doubt, the language of sections 503 and 507 of the Bankruptcy Code controls.

(v) compensation for services rendered by an indenture trustee; and

(vi) the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business.

Under section 101(5) of the Bankruptcy Code and as used in this Notice, the word "claim" means the "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured" or the "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured."

**2. WHAT TO FILE**

Your filed proof of Chapter 11 Administrative Claim must conform substantially to the forms annexed hereto.

All proofs of Chapter 11 Administrative Claim forms must be **signed** by the claimant or, if the claimant is not an individual, by an authorized agent of the claimant. It must be written in English and be denominated in United States currency. You should attach to your completed proof of Chapter 11 Administrative Claim any documents on which the claim is based (if voluminous, attach a summary) or an explanation as to why the documents are not available.

**Your proof of Chapter 11 Administrative Claim form must not contain complete social security numbers or taxpayer identification numbers (only the last four digits), a complete birth date (only the year), the name of a minor (only the minor's initials) or a financial account number (only the last four digits of such financial account).**

**3. WHEN AND WHERE TO FILE**

Except as provided for herein, all proofs of Chapter 11 Administrative Claims must be filed so as to be **received on or before May 18, 2026**.

Attorneys (with full access accounts) and employees of institutional creditors (with limited access accounts) should file proofs of Chapter 11 Administrative Claims electronically on the Official Court Electronic Document Filing System ("**CM/ECF**") system.

Those without accounts to the CM/ECF system may file their proofs of Chapter 11 Administrative Claims by mailing or delivering the original proof of Chapter 11 Administrative Claim to the Bankruptcy Court at the address provided below:

United States Bankruptcy Court, Eastern District of New York
271-C Cadman Plaza East, Suite 1595
Brooklyn, New York 11201-1800

Those without accounts to the CM/ECF system may also file proofs of Chapter 11 Administrative Claims electronically at: https://www.nyeb.uscourts.gov/electronic-filing-proof-claim-epoc by selecting "File Proof of Claim (ePOC)." This application does not require a login and password;

Proofs of Chapter 11 Administrative Claims will be deemed filed only when **received** by the Bankruptcy Court on or before the Chapter 11 Bar Date. Proofs of Chapter 11 Administrative Claims may not be delivered by facsimile, telecopy or electronic mail transmission.

## 4. CLAIMS FOR WHICH PROOFS OF CHAPTER 11 ADMINISTRATIVE CLAIMS NEED NOT BE FILED

You do **not** need to file a proof of Chapter 11 Administrative Claim on or prior to the Chapter 11 Bar Date if the claim falls into one of the following categories:

(i) any proof of a Chapter 11 Administrative Claim that has already been filed against the Debtor as a Chapter 11 Administrative Claim in this case with the Clerk of the Bankruptcy Court for the Eastern District of New York in a form substantially similar to Official Bankruptcy Form 410 or the form annexed hereto with respect to such filed Chapter 11 Administrative Claim;

(ii) any Chapter 11 Administrative Claim that previously has been allowed by order of the Court;

(iii) any Chapter 11 Administrative Claim that has been paid in full;

(iv) any Chapter 11 Administrative Claim for which a different deadline has previously been fixed by the Court;

(v) any Chapter 11 Administrative Claim of any professional who has already filed a final fee application in the Debtor's case;

(vi) any special charges or fees of the Clerk of the Court; and/or

(vii) any administrative expense claim asserted by the United States Trustee under section 1930(a)(6) of title 28, United States Code.

This Notice is being sent to many persons and entities that have had some relationship with or have done business with the Debtor but may not have an unpaid claim against the Debtor. The fact that you have received this Notice does not mean that you have a claim or that the Trustee or the Bankruptcy Court believe that you have a Chapter 11 Administrative Claim against the Debtor.

**5. EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

If you have a claim arising out of the rejection of an executory contract or unexpired lease as to which the order authorizing such rejection is dated on or before May 29, 2025, which is the date of entry of the Order establishing the Chapter 11 Bar Date, you must file a proof of Chapter 11 Administrative Claim by the Chapter 11 Bar Date. Any person or entity that has a claim arising from the rejection of an executory contract or unexpired lease, as to which the order is dated after the date of entry of the Order establishing the Chapter 11 Bar Date, you must file a proof of Chapter 11 Administrative Claim with respect to such claim by the date fixed by the Bankruptcy Court in the applicable order authorizing rejection of such contract or lease.

**6. EQUITY SECURITY INTERESTS.**

Holders of equity interests in the Debtor need not file proofs of interest with respect to the ownership of such equity interest, provided, however, that if any such holder asserts a claim against the Debtor (including a claim relating to an equity interest or the purchase or sale of such equity interest), a proof of such claim must be filed on or prior to the Chapter 11 Bar Date.

**7. CONSEQUENCES OF FAILURE TO FILE A PROOF OF CHAPTER 11 ADMINISTRATIVE CLAIM BY THE INITIAL CHAPTER 11 BAR DATE**

**ANY HOLDER OF A CHAPTER 11 ADMINISTRATIVE CLAIM THAT IS NOT EXEMPTED FROM THE REQUIREMENTS OF THIS ORDER, AS SET FORTH IN SECTION 4 ABOVE, AND THAT FAILS TO TIMELY FILE A PROOF OF CHAPTER 11 ADMINISTRATIVE CLAIM IN THE APPROPRIATE FORM SHALL NOT BE TREATED AS A CREDITOR WITH RESPECT TO SUCH CLAIM FOR THE PURPOSES OF PARTICIPATING IN ANY DISTRIBUTION FROM THE DEBTOR'S ESTATE ON ACCOUNT OF SUCH CHAPTER 11 ADMINISTRATIVE CLAIM.**

**If you are unsure about any of these matters, including whether you should file a proof of Chapter 11 Administrative Claim, you may wish to consult an attorney.**

Dated: _______________, 2026
Brooklyn, New York

**BY ORDER OF THE COURT**
**United States Bankruptcy Court**
**Eastern District of New York**

**LAMONICA HERBST & MANISCALCO, LLP**
*Counsel to Lori Lapin Jones, as the Chapter 7 Trustee*
Holly R. Holecek, Esq.
3305 Jerusalem Avenue, Suite 201
Wantagh, New York 11793
Telephone: 516-826-6500

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------x

In re: Chapter 7

2281 CHURCH AVENUE LLC, Case No.: 24-43449-jmm

Debtor.

-------------------------------------x

**ORDER, PURSUANT TO 11 U.S.C. 1 5 AND 1, AUTHORI ING THE CHAPTER TRUSTEE TO OPERATE THE DEBTOR'S BUSINESS AND PAY CERTAIN OPERATING E PENSES OF THE ESTATE FOR A LIMITED PERIOD AND FOR RELATED RELIEF**

Upon the motion dated March 19, 2026 ("Motion") ECF No. 163 of Lori Lapin Jones, solely in her capacity as Chapter 7 Trustee ("Trustee") of the bankruptcy estate of 2281 Church Avenue LLC ("Debtor"), seeking pursuant to 11 U.S.C. §§ 105(a) and 721 ("Bankruptcy Code"): (i) entry of an Order authorizing the Trustee to operate the Debtor's business and pay certain operating expenses for a limited period from March 19, 2026 through and including July 21, 2026, without prejudice to seek extensions of such authority; (ii) entry of an interim bridge Order authorizing the Trustee to operate the Debtor's business and pay related expenses through and including April 21, 2026, or such other date as the Motion may be heard ("Bridge Order"); and (iii) granting the Trustee such other and further relief as the Court may deem just and proper; and upon the Court having entered the Bridge Order on March 20, 2026 ECF No. 165 ; and upon the Affidavit of Service of the Motion ECF No. 167 and upon the hearing conducted on April 21, 2026 ("Hearing"), the record of which is incorporated herein by reference; and Holly R. Holecek, Esq. having appeared in the Hearing on behalf of the Trustee; and Kenechukwu C. Okoli, Esq. having appeared in the Hearing on behalf of the Debtor; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and there having been no objections to the relief sought in the Motion filed with the Court;

and for the reasons set forth on the record at the Hearing, and the Court having found that the relief sought in the Motion was necessary and warranted; and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and after due deliberation and sufficient cause appearing therefore, it is hereby:

**ORDERED** that the Motion is granted as set forth herein; and, it is further

**ORDERED** that, pursuant to sections 105(a) and 721 of the Bankruptcy Code, the Trustee is authorized to, for the limited period from March 19, 2026 through and including July 21, 2026, without prejudice to seek further extensions of such authority: (i) operate the Debtor's business; (ii) collect use and occupancy payments from occupants of the Debtor's properties; (iii) enforce lease agreements (if any); (iv) pay or cause to be paid necessary expenses relating to the operation of the Debtor's business including, but not limited to, utilities, insurance, real estate taxes, and minor repairs; (v) take actions reasonably necessary to comply with local laws, building codes, and safety requirements; and (vi) maintain and, if necessary obtain, insurance coverage for the Debtor's properties; and, it is further

**ORDERED** that pursuant to section 704(a)(8) of the Bankruptcy Code, the Trustee shall prepare and file monthly operating business reports on the appropriate form issued by the U.S. Trustee; and, it is further

**ORDERED** that this Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order; and it is further

**ORDERED** that the Trustee is authorized and empowered to expend such funds and execute and deliver all documents as are reasonably necessary to implement the terms of this Order.

**Dated: April 26, 2026**
**Brooklyn, New York**

Jil Mazer-Marino
Chief United States Bankruptcy Judge

Hearing Date: June 11, 2026 at 10:00 a.m.
Objection Deadline: June 4, 2026 at 5:00 p.m.

LAW OFFICES OF K.C. OKOLI, P.C.
5 Penn Plaza, 19th Floor
New York, New York 10001
(212) 564-8152
K.C. Okoli, Esq.

*Attorneys for 2281 Church Avenue LLC, Debtor*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

In re:

2281 CHURCH AVENUE LLC,

Debtor
---------------------------------------------------------------X

Chapter 7

Case No. 24-43449-jmm

**DEBTOR'S NOTICE OF MOTION TO DISMISS CHAPTER 7 CASE**

PLEASE TAKE NOTICE that upon the Declaration of Debbie Harris dated May 4, 2026, the exhibits annexed thereto, the Declaration of K.C. Okoli dated May 4, 2026, and upon all prior pleadings and proceedings heretofore had herein, a hearing will be held on a motion pursuant to 11 U.S.C. §707(a) for the dismissal of this bankruptcy case in the best interest of all parties in interest (the "Motion"), and the Motion of 2281 Church Avenue LLC will be held on **June 11, 2026 at 10: a.m**. (the "Hearing").

PLEASE TAKE FURTHER NOTICE that the Hearing will be held before the Honorable Jil Mazer-Marino, United States Chief Bankruptcy Judge for the Eastern District of New York, Courtroom 3529, Conrad B. Duberstein U.S. Courthouse, 271-C Cadman Plaza East, Brooklyn, New York 11201-1800. Those wishing to participate in the Hearing must register their

appearance by 4:00 p.m. at least two (2) business days prior to the Hearing by using Court's *eCourt Appearances* tool https://ecf.nyeb.uscourts.gov/cgi-bin/nyebAppearances.pl.

PLEASE TAKE FURTHER NOTICE that any responses or objections to the relief requested in the Motion shall: a) be in writing; b) conform to the Federal Rues of Bankruptcy Procedure, Local Bankruptcy Rules for the Eastern District of New York, and all General Orders applicable to chapter 7 cases in the United States Bankruptcy Court for the Eastern District of New York; and c) be filed electronically with the Court by registered users of the Court's electronic filing system and in accordance with all General Orders applicable to chapter 7 cases in the United States Bankruptcy Court for the Eastern District of New York (which are available on the Court's website at (http://www.nyeb.uscourts.gov), so as to be received by all on or before June 4, 2026 at 5 p.m.

PLEASE TAKE FURTHER NOTICE that only those responses or objections that are timely filed, served and received will be considered at the Hearing. Failure to file a timely objection may result in entry of a final order granting the Motion as requested by 2281 Church Avenue LLC.

Dated: New York, New York
May 18, 2026

**LAW OFFICES OF K.C. OKOLI, P.C.**
5 Penn Plaza, 19th Floor
New York, N.Y. 10001
(212) 564-8152

By: */s/ K.C. Okoli*
K.C. OKOLI, ESQ.

*Attorneys for 2281 CHURCH AVENUE LLC.*
*Debtor*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

Case No.: 24-43449-jmm

In re:

2281 CHURCH AVENUE LLC,

Chapter 7

Debtor

----------------------------------------------------------------X

**DECLARATION IN SUPPORT OF DISMISSAL OF CASE**

DEBBIE HARRIS declares the following to be true and correct under the penalty of perjury:

1. I am the Manager of 2281 Church Avenue LLC (the "Debtor") in this case.
2. I am the Manager and a member of the senior management of Debtor.
3. Oswald C. David and I got married in New York on *March 26, 2018*. We lived together as domestic partners for more than ten (10) years before our marriage.
4. By virtue of my position aforesaid, I am familiar with the facts and circumstances described herein.
5. I submit this declaration in support of the motion of Debtor to dismiss this bankruptcy case.
6. With regard to pending legal matters, I have relied upon the advice and counsel of the Debtor's attorneys and other professionals.
7. This bankruptcy case was necessitated by the financial difficulties occasioned by a

judgment in excess of $699,000.00 which was obtained in 2022 in a lawsuit at the Kings County Supreme Court against the Debtor and Oswald David, among others. The lawsuit is captioned *Calvin Cross and Tralon Ellis v. Woodbine Caterers d/b/a Woodbine Ballroom, David Oswald, 2281 Church Avenue LLC, and Bad Dog Security, LLC,* Index No. 516493/2018, Kings County Supreme Court.

8. This bankruptcy case began by filing on August 19, 2024 as a Chapter 11 case.

9. By Order of this Court dated January 29, 2026, this case was converted from a Chapter 11 case to a Chapter 7 case.

10. On May 18, 2026, Debtor secured a blanket mortgage of $3.26 Million with me, Debbie Harris, as a guarantor. Annexed hereto as **Exhibit A** is a copy of the written mortgage commitment for that loan.

11. To make the loan commitment binding, I wired $20,000 as instructed in the mortgage commitment. Annexed hereto as **Exhibit B** is a copy of the Chase Bank wire transfer receipt.

12. I am advised by K.C. Okoli, attorney for Debtor, and I verily believe him, that he requested a written payoff letter from Flushing Bank, the current secured lender on 2281 Church Avenue, Brooklyn, New York 11226, but has not received any. Annexed hereto as **Exhibit C** is a copy of the Mortgage Statement from Flushing Bank as of 1/16/2026 showing a total outstanding principal balance of **$1,464,624.34** for 2281 Church Avenue Brooklyn, New York.

13. The current total amount required to pay off the judgment in favor of Calvin Cross and Tralon Ellis through June 30, 2026, is now **$965,143.78.** Annexed hereto as

**Exhibit D** is the payoff letter in support.

14. The total amount required to pay off the mortgage on our home held by Rocket Mortgage on 1234 East 69th Street, Brooklyn, New York 11234 as of March 31, 2026, is **$177,400.16**. Annexed hereto as **Exhibit E** is a copy of the payoff statement from Rocket Mortgage.

15. K.C. Okoli informs me and I verily believe him that he has requested the Trustee to furnish him with all the debts and administrative costs and expenses incurred on behalf of Debtor, so he can confirm that we have sufficient funds to pay them off, but he is yet to receive same.

16. I am advised by Mr. Okoli, and I verily belief him that NYC Office of Administrative Trials and Hearings (OATH) has filed a claim of $3,549.57 in this case.

17. I am further advised by Mr. Okoli and I verily believe him that the NYS Department of Finance has filed a claim in this matter in the sum of $16,218.85.

18. Apart from the two mortgages, the judgment debt, and claims mentioned above, I am advised that the other potential claims, administrative costs and expenses in this case as of this date is estimated to be less than $100,000.00.

19. The aforesaid loan of $3.26 Million is sufficient for Debtor to pay off all the creditors and lienholders, together with the administrative costs and expenses in this matter.

20. Upon dismissal of this case, no further administrative costs and expenses would be incurred and the $3.26 Million would be available for immediate disbursement to interested parties.

21. I am advised by K.C. Okoli and I verily believe him that, upon dismissal of this case

and payment of the creditors, Debtor will have a fresh start as if Debtor had never filed for bankruptcy.

22. Moreover, Debtor will be able to save our home from a forced sale, and itself from liquidation.

23. It will be in the best interests of all parties to dismiss this case forthwith and stop the further accumulation of administrative costs and expenses.

Dated: New York, New York
May 18, 2026

DEBBIE HARRIS

# EXHIBIT A

KAPLAN, DITRAPANI, FARIA & MANIN LLP

BART D. KAPLAN *
JARED S. KAPLAN **
MATTHEW J. DITRAPANI
JOSEPH A. FARIA
MARA MANIN AMENDOLA
KEVIN HAGLER
RACHEL HOLLYWOOD
JOHN PICCINNINI
SETH ROMANICK

MICHELE RABBINER
JEANINE OBERSTER
POPPY MARKOU
MARY RAGHUNANDAN

Main Office
6851 Jericho Tpke, Ste. 110
Syosset, NY 11791
(516) 801-6363

New York City Office
485 Madison Ave #1600
New York, NY 10022
(212) 404-7804

Hamptons Office
47 Jobs Lane
Southampton, NY 11968
(631) 377-3068

KaplanRealEstateLawyers.com

Of Counsel
HARLAN LEVINE ***
BRETT SILVERMAN ***

* Admitted NY & FL
** Admitted NY, NJ & CT
*** Admitted NY & NJ

KC Okoli
*Via Email*

Re: 2281 Church Ave., LLC- Debbie A. Harris Member

Property address: 2281 Church Avenue, Brooklyn NY and 1232 E. 69th Street, Brooklyn, NY

Dear Mr. Okoli:

The undersigned is Counsel to HGTR Holdings, LLC and The Wheatley Harbor, LLC (Collectively "Lender") whose principals have advised me that they are agreeable to advancing 2281 Church Ave., LLC ("Borrower") in a blanket first mortgage in the sum of Three Million Two Hundred Sixty Thousand Dollars and no cents ($3,260,000.00).

The terms of the loan shall be:

1. The loan will be secured by a Note, Mortgage, Assignment of Leases and Rent and Guaranty affecting the Premises.

2. The loan shall bear interest at the rate of twelve per cent per annum (12%) payable in monthly installments until the Maturity date which shall be 12 months from the date of closing with Six-month minimum interest.

3. The loan proceeds shall be fully disbursed at the closing which includes paying off the first two mortgages, real estate taxes, judgements, legal fees, open water and sewer debt.

4. A late payment charge will be due in the amount of Five percent (5%) for any delinquency exceeding Ten (10) days.

5. Borrower shall pay a two-point commitment fee to Lender in the amount of $65,200.00, Of which shall $20,000.00 be earned and due at the signing of this commitment letter, and the balance, $45,200.00 deemed earned, But due at closing

6. Interest escrows in the amount of $350,000 to be held by lenders attorney and disbursed to the lenders monthly.

7. The loan will be guaranteed by the Borrower.

8. Borrower to provide copies of NYS Incorporation papers.

9. HGTR Holdings, LLC and Wheatley Harbor LLC shall be named as additionally insured on the Insurance policy.

10. Borrower shall pay all of Lender's expenses incident to preparation, insuring and recording of a Note, mortgages, ALR and ancillary documents, including the all-broker fees, entire mortgage tax, premium for issuance of an ALTA policy of fee insurance, recording fees and Lender's Attorney fee in the sum of Seven Thousand Five Hundred and no cents ($7,500.00). This fee includes a $500 title review fee. If the borrower chooses to order title with Appellate land Services, the $500 Title review fee will be waived. **Under no circumstances will First American be permitted as an underwriter.**

11. Borrower and Guarantor must be represented by an Attorney who will issue in favor of the Lender a standard opinion letter including language that the interest rate does not violate the applicable usury laws.

12. Prior to closing borrower shall provide a certificate of occupancy for each building

13. Environmental Indemnification Agreement

If you agree with the terms set forth herein, please countersign a copy of this letter and return it to

the undersigned with a check in the amount of Twenty Thousand Dollars and no cents ($20,000.00) as agreed made payable to the order of Kaplan, DiTrapani, Faria & Manin LLP, Escrowee. This deposit check will be disbursed to the Lender in payment of the commitment fee at closing. In the event that closing does not occur for any reason attributable to the Lender, the deposit shall be refunded in full and Lender shall have no further obligations hereunder. In the event that closing does not occur for any reason attributable to the Borrower, the Lender shall be entitled to deduct its actual expenses from the deposit and the balance will be refunded to the Borrower.

Very truly yours,

s/Jared Kaplan

THE TERMS OF THIS COMMITMENT ARE HEREBY ACCEPTED

May 18, 2026

[signature]
Guarantor: Debbie A. Harris

# EXHIBIT B

CHASE

## Wire Transfer Outgoing Request

### Wire Transfer Sender Information

| | | | | | |
|---|---|---|---|---|---|
| Sender Name: DEBBIE HARRIS | | | | | |
| Account Name: DEBBIE HARRIS | | Street Address: 1234 E 69TH ST | | | |
| City: BROOKLYN | State: NY | Zip: 11234-5724 | Country: USA | | Daytime Phone: 347-822-3970 |
| Primary ID Type: Driver's License | ID Issuer: NY | ID Number: 187275346 | | ID Issue Date: 02/10/2026 | ID Exp: 01/26/2031 |
| Secondary ID Type: | ID Issuer: | ID Number: | | ID Issue Date: | ID Exp: |
| Comments: | | | | | |

### Wire Transfer Information

| | | | |
|---|---|---|---|
| Request Date: 05/18/2026 | Request time: 03:57:02PM Eastern time | Effective date: 05/18/2026 | Wire Type: Domestic |
| Debit Account #: XXXXXX2159 | Debit Account Type: CPC SAVINGS | Wire Amount (US dollars): $20,000.00 | |
| Qualifying Account #: | Qualifying Account Type: | Source of funds: Savings | Wire Fee: $0 |
| Currency type to be sent: US Dollars | Exchange rate: N/A | Foreign currency amount: N/A | Amount to Collect (USD): $20,000.00 |
| FX Contract Number: | | | |

### Recipient Account Information

| | | | | |
|---|---|---|---|---|
| Account Name: EXECUTIVE BUSINESS CORPORATE | | | | |
| Street Address: | Account Number: 3500921329 | | | |
| | City: | State: | Zip: | Country: |
| Text to Recipient: | | | | |

### Receiving Bank Information

| | | | | |
|---|---|---|---|---|
| Bank Name: Wells Fargo Bank National Association | | | | |
| Street Address: 1000 Louisiana St, Tunnel level | Bank ABA/SWIFT Code: 121000248 | | | |
| | City: Houston | State: TX | Zip: 77002 | Country: USA |
| Intermediary Bank Name: | | | | |
| Street Address: | Intermediary Bank ABA: | | | |
| | City: | State: | Zip: | Country: |
| Text to Receiving Bank: | | | | |

## Wire Transfer Agreement - continued

(b) Prior to sending a Consumer International Wire Transfer, we will provide you with certain important disclosures regarding your transaction including, to the extent applicable: the amount that will be transferred to the beneficiary, the amount and description of any fees and taxes imposed by us, the total amount of the transaction, the exchange rate to be used if applicable, the amount of currency to be transferred, the amount and description of any fees imposed by intermediaries or our agents, and the amount that will be received by the beneficiary. In addition to the items above you will also be provided the date the funds are to be made available to the beneficiary, error resolution and cancellation right information and other disclosures. This will be provided either at the time you authorize the wire transfer or on a receipt provided after you've authorized your transaction.

(c) Except as otherwise agreed in writing, we are liable only for damages required to be paid as provided under Regulation E, subpart B or, to the extent applicable, UCC 4A. Except as required by Regulation E, subpart B, we will not be responsible for the acts or omissions of any other person or entity, including but not limited to any processor, any country's central bank, or any other financial institution, and no such person or entity will be deemed our agent. We will not be liable for the failure or delay of any wire transfer or for failing to meet other obligations in the Agreement because of circumstances or causes beyond our control, including governmental, legal or regulatory restrictions or prohibitions, third party actions, natural disasters, equipment or system failures, labor disputes, wars or riots. IN NO EVENT SHALL WE HAVE ANY LIABILITY FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, OR SPECIAL DAMAGES, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

(d) You have the right to cancel Consumer International Wire Transfers at no cost to you within 30 minutes after you have authorized us to send it. Please refer to the disclosure we provided to you at the time you authorized the Consumer International Wire Transfer on how to cancel.

(e) If you think there has been an error or problem with your Consumer International Wire Transfer, call us at 1-855-536-1269, visit a Chase branch or J.P. Morgan Financial Center, or send an account inquiry via Secure Message Center on chase.com or jpmorganonline.com.

You must contact us within 180 days of the date we disclosed to you that funds would be made available to the recipient. When you do, please tell us:

- Your name and address;
- The error or problem with the transfer, and why you believe it is an error or problem;
- The name of the recipient, and if you know it, their telephone number or address;
- The dollar amount of the transfer; or
- The confirmation code or number of the transaction

We will determine whether an error occurred within 90 days after you contact us and we will correct any error promptly. We will tell you the results within three business days after completing our investigation and will advise you of any remedies that may be available to you. If no response is received, we will refund your account for the applicable remedies. If we decide that there was no error, we will send you a written explanation. You may ask for copies of any documents we used in our investigation.

**Be aware of wire scams, because once the wire is sent, you may not be able to recover your money.**

**By providing your signature as authorization, you agree to these terms and conditions, that the wire transfer information in this document is accurate and you authorize us to process this wire transfer.**

**Recipient Bank's Identifier (ABA/SWIFT):** 121000248 **Recipient's Account Number:** 3500921329

**Sender's Signature:** ____________ **Date:** ________

**Email Address:** debbieharris399@gmail.com

**Transaction Number (Contact ID):** 4551853297000001

**The Email Address and Transaction Number provided will be used for communication purposes.**

# EXHIBIT C

**FLUSHING Bank**
1 Corporate Drive
Suite 360
Lake Zurich, IL 60047-8945

# MORTGAGE STATEMENT

Statement Date: 01/16/2026

| | |
|---|---|
| Property Address: | 2281 CHURCH AVENUE BROOKLYN NY 11226 |
| Account Number | 1414224707 |
| Payment Due Date | 02/01/2026 |
| **Amount Due** (Good Through 02/01/2026) | **$73,359.70** |

*If payment is received after 02/16/2026, a $1,514.63 late fee will be charged.*

+ 0288359 000001740 09DVH1 00919832 P1
2281 CHURCH AVE LLC
OSWALD DAVID
1232 EAST 69TH STREET
BROOKLYN, NY 11234

**Contact Us** 1-877-330-4051

| Account Information | |
|---|---|
| Outstanding 1st Principal Balance | $1,464,624.34 |
| Deferred Balance | $17,541.36 |
| Current Escrow Account Balance | $19,434.66 |
| Maturity Date | February 2028 |
| Interest Rate (Until Feb 2028) | 6.940% |

| Explanation of Amount Due | |
|---|---|
| Principal | $3,665.67 |
| Interest | $8,428.38 |
| Escrow (for Taxes and Insurance) | $6,838.88 |
| **Regular Monthly Payment** | **$18,932.93** |
| Fees Charged Since Last Statement | $0.00 |
| Total Fees Charged | $16,560.91 |
| **Overdue Payment** | **$37,865.86** |
| **Total Amount Due** (Good Through 02/01/2026) | **$73,359.70** |

**Housing Counselor Information:** If you would like counseling or assistance, you can contact the following: US Department of Housing and Urban Development (HUD): For a list of homeownership counselors or counseling organizations in your area, go to http://www.hud.gov/offices/hsg/sfh/hcc/hcs.cfm or call 800-569-4287.

**Transaction Activity (7/1/2025 to 01/16/2026)**

| Date | Description | Charges | Payments | Escrow Activity |
|---|---|---|---|---|
| 07/10 | Payment - Thank you | $0.00 | $19,182.60 | $0.00 |
| 07/10 | Payment - Thank you | $0.00 | ($19,182.60) | $0.00 |
| 07/14 | Payment - Thank you | $0.00 | $0.00 | $0.00 |

**Past Payments Breakdown**

| Description | Paid Last Period | Paid Year to Date |
|---|---|---|
| Principal | $0.00 | $3,602.80 |
| Interest | $0.00 | $8,491.25 |
| Escrow (Taxes and Insurance) | $0.00 | $6,838.88 |
| Fees | $0.00 | $0.00 |
| Partial Payment (Unapplied)* | $0.00 | $0.00 |
| **Total** | **$0.00** | **$18,932.93** |

**IMPORTANT MESSAGES:**

* **Partial payments:** Any partial payments that you make are not applied to your mortgage, but instead are held in a separate suspense account. If you pay the balance of a partial payment, the funds will then be applied to your mortgage.

NOTICE TO CUSTOMERS WHO ARE IN BANKRUPTCY OR WHOSE OBLIGATION HAS BEEN DISCHARGED AND NOT REAFFIRMED: TO THE EXTENT YOUR ORIGINAL OBLIGATION WAS DISCHARGED, OR IS SUBJECT TO AN AUTOMATIC STAY OF BANKRUPTCY UNDER TITLE 11 OF THE UNITED STATES CODE, THE INFORMATION IN THIS MORTGAGE STATEMENT IS FOR REGULATORY COMPLIANCE AND INFORMATIONAL PURPOSES ONLY AND DOES NOT CONSTITUTE A DEMAND FOR PAYMENT IN VIOLATION OF THE AUTOMATIC STAY OR THE DISCHARGE INJUNCTION OR AN ATTEMPT TO IMPOSE PERSONAL LIABILITY FOR SUCH OBLIGATION. HOWEVER, CREDITOR RETAINS RIGHTS UNDER ITS SECURITY INSTRUMENT, INCLUDING THE RIGHT TO FORECLOSE ITS LIEN.
PLEASE SEE REVERSE FOR ADDITIONAL IMPORTANT NOTIFICATIONS.

****Delinquency Notice****

You are late on your mortgage payments. Failure to bring your loan current may result in fees and foreclosure - the loss of your home. As of January 16, you are 46 days delinquent on your mortgage loan. The loan became delinquent on 12/01/2025.

***Recent Account History:***

| Payment Due | Payment Status |
|---|---|
| | $18,932.93 *(current payment due)* |
| 01/01/2026 | Unpaid balance of $18,932.93 |
| 12/01/2025 | Unpaid balance of $18,932.93 |
| 11/2025 | PAID in full, on 01/12/2026 |
| 10/2025 | PAID in full, on 12/12/2025 |
| 09/2025 | PAID in full, on 11/05/2025 |
| 08/2025 | PAID in full, on 10/16/2025 |
| 07/2025 | PAID in full, on 08/13/2025 |
| **TOTAL Due** | **$73,359.70** |

**You must pay this amount to bring your loan current.**
This payment amount will expire and may no longer be sufficient to bring the account current on 02/01/2026.

**You agreed to participate in the following Loss Prevention Program - N/A.**
The pre-foreclosure requirements of Real Property Actions and Proceedings Law § 1304 have not been fulfilled. **The first notice or filing required by law for any foreclosure process has not been made. The pre-foreclosure requirements of Real Property Actions and Proceedings Law § 1304 have not been fulfilled.**

**If you are experiencing Financial Difficulty:** If you would like mortgage counseling or assistance, you can find a list of counselors in your area on the U.S. Department of Housing and Urban Development's website at **www.hud.gov.** You can also select to receive counseling through the HOPE Hotline by calling **1-888-995-HOPE.**

*Please note: If you have enrolled in our automatic payment service, your payment will process as scheduled pursuant to the terms of your signed Authorization Form.*
*This statement is provided for informational purposes pursuant to regulatory requirements established by the CFPB.*

2281 CHURCH AVE LLC
OSWALD DAVID
1232 EAST 69TH STREET
BROOKLYN, NY 11234

**PAYMENT COUPON**

*Return This Portion With Your Payment*

**Loan Number: 1414224707**
**Next Payment Due: 02/01/2026**

**Make Check Payable To:**
Flushing Bank

| Amount Due | |
|---|---|
| **Due By 02/01/2026: (Good Through 02/01/2026)** | **$73,359.70** |
| *If payment is received after 02/16/2026, a $1,514.63 late fee will be charged.* | |
| Please designate how you want us to apply any additional funds. | |
| Additional Principal | $ |
| Additional Escrow | $ |
| **Total Amount Enclosed** | **$** |

☐ CHECK HERE IF YOUR ADDRESS INFORMATION HAS CHANGED AND COMPLETE FORM ON REVERSE SIDE.

Flushing Bank
P.O. Box 371306
Pittsburgh PA 15250-7306

288359 0000017 ... 00919832

**FLUSHING** Bank

**MORTGAGE STATEMENT**
Statement Date: 01/16/2026

**Transaction Activity (continued) (7/1/2025 to 01/16/2026)**

| Date | Description | Charges | Payments | Escrow Activity |
|---|---|---|---|---|
| 08/07 | Disb. of Primary Hazard Insurance Premium | $0.00 | $0.00 | $-7,021.79 |
| 08/08 | Payment - Thank you | $0.00 | $19,182.60 | $0.00 |
| 08/08 | Payment - Thank you | $0.00 | ($19,182.60) | $0.00 |
| 08/13 | Payment - Thank you | $0.00 | $0.00 | $0.00 |
| 09/25 | Property Inspection Fee | $30.00 | $0.00 | $0.00 |
| 10/15 | Payment - Thank you | $0.00 | $19,182.60 | $0.00 |
| 10/15 | Payment - Thank you | $0.00 | ($19,182.60) | $0.00 |
| 10/16 | Payment - Thank you | $0.00 | $0.00 | $0.00 |
| 10/31 | Payment - Thank you | $0.00 | $19,182.60 | $0.00 |
| 10/31 | Payment - Thank you | $0.00 | ($19,182.60) | $0.00 |
| 11/05 | Payment - Thank you | $0.00 | $0.00 | $0.00 |
| 11/26 | Property Inspection Fee | $30.00 | $0.00 | $0.00 |
| 12/10 | Payment - Thank you | $0.00 | $18,932.93 | $0.00 |
| 12/10 | City Taxes | $0.00 | $0.00 | $-25,093.52 |
| 12/10 | Payment - Thank you | $0.00 | ($18,932.93) | $0.00 |
| 12/12 | Payment - Thank you | $0.00 | $0.00 | $0.00 |
| 12/26 | Property Inspection Fee | $30.00 | $0.00 | $0.00 |
| 01/09 | Payment - Thank you | $0.00 | $18,932.93 | $0.00 |
| 01/09 | Payment - Thank you | $0.00 | ($18,932.93) | $0.00 |
| 01/12 | Payment - Thank you | $0.00 | $0.00 | $0.00 |

**Amounts displayed in parentheses "($0.00)" are amounts previously held in a suspense account as unapplied partial payments that are now applied to the loan. Please see the Important Messages for more information.**

| Total Outstanding Fee Balances* | Late Charge Assessment | $18,400.91 | Bad Check Fee | $40.00 | Property Inspection Fee | $120.00 |
|---|---|---|---|---|---|---|

*Total Outstanding Fee Balances include current charges plus all fees outstanding as of the date of this statement.

2:2 - 64

# EXHIBIT D

LAW OFFICES OF
BERNARD D'ORAZIO
& ASSOCIATES, P.C.

April 28, 2026

**BY EMAIL TO:** kcokoli@verizon.net

K.C. Okoli, Esq.
Attorney for 2281 Church Avenue LLC
5 Penn Plaza, 19th Floor
New York, NY 10001

**Re: Calvin Cross and Tralon Ellis v. Woodbine Caterers et al.**

Dear Mr. Okoli:

This letter is sent in response to your inquiry for the payoff amount on the Judgment entered in favor of the plaintiffs in the referenced action on April 26, 2022.

The payoff amount for the Judgment, with legal interest (9%) **through June 30, 2026**, is **$965,143.78**. If payment is not received by that date, my office must be contacted for an updated payoff amount. You may contact me at bdorazio@dorazio-law.com.

A check must be sent by overnight delivery to my office.[1] The check must be made payable to "**Bernard D'Orazio & Associates, P.C**. Upon clearance, we will file a Satisfaction and provide a copy to the closing agent or other designated party.

Very truly yours,

Bernard D'Orazio

[1] In the alternative, you may wire the funds:

Account Name: Bernard D'Orazio & Associates, P.C., IOLTA Account
Account No.: 0931595526
ABA No. 021272723
JPMorgan Chase Bank
221 Canal Street Branch
New York, NY 10013
Bank branch telephone number: (212) 925-7885

238 WEST 139TH STREET | NEW YORK, NEW YORK 10030 | T: 212-608-5300 | F: 212-608-5398 | WWW.DORAZIO-LAW.COM

# EXHIBIT E

Rocket Mortgage

Payoff quote

RETURN SERVICE ONLY
PLEASE DO NOT SEND MAIL TO THIS ADDRESS
PO Box 818060 | 5801 Postal Road | Cleveland, OH 44181

| | |
|---|---|
| Loan number | 0753218452 |
| Client fax | 7182288577 |
| Property address | 1232 E 69TH ST BROOKLYN, NY 11234 |
| Notice date | 3/19/26 |

OSWALD DAVID
1234 E 69TH ST
BROOKLYN, NY 11234-5724

Hi OSWALD DAVID,

Enclosed is the payoff statement you requested. We can only accept certified funds. Acceptable payment methods are wire transfers and cashier's checks. We can't accept ACH payments, bank bill pay or personal checks, as these are not considered certified funds. The payoff figures are valid through 3/31/26. Certified funds received after 3/31/26, will require an additional $26.03 in interest per day. You'll need to call us for an updated payoff quote if we don't receive certified funds by 3/31/26.

The amount to payoff your loan is below:

**Payoff statement**

Loan type: CONV

| Payoff breakdown | |
|---|---|
| Principal balance as of 3/31/26: | $149,011.07 |
| Interest - from 1/1/25 to 3/31/26 | $11,863.46 |
| Advances on your behalf | $4,479.71 |
| Escrow Advances | $12,003.92 |
| County Recording Fee | $42.00 |
| **Total amount to payoff to Rocket Mortgage** | **$177,400.16** |

*** How is this calculated?**
Interest is calculated over the course of a month on a daily interest basis. The interest listed in the total amount due is calculated through the proposed payoff date. The interest amount due can be higher or lower based upon when we receive the payoff funds.

**Daily interest calculation:**
Current Unpaid Principal Balance X Interest Rate / 365 = Daily Interest

We reserve the right to correct any errors or omissions in this payoff quote regardless of when funds are received. We also reserve the right to correct any portion of this statement due to changing balances and interest rates on this loan. A payment that is less than the full amount will delay processing, and you will be held responsible for any additional interest.

Please reference the client name, loan number and property address and send certified funds or a wire using the following information:

**Wiring instructions:**
Beneficiary name: Rocket Mortgage
Account number: 10000017802313
ABA/Routing number: 021000021
Bank name: JPMorgan Chase Bank, N.A.
270 Park Ave New York, NY 10017

**Rocket Mortgage – Overnight address:**
Attn: Cash Management Team
8950 Cypress Waters Blvd.
Coppell, TX 75019

Wires and certified funds received by 6:00 p.m. ET will be processed on the date of receipt. All funds received after 6:00 p.m. ET will be processed on the next business day.

Please be advised this communication is sent for informational purposes only and is not intended as an attempt to collect, assess, or recover a claim against, or demand payment from, any individual protected by the U.S. Bankruptcy Code. If this account has been discharged in a bankruptcy proceeding, be advised this communication is for informational purposes only and not an attempt to collect a debt against you; however, the servicer/lender reserves the right to exercise the legal rights only against the property securing the loan obligation, including the right to foreclose its lien under appropriate circumstances. Nothing in this communication shall be construed as an attempt to collect against the borrower personally or an attempt to revive personal liability.

If you are a successor in interest (received the property from a relative through death, devise, or divorce, and you are not a borrower on the loan) that has not assumed, or otherwise become obligated on the debt, this communication is for informational purposes only and is not an attempt to collect a debt from you personally.

EQUAL HOUSING OPPORTUNITY

Rocket Mortgage

Payoff Quote

PO Box 818060 | 5801 Postal Road | Cleveland, OH 44181

**Important notes to remember**

- If you're set up for automatic payments, your monthly payment will draft as usual if it's due before the payoff funds are received. Please notify Rocket Mortgage at least five days prior to your scheduled draft date if you'll be sending in the payoff funds within that period. If you're sending payments through your bank, these will continue to send as usual until you stop them from your bank's website.
- You are still required to make your regular monthly payments on time. If you do not make your payment before the end of the grace period, you may incur a late fee. Any late fees will be added to your total payoff balance. Payments received more than 30 days after the due date will be reported as late to credit reporting agencies.
- Payoff figures are subject to final verification by the note holder. Figures may be adjusted if any check previously received is rejected by the institution upon which it was drawn. To the extent applicable, additional legal fees or costs associated with servicing your loan may accrue daily.
- If payoff funds received are inadequate to pay your loan in full, Rocket Mortgage will contact the appropriate party to collect the shortage. If we can't make contact or if the remaining funds have not been collected within 2 business days, the original funds will be returned to the sender unless the servicing of the loan is transferred or reassigned sooner. To the extent permitted by state law, the note holder reserves the right to withhold the issuance of the satisfaction of mortgage until it receives all funds owed under the terms of the note.
- If this property is being sold, please provide the client(s)' new mailing address. Payoff overage funds will be mailed to the client(s) within 20 days of the loan being paid in full. A 1098 interest statement will be mailed to the client(s) no later than January 31 of the next calendar year.
- If taxes and/or insurance are escrowed, please reach out to your tax agency and/or insurance provider to ensure they are forwarding you the bill.
- This payoff quote is valid through 3/31/26 If your loan is in default and a foreclosure sale is scheduled before that date, please reach out to us for an updated payoff amount before the foreclosure sale. To make sure the foreclosure is cancelled, your payoff funds should be sent overnight and received by us at least 24 hours before the scheduled foreclosure sale. If a foreclosure action is underway, it will continue until your payoff funds are received. This means additional fees or costs may be added before this quote expires, and the total payoff amount may increase. For your convenience, we've included an estimate of fees and costs that could become due between 3/19/26 and 3/31/26. If any of these estimated fees or costs become due during this time, your required payoff amount will increase. Right now, no estimated fees or costs are included in the "Total Payoff Amount" shown in this quote. This estimate is provided as a courtesy, and you won't be charged for any estimated amounts unless a fee or cost is actually billed or incurred. If any estimated fee or cost is added before this quote expires, we'll send you a new payoff quote with updated information.

If you have any questions or concerns, don't forget that we're here to help. You can contact us at (800) 4-ROCKET, Monday through Friday from 8:30 a.m. to 9 p.m. ET and Saturday from 9 a.m. to 4 p.m. ET. You can also reach us at www.RocketMortgage.com.

Sincerely,

Your Rocket Servicing Team

Rocket Mortgage

Payoff Quote

PO Box 818060 | 5801 Postal Road | Cleveland, OH 44181

**New York Residents:** Rocket Mortgage, LLC is licensed by the New York City Department of Consumer and Worker Protection License Numbers: 2131166, 2132245, 2132381, 2132457, 2132458, 2132459 and 2132460. **If you believe a Loss Mitigation request has been wrongly denied, you may file a complaint with the New York State Department of Financial Services at 1-800-342-3736 or www.dfs.ny.gov.** If you want to know the name of your originating lender or the amount that you owe, please contact us. Rocket Mortgage, LLC utilizes third-party providers and remains responsible for all actions taken by these providers.

In accordance with New York law and the Americans with Disabilities Act (ADA), Rocket Mortgage, LLC makes reasonable accommodations to clients with disabilities, such as providing large print monthly statements, upon request. Please contact us toll-free at 800-863-4332 to learn about which ADA accommodations may be available and to request that your communications from us be provided in such specific format, if possible.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

In re:

2281 CHURCH AVENUE LLC,
Debtor

--------------------------------------------------------------X

Case No.: 24-43449-jmm

Chapter 7

## DECLARATION IN SUPPORT OF DISMISSAL OF CASE

K.C. OKOLI declares the following to be true and correct under the penalty of perjury:

1. I am a member of Law Offices of K.C. Okoli, P.C., attorneys for 2281 Church Avenue LLC (the "Debtor") in this case.
2. By virtue of my position aforesaid, I am familiar with the facts and circumstances described herein.
3. I submit this Declaration together with the Declaration of Debbie Harris, in support of the motion of Debtor for voluntary dismissal of this bankruptcy case.
4. This case which started as a Chapter 11 case was converted to a Chapter 7 case by Order of this Court dated January 29, 2026 (ECF 151).
5. On May 18, 2026, Debtor herein secured a written commitment for a blanket mortgage of $3.26 Million to pay off the creditors in this bankruptcy case as well as payoff the administrative costs and expenses to date.
6. On April 22, 2026, I requested from Holly R. Holecek, Trustee, the total claims of creditors known to her, together with the administrative costs and expenses in this case, so we can confirm that Debtor has sufficient funds to pay off these creditors and

administrative expenses.

7. I am yet to receive from the Trustee the total amount of claims from her end.

8. On April 30, 2026, in order to determine how much is currently owed Flushing Bank to pay off the secured mortgage on 2281 Church Avenue, Brooklyn, New York 11226, I requested a payoff letter from Flushing Bank but have not received any.

9. The last Mortgage Statement sent by Flushing Bank to my clients shows an outstanding balance of **$1,464,624.34** as of March 2026. See Declaration of Debbie Harris submitted herewith.

10. The current total amount required to pay off the judgment in favor of Calvin Cross and Tralon Ellis through June 30, 2026, is **$965,143.78**. See Declaration of Debbie Harris submitted herewith.

11. The total amount required to pay off the mortgage on Debtor's property at 1234 East 69th Street, Brooklyn, New York 11234, as of March 31, 2026, is **$177,400.16**. See Declaration of Debbie Harris submitted herewith.

12. I reasonably believe that the unsecured debts together with the administrative costs and expenses in this case as of this date is not more than $100,000.00.

13. The loan commitment of $3.26 Million secured by the Debtor in this case is sufficient to pay off all of Debtor's creditors together with the administrative costs and expenses to this stage in this bankruptcy matter.

14. Upon dismissal of this case, no further administrative costs and expenses would be incurred and funds from the $3.26 Million loan would be available immediately to pay off the debts and administrative expenses.

DISMISSAL WILL ENABLE DEBTOR SECURE A "FRESH START"

15. In ascertaining the best interests of the parties in interest, for purposes of determining whether "cause" exists for voluntary dismissal of a Chapter 7 case, the best interest of the debtor lies generally in securing an effective fresh start upon discharge and in the reduction of administrative expenses leaving him with resources to work out his debts. *See In re Smith,* 507 F.3d 64, 72 (2007). The Second Circuit held that, "the legislative history of section 707(a) does not preclude a debtor's ability to repay her debts from constituting cause for dismissal." Id. at 74.

16. *In re Smith* is remarkably similar to the case at bar, and is controlling in this case. In that case, the Bankruptcy Court (EDNY) denied the Debtor's application to dismiss. The District Court affirmed on appeal. On further appeal, the Second Circuit reversed both the District Court and the Bankruptcy Court. The Circuit Court directed that "On remand, the Bankruptcy Court should consider both the benefits of Smith's proposed arrangement - including that it would allow her pay off her creditors immediately, and also allow her to avoid the harms of discharging her debts through bankruptcy, such as the potential difficulty of securing future credit and the inability to receive Chapter 7 relief again for eight years." Id., at 75.

17. In addition to the foregoing, dismissal here will also save Debtor's two properties from a forced sale which will result from this bankruptcy case being pursued to its logical conclusion.

CONCLUSION

18. It is respectfully submitted that it is in the best interests of all parties to dismiss this

case forthwith and stop the further accumulation of administrative costs and expenses.

Dated: New York, New York
May 18, 2026

K.C. OKOLI
Law Offices of K.C. Okoli, P.C.
5 Penn Plaza, 19th Floor
New York, New York 10001
(212) 564-8152
*Attorney for Debtor*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

| | |
|---|---|
| In re:<br><br>2281 CHURCH AVENUE LLC,<br>Debtor | Case No.: 24-43449-jmm<br><br>Chapter 7 |

-----------------------------------------------------------------X

**ORDER TO SHOW CAUSE WHY STAY OF FURTHER PROCEEDINGS SHOULD NOT BE ORDERED**

WHEREAS, the above-captioned debtor (the "Debtor") filed a petition for relief under Chapter 11 of the Bankruptcy Code; and

WHEREAS, by order dated January 29, 2026, this case was converted from a Chapter 11 case to a Chapter 7 case; and

WHEREAS, Debtor has secured a third-party mortgage loan commitment to pay its creditors, and has filed a motion to dismiss this case so it can work out its debt outside of bankruptcy; and

NOW THEREFORE, it is hereby:

ORDERED, that the Trustee and the Trustee's counsel are directed to appear at a hearing (the "Hearing") before the Honorable Jil Mazer-Marino of the United States Bankruptcy Court for the Eastern District of New York, 271-C Cadman Plaza East, Courtroom 3529, Brooklyn, New York 11201 on June 11, 2025, at 1:00 p.m. to show cause why the court should not issue an order staying further proceedings in this matter pending the hearing and determination of Debtor's motion to dismiss; and it further

ORDERED, that pending the Hearing, further proceeding in this bankruptcy matter is

hereby stayed including any attempts to sell the real estate which are the subject of this bankruptcy proceeding; and it is further

ORDERED, that the Hearing may be held in person, by phone, or by videoconference. Regardless of whether you intend to appear in person, by phone, or by videoconference, those intending to appear at the Hearing must register with eCourt Appearances no later than one (1) day prior to the Hearing. The phone number or video link for the Hearing will be emailed only to those that register with eCourt Appearances in advance of the Hearing. Instructions for registering with eCourt Appearances can be found at https://www.nyeb.uscourts.gov/node/2126. If you do not have internet access or are otherwise unable to register with eCourt Appearances, you may call or email Judge Mazer-Marino's courtroom deputy for instructions at (347) 394-1844, JMM_Hearings@nyeb.uscourts.gov; and it is further

ORDERED, that objections to the stay of this proceeding may be interposed at the Hearing; and it is further

ORDERED, that the Clerk shall serve a copy of this Order on all parties in this matter by ECF.

Dated: New York, New York
May 21, 2026

Jil Mazer-Marino
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
In re:

2281 CHURCH AVENUE LLC,
Debtor

----------------------------------------------------------------X

Case No.: 24-43449-jmm

Chapter 7

**DECLARATION IN SUPPORT OF ORDER TO SHOW CAUSE WHY FURTHER PROCEEDINGS SHOULD NOT BE STAYED**

K.C. OKOLI declares the following to be true and correct under the penalty of perjury:

1. I am a member of Law Offices of K.C. Okoli, P.C., attorneys for 2281 Church Avenue LLC (the "Debtor") in this case.
2. By virtue of my position aforesaid, I am familiar with the facts and circumstances described herein.
3. I submit this Declaration in Support of an Order for stay of further proceedings in this bankruptcy matter, pursuant to 11 U.S.C.A. §105(a), pending the hearing and determination of the Debtor's pending motion to dismiss the case (Exhibit 1 hereto).
4. The Debtor has secured a third-party commitment to lend Debtor $3.26 Million on the security of the Debtor's real estate.
5. As demonstrated in the pending motion to dismiss, in order for the loan to close and funds disbursed to creditors, it is necessary for this bankruptcy case to be first dismissed.
6. The pendency of the motion to dismiss does not stay the Trustee and others from continuing to attempt to sell the Debtor's real estate.

7. The competing equities in this case weigh in favor of the Debtor as against the Trustee and creditors.

8. A stay of further proceedings is necessary to preserve the status quo, pending this Court's hearing and determination of the Debtor's motion to dismiss.

9. Without such a stay, the Trustee may sell the Debtor's real property, which is still being shown to prospective interested parties, to satisfy creditors thus rendering nugatory the already secured loan commitment.

10. Such a turn of events will not be in the interest of the Debtor.

11. Upon information and belief, a sale of the Debtor's real property will irreparably damage both the Debtor and Debbie Harris by depriving Debbie Harris of the only home she had known for the past 20 years, and irreparably. Debbie Harris would be put out of the only home she had known for the past 20 years, and abruptly shutting down the business of the Debtor.

12. As for the creditors, they will not suffer any prejudice from the stay pending dismissal because the secured loan commitment will be closed thus enabling Debtor pay them off more expeditiously without incurring further administrative costs and expenses.

13. Debtor, who is now able to pay creditors and administrative costs and expenses with a loan from a third-party, will be able to secure a fresh start. *See In re Smith,* 507 F.3d 64, 72 (2007).

Dated: New York, New York
May 18, 2026

K.C. OKOLI
Law Offices of K.C. Okoli, P.C.

5 Penn Plaza, 19th Floor
New York, New York 10001
(212) 564-8152
*Attorney for Debtor*

# EXHIBIT 1

Law Offices of K.C. Okoli, P.C., 5 Penn Plaza, 19th Floor, New York, N.Y. 10001

Hearing Date: June 11, 2026 at 10:00 a.m.
Objection Deadline: June 4, 2026 at 5:00 p.m.

LAW OFFICES OF K.C. OKOLI, P.C.
5 Penn Plaza, 19th Floor
New York, New York 10001
(212) 564-8152
K.C. Okoli, Esq.

*Attorneys for 2281 Church Avenue LLC, Debtor*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

In re:

2281 CHURCH AVENUE LLC,

Debtor
-------------------------------------------------------------X

Chapter 7

Case No. 24-43449-jmm

**DEBTOR'S NOTICE OF MOTION TO DISMISS CHAPTER 7 CASE**

PLEASE TAKE NOTICE that upon the Declaration of Debbie Harris dated May 4, 2026, the exhibits annexed thereto, the Declaration of K.C. Okoli dated May 4, 2026, and upon all prior pleadings and proceedings heretofore had herein, a hearing will be held on a motion pursuant to 11 U.S.C. §707(a) for the dismissal of this bankruptcy case in the best interest of all parties in interest (the "Motion"), and the Motion of 2281 Church Avenue LLC will be held on **June 11, 2026 at 10: a.m.** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that the Hearing will be held before the Honorable Jil Mazer-Marino, United States Chief Bankruptcy Judge for the Eastern District of New York, Courtroom 3529, Conrad B. Duberstein U.S. Courthouse, 271-C Cadman Plaza East, Brooklyn, New York 11201-1800. Those wishing to participate in the Hearing must register their

appearance by 4:00 p.m. at least two (2) business days prior to the Hearing by using Court's *eCourt Appearances* tool https://ecf.nyeb.uscourts.gov/cgi-bin/nyebAppearances.pl.

PLEASE TAKE FURTHER NOTICE that any responses or objections to the relief requested in the Motion shall: a) be in writing; b) conform to the Federal Rues of Bankruptcy Procedure, Local Bankruptcy Rules for the Eastern District of New York, and all General Orders applicable to chapter 7 cases in the United States Bankruptcy Court for the Eastern District of New York; and c) be filed electronically with the Court by registered users of the Court's electronic filing system and in accordance with all General Orders applicable to chapter 7 cases in the United States Bankruptcy Court for the Eastern District of New York (which are available on the Court's website at (http://www.nyeb.uscourts.gov), so as to be received by all on or before June 4, 2026 at 5 p.m.

PLEASE TAKE FURTHER NOTICE that only those responses or objections that are timely filed, served and received will be considered at the Hearing. Failure to file a timely objection may result in entry of a final order granting the Motion as requested by 2281 Church Avenue LLC.

Dated: New York, New York
May 18, 2026

**LAW OFFICES OF K.C. OKOLI, P.C.**
5 Penn Plaza, 19th Floor
New York, N.Y. 10001
(212) 564-8152

By: */s/ K.C. Okoli*
K.C. OKOLI, ESQ.

*Attorneys for 2281 CHURCH AVENUE LLC. Debtor*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

Case No.: 24-43449-jmm

In re:

2281 CHURCH AVENUE LLC,

Chapter 7

Debtor

------------------------------------------------------------X

**DECLARATION IN SUPPORT OF DISMISSAL OF CASE**

DEBBIE HARRIS declares the following to be true and correct under the penalty of perjury:

1. I am the Manager of 2281 Church Avenue LLC (the "Debtor") in this case.
2. I am the Manager and a member of the senior management of Debtor.
3. Oswald C. David and I got married in New York on *March 26, 2018*. We lived together as domestic partners for more than ten (10) years before our marriage.
4. By virtue of my position aforesaid, I am familiar with the facts and circumstances described herein.
5. I submit this declaration in support of the motion of Debtor to dismiss this bankruptcy case.
6. With regard to pending legal matters, I have relied upon the advice and counsel of the Debtor's attorneys and other professionals.
7. This bankruptcy case was necessitated by the financial difficulties occasioned by a

judgment in excess of $699,000.00 which was obtained in 2022 in a lawsuit at the Kings County Supreme Court against the Debtor and Oswald David, among others. The lawsuit is captioned *Calvin Cross and Tralon Ellis v. Woodbine Caterers d/b/a Woodbine Ballroom, David Oswald, 2281 Church Avenue LLC, and Bad Dog Security, LLC*, Index No. 516493/2018, Kings County Supreme Court.

8. This bankruptcy case began by filing on August 19, 2024 as a Chapter 11 case.

9. By Order of this Court dated January 29, 2026, this case was converted from a Chapter 11 case to a Chapter 7 case.

10. On May 18, 2026, Debtor secured a blanket mortgage of $3.26 Million with me, Debbie Harris, as a guarantor. Annexed hereto as **Exhibit A** is a copy of the written mortgage commitment for that loan.

11. To make the loan commitment binding, I wired $20,000 as instructed in the mortgage commitment. Annexed hereto as **Exhibit B** is a copy of the Chase Bank wire transfer receipt.

12. I am advised by K.C. Okoli, attorney for Debtor, and I verily believe him, that he requested a written payoff letter from Flushing Bank, the current secured lender on 2281 Church Avenue, Brooklyn, New York 11226, but has not received any. Annexed hereto as **Exhibit C** is a copy of the Mortgage Statement from Flushing Bank as of 1/16/2026 showing a total outstanding principal balance of **$1,464,624.34** for 2281 Church Avenue Brooklyn, New York.

13. The current total amount required to pay off the judgment in favor of Calvin Cross and Tralon Ellis through June 30, 2026, is now **$965,143.78.** Annexed hereto as

**Exhibit D** is the payoff letter in support.

14. The total amount required to pay off the mortgage on our home held by Rocket Mortgage on 1234 East 69th Street, Brooklyn, New York 11234 as of March 31, 2026, is **$177,400.16**. Annexed hereto as **Exhibit E** is a copy of the payoff statement from Rocket Mortgage.

15. K.C. Okoli informs me and I verily believe him that he has requested the Trustee to furnish him with all the debts and administrative costs and expenses incurred on behalf of Debtor, so he can confirm that we have sufficient funds to pay them off, but he is yet to receive same.

16. I am advised by Mr. Okoli, and I verily belief him that NYC Office of Administrative Trials and Hearings (OATH) has filed a claim of $3,549.57 in this case.

17. I am further advised by Mr. Okoli and I verily believe him that the NYS Department of Finance has filed a claim in this matter in the sum of $16,218.85.

18. Apart from the two mortgages, the judgment debt, and claims mentioned above, I am advised that the other potential claims, administrative costs and expenses in this case as of this date is estimated to be less than $100,000.00.

19. The aforesaid loan of $3.26 Million is sufficient for Debtor to pay off all the creditors and lienholders, together with the administrative costs and expenses in this matter.

20. Upon dismissal of this case, no further administrative costs and expenses would be incurred and the $3.26 Million would be available for immediate disbursement to interested parties.

21. I am advised by K.C. Okoli and I verily believe him that, upon dismissal of this case

and payment of the creditors, Debtor will have a fresh start as if Debtor had never filed for bankruptcy.

22. Moreover, Debtor will be able to save our home from a forced sale, and itself from liquidation.

23. It will be in the best interests of all parties to dismiss this case forthwith and stop the further accumulation of administrative costs and expenses.

Dated: New York, New York
May 18, 2026

DEBBIE HARRIS

# EXHIBIT A

KAPLAN, DITRAPANI, FARIA & MANIN LLP

BART D. KAPLAN *
JARED S. KAPLAN **
MATTHEW J. DITRAPANI
JOSEPH A. FARIA
MARA MANIN AMENDOLA
KEVIN HAGLER
RACHEL HOLLYWOOD
JOHN PICCINNINI
SETH ROMANICK

MICHELE RABBINER
JEANINE OBERSTER
POPPY MARKOU
MARY RAGHUNANDAN

Main Office
6851 Jericho Tpke, Ste. 110
Syosset, NY 11791
(516) 801-6363

New York City Office
485 Madison Ave #1600
New York, NY 10022
(212) 404-7804

Hamptons Office
47 Jobs Lane
Southampton, NY 11968
(631) 377-3068

KaplanRealEstateLawyers.com

Of Counsel
HARLAN LEVINE ***
BRETT SILVERMAN ***

* Admitted NY & FL
** Admitted NY, NJ & CT
*** Admitted NY & NJ

KC Okoli
*Via Email*

Re: 2281 Church Ave., LLC- Debbie A. Harris Member

Property address: 2281 Church Avenue, Brooklyn NY and 1232 E. 69th Street, Brooklyn, NY

Dear Mr. Okoli:

The undersigned is Counsel to HGTR Holdings, LLC and The Wheatley Harbor, LLC (Collectively "Lender") whose principals have advised me that they are agreeable to advancing 2281 Church Ave., LLC ("Borrower") in a blanket first mortgage in the sum of Three Million Two Hundred Sixty Thousand Dollars and no cents ($3,260,000.00).

The terms of the loan shall be:

1. The loan will be secured by a Note, Mortgage, Assignment of Leases and Rent and Guaranty affecting the Premises.

2. The loan shall bear interest at the rate of twelve per cent per annum (12%) payable in monthly installments until the Maturity date which shall be 12 months from the date of closing with Six-month minimum interest.

3. The loan proceeds shall be fully disbursed at the closing which includes paying off the first two mortgages, real estate taxes, judgements, legal fees, open water and sewer debt.

4. A late payment charge will be due in the amount of Five percent (5%) for any delinquency exceeding Ten (10) days.

5. Borrower shall pay a two-point commitment fee to Lender in the amount of $65,200.00, Of which shall $20,000.00 be earned and due at the signing of this commitment letter, and the balance, $45,200.00 deemed earned, But due at closing

6. Interest escrows in the amount of $350,000 to be held by lenders attorney and disbursed to the lenders monthly.

7. The loan will be guaranteed by the Borrower.

8. Borrower to provide copies of NYS Incorporation papers.

9. HGTR Holdings, LLC and Wheatley Harbor LLC shall be named as additionally insured on the Insurance policy.

10. Borrower shall pay all of Lender's expenses incident to preparation, insuring and recording of a Note, mortgages, ALR and ancillary documents including the all-broker fees, entire mortgage tax, premium for issuance of an ALTA policy of fee insurance, recording fees and Lender's Attorney fee in the sum of Seven Thousand Five Hundred and no cents ($7,500.00). This fee includes a $500 title review fee. If the borrower chooses to order title with Appellate land Services, the $500 Title review fee will be waived. **Under no circumstances will First American be permitted as an underwriter.**

11. Borrower and Guarantor must be represented by an Attorney who will issue in favor of the Lender a standard opinion letter including language that the interest rate does not violate the applicable usury laws.

12. Prior to closing borrower shall provide a certificate of occupancy for each building

13. Environmental Indemnification Agreement

If you agree with the terms set forth herein, please countersign a copy of this letter and return it to

the undersigned with a check in the amount of Twenty Thousand Dollars and no cents ($20,000.00) as agreed made payable to the order of Kaplan, DiTrapani, Faria & Manin LLP, Escrowee. This deposit check will be disbursed to the Lender in payment of the commitment fee at closing. In the event that closing does not occur for any reason attributable to the Lender, the deposit shall be refunded in full and Lender shall have no further obligations hereunder. In the event that closing does not occur for any reason attributable to the Borrower, the Lender shall be entitled to deduct its actual expenses from the deposit and the balance will be refunded to the Borrower.

Very truly yours,

s/Jared Kaplan

THE TERMS OF THIS COMMITMENT ARE HEREBY ACCEPTED

May 18, 2026

Debbie A. Harris
Guarantor: Debbie A. Harris

# EXHIBIT B

Case 1-24-43449-jmm Doc 173 Filed 05/18/26 Entered 05/18/26 18:29:30

CHASE

## Wire Transfer Outgoing Request

### Wire Transfer Sender Information

| | | | | | |
|---|---|---|---|---|---|
| Sender Name: DEBBIE HARRIS | | | | | |
| Account Name: DEBBIE HARRIS | | Street Address: 1234 E 69TH ST | | | |
| City: BROOKLYN | State: NY | Zip: 11234-5724 | Country: USA | | Daytime Phone: 347-822-8970 |
| Primary ID Type: Driver's License | ID Issuer: NY | ID Number: 187275346 | | ID Issue Date: 02/10/2026 | ID Exp: 01/26/2031 |
| Secondary ID Type: | ID Issuer: | ID Number: | | ID Issue Date: | ID Exp: |
| Comments: | | | | | |

### Wire Transfer Information

| | | | |
|---|---|---|---|
| Request Date: 05/18/2026 | Request time: 03:57:02PM Eastern time | Effective date: 05/18/2026 | Wire Type: Domestic |
| Debit Account #: XXXXXX2159 | Debit Account Type: CPC SAVINGS | Wire Amount (US dollars): $20,000.00 | |
| Qualifying Account #: | Qualifying Account Type: | Source of funds: Savings | Wire Fee: $0 |
| Currency type to be sent: US Dollars | Exchange rate: N/A | Foreign currency amount: N/A | Amount to Collect (USD): $20,000.00 |
| FX Contract Number: | | | |

### Recipient Account Information

| | | | | |
|---|---|---|---|---|
| Account Name: EXECUTIVE BUSINESS CORPORATE | | | | |
| Street Address: | Account Number: 3500921329 | | | |
| | City: | State: | Zip: | Country: |
| Text to Recipient: | | | | |

### Receiving Bank Information

| | | | | |
|---|---|---|---|---|
| Bank Name: Wells Fargo Bank National Association | | | | |
| Street Address: 1000 Louisiana St, Tunnel level | Bank ABA/SWIFT Code: 121000248 | | | |
| | City: Houston | State: TX | Zip: 77002 | Country: USA |
| Intermediary Bank Name: | | | | |
| Street Address: | Intermediary Bank ABA: | | | |
| | City: | State: | Zip: | Country: |
| Text to Receiving Bank: | | | | |

## Wire Transfer Agreement - continued

**(b)** Prior to sending a Consumer International Wire Transfer, we will provide you with certain important disclosures regarding your transaction including, to the extent applicable: the amount that will be transferred to the beneficiary, the amount and description of any fees and taxes imposed by us, the total amount of the transaction, the exchange rate to be used if applicable, the amount of currency to be transferred, the amount and description of any fees imposed by intermediaries or our agents, and the amount that will be received by the beneficiary. In addition to the items above you will also be provided the date the funds are to be made available to the beneficiary, error resolution and cancellation right information and other disclosures. This will be provided either at the time you authorize the wire transfer or on a receipt provided after you've authorized your transaction.

**(c)** Except as otherwise agreed in writing, we are liable only for damages required to be paid as provided under Regulation E, subpart B or, to the extent applicable, UCC 4A. Except as required by Regulation E, subpart B, we will not be responsible for the acts or omissions of any other person or entity, including but not limited to any processor, any country's central bank, or any other financial institution, and no such person or entity will be deemed our agent. We will not be liable for the failure or delay of any wire transfer or for failing to meet other obligations in the Agreement because of circumstances or causes beyond our control, including governmental, legal or regulatory restrictions or prohibitions, third party actions, natural disasters, equipment or system failures, labor disputes, wars or riots. IN NO EVENT SHALL WE HAVE ANY LIABILITY FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, OR SPECIAL DAMAGES, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**(d)** You have the right to cancel Consumer International Wire Transfers at no cost to you within 30 minutes after you have authorized us to send it. Please refer to the disclosure we provided to you at the time you authorized the Consumer International Wire Transfer on how to cancel.

**(e)** If you think there has been an error or problem with your Consumer International Wire Transfer, call us at 1-855-536-1269, visit a Chase branch or J.P. Morgan Financial Center, or send an account inquiry via Secure Message Center on chase.com or jpmorganonline.com.

You must contact us within 180 days of the date we disclosed to you that funds would be made available to the recipient. When you do, please tell us:

- Your name and address;
- The error or problem with the transfer, and why you believe it is an error or problem;
- The name of the recipient, and if you know it, their telephone number or address;
- The dollar amount of the transfer; or
- The confirmation code or number of the transaction

We will determine whether an error occurred within 90 days after you contact us and we will correct any error promptly. We will tell you the results within three business days after completing our investigation and will advise you of any remedies that may be available to you. If no response is received, we will refund your account for the applicable remedies. If we decide that there was no error, we will send you a written explanation. You may ask for copies of any documents we used in our investigation.

**Be aware of wire scams, because once the wire is sent, you may not be able to recover your money.**

By providing your signature as authorization, you agree to these terms and conditions, that the wire transfer information in this document is accurate and you authorize us to process this wire transfer.

Recipient Bank's Identifier (ABA/SWIFT): 121000248 Recipient's Account Number: 3500921329

Sender's Signature: ______________________ Date: ____________

Email Address: debbieharris399@gmail.com

Transaction Number (Contact ID): 455185329700001

The Email Address and Transaction Number provided will be used for communication purposes.

# EXHIBIT C

**FLUSHING Bank**
1 Corporate Drive
Suite 360
Lake Zurich, IL 60047-8945

# MORTGAGE STATEMENT

Statement Date: 01/16/2026

| | |
|---|---|
| Property Address: | 2281 CHURCH AVENUE BROOKLYN NY 11226 |
| Account Number | 1414224707 |
| Payment Due Date | 02/01/2026 |
| **Amount Due** (Good Through 02/01/2026) | **$73,359.70** |

*If payment is received after 02/16/2026, a $1,514.63 late fee will be charged.*

+ 0266359 000001790 090VH1 00914832 P1
2281 CHURCH AVE LLC
OSWALD DAVID
1232 EAST 69TH STREET
BROOKLYN, NY 11234

| Contact Us | 1-877-330-4051 |
|---|---|

| Account Information | |
|---|---|
| Outstanding 1st Principal Balance | $1,464,624.34 |
| Deferred Balance | $17,541.38 |
| Current Escrow Account Balance | $19,434.66 |
| Maturity Date | February 2028 |
| Interest Rate (Until Feb 2028) | 6.940% |

| Explanation of Amount Due | |
|---|---|
| Principal | $3,665.67 |
| Interest | $8,428.38 |
| Escrow (for Taxes and Insurance) | $6,838.88 |
| Regular Monthly Payment | $18,932.93 |
| Fees Charged Since Last Statement | $0.00 |
| Total Fees Charged | $16,560.91 |
| Overdue Payment | $37,865.86 |
| Total Amount Due (Good Through 02/01/2026) | $73,359.70 |

**Housing Counselor Information:** If you would like counseling or assistance, you can contact the following: US Department of Housing and Urban Development (HUD): For a list of homeownership counselors or counseling organizations in your area, go to http://www.hud.gov/offices/hsg/sfh/hcc/hcs.cfm or call 800-569-4287.

**Transaction Activity (7/1/2025 to 01/16/2026)**

| Date | Description | Charges | Payments | Escrow Activity |
|---|---|---|---|---|
| 07/10 | Payment - Thank you | $0.00 | $19,182.60 | $0.00 |
| 07/10 | Payment - Thank you | $0.00 | ($19,182.60) | $0.00 |
| 07/14 | Payment - Thank you | $0.00 | $0.00 | $0.00 |

**Past Payments Breakdown**

| Description | Paid Last Period | Paid Year to Date |
|---|---|---|
| Principal | $0.00 | $3,602.80 |
| Interest | $0.00 | $8,491.25 |
| Escrow (Taxes and Insurance) | $0.00 | $6,838.88 |
| Fees | $0.00 | $0.00 |
| Partial Payment (Unapplied)* | $0.00 | $0.00 |
| Total | $0.00 | $18,932.93 |

****Delinquency Notice****

**You are late on your mortgage payments.** Failure to bring your loan current may result in fees and foreclosure - the loss of your home. As of January 16, you are 46 days delinquent on your mortgage loan. The loan became delinquent on 12/01/2026.

***Recent Account History:***

| Payment Due | Payment Status |
|---|---|
| | $18,932.93 *(current payment due)* |
| 01/01/2026 | Unpaid balance of $18,932.93 |
| 12/01/2025 | Unpaid balance of $18,932.93 |
| 11/2025 | PAID in full, on 01/12/2026 |
| 10/2025 | PAID in full, on 12/12/2026 |
| 09/2026 | PAID in full, on 11/06/2025 |
| 08/2026 | PAID in full, on 10/16/2025 |
| 07/2025 | PAID in full, on 08/13/2025 |
| TOTAL Due | $73,359.70 |

**You must pay this amount to bring your loan current.**
This payment amount will expire and may no longer be sufficient to bring the account current on 02/01/2026.

**IMPORTANT MESSAGES:**

* Partial payments: Any partial payments that you make are not applied to your mortgage, but instead are held in a separate suspense account. If you pay the balance of a partial payment, the funds will then be applied to your mortgage.

**NOTICE TO CUSTOMERS WHO ARE IN BANKRUPTCY OR WHOSE OBLIGATION HAS BEEN DISCHARGED AND NOT REAFFIRMED: TO THE EXTENT YOUR ORIGINAL OBLIGATION WAS DISCHARGED, OR IS SUBJECT TO AN AUTOMATIC STAY OF BANKRUPTCY UNDER TITLE 11 OF THE UNITED STATES CODE, THE INFORMATION IN THIS MORTGAGE STATEMENT IS FOR REGULATORY COMPLIANCE AND INFORMATIONAL PURPOSES ONLY AND DOES NOT CONSTITUTE A DEMAND FOR PAYMENT IN VIOLATION OF THE AUTOMATIC STAY OR THE DISCHARGE INJUNCTION OR AN ATTEMPT TO IMPOSE PERSONAL LIABILITY FOR SUCH OBLIGATION. HOWEVER, CREDITOR RETAINS RIGHTS UNDER ITS SECURITY INSTRUMENT, INCLUDING THE RIGHT TO FORECLOSE ITS LIEN.**
**PLEASE SEE REVERSE FOR ADDITIONAL IMPORTANT NOTIFICATIONS.**

You agreed to participate in the following Loss Prevention Program - N/A.
The pre-foreclosure requirements of Real Property Actions and Proceedings Law § 1304 have not been fulfilled. **The first notice or filing required by law for any foreclosure process has not been made. The pre-foreclosure requirements of Real Property Actions and Proceedings Law § 1304 have not been fulfilled.**
If you are **experiencing Financial Difficulty:** If you would like mortgage counseling or assistance, you can find a list of counselors in your area on the U.S. Department of Housing and Urban Development's website at www.hud.gov. You can also select to receive counseling through the HOPE Hotline by calling 1-888-995-HOPE.

*Please note: If you have enrolled in our automatic payment service, your payment will process as scheduled pursuant to the terms of your signed Authorization Form.*
*This statement is provided for informational purposes pursuant to regulatory requirements established by the CFPB.*

2281 CHURCH AVE LLC
OSWALD DAVID
1232 EAST 69TH STREET
BROOKLYN, NY 11234

## PAYMENT COUPON

*Return This Portion With Your Payment*

**Make Check Payable To:** Flushing Bank

**Loan Number: 1414224707**
**Next Payment Due: 02/01/2026**

☐ CHECK HERE IF YOUR ADDRESS INFORMATION HAS CHANGED AND COMPLETE FORM ON REVERSE SIDE.

**Amount Due**

**Due By 02/01/2026: (Good Through 02/01/2026)** $73,359.70
*If payment is received after 02/16/2026, a $1,514.63 late fee will be charged.*

Please designate how you want us to apply any additional funds.

| | |
|---|---|
| Additional Principal | $ |
| Additional Escrow | $ |
| **Total Amount Enclosed** | $ |

Flushing Bank
P.O. Box 371306
Pittsburgh PA 15250-7306

**FLUSHING** Bank

268359 0000031140 0200M1 00219832

**MORTGAGE STATEMENT**
Statement Date: 01/16/2026

**Transaction Activity (continued) (7/1/2025 to 01/16/2026)**

| Date | Description | Charges | Payments | Escrow Activity |
|---|---|---|---|---|
| 08/07 | Disb. of Primary Hazard Insurance Premium | $0.00 | $0.00 | $-7,021.78 |
| 08/08 | Payment - Thank you | $0.00 | $19,182.60 | $0.00 |
| 08/08 | Payment - Thank you | $0.00 | ($19,182.60) | $0.00 |
| 08/13 | Payment - Thank you | $0.00 | $0.00 | $0.00 |
| 09/25 | Property Inspection Fee | $30.00 | $0.00 | $0.00 |
| 10/15 | Payment - Thank you | $0.00 | $19,182.60 | $0.00 |
| 10/15 | Payment - Thank you | $0.00 | ($19,182.60) | $0.00 |
| 10/16 | Payment - Thank you | $0.00 | $0.00 | $0.00 |
| 10/31 | Payment - Thank you | $0.00 | $19,182.60 | $0.00 |
| 10/31 | Payment - Thank you | $0.00 | ($19,182.60) | $0.00 |
| 11/05 | Payment - Thank you | $0.00 | $0.00 | $0.00 |
| 11/26 | Property Inspection Fee | $30.00 | $0.00 | $0.00 |
| 12/10 | Payment - Thank you | $0.00 | $18,932.93 | $0.00 |
| 12/10 | City Taxes | $0.00 | $0.00 | $-25,093.52 |
| 12/10 | Payment - Thank you | $0.00 | ($18,932.93) | $0.00 |
| 12/12 | Payment - Thank you | $0.00 | $0.00 | $0.00 |
| 12/26 | Property Inspection Fee | $30.00 | $0.00 | $0.00 |
| 01/09 | Payment - Thank you | $0.00 | $18,932.93 | $0.00 |
| 01/09 | Payment - Thank you | $0.00 | ($18,932.93) | $0.00 |
| 01/12 | Payment - Thank you | $0.00 | $0.00 | $0.00 |

**Amounts displayed in parentheses "($0.00)" are amounts previously held in a suspense account as unapplied partial payments that are now applied to the loan. Please see the Important Messages for more information.**

| Total Outstanding Fee Balances* | Late Charge Assessment | $18,400.91 | Bad Check Fee | $40.00 | Property Inspection Fee | $120.00 |
|---|---|---|---|---|---|---|

*Total Outstanding Fee Balances include current charges plus all fees outstanding as of the date of this statement.

# EXHIBIT D

LAW OFFICES OF
BERNARD D'ORAZIO
& ASSOCIATES, P.C.

April 28, 2026

**BY EMAIL TO:** kcokoli@verizon.net

K.C. Okoli, Esq.
Attorney for 2281 Church Avenue LLC
5 Penn Plaza, 19th Floor
New York, NY 10001

**Re: Calvin Cross and Tralon Ellis v. Woodbine Caterers et al.**

Dear Mr. Okoli:

This letter is sent in response to your inquiry for the payoff amount on the Judgment entered in favor of the plaintiffs in the referenced action on April 26, 2022.

The payoff amount for the Judgment, with legal interest (9%) **through June 30, 2026**, is **$965,143.78**. If payment is not received by that date, my office must be contacted for an updated payoff amount. You may contact me at bdorazio@dorazio-law.com.

A check must be sent by overnight delivery to my office.[1] The check must be made payable to "**Bernard D'Orazio & Associates, P.C.** Upon clearance, we will file a Satisfaction and provide a copy to the closing agent or other designated party.

Very truly yours,

Bernard D'Orazio

[1] In the alternative, you may wire the funds:

Account Name: Bernard D'Orazio & Associates, P.C., IOLTA Account
Account No.: 0931595526
ABA No. 021272723
JPMorgan Chase Bank
221 Canal Street Branch
New York, NY 10013
Bank branch telephone number: (212) 925-7885

# EXHIBIT E

**Rocket Mortgage**

RETURN SERVICE ONLY
PLEASE DO NOT SEND MAIL TO THIS ADDRESS
PO Box 818060 | 5801 Postal Road | Cleveland, OH 44181

**Payoff quote**

| | |
|---|---|
| Loan number | 0753218452 |
| Client fax | 7132288577 |
| Property address | 1232 E 69TH ST BROOKLYN, NY 11234 |
| Notice date | 3/19/26 |

OSWALD DAVID
1234 E 69TH ST
BROOKLYN, NY 11234-5724

Hi OSWALD DAVID,

Enclosed is the payoff statement you requested. We can only accept certified funds. Acceptable payment methods are wire transfers and cashier's checks. We can't accept ACH payments, bank bill pay or personal checks, as these are not considered certified funds. The payoff figures are valid through 3/31/26. Certified funds received after 3/31/26, will require an additional $26.03 in interest per day. You'll need to call us for an updated payoff quote if we don't receive certified funds by 3/31/26.

The amount to payoff your loan is below:

**Payoff statement**

Loan type: CONV

| **Payoff breakdown** | |
|---|---|
| Principal balance as of 3/31/26: | $149,011.07 |
| Interest - from 1/1/25 to 3/31/26 | $11,863.46 |
| Advances on your behalf | $4,479.71 |
| Escrow Advances | $12,003.92 |
| County Recording Fee | $42.00 |
| **Total amount to payoff to Rocket Mortgage** | **$177,400.16** |

**How is this calculated?**
Interest is calculated over the course of a month on a daily interest basis. The interest listed in the total amount due is calculated through the proposed payoff date. The interest amount due can be higher or lower based upon when we receive the payoff funds.

**Daily interest calculation:**
Current Unpaid Principal Balance X Interest Rate / 365 = Daily Interest

We reserve the right to correct any errors or omissions in this payoff quote regardless of when funds are received. We also reserve the right to correct any portion of this statement due to changing balances and interest rates on this loan. A payment that is less than the full amount will delay processing, and you will be held responsible for any additional interest.

Please reference the client name, loan number and property address and send certified funds or a wire using the following information:

**Wiring instructions:**
Beneficiary name: Rocket Mortgage
Account number: 10000017802313
ABA/Routing number: 021000021
Bank name: JPMorgan Chase Bank, N.A.
270 Park Ave New York, NY 10017

**Rocket Mortgage – Overnight address:**
Attn: Cash Management Team
8950 Cypress Waters Blvd.
Coppell, TX 75019

Wires and certified funds received by 6:00 p.m. ET will be processed on the date of receipt. All funds received after 6:00 p.m. ET will be processed on the next business day.

Please be advised this communication is sent for informational purposes only and is not intended as an attempt to collect, assess, or recover a claim against, or demand payment from, any individual protected by the U.S. Bankruptcy Code. If this account has been discharged in a bankruptcy proceeding, be advised this communication is for informational purposes only and not an attempt to collect a debt against you; however, the servicer/lender reserves the right to exercise the legal rights only against the property securing the loan obligation, including the right to foreclose its lien under appropriate circumstances. Nothing in this communication shall be construed as an attempt to collect against the borrower personally or an attempt to revive personal liability.

If you are a successor in interest (received the property from a relative through death, devise, or divorce, and you are not a borrower on the loan) that has not assumed, or otherwise become obligated on the debt, this communication is for informational purposes only and is not an attempt to collect a debt from you personally.

EQUAL HOUSING OPPORTUNITY

Case 1-24-43449-jmm Doc 175 Filed 05/18/26 Entered 05/18/26 18:29:30

Rocket Mortgage

**Payoff quote**

PO Box 818060 | 5801 Postal Road | Cleveland, OH 44131

**Important notes to remember**

- If you're set up for automatic payments, your monthly payment will draft as usual if it's due before the payoff funds are received. Please notify Rocket Mortgage at least five days prior to your scheduled draft date if you'll be sending in the payoff funds within that period. If you're sending payments through your bank, these will continue to send as usual until you stop them from your bank's website.
- You are still required to make your regular monthly payments on time. If you do not make your payment before the end of the grace period, you may incur a late fee. Any late fees will be added to your total payoff balance. Payments received more than 30 days after the due date will be reported as late to credit reporting agencies.
- Payoff figures are subject to final verification by the note holder. Figures may be adjusted if any check previously received is rejected by the institution upon which it was drawn. To the extent applicable, additional legal fees or costs associated with servicing your loan may accrue daily.
- If payoff funds received are inadequate to pay your loan in full, Rocket Mortgage will contact the appropriate party to collect the shortage. If we can't make contact or if the remaining funds have not been collected within 2 business days, the original funds will be returned to the sender unless the servicing of the loan is transferred or reassigned sooner. To the extent permitted by state law, the note holder reserves the right to withhold the issuance of the satisfaction of mortgage until it receives all funds owed under the terms of the note.
- If this property is being sold, please provide the client(s)' new mailing address. Payoff overage funds will be mailed to the client(s) within 20 days of the loan being paid in full. A 1098 interest statement will be mailed to the client(s) no later than January 31 of the next calendar year.
- If taxes and/or insurance are escrowed, please reach out to your tax agency and/or insurance provider to ensure they are forwarding you the bill.
- This payoff quote is valid through 3/31/26 If your loan is in default and a foreclosure sale is scheduled before that date, please reach out to us for an updated payoff amount before the foreclosure sale. To make sure the foreclosure is cancelled, your payoff funds should be sent overnight and received by us at least 24 hours before the scheduled foreclosure sale. If a foreclosure action is underway, it will continue until your payoff funds are received. This means additional fees or costs may be added before this quote expires, and the total payoff amount may increase. For your convenience, we've included an estimate of fees and costs that could become due between 3/19/26 and 3/31/26. If any of these estimated fees or costs become due during this time, your required payoff amount will increase. Right now, no estimated fees or costs are included in the "Total Payoff Amount" shown in this quote. This estimate is provided as a courtesy, and you won't be charged for any estimated amounts unless a fee or cost is actually billed or incurred. If any estimated fee or cost is added before this quote expires, we'll send you a new payoff quote with updated information.

If you have any questions or concerns, don't forget that we're here to help. You can contact us at (800) 4-ROCKET, Monday through Friday from 8:30 a.m. to 9 p.m. ET and Saturday from 9 a.m. to 4 p.m. ET. You can also reach us at www.RocketMortgage.com.

Sincerely,

Your Rocket Servicing Team

**Rocket Mortgage** **Payoff quote**

PO Box 818060 | 5801 Postal Road | Cleveland, OH 44181

**New York Residents:** Rocket Mortgage, LLC is licensed by the New York City Department of Consumer and Worker Protection License Numbers: 2131166, 2132245, 2132381, 2132457, 2132458, 2132459 and 2132400. **If you believe a Loss Mitigation request has been wrongly denied, you may file a complaint with the New York State Department of Financial Services at 1-800-342-3736 or www.dfs.ny.gov.** If you want to know the name of your originating lender or the amount that you owe, please contact us. Rocket Mortgage, LLC utilizes third-party providers and remains responsible for all actions taken by these providers.

In accordance with New York law and the Americans with Disabilities Act (ADA), Rocket Mortgage, LLC makes reasonable accommodations to clients with disabilities, such as providing large print monthly statements upon request. Please contact us toll-free at 800-863-4332 to learn about which ADA accommodations may be available and to request that your communications from us be provided in such specific format, if possible.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

In re:

2281 CHURCH AVENUE LLC,
Debtor

------------------------------------------------------------X

Case No.: 24-43449-jmm

Chapter 7

**DECLARATION IN SUPPORT OF DISMISSAL OF CASE**

K.C. OKOLI declares the following to be true and correct under the penalty of perjury:

1. I am a member of Law Offices of K.C. Okoli, P.C., attorneys for 2281 Church Avenue LLC (the "Debtor") in this case.

2. By virtue of my position aforesaid, I am familiar with the facts and circumstances described herein.

3. I submit this Declaration together with the Declaration of Debbie Harris, in support of the motion of Debtor for voluntary dismissal of this bankruptcy case.

4. This case which started as a Chapter 11 case was converted to a Chapter 7 case by Order of this Court dated January 29, 2026 (ECF 151).

5. On May 18, 2026, Debtor herein secured a written commitment for a blanket mortgage of $3.26 Million to pay off the creditors in this bankruptcy case as well as payoff the administrative costs and expenses to date.

6. On April 22, 2026, I requested from Holly R. Holecek, Trustee, the total claims of creditors known to her, together with the administrative costs and expenses in this case, so we can confirm that Debtor has sufficient funds to pay off these creditors and

Case 1-24-43449-jmm Doc 173 Filed 05/18/26 Entered 05/18/26 18:29:30

administrative expenses.

7. I am yet to receive from the Trustee the total amount of claims from her end.

8. On April 30, 2026, in order to determine how much is currently owed Flushing Bank to pay off the secured mortgage on 2281 Church Avenue, Brooklyn, New York 11226, I requested a payoff letter from Flushing Bank but have not received any.

9. The last Mortgage Statement sent by Flushing Bank to my clients shows an outstanding balance of **$1,464,624.34** as of March 2026. See Declaration of Debbie Harris submitted herewith.

10. The current total amount required to pay off the judgment in favor of Calvin Cross and Tralon Ellis through June 30, 2026, is **$965,143.78**. See Declaration of Debbie Harris submitted herewith.

11. The total amount required to pay off the mortgage on Debtor's property at 1234 East 69th Street, Brooklyn, New York 11234, as of March 31, 2026, is **$177,400.16**. See Declaration of Debbie Harris submitted herewith.

12. I reasonably believe that the unsecured debts together with the administrative costs and expenses in this case as of this date is not more than $100,000.00.

13. The loan commitment of $3.26 Million secured by the Debtor in this case is sufficient to pay off all of Debtor's creditors together with the administrative costs and expenses to this stage in this bankruptcy matter.

14. Upon dismissal of this case, no further administrative costs and expenses would be incurred and funds from the $3.26 Million loan would be available immediately to pay off the debts and administrative expenses.

DISMISSAL WILL ENABLE DEBTOR SECURE A "FRESH START"

15. In ascertaining the best interests of the parties in interest, for purposes of determining whether "cause" exists for voluntary dismissal of a Chapter 7 case, the best interest of the debtor lies generally in securing an effective fresh start upon discharge and in the reduction of administrative expenses leaving him with resources to work out his debts. *See In re Smith,* 507 F.3d 64, 72 (2007). The Second Circuit held that, "the legislative history of section 707(a) does not preclude a debtor's ability to repay her debts from constituting cause for dismissal." *Id.* at 74.

16. *In re Smith* is remarkably similar to the case at bar, and is controlling in this case. In that case, the Bankruptcy Court (EDNY) denied the Debtor's application to dismiss. The District Court affirmed on appeal. On further appeal, the Second Circuit reversed both the District Court and the Bankruptcy Court. The Circuit Court directed that "On remand, the Bankruptcy Court should consider both the benefits of Smith's proposed arrangement - including that it would allow her pay off her creditors immediately, and also allow her to avoid the harms of discharging her debts through bankruptcy, such as the potential difficulty of securing future credit and the inability to receive Chapter 7 relief again for eight years." *Id.* at 75.

17. In addition to the foregoing, dismissal here will also save Debtor's two properties from a forced sale which will result from this bankruptcy case being pursued to its logical conclusion.

CONCLUSION

18. It is respectfully submitted that it is in the best interests of all parties to dismiss this

Case 1-24-43449-jmm Doc 173 Filed 05/18/26 Entered 05/18/26 18:29:30

case forthwith and stop the further accumulation of administrative costs and expenses.

Dated: New York, New York
May 18, 2026

K.C. OKOLI
Law Offices of K.C. Okoli, P.C.
5 Penn Plaza, 19th Floor
New York, New York 10001
(212) 564-8152
*Attorney for Debtor*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X Case No.: 24-43449-jmm
In re:

2281 CHURCH AVENUE LLC, Chapter 7
Debtor

---------------------------------------------------------------X

**NOTICE OF PRESENTMENT OF ORDER TO SHOW CAUSE**

**PLEASE TAKE NOTICE** that the proposed Order to Show Cause why this Court should not issue an order forthwith, for stay of further proceedings in this matter pending the hearing and determination of Debtor's motion to dismiss (Doc 176), will be presented to the Court on May 26, 2026 at 12 noon.

Dated: New York, New York
May 22, 2026

**LAW OFFICES OF K.C. OKOLI, P.C.**
5 Penn Plaza, 19th Floor
New York, N.Y. 10001
(212) 564-8152

By: */s/ K.C. Okoli*
K.C. OKOLI, ESQ.

*Attorneys for 2281 CHURCH AVENUE LLC, Debtor*

Information to identify the case:

Debtor 2281 Church Avenue LLC EIN: 82−1453850

Name

United States Bankruptcy Court Eastern District of New York Date case filed in chapter: 11 8/19/24

Case number: 1−24−43449−jmm Date case converted to chapter: 7 1/29/26

# NOTICE OF DISCOVERY OF ASSETS

**NOTICE IS HEREBY GIVEN THAT:**

It appeared from the schedules filed when the above case was initiated that there were no assets from which dividends could be paid to creditors as indicated on the notice of meeting of creditors.

It now appears that payment of a dividend may be possible. Creditors must now file claims in order to share in any distribution from the estate. Claims must be filed with the Clerk's Office at the location given below:

UNITED STATES BANKRUPTCY COURT
271−C Cadman Plaza East, Suite 1595
Brooklyn, NY 11201−1800

**Creditors who have previously filed a claim in this case need not file again. Claims must be filed on or before August 31, 2026** .

A Proof of Claim form, "Official Form 410", can be obtained at the United States Courts Web site: (http://www.uscourts.gov/FormsAndFees/Forms/BankruptcyForms.aspx) or at any Bankruptcy Clerk's Office.

If you are an ECF account holder, proofs of claim may be filed over the Internet. If you are not a current ECF account holder, you may file a proof of claim by going to the Court's website Electronic Filing of Proof of Claim (ePOC) at http://www.nyeb.uscourts.gov/electronic−filing−proof−claim−epoc and select File a Claim (ePOC). This application does not require a login and password. You can also file a proof of claim by CD−ROM/DVD or flash drive and mail it to the address stated above.

Dated: June 1, 2026

For the Court, Paul Dickson, Clerk of Court

**BLdasPOC12a.jsp** [Discovery of Assets rev. 02/01/17]

# Notice Recipients

| | | |
|---|---|---|
| District/Off: 0207−1 | User: admin | Date Created: 06/01/2026 |
| Case: 1−24−43449−jmm | Form ID: 178 | Total: 43 |

**Recipients of Notice of Electronic Filing:**

| | | |
|---|---|---|
| tr | Lori Lapin Jones | ljones@jonespllc.com |
| aty | Holly R. Holecek | hrh@lhmlawfirm.com |
| aty | Kamini Fox | kamini@kfoxlaw.com |
| aty | Karamvir Dahiya | karam@dahiya.law |
| aty | Kenechukwu C Okoli | kcokoli@verizon.net |

TOTAL: 5

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**

| | |
|---|---|
| db | 2281 Church Avenue LLC 2281 Church Avenue Brooklyn, NY 11226 |
| aty | LaMonica Herbst & Maniscalco, LLP 3305 Jerusalem Avenue Suite 201 Wantagh, NY 11793 |
| smg | NYS Department of Taxation & Finance Bankruptcy Unit PO Box 5300 Albany, NY 12205 |
| smg | NYS Unemployment Insurance Attn: Insolvency Unit Bldg. #12, Room 256 Albany, NY 12240 |
| smg | Office of the United States Trustee Eastern District of NY (Brooklyn) Alexander Hamilton Custom House One Bowling Green, Room 510 New York, NY 10004−1408 |
| 10385057 | American Express PO Box 1270 Newark, NJ 07101 |
| 10385058 | Barclays PO Box 13337 Philadelphia, PA 19101 |
| 10386687 | Bonnie L. Pollack, Esq. Cullen and Dykman LLP 333 Earle Ovington Boulevard, 2nd Fl. Uniondale, NY 11553 |
| 10386755 | Calvin Cross Tralon Ellis c/o Bernard D'Orazio & Associates, P.C. 238 West 139th Street New York, NY 10030 |
| 10385059 | Calvin Cross c/o Law Offices of Bernard D'Orazio & As 238 West 139th Street New York, NY 10030 |
| 10704478 | Dahiya Law Offices LLC 111 John Street Suite 1860 New York NY 10038 Tel 212 766 8000 |
| 10704479 | Dahiya Law Offices LLC 111 John Street Suite 1860 New York New York 10038 |
| 10385060 | Dovenmuehle Mortgage, Inc. 1 Corporate Drive Suite 360 Lake Zurich, IL 60047 |
| 10385061 | Flushing Bank P.O. Box 371306 Pittsburgh, PA 15250 |
| 10413043 | Flushing Bank c/o Cullen and Dykman LLP Attn Bonnie Pollack 333 Earle Ovington Blvd, 2nd Floor Uniondale, NY 11553 |
| 10689193 | Gerard R. Luckman, Esq. 333 Earle Ovington Blvd., Suite 1010 Uniondale, NY 11553 |
| 10689194 | Holly R. Holecek, Esq. LaMonica Herbst & Maniscalco LLP 3305 Jerusalem Avenue Wantagh, NY 11793 |
| 10681899 | Kamini Fox, PLLC 825 East Gate Blvd., Suite 308 Garden City, NY 11530 |
| 10385062 | Khalil Hamed 2766 Bedford Avenue Brooklyn, NY 11226 |
| 10386706 | Kyriaki Christodoulou, Esq. Cullen and Dykman LLP One Battery Park Plaza, 34th Fl. New York, New York 10004 |
| 10385063 | Mark David Shirian, P.C. 228 East 45th Street Suite 1700B New York, NY 10017 |
| 10578124 | NEW RESIDENTIAL MORTGAGE LOAN TRUST 2017−1 C/o Nationstar Mortgage LLC Attn: Bankruptcy Dept. PO Box 619096 Dallas TX 75261−9741 |
| 10700896 | NYC Department of Finance 375 Pearl Street, 29th Floor Attn: Lesley Spencer−Mhya New York, NY 10038 |
| 10698446 | NYC Office of Administrative Trials & Hearings 66 John Street 11th Floor New York, NY 10038 |
| 10386339 | NYC Water Board 59−17 Junction Blvd. Flushing, New York 11373 |
| 10385065 | NYC Water Board 825 East Gate Blvd. Suite 308 Newark, NJ 07101 |
| 10386578 | NYC Water Board Richard J Costa Senior Counsel − Bureau of Legal Affairs 59−17 Junction Blvd, 13th Fl Elmhurst, NY 11373−5108 |
| 10386341 | National Grid One MetroTech−Center 345 Jay Street Brooklyn, New York 11201 |
| 10385064 | National Grid PO Box 371416 Pittsburgh, PA 15250 |
| 10525195 | Nationstar Mortgage LLC c/o ALDRIDGE PITE, LLP 3333 Camino del Rio South, Suite 225 San Diego, CA 92108 |
| 10385066 | PHH Mortgage Services P.O. Box 24736 West Palm Beach, FL 33416 |
| 10385067 | Robert Gonzalez Dominguez 2184 Bedford Avenue Brooklyn, NY 11226 |
| 10385068 | Sarrazin 274 Willougby Street Brooklyn, NY 11205 |
| 10385145 | Synchrony Bank PO Box 71715 Philadelphia, PA 19176 |
| 10385069 | Synchrony Bank PO Box 71715 Philadelphia, PA 19176 |
| 10385070 | Tralon Ellis c/o Law Offices of Bernard D'Orazio & As 238 West 139th Street New York, NY 10030 |
| 10689195 | U.S. Trustee Office of the United States Trustee EDNY |
| 10385071 | Woodbine Caterers 2281 Church Avenue Brooklyn, NY 11226 |

TOTAL: 38

**LaMONICA HERBST & MANISCALCO, LLP**
*Counsel to Lori Lapin Jones, Chapter 7 Trustee*
3305 Jerusalem Avenue, Suite 201
Wantagh, New York 11793
Telephone: (516) 826-6500
Holly R. Holecek, Esq.

**Relates to a hearing on June 24, 2026**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
In re: Chapter 7

2281 CHURCH AVENUE LLC, Case No.: 24-43449-jmm

Debtor.
-------------------------------------------------------x

**OMNIBUS OBJECTION OF CHAPTER 7 TRUSTEE TO MOTION TO DISMISS CHAPTER 7 CASE AND MOTION TO STAY PROCEEDINGS**

TO THE HONORABLE JIL MAZER-MARINO,
CHIEF UNITED STATES BANKRUPTCY JUDGE

Lori Lapin Jones, solely in her capacity as Chapter 7 Trustee ("Trustee") of the estate of 2281 Church Avenue LLC ("Debtor"), hereby objects to: (i) the motion filed on behalf of the Debtor to dismiss the Debtor's Chapter 7 case ("Dismissal Motion") [ECF No. 173]; and (ii) the motion filed on behalf of the Debtor to stay further proceedings ("Stay Motion")[1] [ECF No. 176], and respectfully represents as follows:

## PRELIMINARY STATEMENT

Having spent seventeen (17) months in Chapter 11 without confirming a plan, the movant seeks to regain control over the Debtor's assets, but that control now firmly resides with the Trustee. The movant lacks standing to bring the Motions which, in any event, seek dubious relief that is not in the best interests of the Debtor's estate and is incompatible with the statutory framework and protections afforded in a Chapter 7 case. As more fully set forth below, the Motions should be denied.

---

[1] Together, the Dismissal Motion and the Stay Motion are referred to herein as the "Motions".

**BACKGROUND**

1. On August 19, 2024 ("Filing Date"), a voluntary petition for relief under subchapter V of Chapter 11 of the Bankruptcy Code was filed on the Debtor's behalf in the Court. See ECF No. 1. The Debtor's voluntary petition was signed by Oswald C. David ("David") as President. See id.[2] According to the Debtor's statement of financial affairs, David was the sole shareholder of the Debtor. See id.

2. According to the Debtor's Schedule A/B, as of the Filing Date, the Debtor owned the real properties located at: (a) 2281 Church Avenue, Brooklyn, New York 11226 ("Church Ave Property"); and (b) 1232 E. 69th Street, Brooklyn, New York 11234 ("69th Street Property"). See ECF No. 1. The Debtor's business consists of the ownership and operation of the Church Ave Property and the 69th Street Property (together "Properties").

3. On August 20, 2024, Gerard R. Luckman, Esq. was appointed as the Subchapter V Trustee. See ECF No. 17.

4. On October 25, 2024, Flushing Bank filed a secured claim in the Debtor's case in the amount of $1,642,601.15 arising out of a note and mortgage against the Church Ave Property.

5. On October 28, 2024, the Court entered a Stipulation and Order Authorizing Final Use of Cash and Other Collateral and Grant of Adequate Protection to Flushing Bank. See ECF No. 42.

6. By motion dated August 11, 2025, Flushing Bank sought entry of an Order converting the Debtor's Chapter 11 case to a Chapter 7 case and for turnover of cash collateral. See ECF No. 101 ("Motion to Convert"). The Debtor opposed the Motion to Convert. See ECF No. 105. Flushing Bank replied to the Debtor's objection. See ECF No. 107.

---

[2] The Trustee is informed that, in or around May 2026, David passed away.

7. On October 28, 2025, the Court entered an Order conditionally granting the Motion to Convert, see ECF No. 113 ("October Order"). Pursuant to the October Order, certain deadlines were fixed for the Debtor to market and sell the Church Ave Property. See id.

8. On November 10, 2025, the Court entered a further Order conditionally granting the Motion to Convert. See ECF No. 119 ("November Order"). The November Order, among other things, required Debbie Harris ("Harris") to convey tittle to the Church Ave Property back to the Debtor, and fixed a deadline for the Debtor to file an amended Chapter 11 plan. See id.

9. On January 7, 2026, the Court entered an Order extending certain deadlines in the October Order and the November Order. See ECF No. 135 ("January Order").

10. On January 20, 2026, Flushing Bank docketed a letter advising that the Debtor defaulted under the January Order and requesting that the Court convert the Debtor's case to a Chapter 7 case. See ECF No. 138.

11. On January 23, 2026, the Court entered an Order scheduling a hearing on the letter that was filed by Flushing Bank, which provided that the Court would enter an Order converting the Debtor's case to a Chapter 7 case if the Debtor did not file a sale motion on the docket by January 26, 2026. See ECF No. 146. The Debtor did not file a sale motion on the docket by January 26, 2026.

12. On January 29, 2026, the Court entered an Order converting the Debtor's Chapter 11 case to a Chapter 7 case ("Conversion Order"). See ECF No. 151. The Conversion Order is final and non-appealable.

13. On February 4, 2026, Lori Lapin Jones was appointed as Chapter 7 Trustee of the Debtor's estate. See ECF No. 155.

14. By letter to the Debtor dated February 4, 2026 ("February 4 Letter") counsel to the

Trustee requested, inter alia, that documents and information relating to the Debtor's financial affairs be turned over by no later than February 13, 2026.

15. On February 4, 2026, Kamini Fox, PLLC, former counsel to the Debtor, turned over copies of the Debtor's tax returns for 2023 and 2024. Other than these tax returns, the Debtor did not turn over any of the other documents requested in the February 4 Letter to the Trustee.

16. On February 10, 2026, the Trustee inspected the Church Ave Property with MYC & Associates, Inc. ("MYC"). The Church Ave Property consists of a 6,288 square foot lot improved by approximately 11,828 square feet of commercial retail space. There are seven (7) retail occupants on the ground floor and one (1) commercial occupant on the 2nd floor. The 69th Street Property consists of a 4,475 square foot lot improved by an approximately 3,562 square foot multi-family dwelling. The Trustee is informed that there are three (3) residential occupancies at the 69th Street Property.

17. By motion dated March 19, 2026 ("721 Motion"), the Trustee sought entry of an Order authorizing the Trustee to operate the Debtor's business and pay certain operating expenses of the estate for a limited period of time. See ECF No. 163.

18. On March 20, 2026, the Court entered an interim Order authorizing the Trustee to operate the Debtor's business and pay certain operating expenses of the estate from March 19, 2026 until the date of the hearing on the 721 Motion. See ECF No. 165.

19. On March 24, 2026, the Court entered an Order approving the Trustee's employment of MYC as property manager and real estate broker to market and solicit offers for the Properties. See ECF No. 166.

20. On March 27, 2026, at the Trustee's request, MYC visited the Properties. See **Exhibit A**, Declaration of Marc P. Yaverbaum ("Yaverbaum Decl."), at ¶4. Among other things,

MYC spoke with certain tenants/occupants and provided written notice that all future rent should be paid to the Trustee ("Notices").[3] See id. MYC was informed by certain of the tenants/occupants of the Church Ave Property that, in March 2026, rents were collected by Harris and the super. See id.

21. By letter to the Debtor dated March 27, 2026, counsel to the Trustee reiterated that the Trustee did not authorize the collection of rents from the Properties, that all rents collected from the Properties was property of the Debtor's estate, and that neither the Debtor nor anyone acting on the Debtor's behalf, including but not limited to Harris and the super, were authorized to collect any rent from the Properties.

22. On April 4, 2026, MYC visited the Church Ave Property. See Yaverbaum Decl. at ¶6. A tenant/occupant provided MYC with copies of the fronts and backs of two (2) cancelled checks dated February 9, 2026 and March 5, 2026 (i.e., after the conversion of the Debtor's case, the appointment of the Trustee, and the February 4 Letter), payable to Harris that appear to have been endorsed by Harris. See id. A tenant/occupant also provided a voicemail message where David instructs the tenant/occupant to, inter alia, change rent checks in the future to be payable to Harris. See id.

23. On April 8, 2026, the Court entered an Order establishing May 18, 2026 ("Chapter 11 Administrative Bar Date") as the deadline for the filing of proofs of Chapter 11 administrative expense claims against the Debtor's estate. See ECF No. 169.

24. On April 27, 2026, the Court entered an Order authorizing the Trustee to operate the Debtor's business and pay certain operating expenses of the estate from March 19, 2026 through and including July 21, 2026, without prejudice to further extensions of such authority

---

[3] On March 30, 2026, MYC caused copies of the Notices to be mailed to each of the tenant/occupants of the Properties. See Yaverbaum Decl. at ¶5.

("721 Order"). See ECF No. 172. In accordance with the 721 Order, the Trustee has been operating the Debtor's business.

25. In or around May 2026, the Trustee was informed that David passed away.

26. On May 18, 2026, the Dismissal Motion was filed with the Court. See ECF No. 173.

27. On May 21, 2026, the Stay Motion was filed with the Court. See ECF No. 176.

28. On May 29, 2026, the Court entered an Order scheduling a hearing on the Stay Motion. See ECF No. 179.

29. Pursuant to a Notice of Discovery Assets, the deadline to file proofs of pre-petition claims against the Debtor is August 31, 2026 ("Pre-Petition Bar Date"). See ECF No. 178.

30. As of the date of this Objection, ten (10) proofs of claim totaling $2,837,318.25 have been filed with the Court, which include: (a) "secured" claims totaling $2,711,823.90 (which do not account for interest and other charges that may have accrued since such claims were filed); (b) Chapter 11 administrative expense claims totaling $109,275.50[4]; and (c) a priority claim in the amount of $16,218.85.

**TRUSTEE'S OBJECTION**

31. The Motions, brought by the Debtor, each should be denied because only the Trustee may act for the Debtor. Further, there is no question that dismissal of this Chapter 7 case is not in the best interests of the Debtor's estate and its creditors. Finally, the Stay Motion is procedurally improper and not supported by law or fact.

**A. The Movant Does Not Have Standing To Prosecute The Motions**

32. When the Debtor's Chapter 11 case was converted to a case under Chapter 7 and

[4] It is noted that this sum includes the claim for the fees and expenses of Debtor's counsel for the Chapter 11 period, which were awarded pursuant to final Order of the Court. See ECF No. 162.

the Trustee was appointed, the Trustee became the representative of the Chapter 7 estate. See 11 U.S.C. § 323(a).

33. The United States Supreme Court in Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343 (1985) held that the trustee holds the power to exercise control over the debtor and its property. That holding is a fundamental principal of the Chapter 7 liquidation process. In Weintraub, the United States Supreme Court explained:

> the Bankruptcy Code gives the trustee wide-ranging management authority over the debtor. In contrast, the powers of the debtor's directors are severely limited. Their role is to turn over the corporation's property to the trustee and to provide certain information to the trustee and to the creditors. **Congress contemplated that when a trustee is appointed, he assumes control of the business, and the debtor's directors are completely ousted.**

Id. at 352-53 (internal citations and quotation marks omitted) (emphasis added).

34. In short, "[o]nce appointed, the trustee assumes control over the debtor's entire estate and all such interests" and that "control is not limited to the corporation's management. The trustee also assumes the sole power to prosecute legal claims on behalf of the debtor." Quest Ventures, Ltd. v. IPA Mmt. IV, LLC, 2018 U.S. Dist. LEXIS 25225, 2018 WL 922145, at *1-2 (E.D.N.Y. Feb. 15, 2018) (granting a Chapter 7 trustee's motion to dismiss a debtor's appeal of a conversion order). See also FED. R. BANKR. P. 6009 ("With or without court approval, the trustee. . . may: (a) prosecute—or appear in and defend—any pending action or proceeding by or against the debtor; or (b) commence and prosecute in any tribunal an action or proceeding on the estate's behalf.").

35. Here, the movant is purportedly the Debtor. See ECF Nos. 173, 176. Since only the Trustee may act for the Debtor, and the Trustee did not authorize the Motions, the Motions must

be denied.[5]

**B. Dismissal Is Not In The Best Interests Of The Estate**

36. Lack of standing aside, there is no cause to dismiss this case, and dismissal is not in the best interests of the Debtor's estate or its creditors.

37. A Chapter 7 debtor does not have an absolute right to have its case dismissed. See Smith v. Geltzer, 507 F.3d 64, 72 (2d Cir. 2007) (citations omitted). Pursuant to section 707(a) of the Bankruptcy Code, the Court may dismiss a Chapter 7 case only after notice and a hearing and only for "cause". See 11 U.S.C. § 707(a). The burden of proof is on the movant "to show that 'cause' exists to dismiss and that creditors will not be prejudiced by the dismissal." In re Katos, Case No. 10-72490-ast, 2010 Bankr. LEXIS 4516, at *4 (Bankr. E.D.N.Y. Dec. 9, 2010) (citing In re Stephenson, 262 B.R. 871, 874 (Bankr. W.D. Okla. 2001)); see Smith, 507 F.3d at 72. The decision to dismiss is guided by equitable considerations and is "committed to the sound discretion of the bankruptcy court." See id. at 73 (quoting In re Hull, 339 B.R. 304, 308 (Bankr. E.D.N.Y. 2006)).

38. "Courts generally consider the following factors when ruling on a debtor's motion to dismiss: (1) whether all of the creditors have consented; (2) whether the debtor is acting in good faith; (3) whether dismissal would result in an prejudicial delay in payment; (4) whether dismissal would result in a reordering of priorities; (5) whether there is another proceeding through which the payment of claims can be handled; and (6) whether an objection to discharge, an objection to exemptions, or a preference claim is pending." Turpen v. Eide (In re Turpen), 244 B.R. 431, 434 (B.A.P. 8th Cir. 2000) (citations omitted); see also Misty Mt., L.C. v. United States Tr. (In re Misty

---

5 Harris submitted a declaration in support of the Dismissal Motion. Aside from the fact that only the Trustee can act for the Debtor, the Trustee notes that the Power of Attorney for David that Harris filed with the Court terminated on David's death. See ECF No. 143 Section 1.07.

Mt., L.C.), 270 B.R. 53 (W.D. Va. 2001) (applying above factors and denying a business debtor's motion to dismiss). In this circuit, courts consider whether such dismissal is in the best interest of all the parties in interest. Smith, 507 F.3d at 72 (citing Dinova v. Harris (In re Dinova), 212 B.R. 437, 442 (B.A.P. 2d Cir. 1997)).

39. Here, the Debtor has not and cannot establish cause for dismissal. There is no evidence that creditors consent to dismissal; indeed, the universe of the Debtor's creditors is not fully known. There is also no evidence that the Debtor will be able to pay its creditors outside of bankruptcy because, inter alia, the term sheet annexed to the Dismissal Motion is not a commitment to lend and, more importantly, the anticipated net proceeds are insufficient to pay the known creditors of the Debtor's estate, including all the Chapter 11 and Chapter 7 costs of administration.

40. Moreover, there can be no serious argument that dismissal is in the best interests of the Debtor's creditors or its estate. The Debtor failed to stay current with its pre-petition obligations, which led to the commencement of this case. Further, when in Chapter 11, the Debtor failed to reorganize despite multiple opportunities to do so and failed to comply with Orders of the Court which led to the entry of the Conversion Order. When the case was converted to Chapter 7, the opportunity to reorganize ended and the statutory duty of the Trustee to liquidate assets began.

41. As the United States Court of Appeals for the Second Circuit has explained, "[t]he chief purposes of the bankruptcy laws are to secure a prompt and effectual administration and settlement of the estate of all bankrupts within a limited period, to place the property of the bankrupt, wherever found, under the control of the court, for equal distribution among the creditors, and to protect the creditors from one another[.]" Superintendent of Ins. v. Ochs (In re First Cent. Fin. Corp.), 377 F.3d 209, 217 (2d Cir. 2004) (internal quotations and citations omitted).

The statutory duty to ensure an appropriate distribution to creditors lies with the Trustee. See In re Cink, No. 06-40019, 2007 Bankr. LEXIS 649, at *7 (Bankr. D.S.D. Feb. 21, 2007). Here, dismissal would result in the Debtor's assets being taken out of the control of a statutory fiduciary and put into the hands of a person who has no authority to control the Debtor's assets and who has interfered with the Trustee's administration of the Debtor's estate. Dismissal of the Debtor's case is not in the best interests of the Debtor's creditors and, as such, the Dismissal Motion must be denied.

42. The facts in Smith v. Geltzer (In re Smith), 507 F. 3d 64 (2d Cir. 2007), the lone case cited by the Debtor in its Motions, are inapposite. In Smith, an individual debtor with debts of approximately $14,000.00 filed a voluntary Chapter 7 petition. See id. at *67-68. The individual debtor's sole potential asset was a personal injury claim, the value of which was unknown. See id. at *68. The individual debtor moved to dismiss her case after securing funds sufficient to pay all creditors but before the value of her personal injury claim was liquidated. See id. at *69. The bankruptcy court denied the motion and the decision was affirmed by the district court. See id. at *70-71. The Second Circuit Court of Appeals reversed the district court remanded the case with instructions to the district court to vacate the bankruptcy court order denying dismissal and return the case to the bankruptcy court for further proceedings. See id. at *76. The Second Circuit Court of Appeals recommended that:

> On remand, the Bankruptcy Court should consider both the benefits of Smith's proposed arrangement--including that it would allow her to pay off her creditors immediately, and also allow her to avoid the harms of discharging her debts through bankruptcy, such as the potential difficulty of securing future credit and the inability to receive Chapter 7 relief again for eight years, *see* 11 U.S.C. § 727(a)(8)--and the arrangement's potential costs--including that the high rate of interest charged by Setareh could reduce significantly any judgment or settlement amount eventually secured by Smith.

See id. at *75.

43. Here, the Debtor is a corporation and not an individual. A corporation cannot receive a discharge. See 11 U.S.C. § 727(a)(1). There is no "fresh start" to be obtained by this Debtor should its case be dismissed. There is, however, great risk to all creditors of the Debtor that they will never be paid if the Debtor's case is dismissed.

44. The interests of the Debtor's creditors are best served by this case remaining in Chapter 7 where the Trustee – an independent fiduciary for all creditors – has been and will continue to competently and efficiently administer the Debtor's estate, liquidate property of the Debtor's estate to the extent feasible and compatible with the best interests of the estate, and pay creditors in accordance with the priority scheme provided in the Bankruptcy Code.

**C. There Is No Basis For A Stay Of The Debtor's Chapter 7 Case**

45. By the Stay Motion, the Debtor seeks to stay the Trustee's administration of the estate pending the Court's determination of the Dismissal Motion. See generally ECF No. 176. If the Court denies the Dismissal Moton, the Stay Motion, is moot. Nevertheless, the Stay Motion, which is procedurally improper and unsupported by fact and law, should be denied.

46. Pursuant to section 704(a) of the Bankruptcy Code, the Trustee is statutorily charged with, inter alia, collecting and reducing to money property of the Debtor's estate. See 11 U.S.C. § 704(a)(1). The Debtor in effect seeks to enjoin the Trustee from performing her statutory duties. That injunctive relief can only be obtained through an adversary proceeding. See FED. R. BANKR. P. 7001(g) (listing adversary proceedings as including "a proceeding to obtain an injunction or other equitable relief"). Accordingly, the Stay Motion is procedurally defective.

47. The Stay Motion is also wholly unsupported by fact and law. The Debtor argues that absent a stay, "the Trustee may sell the Debtor's real property[.]" See ECF No. 176 at ¶6.

However, the Trustee cannot sell property of the Debtor's estate absent notice, a hearing and further Order of the Court. See § 363(b)(1) (providing that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate"); see also FED. R. BANKR. P. 2002(a)(2) (requiring at least twenty-one (21) days' notice of the proposed sale of property of the estate unless shortened by order of the court). When and if the Trustee determines to proceed with the sale of property of the Debtor's estate, notice of any such sale will be filed with the Court in accordance with applicable bankruptcy law and rules, and parties with standing will have an opportunity to be heard. However, the mere prospect of such relief being granted does not constitute "irreparable damage" as alleged by the Debtor.

48. Furthermore, the argument that Harris will be "deprived of the only home she has known for the past 20 years" is curious. Upon information and belief, Harris does not reside at either of the Properties and instead resides at the real property adjacent to the Debtor's 69th Street Property, i.e., 1234 E. 69th Street, Brooklyn, New York 11234.[6]

[6] According to the New York City Department of Finance Office of the City Register, title to the property at 1234 E. 69th Street, Brooklyn, New York 11234 was conveyed by David to Harris by deed recorded on July 28, 2022.

## CONCLUSION

49. The Debtor voluntarily commenced a Chapter 11 case and was afforded ample time to reorganize its financial affairs. It did not do so. The Debtor's case is now in Chapter 7, the Trustee is the sole representative of the Debtor, and the Chapter 7 estate should be administered by the Trustee in accordance with the Bankruptcy Code. Accordingly, and for the reasons set forth above, each Motions should be denied in their entirety.

Dated: June 17, 2026
Wantagh, New York

**LaMONICA HERBST & MANISCALCO, LLP**
*Counsel to Lori Lapin Jones, as Chapter 7 Trustee*

By: *s/ Holly R. Holecek*
Holly R. Holecek, Esq.
A Partner of the Firm
3305 Jerusalem Avenue, Suite 201
Wantagh, New York 11793
Telephone: (516) 826-6500

# EXHIBIT A

MYC & Associates, Inc.
1110 South Avenue, Suite 22
Staten Island, New York 10314
Marc P. Yaverbaum
Email: my@myccorp.com
Telephone: (347) 273-1258

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------x

In re: Chapter 7

2281 CHURCH AVENUE LLC, Case No.: 24-43449-jmm

Debtor.

-------------------------------------------------------x

**DECLARATION**

Marc P. Yaverbaum, declares as follows pursuant to 28 U.S.C. § 1746:

1. I am a licensed real estate broker and principal shareholder of MYC & Associates, Inc. ("MYC"). MYC maintains its corporate office at 1110 South Avenue, Suite 22, Staten Island, New York 10314. The facts set forth herein are based upon personal knowledge.

2. I submit this Declaration in connection with the omnibus objection of Lori Lapin Jones, solely in her capacity as Chapter 7 Trustee ("Trustee") of the estate of 2281 Church Avenue LLC ("Debtor") to the motions filed on behalf of the Debtor to dismiss this Chapter 7 case and for a stay of this Chapter 7 case.

3. By Order entered on March 24, 2026, the Court authorized and approved the Trustee's employment of MYC as property manager and real estate broker to the Trustee to market and sell the Debtor's the real properties located at: (a) 2281 Church Avenue, Brooklyn, New York 11226 ("Church Ave Property"); and (b) 1232 E. 69th Street, Brooklyn, New York 11234 ("69th Street Property") (together, the Church Ave Property and the 69th Street Property are the "Properties"). See ECF No. 166.

4. On March 27, 2026, at the Trustee's request, I along with Victor Moneypenny of MYC visited the Properties. Among other things, we spoke with certain tenants/occupants and provided written notice that all future rent should be paid to the Trustee ("Notices"). Copies of the Notices (without exhibits) are annexed as **Exhibit 1**. We were informed by certain of the tenants/occupants of the Church Ave Property that, in March 2026, rents were collected from the Church Ave Property by Debbie Harris and the super.

5. On March 30, 2026, MYC caused copies of the Notices to be mailed to each of the tenants/occupants of the Properties.

6. On April 4, 2026, I visited the Church Ave Property. A tenant/occupant provided MYC with copies of the fronts and backs of two (2) cancelled checks dated February 9, 2026 and March 5, 2026 payable to Debbie Harris that appear to have been endorsed by Debbie Harris. Copies of the cancelled checks are annexed as **Exhibit 2**. A tenant/occupant also provided me with a voicemail message where Oswald C. David instructs the tenant/occupant to, inter alia, change rent checks in the future to be payable to Debbie Harris. The voicemail message that I was provided is available on request.

7. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17th day of June 2026.

*s/ Marc P. Yaverbaum*
Marc P. Yaverbaum

# EXHIBIT 1

MYC

# NOTICE TO ALL OCCUPANTS

| | |
|---|---|
| **TO**: | All Occupants |
| **PROPERTY ADDRESS**: | 2281 Church Avenue, Brooklyn, New York 11226 |
| **FROM**: | MYC & Associates, Inc. |
| **RE**: | Property Manager |
| **DATE**: | March 27, 2026 |

---

Please be advised that MYC & Associates, Inc. ("**MYC**"), is the property manager to Lori Lapin Jones, solely in her capacity as Chapter 7 Trustee ("**Trustee**"), of the bankruptcy estate of 2281 Church Avenue LLC ("**Debtor**"). The Debtor's case is currently pending in the United States Bankruptcy Court for the Eastern District of New York ("**Bankruptcy Court**") under case no.: 24-43449-jmm. The Debtor is the owner of the real property located at 2281 Church Avenue, Brooklyn, New York 11226 ("**Real Property**").

Annexed to this Notice are: (i) a copy of the Order of the Bankruptcy Court authorizing the Trustee to operate the Debtor's business; and (ii) a copy of the Order of the Bankruptcy Court approving the Trustee's retention of MYC as, among other things, her property manager.

**EFFECTIVE IMMEDIATELY, all past due, current and/or future rent / use & occupancy payments relating to the Real Property are to be made payable to "Lori Lapin Jones, as Trustee" and mailed or delivered to:**

Lori Lapin Jones, Trustee
Lori Lapin Jones PLLC
98 Cutter Mill Road - Suite 255 South
Great Neck, New York 11021

MYC understands that changes in management can be unsettling, and we want to assure you that we are committed to making this transition as smooth as possible. We encourage you to reach out to us with any questions or concerns using the information below. We look forward to a positive working relationship with you.

You may reach us at the address below or by email or phone as follows: Marc Yaverbaum: Email: my@mycorp.com, Mobile/Text: (917) 648-8059; or Victor Moneypenny: vm@mycorp.com; Mobile/Text: (917) 699-9694.

MYC

# NOTICE TO ALL OCCUPANTS

**TO:** All Occupants
**PROPERTY ADDRESS:** 1232 E. 69th Street, Brooklyn, New York 11234
**FROM:** MYC & Associates, Inc.
**RE:** Property Manager
**DATE:** March 27, 2026

---

Please be advised that MYC & Associates, Inc. ("**MYC**"), is the property manager to Lori Lapin Jones, solely in her capacity as Chapter 7 Trustee ("**Trustee**"), of the bankruptcy estate of 2281 Church Avenue LLC ("**Debtor**"). The Debtor's case is currently pending in the United States Bankruptcy Court for the Eastern District of New York ("**Bankruptcy Court**") under case no.: 24-43449-jmm. The Debtor is the owner of the real property located at 1232 E. 69th Street, Brooklyn, New York 11234 ("**Real Property**").

Annexed to this Notice are: (i) a copy of the Order of the Bankruptcy Court authorizing the Trustee to operate the Debtor's business; and (ii) a copy of the Order of the Bankruptcy Court approving the Trustee's retention of MYC as, among other things, her property manager.

**EFFECTIVE IMMEDIATELY, all past due, current and/or future rent / use & occupancy payments relating to the Real Property are to be made payable to "Lori Lapin Jones, as Trustee" and mailed or delivered to:**

Lori Lapin Jones, Trustee
Lori Lapin Jones PLLC
98 Cutter Mill Road - Suite 255 South
Great Neck, New York 11021

MYC understands that changes in management can be unsettling, and we want to assure you that we are committed to making this transition as smooth as possible. We encourage you to reach out to us with any questions or concerns using the information below. We look forward to a positive working relationship with you.

You may reach us at the address below or by email or phone as follows: Marc Yaverbaum: Email: my@mycorp.com, Mobile/Text: (917) 648-8059; or Victor Moneypenny: vm@mycorp.com; Mobile/Text: (917) 699-9694.

# EXHIBIT 2

CHECK 0 OF 0

Front | Back

2681

**SUNRISE GOURMET DELI II CORP**
2186 BEDFORD AVE
BROOKLYN, NY 11226-3210

DATE 2-9-2026 1-2/210

PAY TO THE ORDER OF DEBBIE HARRIS $ 4250 xx/xx

FOR THOUSAND TOW HUNDRED- FIFT DOLLARS

CHASE
JPMorgan Chase Bank, N.A.
www.Chase.com

FOR STOR RENT

⑈002681⑈ ⑆021000021⑆ [redacted]

CHECK 0 OF 0

Front | Back



CHECK 0 OF 0

Front | Back

2709

**SUNRISE GOURMET DELI II CORP**
2186 BEDFORD AVE
BROOKLYN, NY 11226-3210

DATE 3-5-2026 1-2/210

PAY TO THE ORDER OF DEBBE HARRIS $ 4250.00

FOUR Thousand Tow hundred fafty DOLLARS

CHASE
JPMorgan Chase Bank, N.A.
www.Chase.com

FOR REN· OF MARCH-26

⑈002709⑈ ⑆021000021⑆ [redacted]

CHECK 0 OF 0

Front | Back



CULLEN AND DYKMAN LLP
The Omni Building
333 Earle Ovington Boulevard, 2nd Floor
Uniondale, New York 11553
(516) 357-3700
Bonnie L. Pollack, Esq.
Kyriaki A. Christodoulou, Esq.
bpollack@cullenllp.com
kchristodoulou@cullenllp.com

*Counsel for Flushing Bank*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| | : | |
| 2281 CHURCH AVENUE LLC | | Case No. 24-43449 (JMM) |
| | : | |
| Debtor. | : | |

**OPPOSITION OF FLUSHING BANK TO DEBTOR'S MOTION**
**<u>TO DISMISS CHAPTER 7 CASE AND REQUEST TO STAY CASE UNTIL DISMISSAL</u>**

TO THE HONORABLE JIL MAZER-MARINO,
CHIEF UNITED STATES BANKRUPTCY JUDGE:

Flushing Bank ("<u>Flushing</u>"), secured creditor of the Debtor, by and through its counsel Cullen and Dykman LLP, hereby submits this opposition (the "<u>Opposition</u>") to the motion (the "<u>Motion</u>") of the Debtor to dismiss its chapter 7 case and to stay the chapter 7 case until dismissal. For the reasons discussed below, the Motion must be denied.

1. This case has a tortured history, to say the least, particularly as a result of dilatory and improper actions of the Debtor's principal and his wife Debbie Harris. Without going into the details of every troublesome issue that arose, the following occurred:

- The Debtor entered into a cash collateral agreement with Flushing and repeatedly defaulted

each month thereafter. The defaults resulted in Flushing terminating the use of cash collateral as of March 31, 2025, although the Debtor continued to use the rents improperly after that and has never accounted for such use.

- The Debtor is now on its third attorney, firing each when things are not going the way the Debtor wants.
- The Debtor has filed at least 5 plans, all of which were contested by Flushing among other parties; the ones based on a restructuring of its mortgages were never feasible nor could they ever be feasible, and the ones based on a sale were never properly pursued.
- The Debtor would enter into agreements in Court, on the record, and then renege within days (or worse try to argue that the particular matter was never agreed to).
- When the Debtor finally agreed to sell the Church Ave. property, it never marketed the property for sale in a manner that would actually lead to the closing of a sale. The Debtor used its requests for "marketing periods" to simply delay the inevitable. To tend, the Debtor insisted on hiring a broker who not only had zero knowledge about commercial buildings in the city, but was also persuaded by the Debtor to list the property for more than 3 times the actual value of the property. That, of course, ended predictably.
- Ms. Harris began to act on behalf of the Debtor during the bankruptcy case, even though she had no corporate authority to do so. After the recent death of the principal, she has continued to act on behalf of the Debtor although, to the best of Flushing's knowledge, no letters testamentary or of administration have been produced, nor has she demonstrated that the member interest in the Debtor was transferred legally to her.
- The Debtor was able to stave off conversion of the case for a period of nearly 6 months with delusions of grandeur and broken promises. Conditional orders that were entered

during that time were ***all*** defaulted on by the Debtor.

- ***Ms. Harris knowingly fraudulently transferred the Debtor's property to herself in the middle of the case with no court approval and without the knowledge of any parties to the case. It was discovered by happenstance.***
- The Debtor still has not sat for a section 341 meeting in the chapter 7 case, to the best of Flushing's knowledge.
- Throughout the majority of this time, Flushing has not been paid on its mortgage, interest and fees continue to accrue, and Flushing has had to come out of pocket for many expenses associated with the Church Ave. property.

2. This is but a short list of how the Debtor undertook to manage its bankruptcy case, and the disrespect that the Debtor, and Ms. Harris, have for the Court and the legal system.

3. Now comes the Debtor, waltzing in as if none of the foregoing has occurred, and wants the case to be dismissed and wants a stay of the case until it is. The Debor claims that it will sell the property based on a financing commitment and that it will be able to pay its creditors with the proceeds. As always, there can be no assurances (quite the opposite based on the history) that the Debtor will actually enter into the contract, undertake its obligations under the contract, close the sale and actually distribute the proceeds to creditors in the required manner. The Debtor expects the Court to believe that it has suddenly changed its stripes and will not act improperly or for their own selfish benefit.

4. There are no grounds to grant the Debtor's Motion. First, the basis of the Motion is that the Debtor is ready to sell the Church Ave. property. That does not seem to be the case. All that is attached to the Motion is a commitment to possibly commit; the lender is "agreeable to advancing funds". There is no way of knowing whether this is even a real commitment, whether

there will be any contingencies that will be impossible to meet and whether the lender has done diligence.

5. Second, the "commitment" is signed by Ms. Harris, who is identified as a member of the Debtor. It is not clear whether she has standing to sell the property or to even file the Motion. It would not be the first time that Ms. Harris acted without authority in this case.

6. Third, the Debtor expects the Court, trustee and creditors to trust it to carry out this process, when it has done nothing to have earned that trust. Quite the opposite. Once dismissed, there is no reason to believe that the Debtor will actually comply with its obligations to pay creditors.

7. Fourth, the Court already converted the case to chapter 7, thereby determining that it was the better alternative under section 1112 of the Bankruptcy Code.

8. Finally, if this is a real deal, there is nothing stopping Ms. Harris from obtaining the financing to buy the property in a sale conducted by the trustee. If she were the successful bidder, she would obtain the same result , but through a trusted process with a trustworthy seller who will ensure that creditors are paid.

9. In short, it takes a certain amount of chutzpah to act in the improper manner in which the Debtor and Ms. Harris have in this case, including knowingly transferring the Church Ave. property to Ms. Harris in a fraudulent manner, and then come to the Court and expect that the case would just be dismissed with a waive of a hand, so that the Debtor and Ms. Harris can do whatever they want without any Court oversight. That is a result that should not even be entertained by the Court.

10. There are also no grounds to stay the case pending dismissal. There is no irreparable harm (or any harm for that matter) in the trustee continuing to work toward a sale which may be

for greater consideration than the one contemplated by the Motion. Furthermore, during this process the trustee should be the one to continue to collect rents so that they actually make it into the hands of the estate. It seems pretty obvious to Flushing at least, that the Debtor is seeking this stay to avoid attending a 341 meeting, at least in the immediate future, possibly because it has things to hide from the trustee. These are not reasons to stay the trustee from doing her duty in this case.

11. Accordingly, Flushing submits that the Court should deny the Motion in its entirety.

**WHEREFORE**, Flushing requests that the Court deny the Motion, and grant Flushing such other and further relief as may be just and proper under the circumstances.

Dated: Uniondale, New York
June 17, 2026

CULLEN AND DYKMAN LLP
Counsel to Flushing Bank

By: *s/Bonnie L. Pollack*
Bonnie L. Pollack, Esq.
Kyriaki A. Christodoulou, Esq.
The Omni Building
333 Earle Ovington Boulevard, 2nd Floor
Uniondale, New York 11553
(516) 357-3700
bpollack@cullenllp.com
kchristodoulou@cullenllp.com

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
In re:

2281 CHURCH AVENUE LLC,

Debtor
-----------------------------------------------------------X

Chapter 7

Case No. 24-43449-jmm

RESPONSE TO THE OMNIBUS OBJECTIONS OF THE CHAPTER 7 TRUSTEE AND OPPOSITION OF FLUSHING BANK

Shorn of all distractions, the only question which is raised by Debor's motion to dismiss is whether this bankruptcy action should be dismissed in light of the principles enunciated by the Second Circuit in *In re Smith*, 507 F.3d 64 (2d Cir. 2007)? As this reply will show, the answer is a resounding, "Yes."

Standing of Debbie Harris to Act on Behalf of 2281 Church Avenue LLC

Oswald David was the sole shareholder and President of 2281 Church Avenue LLC ("Debtor"). During his lifetime, Mr. David was married to Debbie Harris until his death. As 100% shareholder of Debtor, Mr. David appointed Ms. Harris Manager of 2281 Church Avenue LLC. Mr. David also appointed Ms. Harris his attorney-in-fact for most of his personal things. See Power of Attorney, dated December 7, 2023. In December 2023, Mr. David set up a trust named OSWALD DAVID LIVING TRUST which he executed on December 18, 2023. Under this Living Trust, Mr. David appointed himself the sole trustee with all powers. See Reply Declaration of Debbie Harris dated June 20, 202 ("Harris Reply Declaration"), Exhibit F, Section 1.05.

By the same trust instrument, Mr. David appointed Debbie Harris as his successor trustee upon his death. (Harris Reply Declaration, Section 3.03). Mr. David died intestate on May 2, 2026. As successor trustee to Mr. David, Debbie Harris is vested with all the powers and interests possessed by Oswald David as trustee of the trust with regard to his business and property interests. By the terms of the Living Trust, the trust which was revocable during the lifetime of Mr. David became ***irrevocable*** upon Oswald David's death. (Harris Reply Declaration, Section 5.01).

Upon the death of Oswald David, Ms. Harris, as Trustee, was empowered to distribute the following to herself, *outright free of trust*:

1) 1232 East 69th Street, Brooklyn, NY 11234
2) 2281 Church Avenue, Brooklyn, NY 11236
3) Flushing Bank, 200 RX Plaza, Uniondale, NY 11556, A/c # 8900138098 (Section 6.02)

Effect of Bankruptcy Filing

As a beneficiary and sole Trustee of the OSWALD DAVID LIVING TRUST, Debbie Harris stepped into the shoes of Oswald David, both as a person and as *sole trustee* of Oswald David Living Trust. So, Ms. Harris now possesses whatever authority, rights or interests Oswald David may have possessed as 100% shareholder in 2281 Church Avenue LLC (Debtor), together with her position as duly appointed Manager of Debtor. The interest of Debbie Harris in the Debtor is only qualified by the powers of the Chapter 7 Trustee during the pendency of this bankruptcy case.

A Chapter 7 Debtor has authority to apply for the dismissal of a pending bankruptcy case without the consent of the Chapter 7 Trustee. *See In re Smith*, 507 F.3d 64 (2d Cir. 2007). Like

here, Debtor in *Smith* moved to dismiss her bankruptcy case and the Chapter 7 Trustee opposed. The Bankruptcy Court *denied dismissal* which was affirmed by the District Court. On further appeal, the Second Circuit Court of Appeals reversed.

Flushing Bank's Challenge to the Authority of Debbie Harris to Act

Flushing Bank appears to challenge the authority of Debbie Harris to take steps on behalf of the Debtor in this matter. As we shall see, Flushing Bank is mistaken as to the source of the current authority of Debbie Harris to *continue* to act here. Flushing Bank claims that "Ms. Harris began to act on behalf of the Debtor during the bankruptcy case, even though she *had no corporate authority* to do so." (Emphasis added) (Flushing Opposition, at p. 2). Flushing Bank is wrong. Initially, Ms. Harris acted for the Debtor on the strength of her appointment as Manager by the sole shareholder, Oswald David. Ms. Harris also acted for Mr. David on the strength of a Power of Attorney duly executed by Mr. David.

Flushing Bank cannot have it both ways. If, in fact, Ms. Harris had no authority to act for the Debtor, as Flushing Bank now contends, it means that all the steps taken by Ms. Harris on behalf of the Debtor are invalid. And the court orders based wholly or in part on those steps amount to a nullity! Counsel for Flushing Bank noted many instances in which Ms. Harris "acted without authority in this case." If that is correct, the question then arises: Did Flushing Bank's counsel discharge her ethical duty of candor to the court by promptly bringing Ms. Harris's lack of authority to the attention of the court?

Moreover, Flushing Bank appears to believe that letters testamentary or letters of administration are needed for Ms. Harris to *continue to act in place of* Mr. David or the Debtor. Flushing Bank is grossly mistaken. Ms. Harris' husband created the Oswald David Living Trust

while he was alive as a private entity. One of the reasons for creating this trust is exactly to avoid probate and the involvement of the courts in the settlement of his affairs of his estate upon his death. By its terms, the trust became *irrevocable* upon Oswald David's death. (Harris Reply Declaration, Section 5.01). This trust instrument does not require the approval of any Court and is not subject to probate proceedings. (Harris Reply Declaration, Section 11.04). This trust instrument is all the authority that Ms. Harris needs to continue to act in this matter, both for the Debtor and for Mr. David. Ms. Harris also has a right, pursuant to the trust instrument, to provide to third parties, affidavit/certificate of the existence of the trust without providing a copy of the instrument. This is an issue of privacy for both Mr. David and Ms. Harris. (Harris Reply Declaration, Section 1.02).

On the other hand, if Flushing Bank is correct in its contention that Ms. Harris is without authority to act for the Debtor, it means that this bankruptcy case will be delayed indefinitely, as no one will have authority to act, and there is no avenue for the affairs of Oswald. David who died intestate to be resolved in the Surrogate's Court. Meanwhile, costs and expenses will continue to mount.

<u>Response to Flushing Bank's Opposition on the Merits</u>

Having dealt with the issue of Ms. Harris' authority and standing to take steps on behalf of Debtor and Mr. David, we now turn to the merits of Flushing Bank's opposition. Remarkably, Flushing Bank is the only creditor who opposes dismissal of this case. Flushing Bank goes into a litany of events which have nothing to do with whether or not this court should dismiss this case from bankruptcy. Nothing alleged by Flushing Bank in its prolix and ineffectual opposition provides any valid <u>legal distinction</u> between this case and *In re Smith, supra*. Moreover, Flushing

Bank speculates, without an iota of proof, that "if this deal is real, there is nothing stopping Ms. Harris *from obtaining the financing to buy the property in a sale* to be conducted by the trustee. *If she were the successful bidder*, she could obtain the same result, but through a trusted process with a trustworthy seller who will ensure that creditors are paid." (Emphasis added)(Flushing Bank Objections, page 4, ¶8).

If this were not a very serious matter, Flushing Bank's aforesaid contention would be laughable. First, Flushing Bank appears to question whether the funding deal secured from a third party by Ms. Harris with a payment of $20,000 is "real." Yet, Flushing Bank failed to include any information, in its opposition, to show that it made a simple inquiry from this identified third-party, and that the third party denied or disavowed the loan commitment. Secondly, it is totally untrue that Ms. Harris would *obtain the same result* if she were to go into a bidding war with others for the purchase of the property. Flushing Bank's contention shows utter naivety.

Thirdly, Ms. Harris would have no control over the ultimate price at which the property would be sold under a bankruptcy regime. Fourthly, no serious person would lend the kind of money required to purchase the subject property without adequate security. And it is undisputed that, while this case remains in the Bankruptcy Court, Ms. Harris cannot utilize the Debtor's property, which is currently under the control of the Trustee, as security for the money to be utilized in the bidding. Besides, a sale or purchase through the bankruptcy process will involve the payment of additional fees and administrative expenses. Finally, there *is no guarantee* that Ms. Harris would be the *successful bidder* if the property were to be subjected to a public bidding.

On the other hand, a dismissal of this case from bankruptcy would enable the third-party close on the loan commitment already secured, and pay off creditors from the loan proceeds. The Debtor whose only business is ownership and use of 2281 Church Avenue, Brooklyn, NY, will remain in business if this Court dismisses this case from bankruptcy. On the other hand, if the property is sold through bankruptcy, the Debtor will effectively cease to do business permanently.

Conflicting Evidence Between Trustee and Flushing Bank as to What is Owed to Creditors

Flushing Bank which is the only creditor opposing dismissal of this case has made unexplained conflicting claims. The Trustee asserts that on *October 25, 2024*, Flushing Bank filed a secured claim of $1,642,601.15. Meanwhile, Flushing Bank represented to the Debtor that as of *January 16, 2026*, Debtor owed Flushing Bank a balance of $1,464,624.34 (Exhibit C, Declaration in Support of Dismissal by Debbie Harris). In a complete display of bad faith, nowhere in its Opposition papers did Flushing Bank explain the conflict between the secured claim of $1,642,601.15 that it filed, and its subsequent claimed balance of $1,464,624.34 as of January 16, 2026, a difference of over $177,976.00!

Flushing Bank's argument with regard to other creditors of Debtor which it does not represent is entirely of no moment and should be disregarded by the court. Flushing Bank's attorney has no legal standing to advocate the position of those creditors who have not retained her services. As noted above, other than Flushing Bank, no other creditor has opposed the dismissal of this bankruptcy case. In fact, the judgment creditors of the largest claim have shown, through their attorney, that they are simply interested in getting paid regardless of the source from which the payment comes. *See* Exhibit D, Debbie Harris Affirmation in Support of

Dismissal.

Response to Chapter 7 Trustee's Position

To the extent that the Chapter 7 Trustee is challenging the standing or authority of Debbie Harris to take steps in this matter, Debtor's response above to the challenge of Flushing Bank is hereby incorporated.

Stay Pending Decision on Motion to Dismiss Case

Both the Trustee and Flushing Bank have either misread the Debtor's motion for stay or totally misconstrued same. Debtor did not seek to permanently stay action here. Stay is only sought to preserve the status quo pending the Court's determination of Debtor's motion to dismiss. Are the Trustee and Flushing Bank suggesting that this Court is without authority to control its processes by preserving the status quo until further order? Are they suggesting that they could go ahead and take steps which would foist upon the court a fait accompli should the court dismiss the case? The temporary stay sought here does not interfere with the Trustee's power to manage the property.

The point is not lost on Debtor that the longer this matter remains in bankruptcy, the greater control the Trustee has over the Debtor's assets, and the more money the Debtor expends on the Trustee and those the Trustee hired to provide various services in connection with the bankruptcy, including real estate agents. The Trustee's position here is expressed to be "solely in her capacity as Chapter 7 Trustee." *See* Omnibus Objection, page 1). This means that the Trustee has no personal interest in this matter. If this is in fact so, and with only Flushing Bank opposing, what is the rationale for the Trustee's objection to the dismissal of this case? This is especially so in light of the unexplained conflicting claims of Flushing Bank.

CONCLUSION

In light of the foregoing, the Court should dismiss this case from bankruptcy forthwith so that Debtor can conclude steps to pay off its creditors and continue its business.

Dated: New York, New York
June 22, 2026

**LAW OFFICES OF K.C. OKOLI, P.C.**
5 Penn Plaza, 19th Floor
New York, N.Y. 10001
(212) 564-8152

By: */s/ K.C. Okoli*
K.C. OKOLI, ESQ.

*Attorneys for 2281 CHURCH AVENUE LLC, Debtor*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
In re:

2281 CHURCH AVENUE LLC,

Debtor
-------------------------------------------------------------X

Case No.: 24-43449-jmm

Chapter 7

**REPLY DECLARATION IN FURTHER SUPPORT OF DISMISSAL OF CASE**

DEBBIE HARRIS declares the following to be true and correct under the penalty of perjury:

1. I am the duly appointed Manager of 2281 Church Avenue LLC (the "Debtor") by Oswald David, the 100% shareholder of the Debtor during his lifetime.
2. I submit this Reply Declaration in further support of the motion of Debtor to dismiss this bankruptcy case.
3. In addition to my being duly appointed Manager of Debtor, I am also successor trustee to Oswald David as *sole trustee* of Oswald David Living Trust. Annexed hereto as **Exhibit F** are excerpts of the trust instrument which set up the trust on December 18, 2023.
4. The trust instrument gives me the right to provide an affidavit instead of a copy of trust instrument to third parties which I hereby exercise for privacy reasons.
5. That trust instrument became *irrevocable* upon the death of Oswald David who died

intestate on May 2, 2026.

6. I have read the Opposition papers of Flushing Bank in this matter and aspersions she cast on my person. I will refrain from responding to those other than to say that the tone and language employed by Flushing Bank's counsel leaves much to be desired.

7. Contrary to the position taken by Flushing Bank and the Trustee, I have all the authority needed in this bankruptcy action, to represent the interests of both Oswald David's Estate and the Debtor.

8. With regard to pending legal matters, I have relied upon the advice and counsel of the Debtor's attorney and other professionals.

9. I reiterate that, if this case is dismissed from bankruptcy, Debtor has secured a binding commitment from third parties to lend Debtor **$3.26 Million** which is sufficient to pay off all creditors who are known to have filed claims in this bankruptcy case.

10. A sale of the Debtor's property through bankruptcy will cause Debtor to go out of business permanently.

11. I have also read the Opposition papers of the Trustee dated June 17, 2026.

12. The statement of the Trustee contained in paragraph "48" needs to be explained. When I began dating Oswald David more than 20 years ago, I moved in with him into **1232** East 69th Street, Brooklyn, New York 11234. I rented out my personal property at 1234 East 69th Street, Brooklyn, New York 11234 to tenants, and Mr. David never had any legal interest in that property.

13. When Mr. David's health got pretty bad in 2024, it was very difficult for him to climb

stairs and do thing which he was compelled to do in 1232. I then evicted a tenant from my building at 1234 East 69th Street, so as to move in where Mr. David would have it much easier.

14. My children then moved into 1232 from which we moved out. Due to the ill-health of Mr. David, he and I remained in my personal property at 1234 until his death.

15. Mr. David gave me **1232** outright free of trust by virtue of the trust he created in 2023.

16. The competing equities in this case favor dismissal. Neither the Trustee nor Flushing Bank has demonstrated that continuing to pursue bankruptcy in this matter will be in the best interests of all parties, *including the creditors and Debtor*, than dismissing the case and paving the way for the third-party loan of $3.26 Million which will be available to pay the creditors with money left for the Debtor to continue its business.

Dated: New York, New York
June 20, 2026

DEBBIE HARRIS

# EXHIBIT F

# OSWALD DAVID LIVING TRUST

December 18, 2023

LAW OFFICES
LAW OFFICE OF DENRICK W COOPER PLLC
207-23 HILLSIDE AVE
QUEENS VILLAGE, NEW YORK 11427

# Oswald David Living Trust

## Article One
## Establishing My Trust

The date of this revocable trust agreement is ____________________, 20___. The parties to this agreement are Oswald David (the "Grantor") and Oswald David (my "Trustee").

By this agreement, I intend to create a valid trust under the laws of New York and under the laws of any state in which any trust created under this agreement is administered.

### Section 1.01 Identifying My Trust

My trust is called the "Oswald David Living Trust." However, the following format should be used for taking title to assets: "Oswald David, Trustee of the Oswald David Living Trust, dated ______ ______, 20___, and any amendments thereto."

During any period that my trust is a Grantor Trust, the taxpayer identification number of my trust may be my Social Security number in accordance with Treasury Regulation Sections 301.6109-1(a)(2)(i)(B) and 1.671-4(b)(2)(i)(A).

### Section 1.02 Third-Party Reliance on Affidavit or Certification of Trust

My Trustee may provide an affidavit or certification of trust to third parties in lieu of providing a copy of this agreement. Third parties are exonerated from any liability for acts or omissions in reliance on the affidavit or certification of trust, and for the application that my Trustee makes of funds or other property delivered to my Trustee.

### Section 1.03 Transferring Property to My Trust

By execution of this agreement, I transfer, convey, and assign to my Trustee, the trust property described on Schedule A, attached to this agreement, and my Trustee accepts and agrees to hold such property under the terms of this agreement. My Trustee may accept any additional property transferred to my trust, at any time, including as the result of a beneficiary designation.

To the extent New York law allows, any joint tenancy interest conveyed to my trust will sever the joint tenancy, creating a separate property interest.

To the extent New York law allows, all community property conveyed to my trust will retain its character as community property to the same extent as if it had not been conveyed to my trust.

# Article Three
# Trustee Succession

### Section 3.01 Definition of Incapacity

For purposes of this Article, any person, including me, is considered incapacitated if the requirements of Section 12.05(f) are satisfied.

### Section 3.02 Trustee Succession During Incapacity

If I am incapacitated, I appoint Debbie Ann Harris to serve as Trustee of my trust, replacing the serving Trustee.

### Section 3.03 Trustee Succession After Death

After my death, I appoint Debbie Ann Harris to serve as Trustee of my trust, replacing the serving Trustee, and over any trust created under this agreement.

### Section 3.04 Beneficiary's Right to Serve as Trustee

Upon the creation of a separate trust for a beneficiary under Article Eight, entitled "Residuary to My ," the primary beneficiary of a separate trust, upon attaining the age of 21, may appoint himself or herself as a Cotrustee of his or her separate trust and may serve as the sole Trustee of the trust.

If the interest of a beneficiary will be merged into a life estate or an estate for years because the beneficiary is serving as sole Trustee, the beneficiary shall appoint a Cotrustee to avoid such merger. Similarly, if the interest of a beneficiary becomes, or is likely to become, subject to the claims of any creditor or to legal process as a result of serving as sole Trustee, the beneficiary shall appoint an Independent Trustee to serve as Cotrustee.

### Section 3.05 Trustee Resignation, Removal, and Appointment

If I am serving as Trustee, I may resign and appoint a replacement at any time. Any other Trustee may resign by giving notice to me, or if I am incapacitated, to my agent. If I am deceased, a resigning Trustee will give notice to the income beneficiaries of the trust and to any other Trustee then serving.

Any of the following may remove and replace any Trustee and fill a Trustee vacancy, with or without cause, at any time:

(i) me;

(ii) if I am incapacitated, my wife, Debbie Ann Harris;

(iii) if I am incapacitated, the person court-appointed for me as Conservator of the Estate;

(iv) the primary beneficiary of any trust created under this agreement as it relates to the Trustee of that trust; or

# Article Six
# Specific Distributions, Tangible Personal Property, and Elective Share

## Section 6.01 Specific Gift of Residence to My Wife

Upon my death, if my wife survives me, my Trustee will distribute any real property (including buildings and improvements) used by my wife as her principal residence, to my wife, outright, free of trust. This gift includes insurance policies on the property and claims under the policies, and is subject to all liens and encumbrances against the property that exist at my death.

## Section 6.02 Specific Distribution to My Wife

Upon my death, if my wife survives me, my Trustee will distribute the following properties and accounts to my wife, outright, free of trust. The properties and account are:

(1) 1232 East 69th Street, Brooklyn, New York 11234

(2) 2281 Church Avenue, Brooklyn, New York 11226

(3) Flushing Bank, 220 RX Plaza, Uniondale, NY 11556, acct. no. 8900138098

If my wife is not then living, my Trustee will distribute the property subject to this distribution to my wife's descendants, per stirpes. Property passing under this Section will pass free of any administrative expenses or death taxes.

## Section 6.03 Specific Distribution to My Wife

I acknowledge that I have ten (10) children, however, I decided to leave all of my real estate and bank account, to my wife Debbie Ann Harris:

I give $5,000 to nine (9) of my children and $10,000 to one of my children, namely, Robert David as specified in Section 6.

## Section 6.04 Specific Distribution to Bradford David

Upon my death, even if my wife survives me, my Trustee will distribute the sum of $5,000 to Bradford David, outright, free of trust. If Bradford David is not then living, my Trustee will distribute the property subject to this distribution to Bradford David's descendants, per stirpes. Property passing under this Section will pass free of any administrative expenses or death taxes.

# Article Five
# Administration Upon My Death

### Section 5.01 Irrevocability and Termination of Spousal Interest

Upon my death, any principal, income, or beneficial interest that my wife had in my trust estate shall terminate; however, my wife may still be a beneficiary under the provisions that follow.

My trust will become irrevocable upon my death, and my Social Security number may no longer be used to identify my trust. My Trustee will apply for a separate Taxpayer Identification Number for my trust, as needed.

### Section 5.02 Payment of My Claims and Expenses

My Trustee, in my Trustee's sole discretion, is authorized, but not directed, to pay:

(i) expenses of my last illness, funeral, and burial or cremation, including expenses of memorials and memorial services;

(ii) legally enforceable claims against me or my estate;

(iii) expenses of administering my trust and my estate; and

(iv) court-ordered allowances for those dependent upon me.

No third party may enforce any claim or right to payment against my trust by virtue of this discretionary authority.

If payment would increase the federal estate tax due from my estate, my Trustee may not pay any administrative expenses from assets passing to an organization that qualifies for the federal estate tax charitable deduction.

By authorizing my Trustee to make payments described in this Section, I do not thereby waive any statutory or common law exemption afforded to any asset from satisfaction of such payments (for example, from life insurance proceeds payable to my trust).

(iii) the trust is a common trust where, at the time the retirement account becomes payable to the trust, more than one beneficiary is presently entitled to receive distributions from the trust,

then no individual, other than an eligible designated beneficiary described in Section 401(a)(9)(E)(ii)(III) or (IV) of the Internal Revenue Code, has any right to receive distributions from the retirement account until the death of all such eligible designated beneficiaries with respect to the trust's interest in the retirement account.

**(c) Intent to Qualify as Accumulation Trust**

These provisions are intended to qualify any trust created under this agreement that receives distributions from a retirement account as an accumulation trust, and to use the life expectancy of an individual who is named as the primary or secondary beneficiary to calculate the required minimum distributions under Section 401(a)(9) of the Internal Revenue Code.

**(d) No Intent to Diminish Shares of Other Beneficiaries**

These provisions are not intended to diminish the trust share for beneficiaries to whom retirement-account proceeds must not be distributed, except to the extent that non-retirement account trust property is insufficient to satisfy those beneficiaries' shares, in which case their shares will be diminished on a pro rata basis.

**(e) Restriction on Payments**

Other than as required by law, retirement-account proceeds must not be used for payment of any of the following:

(1) my debts;

(2) my taxes;

(3) expenses of estate administration;

(4) other claims against my estate; or

(5) payment of estate, inheritance, or other similar transfer taxes.

**(f) Definition of Retirement Account**

"Retirement account" means any qualified retirement account, pension plan, profit-sharing plan, Keogh, individual retirement account, or any other like plan or account.

## Section 11.04 No Court Proceedings

My trust will be administered expeditiously, consistent with the provisions of this agreement, free of judicial intervention, and without order, approval, or action of any court.

## Grantor and Trustee

This agreement is executed on December 18, 2023

I, Oswald David, as Grantor hereunder, certify that I have read this agreement, that I understand it, and that it correctly states the provisions under which the trust property is to be administered and distributed by my Trustee. I hereby sign this agreement in the presence of the witnesses. I, Oswald David, agree to serve as Trustee hereunder and to administer and distribute trust property according to the provisions of this agreement.

______________________________
**Oswald David, Grantor and Trustee**

STATE OF NEW YORK )
COUNTY OF Queens )

On the 18th day of December, in the year 2023 before me, the undersigned, personally appeared Oswald David, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

BEVERLY G. P[illegible]KINS
Commis[illegible] of Deeds
City of New Y[illegible] No. [illegible]9
Certificate Filed in Queens County
Commission Expires: July 1, 2025

______________________________
Notary Public

## Witnesses

The foregoing instrument was signed by Grantor in our presence, and we, in Grantor's presence and the presence of each other, sign as witnesses.

(Witness signature) (Witness signature)

(printed name) (printed name)

(street address) (street address)

(city, state zip) (city, state zip)

(Witness signature)

(printed name)

(street address)

(city,state,zip)

**Affidavit of Witnesses (Self-Proof)**

STATE OF NEW YORK )
COUNTY OF Queens )

We, Omar Barter and Eric Cooper, have been sworn by the officer signing below, and declare to that officer on our oaths that Grantor declared the instrument to be Grantor's trust agreement and signed it in our presence and that we each signed the instrument as a witness in the presence of Grantor and of each other.

(Witness signature)
OMAR BAXTER
(printed name)

(Witness signature)
ERIC COOPER
(printed name)

(Witness signature)
(printed name)

Sworn to before me this 19th day of December, 2023

Notary Public

BEVERLY [illegible]
[illegible]
Certified in Queens County
Commission Expires: July 1, 2027

**LaMONICA HERBST & MANISCALCO, LLP**
*Counsel to Lori Lapin Jones, as Trustee*
3305 Jerusalem Avenue, Suite 201
Wantagh, New York 11793
Telephone: (516) 826-6500
Holly R. Holecek, Esq.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x
In re: Chapter 7

2281 CHURCH AVENUE LLC, Case No.: 24-43449-jmm

Debtor.
-----------------------------------------------------x

**MOTION FOR: (I) ORDER: (A) APPROVING THE STALKING HORSE TERMS AND CONDITIONS OF SALE OF THE DEBTOR'S REAL PROPERTY AND IMPROVEMENTS LOCATED AT 2281 CHURCH AVENUE, BROOKLYN, NEW YORK 11226; (B) APPROVING COMPETING TERMS AND CONDITIONS OF SALE; (C) APPROVING THE FORM AND MANNER OF NOTICE OF THE SALE OF; (D) SCHEDULING A HEARING TO CONFIRM THE SALE; (E) WAIVING THE 14-DAY STAY PERIOD; AND (F) GRANTING RELATED RELIEF; AND (II) AN ORDER: (A) CONFIRMING THE SALE OF THE DEBTOR'S REAL PROPERTY AND IMPROVEMENTS LOCATED AT 2281 CHURCH AVENUE, BROOKLYN, NEW YORK 11262; AND (B) GRANTING RELATED RELIEF**

TO THE HONORABLE JIL MAZER-MARINO,
CHIEF UNITED STATES BANKRUPTCY JUDGE:

Lori Lapin Jones, solely in her capacity as Chapter 7 Trustee ("Trustee") of the estate of 2281 Church Avenue LLC ("Debtor"), by her undersigned counsel, submits this motion ("Motion") seeking entry of: (I) an Order, substantially in the form annexed as **Exhibit A** ("Authorization Order"): (a) approving the Stalking Horse Terms and Conditions of Sale of the Debtor's real property and improvements located at 2281 Church Avenue, Brooklyn, New York 11226 ("Property"), a copy of which is annexed as **Exhibit B**; (b) approving the Competing Terms and Conditions of Sale of the Property, a copy of which is annexed as **Exhibit C**; (c) approving the form and manner of notice of the sale of the Property, substantially in the form annexed as

**Exhibit D**; (d) scheduling a hearing to confirm the sale of the Property; (e) waiving the 14-day stay period; and (f) granting related relief; and (II) an Order ("Approval Order"): (a) approving the sale of the Property; and (b) granting related relief, and respectfully represents as follows:

**JURISDICTION AND VENUE**

1. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory predicates for the relief sought in this Motion include 11 U.S.C. §§ 105 and 363 ("Bankruptcy Code"), Rules 2002 and 6004(h) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), Local Bankruptcy Rule 6004-1, and Administrative Order No. 557 respecting the Adoption of Sale Guidelines ("Sale Guidelines").

**BACKGROUND**

**A. The Chapter 11 Filing and Conversion of the Debtor's Case to Chapter 7**

4. On August 19, 2024 ("Filing Date"), a voluntary petition for relief under subchapter V of Chapter 11 of the Bankruptcy Code was filed on the Debtor's behalf in the Court. See ECF No. 1.

5. According to the Debtor's Schedule A/B, as of the Filing Date, the Debtor owned, inter alia, the Property. See ECF No. 1.

6. On August 20, 2024, Gerard R. Luckman, Esq. was appointed as the Subchapter V Trustee. See ECF No. 17.

7. On October 25, 2024, Flushing Bank filed a secured claim in the Debtor's case in the amount of $1,642,601.15 arising out of a note and mortgage against the Property.

8. On October 28, 2024, the Court entered a Stipulation and Order Authorizing Final

Use of Cash and Other Collateral and Grant of Adequate Protection to Flushing Bank. See ECF No. 42.

9. By motion dated August 11, 2025, Flushing Bank sought entry of an Order converting the Debtor's Chapter 11 case to a Chapter 7 case and for turnover of cash collateral. See ECF No. 101 ("Motion to Convert"). The Debtor opposed the Motion to Convert. See ECF No. 105. Flushing Bank replied to the Debtor's objection. See ECF No. 107.

10. On October 28, 2025, the Court entered an Order conditionally granting the Motion to Convert, see ECF No. 113 ("October Order"). Pursuant to the October Order, certain deadlines were fixed for the Debtor to market and sell the Property. See id.

11. On November 10, 2025, the Court entered a further Order conditionally granting the Motion to Convert. See ECF No. 119 ("November Order"). The November Order, among other things, required Debbie Harris ("Harris") to convey title to Property back to the Debtor, and fixed a deadline for the Debtor to file an amended Chapter 11 plan. See id.

12. On January 7, 2026, the Court entered an Order extending certain deadlines in the October Order and the November Order. See ECF No. 135 ("January Order").

13. On January 20, 2026, Flushing Bank docketed a letter advising that the Debtor defaulted under the January Order and requesting that the Court convert the Debtor's case to a Chapter 7 case. See ECF No. 138.

14. On January 23, 2026, the Court entered an Order scheduling a hearing on the letter that was filed by Flushing Bank, which provided that the Court would enter an Order converting the Debtor's case to a Chapter 7 case if the Debtor did not file a sale motion on the docket by January 26, 2026. See ECF No. 146. The Debtor did not file a sale motion on the docket by January 26, 2026.

15. On January 29, 2026, the Court entered an Order converting the Debtor's Chapter 11 case to a Chapter 7 case ("Conversion Order"). See ECF No. 151. The Conversion Order is final and non-appealable.

**B. The Trustee's Appointment and Administration of the Estate**

16. On February 4, 2026, Lori Lapin Jones was appointed as Chapter 7 Trustee of the Debtor's estate. See ECF No. 155.

17. On February 10, 2026, the Trustee inspected the Property with MYC & Associates, Inc. ("MYC"). The Property consists of a 6,288 square foot lot improved by approximately 11,828 square feet of commercial retail space. There are seven (7) retail occupants on the ground floor and one (1) commercial occupant on the 2nd floor.

18. By motion dated March 19, 2026 ("721 Motion"), the Trustee sought entry of an Order authorizing the Trustee to operate the Debtor's business and pay certain operating expenses of the estate for a limited period of time. See ECF No. 163.

19. On March 20, 2026, the Court entered an interim Order authorizing the Trustee to operate the Debtor's business and pay certain operating expenses of the estate from March 19, 2026 until the date of the hearing on the 721 Motion. See ECF No. 165.

20. On March 24, 2026, the Court entered an Order approving the Trustee's employment of MYC as property manager and real estate broker to market and solicit offers for, inter alia, the Property. See ECF No. 166 ("Employment Order").

21. On April 27, 2026, the Court entered an Order authorizing the Trustee to operate the Debtor's business and pay certain operating expenses of the estate from March 19, 2026 through and including July 21, 2026, without prejudice to further extensions of such authority ("721 Order"). See ECF No. 172. In accordance with the 721 Order, the Trustee has been operating

the Debtor's business.

## C. The Proposed Sale

22. Following entry of the Employment Order on March 24, 2026, MYC began marketing and soliciting offers for the Property. Among other things, MYC caused professional photographs of the Property to be taken, created and published a property-specific webpage on its website (https://myccorp.com/products/large-flatbush-redevelopment-site), and listed the Property on multiple websites (including, but not limited to, www.loopnet.com, www.propertyshark.com, www.crexi.com, www.mls.com, and www.costar.com). MYC conducted 15 inspections of the Property with interested parties. MYC received multiple expressions of interest in the Property.

23. On June 24, 2026, Arthur Koptiev, or an entity to be formed and owned solely by him ("Koptiev"), agreed to purchase the Property for the sum of $4,550,000.00 subject to: (a) the Stalking Horse Terms and Conditions of Sale; and (b) higher or better offers that may be tendered by any other person(s) to the Trustee ("Offer"). The salient terms of the Offer and the Stalking Horse Terms and Conditions of Sale[1] are as follows:

a. Simultaneous with the execution of the Stalking Horse Terms and Conditions of Sale, the sum of $455,000.00 will be deposited with the Trustee towards the purchase price of the Property ("Deposit"). See Exhibit B at ¶7. The Deposit was paid to the Trustee.

b. The Trustee shall solicit higher or better offers for the Property for a period of thirty (30) days from the entry of the Authorization Order ("Solicitation Period"). The next highest bid for the Property shall be not less than $4,600,000.00. See id. at ¶9.

c. To the extent the Trustee receives a higher or better offer for the Property before the expiration of the Solicitation Period, the Trustee shall schedule a date and time to conduct an auction sale of the Property ("Auction"), notice of which will be

[1] This is intended to provide a summary only of the terms of the Stalking Horse Terms and Conditions of Sale and is not intended to capture every term or the precise language of the Stalking Horse Terms and Conditions of Sale. If the Stalking Horse Terms and Conditions of Sale are approved by the Court, the terms of the Stalking Horse Terms and Conditions of Sale will control.

separately provided to, among others, Koptiev. The Auction shall be conducted within approximately five (5) days of the expiration of the Solicitation Period. For avoidance of doubt, Koptiev may bid at such Auction. See id. at ¶10.

d. If Koptiev is the successful bidder for the Property at the Auction, within forty-eight (48) hours of the Auction, Koptiev shall deliver to the Trustee, by wire transfer from an account of Koptiev (or its counsel on Koptiev' behalf), an amount equal to 20% of the purchase price minus the amount of the Deposit, as and for a good faith deposit (such amount, plus the Deposit, "Additional Deposit"). See id. at ¶11.

e. Koptiev must close on the sale of the Property within thirty (30) days from entry of an Order of the Bankruptcy Court authorizing and approving the sale of the Property to Koptiev ("Closing Date"), TIME BEING OF THE ESSENCE as to Koptiev, although such date may be extended solely by the Trustee. See id. at ¶12.

f. Real estate taxes, water and sewer charges will be apportioned as of 12:00 a.m. on the Closing Date. There will be no other apportionments pertaining to the Property. See id. at ¶14.

g. Koptiev shall be solely responsible for the payment of any city, county, or state transfer taxes incurred in connection with the transfer of the Property to Koptiev. See id. at ¶15.

h. The Property is being sold:

(i) "AS IS" "WHERE IS", "WITH ALL FAULTS," without any representations, covenants, guarantees or warranties of any kind or nature whatsoever;

(ii) free and clear of any and all monetary interests of whatever kind or nature including, but not limited to, liens, claims, encumbrances, judgments and/or mortgages (collectively, "Interests"), with such Interests, if any, to attach to the proceeds of sale in such order and priority as they existed immediately prior to the entry of the Order for Relief against the Debtor; and

(iii) subject to, among other things:

(A) any and all occupancies and tenancies;

(B) any state of facts that an accurate survey may show;

(C) any state of facts a physical inspection may show;

(D) any covenants, restrictions and easements of record;

(E) any building or zoning ordinances or other applicable municipal regulations and violations thereof;

(F) environmental conditions; and

(G) any and all non-monetary violations existing on the Property as of the Closing Date.

See id. at ¶18.

i. The Trustee shall convey the Property by delivery of a Trustee's Deed. The quality of title shall be that which any reputable title insurance company authorized to do business in the State of New York is willing to approve and insure. The Trustee may at her option arrange for the issuance of a title insurance policy by such a company at Koptiev's sole cost and expense. See id. at ¶20.

j. If Koptiev is not the highest or best offeror for the Property at the Auction, then: (i) the Stalking Horse Terms and Conditions of Sale shall be deemed null and void, with no liability accruing hereunder to either Koptiev or the Trustee (except as otherwise expressly provided therein); (ii) the Deposit and any Additional Deposit will be returned to Koptiev within five (5) business days after the date that the Bankruptcy Court enters an order approving the Sale to another person or entity; (iii) except as otherwise expressly provided, Koptiev shall have no further rights or remedies of any kind under the Stalking Horse Terms and Conditions of Sale. See id. at ¶21.

24. Koptiev expressly represented and warranted that: (a) Koptiev is capable of performing his obligations and has the financial wherewithal to perform his obligations under the Stalking Horse Terms and Conditions of Sale; (b) Koptiev has no connections or ownership interest in the Debtor and (b) other than the Debtor's instant bankruptcy case, he does not have any connections to the Trustee or the Trustee's professionals. See Exhibit B at ¶¶4, 5.

**RELIEF REQUESTED AND BASIS FOR RELIEF**

**I. The Authorization Order Should Be Entered**

25. By this Motion, the Trustee seeks, inter alia, entry of the Authorization Order (Exhibit A hereto): (a) approving the Stalking Horse Terms and Conditions of Sale (Exhibit B hereto); (b) approving the Competing Terms and Conditions of Sale (Exhibit C hereto); (c)

approving the form and manner of notice of the sale of the Property (Exhibit D hereto); (d) scheduling a hearing to confirm the sale of the Property ("Sale Approval Hearing"); (e) waiving the 14-day stay period pursuant to Bankruptcy Rule 6004(h); and (f) granting related relief.

**A. The Stalking Horse Terms And Conditions Of Sale Should Be Approved**

26. For more than sixty (60) days, MYC solicited offers for the Property. The Offer from Koptiev establishes a floor value for the Property. The Offer is structured to ensure that the value of the Property is maximized and that the highest or best offer for the Property is received. Indeed, the Offer from Koptiev is a firm commitment from Koptiev to purchase the Property, but is subject to higher or better offers that may be tendered to the Trustee.

27. If Koptiev is the successful purchaser of the Property, Koptiev must: (a) close title within thirty (30) days from entry of an Order of the Court authorizing and approving the sale of the Property to Koptiev, time being of the essence as to Koptiev; and (b) pay any and all city, county, state or other transfer taxes incurred by or in connection with the transfer of the Property.

28. The Trustee agreed to provide Koptiev overbid protection so that the next offer for the Property submitted will be no less than $460,000.00. The Trustee, in her best business judgment, submits that the overbid protection is fair and reasonable and will not chill bidding at the sale. Koptiev is not being compensated for his time, diligence, and/or legal fees incurred in connection with the Offer, as the Trustee has not agreed to provide any expense reimbursement to Koptiev.

29. Under the circumstances, the Trustee submits that the terms of the Stalking Horse Terms and Conditions of Sale are appropriate and merit the Court's approval.

**B. The Competing Terms And Conditions Of Sale Should Be Approved**

30. The proposed Competing Terms and Conditions of Sale for the Property (which are

consistent with the Stalking Horse Terms and Conditions of Sale) are annexed as Exhibit C. The salient provisions of the proposed Competing Terms and Conditions of Sale[2] are as follows:

a. To bid on the Property, an Offeror must by 11:59 p.m. on [TBD] 2026 ("Solicitation Period"): (a) sign the Competing Terms and Conditions of Sale; (b) bid not less than $4,600,000.00 for the Property; and (c) deposit the sum of $460,000.00 ("Deposit") with the Trustee by wire transfer from an account of such offeror, or counsel on such offeror's behalf, which Deposit will be maintained by the Trustee in a segregated estate account. See Exhibit C at ¶4.

b. To the extent the Trustee receives a higher or better offer for the Property in accordance with paragraph of the Competing Terms and Conditions of Sale, the Trustee shall schedule a date and time to conduct an auction sale of the Property (i.e., the Auction), notice of which will be separately provided by the Trustee. The Auction shall be conducted within approximately five (5) days of the expiration of the Solicitation Period. The Trustee shall determine the highest and best bid for the Property at the Auction ("Auction Price"). For avoidance of doubt, Koptiev may bid at such Auction. See id. at ¶6.

c. If the Offeror is the successful bidder for the Property at the Auction, within forty-eight (48) hours of the Auction, the Offeror shall deliver to the Trustee, by wire transfer from an account of the Offeror, or counsel on the Offeror's behalf, an amount equal to 20% of the Auction Price minus the amount of the Deposit, as and for a good faith deposit (such amount, plus the Deposit, hereinafter "Additional Deposit"). See id. at ¶10.

d. The Offeror must close on the sale of the Property within thirty (30) days from entry of an Order of the Bankruptcy Court authorizing and approving the sale of the Property to the Offeror ("Closing Date"), TIME BEING OF THE ESSENCE as to the Offeror, although such date may be extended solely by the Trustee. See id. at ¶11.

e. Real estate taxes, water and sewer charges will be apportioned as of 12:00 a.m. on the Closing Date. There will be no other apportionments pertaining

2 This is intended to provide a summary only of the terms of the proposed Competing Terms and Conditions of Sale, and is not intended to capture every term or the precise language of the Competing Terms and Conditions of Sale. If the Competing Terms and Conditions of Sale are approved by the Court, the terms of the Competing Terms and Conditions of Sale of Sale will control.

to the Property. See id. at ¶13.

f. Offeror shall be solely responsible for the payment of any city, county, or state transfer taxes incurred in connection with the transfer of the Property to Offeror. See id. at ¶14.

g. The Property is being sold:

(i) "AS IS" "WHERE IS", "WITH ALL FAULTS," without any representations, covenants, guarantees or warranties of any kind or nature whatsoever;

(ii) free and clear of any and all monetary interests of whatever kind or nature including, but not limited to, liens, claims, encumbrances, judgments and/or mortgages (collectively, "Interests"), with such Interests, if any, to attach to the proceeds of sale in such order and priority as they existed immediately prior to the entry of the Order for Relief against the Debtor; and

(iii) subject to, among other things:

(A) any and all occupancies and tenancies;

(B) any state of facts that an accurate survey may show;

(C) any state of facts a physical inspection may show;

(D) any covenants, restrictions and easements of record;

(E) any building or zoning ordinances or other applicable municipal regulations and violations thereof;

(F) environmental conditions; and

(G) any and all non-monetary violations existing on the Property as of the Closing Date.

See id. at ¶17.

h. The Trustee shall convey the Property by delivery of a Trustee's Deed. The quality of title shall be that which any reputable title insurance company authorized to do business in the State of New York is willing to approve and insure. The Trustee may at her option arrange for the issuance of a title insurance policy by such a company at Offeror's sole cost and expense. See id. at ¶19.

31. The proposed Competing Terms and Conditions of Sale also require offerors to disclose any connections to the Debtor, Koptiev the Trustee and/or the Trustee's professionals. See Exhibit C at ¶9.

32. The Trustee submits in her reasonable business judgment that the proposed Competing Terms and Conditions of Sale are designed to ensure that the Debtor's estate receives the maximum benefit from the sale of the Property on a reasonable timetable given the circumstances of this case and therefore warrant Court approval.

**C. The Notice Of Sale Should Be Approved**

33. Pursuant to Bankruptcy Rules 2002(c) and 6004(a), the Trustee is required to give twenty-one (21) days' notice of any proposed sale of property not in the ordinary course of business to the Debtor and all creditors. See FED. R. BANKR. P. 2002(c) and 6004(a). Bankruptcy Rule 2002(c) provides that such notice must include the time and place of any auction, a sale hearing, and the time fixed for objections to the sale. See FED. R. BANKR. P. 2002(c).

34. Here, notice of this Motion will be provided to, among others, the Debtor, all scheduled creditors of the Debtor, and all creditors that filed proofs of claim against the Debtor's estate. In addition, to the extent the Court approves the Stalking Horse Terms and Conditions of Sale, the Solicitation Period will commence, and the Trustee intends to advertise the Offer immediately and seek competing offers. Notice, substantially in the form annexed as Exhibit D ("Sale Notice"), will be served in accordance with Bankruptcy Rule 2002(c). As reflected in the Sale Notice, it includes: (a) the salient terms of the Competing Terms and Conditions of Sale; (b) the date, time and manner by which a competing offer and related deposit must be submitted; and (c) a reasonably specific description of the Property.

35. The Trustee submits that the Sale Notice as proposed substantially complies with

Bankruptcy Rule 2002 and the Sale Guidelines, and constitutes good and adequate notice of the sale. Therefore, the Trustee respectfully requests that the Court approve the proposed Sale Notice.

**D. The Sale Approval Hearing Should Be Scheduled**

36. The Trustee proposes that, following the expiration of Solicitation Period or the Auction (as applicable), an affirmation to confirm the results of the sale will be submitted to the Court along with the proposed Approval Order authorizing and approving, inter alia, the Trustee's sale of the Property to Koptiev or the successful bidder at the Auction (as applicable) and that, thereafter, the Sale Approval Hearing will be conducted.

**E. The 14-Day Stay Period Should Be Waived**

37. Pursuant to Bankruptcy Rule 6004(h), all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen (14) days after entry of the order, unless otherwise ordered by the Court. See FED. R. BANKR. P. 6004(h). The stay period is intended to provide sufficient time for an objecting party to appeal before the order is implemented. See Advisory Committee Notes to FED. R. BANKR. P. 6004(h).

38. Although little guidance is provided by either Bankruptcy Rule 6004(h) or the Advisory Committee Notes as to when a court should "order otherwise", it has been suggested that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." See 10 COLLIER ON BANKRUPTCY § 6004.09 (Lawrence P. King, et al. eds, 15th ed. rev. rel. 2003). If an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to seek a stay pending such appeal. Id.

39. Here, the Trustee respectfully requests that the Court waive the 14-day stay period required under Bankruptcy Rule 6004(h). This relief is both necessary and appropriate under the

circumstances of this case. Indeed, in the event the Motion is approved, the Solicitation Period will be running and the Trustee intends to commence advertising the sale immediately.

## II. The Approval Order Should Be Entered

40. By this Motion, the Trustee also seeks entry of the Approval Order following the Sale Approval Hearing. As set forth above, the Trustee intends to submit an affirmation confirming the results of the Sale and the proposed Approval Order prior to the Sale Approval Hearing.

### A. The Sale Of The Property Represents A Reasonable Exercise Of The Trustee's Business Judgment And Should Be Approved

41. The Trustee is statutorily charged with liquidating property of the Debtor's estate as expeditiously as is compatible with the best interests of the estate. See 11 U.S.C. § 704(a)(1).

42. Pursuant to section 363 of the Bankruptcy Code, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate. …" 11 U.S.C. § 363(b)(1). Under Bankruptcy Rule 6004(f)(1), a trustee is permitted to sell property of the estate pursuant to section 363(b) of the Bankruptcy Code by private sale or public auction. See FED. R. BANKR. P. 6004(f)(1).

43. Although section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets, the Second Circuit, in applying this section, has required that it be based upon the sound business judgment of the trustee. See Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC), 478 F.3d 452, 466 (2d Cir. 2007) (quoting Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983)); Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 145 (2d Cir. 1993); Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.), 430 B.R. 65, 83 (S.D.N.Y. 2010) ("The overriding consideration for approval of

a Section 363 sale is whether a 'good business reason' has been articulated." (citations omitted)); In re Hirsch, 360 B.R. 43, 45-46, 48, 50 (Bankr. E.D.N.Y. 2007) (requiring "existence of 'a good business reason to grant such an application.'" (quoting In re Lionel Corp., 722 F.2d at 1071)). In Lionel, the Second Circuit determined that a sale of assets could be approved if the trustee could demonstrate an "articulated business justification" for the sale. In re Lionel Corp., 722 F.2d at 1070.

44. If a sound business justification exists, then a presumption attaches that the decision was informed, in good faith and in the honest belief that the action was in the best interests of the estate. See Integrated Res. v. Integrated Res. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (citations omitted). The terms of such sale are also generally within the sound discretion of the Trustee. See In re Dial-A-Mattress Operating Corp., Case No. 1-09-41966 (dem), 2009 Bankr. LEXIS 1801, at *12 (Bankr. E.D.N.Y. June 24, 2009) (explaining courts "generally will defer to the business judgment of the debtor's management" (citations omitted)); In re Ionosphere Clubs, Inc., 100 B.R. 670 (Bankr. S.D.N.Y. 1989).

45. In addition to requiring sound business reasons to approve a sale pursuant to section 363(b) of the Bankruptcy Code, many courts have required a showing that the price to be obtained for assets be fair and reasonable; that the sale to the proposed purchaser was negotiated in good faith; and that it does not unfairly benefit insiders, the purchaser, or a certain creditor or class of creditors. See, e.g., In re Channel One Communications, 117 B.R. at 494-97; In re Indus. Valley Refrig. & Air Cond. Supplies, Inc., 77 B.R. 15 (Bankr. E.D. Pa. 1987).

46. In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside of the ordinary course of business may be by private sale or by public auction sale. The Sale Guidelines

supplement the requirements of section 363 of the Bankruptcy Code and Bankruptcy Rule 6004, and provides, in pertinent part, that:

> When an auction is contemplated in cases filed under chapter 11 and where appropriate under other chapters, the [trustee] should ordinarily file a single motion seeking the entry of two orders to be considered at two separate hearings. The first order ("Sale Procedures Order") will approve procedures for the sale process, including any protections for an initial, or stalking horse bidder ("stalking horse"), and the second order ("Sale Order") will approve the sale to the successful bidder at the auction. If no auction is contemplated or the [trustee] has not actively solicited or will not actively solicit higher and better offers, the motion seeking approval of the sale should explain why the [trustee] proposes to structure the sale in such manner.

See Sale Guidelines at p. 2, ¶1.

47. Here, the Trustee used her sound business judgment to determine that selling the Property outside the ordinary course of business and pursuant to the Stalking Horse Terms and Conditions of Sale is justified, necessary and appropriate. The Property is a significant asset of the Debtor's estate. The Property is encumbered by a mortgage and two (2) judgments and, inter alia, interest is accruing. There also are unpaid post-petition water and wastewater charges of over $20,000.00, and pre-petition unpaid water and wastewater charges owed of over $13,000.00, which are liens on the Property. There are accrued and unpaid Chapter 11 administrative claims. The Trustee believes that the sale of the Property, as outlined herein, is the estate's best opportunity to achieve the highest and best offer for the Property, and to recover the maximum value from the Property for the benefit of the estate and its creditors.

48. Based upon the foregoing, and the record in this case, the Trustee submits that the proposed sale of the Property represents a reasonable exercise of the Trustee's business judgment and should be approved.

**B. The Property Should Be Sold Free And Clear Of Any And All Monetary Interests Pursuant To Section 363(f) Of The Bankruptcy Code**

49. The Trustee proposes that the Property be sold free and clear of any and all monetary interests of whatever kind or nature including, but not limited to, liens, claims, encumbrances, judgments and/or mortgages (i.e., all Interests), with such Interests, if any, to attach to the proceeds of sale in such order and priority as they existed immediately prior to the commencement of the Debtor's bankruptcy case.

50. Section 363 of the Bankruptcy Code permits a trustee to sell property free and clear of any interest in such property if: (a) applicable state law will permit the sale; (b) such entity consents; (c) the price at which the assets is being sold exceeds the aggregate value of all liens on such property; (d) the interest is in bona fide dispute; or (e) the entity with an interest in the asset being sold could be compelled in a legal or equitable proceeding to accept a money satisfaction of its interest in and to the property. See 11 U.S.C. § 363(f).

51. Several courts have held that notwithstanding the use of the term "interest" in the statutory language of section 363(f), such section grants bankruptcy courts the power to convey assets free and clear of claims. See, e.g., In re Trans World Airlines., Inc., 322 F.3d 283, 290 (3d Cir. 2003); In re Medical Software Solutions, 286 B.R. 431, 446 (Bankr. D. Utah 2002); In re TWA, No. 01-0056 (PJW), 2001 Bankr. LEXIS 723 at *13-14 (Bankr. D. Del. Mar. 27, 2001) ("Authorizing the sale [of debtor's assets] free and clear of . . . successor liability claims achieves the purpose of section 363 [of the Bankruptcy Code] intended by Congress."). Section 105(a) of the Bankruptcy Code provides additional support for court's authority to convey assets free and clear of claims. See In re White Motor Credit Corp., 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (stating that the absence of specific authority to sell assets free and clear of claims poses no impediment to such sale, as such authority is implicit in the court's equitable powers when

necessary to carry out the provisions of Title 11); see also Equity Broad. Corp. v. Shubert (In re Winstar Commc'ns, Inc.), 284 B.R. 40, 48 (Bankr. D. Del. 2002) (approving a sale order transferring the debtor's securities free and clear of all encumbrances pursuant to sections 105(a) and 363(f) of the Bankruptcy Code).

52. Here, the Offer exceeds the sum of all known of liens on the Property and that Offer is subject to higher or better offers. Whether Koptiev or another person is the ultimate purchaser of the Property, the Trustee intends to pay and satisfy all known liens against the Property which, as of the date of this Motion, include real estate taxes, water and wastewater charges, the mortgage of Flushing Bank, and the judgment liens of Calvin Cross and Tralon Ellis.

53. In addition, holders of all known Interests in the Property will be provided notice of the proposed sale. Thus, all known holders of Interests in the Property will have an opportunity to oppose the proposed sale of the Property pursuant to section 363(f) of the Bankruptcy Code and to be heard at the hearing.

54. Based on the foregoing, the requirements of section 363(f) of the Bankruptcy Code are satisfied, and the Property may be sold free and clear of any and all Interests.

**C. The Successful Purchaser Should Be Afforded Protection Under Section 363(m) Of The Bankruptcy Code**

55. Section 363(m) of the Bankruptcy Code affords protection to a good faith purchaser in any interest in property purchased from an estate, whether the sale conducted is later reversed or modified on appeal. Specifically, section 363(m) provides as follows:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m); see also Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal."); In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

56. The United States Court of Appeals for Second Circuit has held that a party would have to show fraud or collusion between a buyer and the debtor-in-possession or trustee in order to demonstrate a lack of good faith. See Kabro Assocs., L.L.C. v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269, 276 (2d Cir. 1997) (citations omitted) ("[t]ypically the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the Trustee, or an attempt to take grossly unfair advantage of other bidders."); see also In re Bakalis, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998).

57. Here, the Trustee intends to solicit higher or better offers for the Property. The Trustee anticipates that, following the Solicitation Period, she will either seek to confirm the sale to Koptiev, or she will schedule the Auction and seek to confirm the sale to the highest or best bidder at the Auction (which could be Koptiev). The Trustee anticipates that the successful bidder (including Koptiev) will be acting in good faith since the sale will be conducted at arm's-length with an opportunity for competitive bidding. Accordingly, it is anticipated that the Approval Order will afford the successful bidder (including Koptiev) the protections available under section 363(m) of the Bankruptcy Code.

**D. The Trustee Should Be Granted Related Relief**

58. To the extent the Court authorizes and approves the Sale and the Sale closes, there may be taxes due (e.g., capital gain). The total amount, if any, of such taxes cannot be calculated at this time but, based on the information now available to the Trustee, there should remain sufficient funds for estate obligations after payment of any such taxes.

59. The Trustee should be authorized pursuant to sections 105(a) and 363 of the Bankruptcy Code to pay the estate taxes owed, which she will do in consultation with her retained professionals.

60. Pursuant to the Sale Guidelines, the Trustee is required to highlight any "extraordinary provisions" in a separate section of a motion seeking to sell estate assets. The Trustee submits that there are no "extraordinary provisions" with respect to the proposed sale that have not otherwise been highlighted herein.

**NOTICE AND NO PRIOR REQUEST**

61. By separate application, the Trustee will seek entry of an Order scheduling a hearing on shortened notice of this Motion.

62. No previous request for the relief sought herein has been made by the Trustee to this or any other Court.

**WHEREFORE** the Trustee respectfully requests that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated: June 25, 2026
Wantagh, New York

**LaMONICA HERBST & MANISCALCO, LLP**
*Counsel to Lori Lapin Jones, as Trustee*

By: *s/ Holly R. Holecek*
Holly R. Holecek, Esq.
A Partner of the Firm
3305 Jerusalem Avenue, Suite 201
Wantagh, New York 11793
Telephone: (516) 826-6500

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

In re: Chapter 7

2281 CHURCH AVENUE LLC, Case No.: 24-43449-jmm

Debtor.
-----------------------------------------------------------x

**ORDER: (A) APPROVING THE STALKING HORSE TERMS AND CONDITIONS OF SALE OF THE DEBTOR'S REAL PROPERTY AND IMPROVEMENTS LOCATED AT 2281 CHURCH AVENUE, BROOKLYN, NEW YORK 11226; (B) APPROVING COMPETING TERMS AND CONDITIONS OF SALE; (C) APPROVING THE FORM AND MANNER OF NOTICE OF THE SALE OF; (D) SCHEDULING A HEARING TO CONFIRM THE SALE; (E) WAIVING THE 14-DAY STAY PERIOD; AND (F) GRANTING RELATED RELIEF**

Upon that portion of the motion dated June 25, 2026 [ECF No. ___] ("Motion")[1] of Lori Lapin Jones, solely in her capacity as Chapter 7 Trustee ("Trustee") of the estate of 2281 Church Avenue LLC ("Debtor"), by her counsel, seeking entry of an Order: (a) approving the Stalking Horse Terms and Conditions of Sale of the Debtor's real property and improvements located at 2281 Church Avenue, Brooklyn, New York 11226 ("Property"); (b) approving the Competing Terms and Conditions of Sale; (c) approving the form and manner of notice of the sale of the Property; (d) scheduling a hearing to confirm the sale of the Property; (e) waiving the 14-day stay period; and (f) granting related relief; and upon the Trustee's application dated June 25, 2026 seeking entry of an Order scheduling a hearing on shortened notice of the Motion [ECF No. ___]; and upon the Order entered on June ___, 2026 scheduling a hearing on shortened notice of the Motion ("Scheduling Order") [ECF No. ____]; and upon the Affidavit of Service relating to the Motion and Scheduling Order; and upon the hearing conducted on July 13, 2026 ("Hearing"), the

[1] Unless otherwise defined herein, capitalized terms shall have the same meanings ascribed to them in the Motion.

transcript of which is incorporated by reference; and counsel to the Trustee having appeared at the Hearing; and upon the record of the Hearing; and after due deliberation and good cause appearing therefor, it is hereby **FOUND AND DETERMINED THAT**:[2]

A. This Court has jurisdiction over the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of the Motion and the relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B. Good and sufficient notice of the relief sought in the Motion has been given, and no further notice is required. A reasonable opportunity to object or be heard regarding the relief requested in the Motion has been afforded to interested persons and entities, including: (i) the Debtor through its counsel of record; (ii) the United States Trustee; (iii) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002; (iv) all scheduled creditors of the Debtor; (v) all creditors that filed proofs of claim against the Debtor's estate; (vi) all known parties with an interest in the Property; and (vii) Debbie Harris (collectively, "Notice Parties").

C. The proposed Notice of Sale is good, appropriate, adequate, and sufficient, and service on the Notice Parties is reasonably calculated to provide all interested parties timely and proper notice of the Sale, and no other or further notice of the Sale is required.

D. The Trustee has articulated good and sufficient reasons for this Court to grant the relief requested in the Motion, including this Court's approval of the Stalking Horse Terms and Conditions of Sale, the Competing Horse Terms and Conditions of Sale and the form and manner of service of the Notice of Sale.

E. The Trustee has articulated good and sufficient reasons for, and the best interests

---

2 Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact, when appropriate. See FED. R. BANKR. P. 7052.

of the Debtor's estate will be served by, this Court scheduling a hearing to consider whether to grant the remainder of the relief requested in the Motion.

**NOW THEREFORE, IT IS HEREBY ORDERED THAT:**

1. The Stalking Horse Terms and Conditions of Sale annexed to the Motion as Exhibit B are approved.

2. The Trustee is authorized to take all actions necessary to fully implement the Stalking Horse Terms and Conditions of Sale.

3. The Competing Terms and Conditions of Sale in the form annexed to the Motion as Exhibit C are approved.

4. All objections to entry of this Order or to the relief provided herein and requested in the Motion that have not been withdrawn, waived, resolved, or settled are hereby denied and overruled in their entirety.

**NOTICE**

5. There shall be a solicitation period for higher or better offers for the Property for a period of thirty (30) days from entry of this Order ("Solicitation Period") to **11:59 p.m. on [TBD] 2026**. The next highest bid for the Property shall be not less than $4,600,000.00.

6. To the extent the Trustee receives a higher or better offer for the Property before the expiration of the Solicitation Period, the Trustee shall schedule a date and time to conduct an auction sale of the Property ("Auction"). The Auction shall be conducted within approximately five (5) days of the expiration of the Solicitation Period. Prior to the scheduled Auction, the Trustee may file a notice on the docket reflecting the date and time of the Auction.

7. The Notice of Sale, substantially in the form annexed to the Motion as Exhibit D, is hereby approved.

8. The Trustee shall cause notice of the Sale to be published at least once in accordance with Bankruptcy Rule 2002(l).

9. The notice as set forth in the preceding paragraphs shall provide good and sufficient notice of the sale and no other or further notice of the sale shall be necessary or required.

**SALE APPROVAL HEARING**

10. To the extent the Trustee does not receive a higher or better offer for the Property before the expiration of the Solicitation Period, the Sale Approval Hearing shall be held before this Court on **____________________, 2026 at ________.**

11. To the extent the Trustee receives a higher or better offer for the Property before the expiration of the Solicitation Period, the Sale Approval Hearing shall be held before this Court on **____________________, 2026 at ________.**

12. The Sale Approval Hearing will be conducted by telephone, video or in person, as the Court deems appropriate. Whether the Sale Approval Hearing is in person or remote, to appear, parties must register through eCourt Appearances, which can be accessed here: https://ecf.nyeb.uscourts.gov/cgi-bin/eCourtAppearances.pl.

13. The Sale Approval Hearing may be adjourned by the Trustee by filing a notice with this Court and serving such notice on the Notice Parties.

**ADDITIONAL PROVISIONS**

14. Notwithstanding Bankruptcy Rule 6004(h), this Order shall not be stayed for fourteen (14) days after the entry hereof and shall be effective and enforceable immediately upon entry hereof.

15. The Trustee is authorized and empowered to take such steps, incur and pay such costs and expenses, and do such things as may be reasonably necessary to fulfill the requirements

established by this Order.

16. This Court may retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order.

# EXHIBIT B

**STALKING HORSE TERMS AND CONDITIONS OF SALE**

1. These Stalking Horse Terms and Conditions of Sale are entered into in connection with the sale ("Sale") of the real property and improvements known as and located at 2281 Church Avenue, Brooklyn, New York 11226 ("Property").

2. The seller of the Property is Lori Lapin Jones, solely in her capacity as Chapter 7 Trustee ("Trustee") of the estate of 2281 Church Avenue LLC ("Debtor"). The Debtor's Chapter 7 bankruptcy case is pending in the United States Bankruptcy Court for the Eastern District of New York ("Bankruptcy Court") under case no. 24-43449-jmm. The Trustee's obligations under these Stalking Horse Terms and Conditions of Sale are entirely subject to, and contingent upon approval by the Bankruptcy Court.

3. Arthur Koptiev, or an entity to be formed and owned solely by him ("Koptiev"), hereby agrees to purchase the Property for the sum of $4,550,000.00 subject to: (a) these Stalking Horse Terms and Conditions of Sale; and (b) higher or better offers that may be tendered by any other person(s) to the Trustee ("Offer").

4. Koptiev represents and warrants that he is capable of performing his obligations under these Stalking Horse Terms and Conditions of Sale and has the financial wherewithal to perform his obligations under these Stalking Horse Terms and Conditions of Sale.

5. Koptiev has no connections or ownership interest in the Debtor. Other than the Debtor's Chapter 7 case, Koptiev has no connections to the Trustee or the Trustee's professionals.

6. The Offer is subject to Bankruptcy Court approval and subject to higher or better offers for the Property that may be offered by any other person(s) to the Trustee.

7. Simultaneous with the execution of these Stalking Horse Terms and Conditions of Sale, Koptiev will deposit the sum of $455,000.00 ("Deposit") with the Trustee by wire transfer from an account (or accounts) of Koptiev, or his counsel on his behalf, which Deposit will be maintained by the Trustee in a segregated estate account.

8. Upon receipt of the Deposit, the Trustee shall seek Bankruptcy Court approval of, inter alia, these Stalking Horse Terms and Conditions of Sale.

9. The Trustee shall solicit higher or better offers for the Property for a period of thirty (30) days from entry of an Order of the Bankruptcy Court approving these Stalking Horse Terms and Conditions of Sale ("Solicitation Period"). The next highest bid for the Property shall be not less than $4,600,000.00.

10. To the extent the Trustee receives a higher or better offer for the Property before the expiration of the Solicitation Period, the Trustee shall schedule a date and time to conduct an auction sale of the Property ("Auction"), notice of which will be separately provided to Koptiev. The Auction shall be conducted within approximately five (5) days of the expiration of the Solicitation Period. For avoidance of doubt, Koptiev may bid at such Auction.

11. If Koptiev is the successful bidder for the Property at the Auction, within forty-eight (48) hours of the Auction, Koptiev shall deliver to the Trustee, by wire transfer from an account (or accounts) of Koptiev, or his counsel on his behalf, an amount equal to 20% of the Purchase Price minus the amount of the Deposit, as and for a good faith deposit (such amount, plus the Deposit, hereinafter "Additional Deposit").

12. Koptiev must close title to the Property within thirty (30) days from entry of an Order of the Bankruptcy Court authorizing and approving the sale of the Property to Koptiev ("Closing Date"), **TIME BEING OF THE ESSENCE** as to Koptiev, although such date may be extended solely by the Trustee.

13. On or before the Closing Date, Koptiev must pay the balance of the Purchase Price to the Trustee by wire transfer from an account (or accounts) of Koptiev, or his counsel on their behalf, to close title to the Property ("Closing"). The Closing shall take place on or before the Closing Date at the offices of the attorneys for the Trustee, LaMonica Herbst & Maniscalco LLP, 3305 Jerusalem Avenue, Wantagh, New York 11793 or remotely, as elected by the Trustee.

14. Real estate taxes, water and sewer charges will be apportioned as of 12:00 a.m. on the Closing Date. There will be no other apportionments pertaining to the Property.

15. Koptiev shall be solely responsible for the payment of any city, county, or state transfer taxes incurred in connection with the transfer of the Property to Koptiev.

16. In connection with the Closing and Closing Date, Koptiev is hereby given notice that **TIME IS OF THE ESSENCE against Koptiev and the failure of Koptiev to close for any reason whatsoever (except as otherwise provided below), including his failure to pay the balance of the Purchase Price on the Closing Date, will result in the Trustee retaining the Deposit or the Additional Deposit (as applicable) and the termination of Koptiev's right to acquire the Property under these Stalking Horse Terms and Conditions of Sale**. The Trustee's right to retain the monies paid including, without limitation, the Deposit or the Additional Deposit (as applicable), is not a penalty but rather liquidated damages and it is hereby agreed and acknowledged by the parties hereto that the amount of damages sustained by the Trustee are difficult to determine and the liquidated damages set forth herein are reasonable under the circumstances. Koptiev shall be obligated to close title to the Property and there is no contingency of any kind or nature that will permit Koptiev to cancel or avoid his obligation under these Stalking Horse Terms and Conditions of Sale other than the Trustee's inability to deliver insurable title to the Property. **Expenses incurred by Koptiev including concerning any due diligence including, but not limited to, obtaining title reports and legal fees, shall be the sole responsibility of Koptiev and under no circumstances shall the Trustee, the estate or the Trustee's professionals be responsible for, or pay, such expenses.**

17. The Trustee and her professionals, including the Trustee's retained broker, MYC & Associates, Inc., have not made, and do not make, any representations or warranties of any kind, including, but not limited to, as to the physical condition, expenses, operations, leases, rents, tenancies, value of the land or buildings thereon, or any other matter or thing affecting or related to the Property that might be pertinent to the purchase of the Property, and including, without limitation: (a) the current or future real estate tax liability, assessment or valuation of the Property;

(b) the potential qualification of the Property for any and all benefits conferred by or available under federal, state or municipal laws, whether for subsidies, special real estate tax treatment, insurance, mortgages, or any other benefits, whether similar or dissimilar to those enumerated; (c) the compliance or non-compliance of the Property, in its current or any future state, with applicable present or future zoning ordinances or other land use law or regulation, or the ability to obtain a change in the zoning or use, or a variance in respect to the Property; (d) the availability of any financing for the purchase, alteration, rehabilitation or operation of the Property from any source, including, but not limited to, any state, city or federal government or institutional lender; (e) the current or future use of the Property; (f) the present and future condition and operating state of any and all machinery or equipment on the Property and the present or future structural and physical condition of any building thereon or its suitability for rehabilitation or renovation; (g) the ownership or state of title of any personal property on the Property; (h) the presence or absence of any laws, ordinances, rules or regulations issued by any governmental authority, agency or board and any violations thereof; (i) any present or future issues concerning subdivision or non-subdivision of the Property; or (j) the compliance or non-compliance with environmental laws and the presence or absence of underground fuel storage tanks, any asbestos or other hazardous materials anywhere on the Property. Koptiev hereby expressly agrees and acknowledges that no such representations or warranties have been made. The Trustee and her professionals, including the Trustee's retained broker, MYC & Associates, Inc., are not liable or bound in any manner by expressed or implied warranties, guaranties, promises, statements, representations or information pertaining to the Property, or any real estate broker, agent, employee, servant or other person or professional representing or purporting to represent the Trustee unless such warranties, guaranties, promises, statements, representations or information are expressly and specifically set forth in writing by the Trustee.

18. The Property is being sold:

(a) **"AS IS" "WHERE IS", "WITH ALL FAULTS,"** without any representations, covenants, guarantees or warranties of any kind or nature whatsoever;

(b) free and clear of any and all monetary interests of whatever kind or nature including, but not limited to, liens, claims, encumbrances, judgments and/or mortgages (collectively, "Interests"), with such Interests, if any, to attach to the proceeds of sale in such order and priority as they existed immediately prior to the entry of the Order for Relief against the Debtor; and

(d) subject to, among other things:

(i) any and all occupancies and tenancies;

(ii) any state of facts that an accurate survey may show;

(iii) any state of facts a physical inspection may show;

(iv) any covenants, restrictions and easements of record;

(v) any building or zoning ordinances or other applicable municipal

regulations and violations thereof;

(vi) environmental conditions; and

(vii) any and all non-monetary violations existing on the Property as of the Closing Date.

19. Koptiev acknowledges that he has had the opportunity to review the state of title thereof and laws, rules and regulations applicable thereto, and will rely solely thereon and on his own independent investigation of the Property. Neither the Trustee nor any of her representatives, including the Trustee's retained broker, MYC & Associates, Inc., make any representations or warranties with respect to the permissible uses of the Property, including, but not limited to, the zoning of the Property. Koptiev acknowledges that he has conducted his own due diligence in connection with the Property and is not relying on any information provided by the Trustee or the Trustee's professionals.

20. The Trustee shall convey the Property by delivery of a Trustee's Deed. The quality of title shall be that which any reputable title insurance company authorized to do business in the State of New York is willing to approve and insure. The Trustee may at her option arrange for the issuance of a title insurance policy by such a company at Koptiev's sole cost and expense.

21. If Koptiev is not the highest or best offeror for the Property at the Auction, then: (a) these Stalking Horse Terms and Conditions of Sale shall be deemed null and void, with no liability accruing hereunder to either Koptiev or the Trustee (except as otherwise expressly provided herein); (b) the Deposit and any additional deposit will be returned to Koptiev within two (2) business days after the date that the Bankruptcy Court enters an order approving the Sale; and (c) except as otherwise expressly provided in this paragraph, Koptiev shall have no further rights or remedies of any kind hereunder.

22. Any notices to the Trustee and/or Koptiev hereunder shall be sufficient if sent by email or overnight mail to counsel for such party as follows:

| If to Koptiev: | If to the Trustee: |
|---|---|
| Joseph N. Misk, Esq.<br>Ginsburg & Misk, LLP<br>21548 Jamaica Avenue<br>Queens Village, New York 11428<br>Email: jmisk@gmlawyers.net<br><br>Peter Young, Esq.<br>Ginsburg & Misk, LLP<br>21548 Jamaica Avenue<br>Queens Village, New York 11428<br>Email: pyoung@gmlawyers.net | LaMonica Herbst & Maniscalco, LLP<br>Attn.: Holly R. Holecek, Esq.<br>3305 Jerusalem Avenue, Ste. 201<br>Wantagh, New York 11793<br>Email: hrh@lhmlawfirm.com |